# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.      13-cv-02894-BNB

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 2 6 2013

JEFFREY P. COLWELL
CLERK

Jason Brooks                                              , Plaintiff,

v.

Colorado Department of Corrections                       ,

David Oba                                                ,

Patrick Blake                                            ,

Angie Turner                                             ,

Corrections Corporation of America                       ,

Debra Foster                                             ,

Julie Russell                                            ,

Kathy Howell                                             ,

Tim Creany                                               ,

Anthony DeCesaro                                          ,

Paul Cline                                               ,

Lou Archuletta                                           ,

Yvette Brown                                             ,

David Tessiere                                           ,

Rick Raemisch                                            ,

Dolores Montoya                                          ,

Ron Wager                                          ,Defendants.

*Amended*

**JURY TRIAL DEMANDED**
**PRISONER COMPLAINT FOR MONEY DAMAGES, DECLARATORY AND**
**INJUNCTIVE RELIEF**

**A. PARTIES**

1.   Jason Brooks #150014
     Fremont Correctional Facility/ 8S302
     P.O. Box 999
     Canon City, CO 81215
          (Plaintiff's name, prisoner identification number, and complete mailing address)

2    Colorado Department of Corrections

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

(Name, title, and address of first defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer:

The Colorado Department of Corrections ("CDOC") is a state operated institution responsible for housing convicted offenders of crimes adjudicated by the Courts of the District of Colorado

---

3.    David Oba, Head Provider/ Medical Doctor

Bent County Correctional Facility

11560 Road F.F. 75

Las Animas, CO 81054

(Name, title, and address of second defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer:

Defendant David Oba is a medical doctor and employee and/or agent of Corrections Corporation of America ("CCA"). He is responsible for the medical care of all the inmates at the Bent County Correctional Facility ("BCCF"), and when he was not present at the facility, there is no other medical doctor authorized to dispense care to the Plaintiff. He is

sued in his individual capacity.

4.  Patrick Blake/ Head Dentist

Bent County Correctional Facility

11560 Road F.F. 75

Las Animas, CO 81054

(Name, title, and address of third defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under

color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer:

Defendant Patrick Blake is a dentist and employee and/or agent of CCA. He is responsible

for the oral hygiene of the Plaintiff and the only dentist at the Bent County Correctional

Facility authorized to provide dental care. He is sued in his individual capacity..

5  Angie Turner/ HSA

Bent County Correctional Facility

11560 Road F.F. 75

Las Animas, CO 81054

(Name, title, and address of fourth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under

color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer:

Defendant Angie Turner is the Health Service Administrator ("HSA") at the Bent County

Correctional Facility and employee and/or agent of CCA. She is responsible for the

oversight of Bent Counties Clinical Services Department. She is sued in her individual capacity.

6   Corrections Corporation of America/ Private Prison Corporation

10 Burton Hills Blvd

Nashville, TN 37215

(Name, title, and address of fifth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer: Corrections Corporation of America ("CCA") is a private prison corporation that contract with 20 states (including Colorado). CCA  is an independent contractor and is specifically precluded from being considered an agent or employee, and is required to indemnify the state. CCA has it's own policy and decision-making structure independent from the Colorado Department of Corrections.

7   Debra Foster/ Former HSA

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

(Name, title, and address of sixth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under

color of state law? _X_ Yes __No (CHECK ONE).  Briefly explain your answer:

Defendant Debra Foster  was the Health Services Administrator at the Fremont

Correctional Facility ("FCF"). She was responsible for the oversight of Fremont's Clinical

Services Department. She is sued in her individual capacity.

---

8    Julie Russell/ ADA Inmate Coordinator

Colorado Department of Corrections

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

                    (Name, title, and address of seventh defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under

color of state law? _X_ Yes __No (CHECK ONE).  Briefly explain your answer:

Defendant Julie Russell is the Americans with Disabilities Act Inmate Coordinator ("AIC")

for the Colorado Department of Corrections. She is responsible to provide reasonable

accommodations to inmates with disabilities as outlined by Title II of the 1990 Americans

with Disabilities Act ("ADA"). She is sued in her individual and official capacities.

---

9    Kathy Howell/ Regional Director of Corrections and Clinical Services

Colorado Department of Corrections

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

               (Name, title, and address of eighth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under

color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer:

Defendant Kathy Howell was the Regional Director of Clinical Services for the Colorado

Department of Corrections. She was responsible for the oversight of CDOC's Clinical

Services. She is sued in her individual and official capacities.

_____

_____

_____

10   Tim Creany/ M.D.

Fremont Correctional Facility

P.O. Box 999

Canon City, CO 81215

               (Name, title, and address of ninth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under

color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer:

Defendant Timothy Creany is a medical doctor and is the only full-time medical doctor at

the Fremont Correctional Facility. He is responsible for the medical care of all inmates at

the Fremont Correctional Facility and when he is not present during the business week,

there is no other medical doctor authorized to dispense care to Plaintiff. He is a part time

contractor with the Colorado Department of Corrections and is also a shareholder of the

Clear Creek Medical Group, P.C.  He is also associated with Centura Health--St Anthony Central Hospital. He is sued in his individual and official capacities.

---

11   Anthony DeCesaro/ Head Grievance Officer

Colorado Department of Corrections

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

(Name, title, and address of tenth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law?  _X_ Yes  __No  (CHECK ONE).  Briefly explain your answer:

Defendant Anthony DeCesaro is the head grievance officer for the Colorado Department of Corrections. He is responsible for answering and providing reasonable administrative remedies to inmates grievances. He is sued in his individual and official capacities.

---

12   Paul Cline/ Head of Offender Services

Colorado Department of Corrections

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

(Name, title, and address of eleventh defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? __X__ Yes ___No  (CHECK ONE).  Briefly explain your answer: Defendant Paul Cline is the head of Offender Services for the Colorado Department of Corrections. He is responsible for determining inmate placement at prisons throughout Colorado. He is sued in his individual and official capacities.

---

13   Lou Archuletta/ Warden

Fremont Correctional Facility

P.O. Box 999

Canon City, CO 81215

(Name, title, and address of twelfth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? __X__ Yes ___No  (CHECK ONE).  Briefly explain your answer: Defendant Lou Archuletta is the the Warden at the Fremont Correctional Facility. By statute (C.R.S. 17-1-104) the Warden is responsible for ensuring the safety and well-being of prisoners under his supervision. He is sued in his individual and official capacities.

---

14   Yvette Brown/ Law Librarian

Fremont Correctional Facility

P.O. Box 999

Canon City, CO 81215

(Name, title, and address of thirteenth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer: Defendant Yvette Brown is the Legal Assistant at the Fremont Correctional Facility and is in charge of the oversight of the Law Library. She is responsible for making sure access to the Law Library at FCF is adequately sufficient. She is sued in her individual and official capacities.

15   David Tessiere/ HSA

Fremont Correctional Facility

P.O. Box 999

Canon City, CO 81215

(Name, title, and address of fourteenth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer: Defendant David Tessiere is the Health Services Administrator at the Fremont Correctional Facility ("FCF"). He is responsible for the oversight of Fremont's Clinical Services Department. He is sued in her individual and official capacities.

16   Rick Raemisch/ Executive Director

Colorado Department of Corrections

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

(Name, title, and address of fifteenth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_Yes __No  (CHECK ONE).  Briefly explain your answer: Defendant Rick Raemisch is the Executive Director of the Colorado Department of Corrections. He is responsible for implementing all policy decisions made within the CDOC. He is sued in his official capacity.

17   Dolores Montoya/ Former HSA

Office of Legal Services

2862 S. Circle Drive

Colorado Spring, CO 80906

(Name, title, and address of sixteenth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? _X_ Yes __No  (CHECK ONE).  Briefly explain your answer: Defendant Dolores Montoya was the Health Services Administrator at the Fremont Correctional Facility. She was responsible for the oversight of Fremont's Clinical Services Department. She is sued in her individual capacity.

18   Ron Wager/ Assistant Warden

Fremont Correctional Facility

P.O. Box 999

Canon City, CO 81215

(Name, title, and address of seventeenth defendant)

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law?  _X_ Yes  __No  (CHECK ONE).  Briefly explain your answer: Defendant Ron Wager is the assistant Warden at the Fremont Correctional Facility. He is sued in his individual and official capacities.

## B. JURISDICTION

19   I assert jurisdiction over my civil rights claim(s) pursuant to:  (check one if applicable)

   _X_   28 U.S.C. § 1343, 28 U.S.C. § 1331, 42 U.S.C. § 12133 (ADA)  and 42 U.S.C. § 1983 (state prisoners)

20   I assert jurisdiction pursuant to the following additional or alternative statutes (if any): Plaintiff seeks declaratory relief pursuant to 28. U.S.C. §§ 2201, 2202. Plaintiffs claims for injunctive relief are authorized by 28. U.S.C. §§ 2283, 2284, and Rule 65 of the Federal Rules of Civil Procedure.

## C. NATURE OF THE CASE

**BRIEFLY** state the background of your case.  If more space is needed to describe the nature of the case, use extra paper to complete this section.

21.    Prior to Plaintiff's arrest on May 24th, 2009, he was severely ill with chronic ulcerative Colitis (UC). His disease was diagnosed September 20th, 2002 and has never been in remission. He had been hospitalized multiple times prior to his arrest and was near death on two occasions, from severe emaciation and dehydration. UC is characterized as an auto-immune disorder that causes chronic inflammation and ulceration of the large intestine. It's root cause is unknown and the disease is non-curable.

22.    Plaintiff's symptoms caused by his UC include: severe abdominal pain, diarrhea, blood loss, fecal incontinence, nutrient malabsorption, weight loss/ emaciation, dehydration, night sweats, joint pain, fissures, intestinal permeability, flatulence, nausea, fatigue, muscle atrophy, and fecal urgency causing the need to sit on the toilet upwards of 30 times per day. Restroom trips are often violent experiences: bloody, straining, spasmodic, painful, and nauseating--a just horrific event to endure repeatedly everyday. Plaintiff's disease is very debilitating and humiliating; however, symptoms can be reasonably managed with appropriate medications, dietary supplementation, and exercise.

23.    By the Americans with Disabilities Act (ADA) definition, UC is a "physical impairment that  substantially limits one or more of the major life activities" of the Plaintiff (28 C.F.R. § 35.104) and would qualify Plaintiff for reasonable accommodations to be made by the Colorado Department of Corrections (CDOC) per Title II of the 1990 ADA. UC is a serious medical need that must be managed by a licensed gastroenterologist.

24.    Upon being committed to the CDOC, Plaintiff has repeatedly stated to every doctor he has seen his medical condition and history.

25.     Plaintiff was initially sent to Denver Reception and Diagnostic Center (DRDC) after being sentenced in Weld County, CO. This transfer occurred on May 3rd, 2010. DRDC is responsible for screening offenders so they may be placed into an appropriate facility based on specific needs assessment of the offender, including medical needs.

26.     On May 20th, 2010, Plaintiff is sent to the Bent Count Correctional Facility in Las Animas,CO. Upon arrival Plaintiff was screened by the medical staff and explained his medical condition and urgent need to be seen by the head provider, Defendant Oba, as Plaintiff was very sick and experiencing the full severity of all his symptoms. Defendant Oba does not reasonably respond.

27.     On May 23rd, 2010, Plaintiff submits a medical kite explaining his need to be seen by Defendant Oba. Plaintiff is told he is scheduled on June 14th, 2010. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

28.     On June 14th, 2010, Plaintiff's appointment is arbitrarily canceled, which becomes a recurring pattern. Plaintiff files another medical kite requesting to see Defendant Oba. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

29.     On June 20th, 2010, Plaintiff request to see Defendant Blake for a cracked tooth, as the tooth was causing pain. Upon information and belief, Defendant Blake should of been aware that there was a small cavity on the tooth that cracked after reviewing Plaintiff's chart from DRDC; therefore, Plaintiff should have been scheduled within a reasonable time frame for an

appointment after arriving to the BCCF so the cavity could be treated, especially since Defendant Blake knows about complications that could result from a cavity. Defendant Blake does not reasonably respond.

30.    On June 23rd, 2010, Plaintiff files a grievance explaining his medical condition and needs. "I'm in constant pain 24 hours a day....I'm in very bad condition....my colon is probably going to be removed....the medications I'm on are not helping me....I need to see the doctor." The grievance response is given by Defendant Turner, alerting her of actual knowledge to Plaintiffs condition.

31.    Subsequently on July 1st, 2010, Plaintiff is finally seen by Defendant Oba after 40 days. Plaintiff explains his medical condition in detail with Defendant Oba. Plaintiff explains his last gastroenterologist recommended him to have surgery to remove his colon and ask for his prior medical records to be ordered for review. Plaintiff request to be seen by Defendant Oba every 30 days because he is so sick. Plaintiff is put under the impression his medical needs will be met and is told he will be scheduled to see a gastroenterologist "soon". The entire dialogue is reported by Defendant Oba, who states Plaintiff is "very knowledgeable about UC" and recommends his own suggested course of action to best treat Plaintiff; however, no treatment is ordered. Medications are prescribed, but they are proven to already be ineffective. Plaintiff waits to see the gastroenterologist.

32.    On July 15th, 2010, Plaintiff request a follow up appointment with Defendant Oba and is told an appointment is scheduled. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

33.     On July 20th, 2010, Plaintiff request pain medication to be renewed after Defendant Oba
writes the prescription to arbitrarily expire, without warning.  Plaintiff's pain medication is
finally renewed after 8 days on July, 27th, 2010.

34.     On August 8th, 2010, Plaintiff ask when he is scheduled to see Defendant Oba for a follow
up appointment. Medications again expire without warning or reason. Plaintiff is told another
appointment is scheduled. Plaintiffs complaints are subverted because of CCA policies that allow
nurses to answer medical kites.

35.     On August 25th, 2010, Plaintiff is sent to Park View Medical Center in Pueblo, Colorado
to be seen by gastroenterologist, Dr. Atul Vahil. Plaintiff is given a endoscopy and Dr. Vahil is
confused why Defendant Oba would not have scheduled a colonoscopy after hearing Plaintiffs
medical condition and history.  Dr. Vahil reports an "ASA grade assessment III- a patient with
severe systemic disease." Dr. Vahil also recommends a colonoscopy at the "next available
appointment".

36.     On August 27th, 2010, Defendant Oba reviews Dr. Vahil's report and never explains his
findings or suggestions to Plaintiff. Plaintiff is never again seen by Dr. Vahil while at Bent
County, as his recommendations are ignored by Defendant Oba.

37.     On September 3rd, 2010, Plaintiff request to see Defendant Blake ASAP for his cracked
tooth again. Plaintiffs complaints are subverted because of CCA policies that allow nurses to
answer medical kites.

38.     On September, 14th, 2010, Plaintiff ask why he still has not been seen by Defendant Oba to discuss the results of the visit to Dr. Vahil. Plaintiff is told he is not scheduled until December 13th, 2010. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

39.     On September 17th, 2010,  Plaintiff files another medical grievance complaining of medical issues. "My ulcerative colitis is still completely out of control....I have been suffering with constant pain and discomfort....I cannot eat at times, my intestine is bleeding on and off,  I can't sleep....I need to see Dr. Oba.." No reasonable response is given.

40.     Subsequently, on September 29th, 2010, Plaintiff finally see's Dr. Oba for only the second time in 4+ months.  Plaintiff is told the endoscopy performed by Dr. Vahil showed that his esophagus and stomach were all inflamed, but that is all that is construed.  Plaintiff tells Defendant Oba he must be seen every 30 days and once again is told this would not be a problem. Defendant Oba knowingly orders medications that have never worked to treat Plaintiff and put's Plaintiff under the impression that his medical needs will be met.

41.     On October 2nd, 2010,  Plaintiff's prescriptions again run out. Specifically, Defendant Oba knowingly allows a medication to run out that must be tapered, totally neglecting any professional judgment and ignoring possible harm to the Plaintiff.

42.     On October 3rd, 2010,  Plaintiff's nutritional support is discontinued without reason by Defendant Oba, depriving Plaintiff adequate nutrition considering his diseases severity. Plaintiffs

complaints are subverted because of CCA policies that allow nurses to answer his kite.

43.     On October 12th, 2010,  Plaintiff files a request to be seen by Defendant Oba and is told an appointment is scheduled for the middle of the next month, again putting  Plaintiff under the false impression he would be seen. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

44.     On November 19th, 2010, Plaintiff  request to be seen by Defendant Oba after the appointment from the previous paragraph is arbitrarily canceled; he is told the appointment has been rescheduled. Another false impression is given to Plaintiff , which prevents a grievance. Plaintiffs complaints are further subverted because of CCA policies that allow nurses to answer medical kites.

45.     On December 3rd, 2010, Plaintiff  ask specific date he is scheduled to see Defendant Oba; told "tentatively" set for December 13th, 2010. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

46.     Also on December 3rd, 2010, Plaintiff 's medications are incorrectly charted, so he is given the wrong dosages of prescribed pain medications. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

47.     On December 15th, 2010, Plaintiff  again request to see Defendant Oba, "I'm sick", as the appointment from paragraph 45 is also canceled for no reason. He is told the appointment is rescheduled again, now for January 1st, 2011, "pending". Plaintiffs complaints are subverted

because of CCA policies that allow nurses to answer medical kites.

48.     On January 15th, 2011, Plaintiff attempts to file a step 2 grievance, complaining of medical issues not being addressed. "I'm legally DISABLED....I'm sick and have been forced to live in constant pain....tired of living this way!!!" This is the first time Plaintiff becomes fully aware of CDOC's grievance procedure requirements, outlined by Administrative Regulation 850-04. No reasonable response provided.

49.     On February 1st, 2011, Plaintiff finally see's Defendant Oba for the first time in over 4 months. Plaintiff explains problems with medications constantly running out, having appointments canceled repeatedly, the need for nutritional support which was arbitrarily discontinued 4 months earlier, the need for a real treatment plan by a gastroenterologist, the need for past medical records to be ordered and reviewed by Defendant Oba, the need for pain medication at night as needed, and discussed all the symptoms Plaintiff was experiencing from his UC. Plaintiff also request a gluten-free diet due to his finding out that his parents have given him a genetic predisposition to gluten intolerance and sensitivity. Plaintiff is told that his medical needs will be met, once again putting Plaintiff under a false impression.

50.     On February 15th, 2011, Plaintiff is notified that he is allergic to oats after testing positive for an allergy to oats; however, no diet change is directed to the kitchen. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

51.     On February 18th, 2011, Plaintiff ask when he is scheduled to see Defendant Oba for follow up and notifies staff he is becoming severely ill. Plaintiffs complaints are subverted

because of CCA policies that allow nurses to answer medical kites.

52.     On March 10th, 2011, Plaintiff's medication is again allowed to run out by Defendant Oba without reason and Plaintiff's scheduled appoint is canceled again. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

53.     On March 11th, 2011, Plaintiff files another grievance addressing medical concerns. "I use the restroom 15+ times a day and am in constant pain. Dr. Oba is not qualified to treat me. I need a gastroenterologist now."  Plaintiff is told an appointment is scheduled for March 29th, 2011, the response is given by Defendant Turner, she fails to reasonably respond.

54.     On March 18th, 2011, Plaintiff files a request for his diet to be gluten/grain/dairy free. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

55.     On March 29th, 2011, Plaintiff see's Defendant Oba and again addresses all the constant problems about his medical care. Plaintiff is prescribed a gluten-free diet and pain medication to have in his cell as needed for the first time. This is the last time Plaintiff is seen by Defendant Oba until February 5th, 2012.

56.     On April 14th, 2011, Plaintiff files a request asking Defendant Oba about the status of the gluten-free diet change and is told the order was sent to Defendant Turner. Defendant Turner fails to reasonably respond.

57.     On May 5th, 2011, Plaintiff again files a request to be provided his prescribed gluten-free diet and need to be seen by Defendant Oba. "Need to know what is going on--no communication--tired of always being sick. Need to see Dr. Oba ASAP." Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

58.     On May 6th, 2011,  Plaintiff files request for an appointment with Defendant Blake for tooth problems; "starting to get migraines". Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

59.     On May 13th, 2011  Plaintiff files a kite requesting pain medication to be given as ordered by Defendant Oba. This medication, Bentyl, was not provided to Plaintiff to have in his cell for the previous year because of a CCA and CDOC policy that controlled the medication, which is an over exaggerated response to any real concern. For whatever reason the medication was finally provided, as prescribed, for Plaintiff to have in his cell (for a short time in March), but after only having the medication a month to take as needed, it was taken away as a "keep-on-person" (KOP) medication. This forced Plaintiff to take the Bentyl in medication line, which only occurred at specified times just twice a day, when Plaintiff's intestinal pain was not intense. Every night Plaintiff could not have this pain medication, as needed,  he would just have to suffer through incapacitating intestinal pain.

60.     On June 8th, 2011, Plaintiff files a request to Defendant Turner requesting the status of the prescribed gluten-free diet. "Dr. Oba wrote the order on 04/15 and nothing has been changed."

61.     On June 16th, 2011, Plaintiff files two more grievances regarding medical care. "I have

21

been forced to live in constant pain and discomfort and have tried everything in my power to get correct medical attention....am greatly concerned about my health." Defendants Turner and Oba fail to reasonably respond.

62.     On June 28th, 2011, Plaintiff files a request to see dentist, Defendant Blake, regarding continuing tooth problems. Defendant Blake advised Plaintiff at his only (previous) appointment that his tooth would have to be pulled and he would not fix it, even though the tooth was savable; Plaintiff opted to keep the tooth in his mouth. This problem with Plaintiff's tooth was the direct result of a small cavity that was not addressed by Defendant Blake for over 8 months, even though Plaintiff's records from DRDC reported the need for the cavity to be fixed. Defendant Blake was also fully aware of the fact that Plaintiff was on medications for his UC that could cause enamel loss and brittle teeth. Subsequently, the tooth completely broke off leaving just the roots in Plaintiff's jaw. Plaintiff was told by Defendant Blake that the nerves of that tooth were dead, but never mentioned the possibility of other problems arising. The roots eventually became severely infected and had to be pulled out.

63.     On June 29th, 2011, Plaintiff files a request to see Defendant Oba about ongoing medical issues; "Diet still not changed so I've been forced to make myself sicker by eating or not eat....didn't realize how much pain I've been in at night. Now that medication is gone (Bentyl). Teeth are breaking--need help." Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

64.     On June 29th, 2011, Plaintiff files a request for medication; "Have to be on prednisone--no other choice and it's killing me—literally."

65.     On July 11th, 2011, Plaintiff develops a tooth infection (as previously described in

paragraph #62) that requires a 14 day anti-biotic protocol. Three days later the roots that were

left in Plaintiff's jaw are pulled out by Defendant Blake.


66.     On July 15th, 2011, Plaintiff's antibiotics for the tooth infection are allowed to run out.

Plaintiff becomes severely ill through the weekend until the medication is provided three days

later. The antibiotic protocol is restarted by Defendant Blake.


67.     On July 19th, 2011, Plaintiff attempt's to file a step 2 grievance addressing ongoing

medical issues;. "All that medical has done has kept me out of the Emergency Room....years of

my medical records have not been ordered for review (despite my numerous request), I'm left in

constant pain (just have to deal with it), none of my medications are administered correctly

(going against doctors orders)....what I have been forced to do goes against even the slightest

disregard for human dignity. I'm scared for my well being and tired if being sick." Defendants

Turner and Oba fail to reasonably respond.


68.     On July 23rd, 2011, Plaintiff's antibiotics for the tooth infection are allowed to run out

again and Plaintiff's UC severely flares up--causing uncontrolled vomiting all weekend long;

"After last weeks disaster with the Flagyl and it running out, it has happened again....I'm sicker

because of this....lost 9 lbs in 2 days....not sure why this is so impossible." Plaintiffs complaints

are subverted because of CCA policies that allow nurses to answer medical kites.


69.     On July 23rd, 2011, Plaintiff request to see Defendant Oba and is told he is scheduled to

see Nurse Practitioner Scobee; "Need to see Dr. Oba. Told I've been scheduled each month for the past 3 months....I'm sick and not doing well." Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

70.     On July 25th, 2011, Plaintiff files a grievance regarding the entire incident with the tooth infection and medications running out. Defendants Turner and Blake fail to reasonably respond.

71.     On August 4th, 2011, Plaintiff again request to see Defendant Oba; "I've been requesting to see you now for over 4 months--still no appointment....lost 15 lbs and am sick. Can't continue this way!!!"

72.     On August 4th, 2011, Plaintiff files a request asking why his prescribed Boost nutritional supplements are always out of stock; respondent blames "distributor".

73.     On August 8th , 2011, Plaintiff is seen by the nurse practitioner (NP), Ms. Scobee. Plaintiff is thoroughly examined for the first time. NP Scobee is shocked after listening to Plaintiff's medical history and current problems and seems confused as to why the "ball has been dropped". NP Scobee immediately request a colonoscopy and finally has Plaintiff's previous medical records ordered for review.

74.     On August 11th, 2011, Plaintiff request pain medication to be fixed again.

75.     On August 11th, 2011, Plaintiff files another grievance regarding medical issues. "My disease has not been 'treated' at all and management has been left up to me--which has been

impossible....I'm left in constant pain....I can never get scheduled to see Dr. Oba....for 4-5 months at a time....This is the 'norm' that has been created and accepted here at Bent County." The grievance is responded to by Defendant Turner and she states," I reviewed your kite log from June to date and you requested a follow up appointment with the provider (Defendant Oba) on 08/25/11, no others were noted". This comment by Defendant Turner is blatantly contradicted by all of Plaintiff medical kites, which shows how dysfunctional the medical care system at the BCCF was; no accountability causing repeated instances of deliberate indifference to Plaintiff's serious medical needs.

76.    On August 15th, 2011, Plaintiff request his pain medication to be fixed again after Defendant Oba prescribes the medication to arbitrarily run out due to CCA policy.

77.    On August 24th, 2011, Plaintiff files a request to see NP Scobee as another appointment is canceled; "Need to do something about my intestinal pain--can't keep living this way". Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

78.    Upon information and belief Defendant Oba purposely passed off Plaintiff's care to NP Scobee so any request for treatment would be her responsibility.

79.    On August 29th, 2011, Plaintiff files another request to see Ms. Scobee; "Can't sleep, intestine is bleeding badly, in a bunch of pain". Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

80.    On August 29th, 2011, Plaintiff files a request asking about his prescribed diet change;

"I'm basically being fed nothing". Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

81.     On August 31ˢᵗ, 2011, Plaintiff files request asking why prescribed Boost nutritional supplement is again out of stock;. "I'm wondering why this happens every single month"; and again on September 4th, 2011;  "I have lost 7 lbs....I need to be weighed so this can be documented....The Boost is just as important as any other medication to me"; and again on September 6th, 2011; "Why is this such a problem".

82.     On September 8ᵗʰ, 2011, Plaintiff is given a colonoscopy by internal medicine Doctor Miller at the BCCF. After the procedure is done the Plaintiff is informed that his disease has progressed and worsened since his last colonoscopy in 2007. The first treatment plan Plaintiff receives since his incarceration began is prescribed by Dr. Miller. Plaintiff is told by Dr. Miller that a follow up appointment will occur is 60 days. It must be noted that Dr. Miller, fully aware of Plaintiff's medical history, decides to give an ASA Classification of "Class 1: healthy patient, no medical problems"; an egregiously incorrect assertion and factual lie.

83.     On September 9ᵗʰ, 2011, Plaintiff request to be seen by Defendant Blake for ongoing dental issues; "My pre-molar keeps breaking/chipping away....just don't want more issues to arise out of this".

84.     On September 12ᵗʰ, 2011, Plaintiff request to be seen by the Private Prison Monitoring Units (PPMU) medical monitor, Doug Roberts;  "I desperately need to speak with you....every time I try to fix a problem through reasonable methods I am threatened to not be seen, threatened

to have prescribed medications taken away, and it's making my life impossible to manage in here being so sick....please see me."

85.     On September 13th, 2011, Plaintiff files a request to ask what is happening with the prescribed Boost nutritional supplements after being threatened to have them taken away.

86.     On September 16th, 2011, Plaintiff ask when medication will be provided that was prescribed by Dr. Miller; is told "order is ready".

87.     On September 24th, 2011, Plaintiff is scheduled to be seen by Defendant Turner, but is turned away;  "Everything that happens to me feels like retaliation for trying to hold you guys responsible for mistakes."

88.     On September 25th, 2011, Plaintiff request pain medication to be given at night; "It's been too painful to deal with, not sleeping at all. Bentyl works, but need it at night. Nothing else has ever worked for me." Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

89.     On or about October 3rd, 2011, Plaintiff is seen by NP Scobee and is prescribed new pain medication to see if it would lessen Plaintiff's abdominal pain at night; however, the medication does not help. Plaintiff lets NP Scobee know that intestinal pain is still an issue; "I think we need to find something that I can get on KOP" (Keep-on-person, which means a medication that would be allowed for Plaintiff to have in his cell at all times).

90.     On October 20th, 2011, Plaintiff asks when medication he was prescribed is going to be in stock. Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

91.     On November 7th, 2011, Plaintiff addresses several medical issues and request to be seen by NP Scobee; "I need to see you ASAP. I'm not sure what medications I am on....Methotrexate did not work so need next possible treatment." Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

92.     On November 8th, 2011, Plaintiff ask for status on medication, "It's been 5 weeks since this medication was ordered....no one knows what is going on."

93.     On November 12th, 2011, Plaintiff attempts to file three grievances addressing medical issues, "It makes treatment impossible"; "Dr. Millers orders not followed"; "medication not ordered". Plaintiff is notified by his units manager, Seth Salazar, to go speak with Defendant Turner before filing the grievances and fills out a pre-grievance work sheet. Seth Salazar, a correctional officer, was fully aware of all Plaintiff's issues with the medical department at the BCCF and knew this attempt by Defendant Turner to quell Plaintiffs issues would probably not resolve anything. He notes on the Pre-grievance worksheet "resolved for now". Defendant Turner and Oba fail to reasonably respond.

94.     As to the previous paragraph, the Plaintiff meets with Defendant Turner and thoroughly explains all his continuing problems with medical and his condition. Plaintiff pleads to be sent to another facility or be treated appropriately. Plaintiff again is put under the impression that his

medical needs will be met and is told to send request for treatment directly to Defendant Turner. Defendant Turner acknowledges that medical kites are not answered by the doctors because of CCA policy that prevents them from having to do so, knowing it was consistently causing the Plaintiff adverse medical consequences. Defendants Turner, Oba, and Blake all knew that this policy caused complaints to purposely be subverted so they would not need to know of and treat these complaints.

95.    On December 6th, 2011, Plaintiff notifies Defendant Blake of continuing problems with prescribed medications. Plaintiff is told, "Mix-up per AM &PM". Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

96.    On December 12th, 2011, Plaintiff request Defendant Turner to schedule him to be seen by either NP Scobee or Defendant Oba, is told "you will be seen by a nurse".

97.    On December 12th, 2011, Plaintiff request to be seen by Defendant Blake for a broken tooth. "I am not able to eat or drink anything because of the pain....I do not want to lose another tooth so we need to fix it....cannot take pain meds because it causes my stomach too many problems". Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

98.    On December 19th, 2011, Plaintiff files another grievance with regard to medical care after CCA, CDOC, and their health care insurer, Correctional Health Partners (CHP), deny the follow-up appointment with Dr. Miller; "This treatment was the 1st and only attempt in 19 months to help get my disease in remission". Defendant Turner goes on to respond to this step 1

grievance by stating "There are no medical facilities in CDOC on those designated for Hospice

care", which would show Defendant Turner acknowledging how sick Plaintiff was if she

subjectively thought that Plaintiff was needing Hospice care and about to die. "My intestine

bleeds daily, I have non-stop abdominal pain/cramping at night, I use the restroom 15+ times a

day, I cannot eat at times, I cannot sleep, my disease has never been in remission, and I'm done

dealing with the incompetence....I've been here 20 months now with all my symptoms still

persisting....shocking how egregious this has been". "How/why DOC rejects the medical

opinions of the doctors they hire is ridiculous". Defendant Turner and Oba fail to reasonably

respond.


99.    On December 28th, 2011, Plaintiff files a request to be seen by NP Scobee; "my colitis is

out of control....very sick". Plaintiffs complaints are subverted because of CCA policies that

allow nurses to answer medical kites.


100.   On December 28th, 2011, Plaintiff request to be seen by the Private Prison Monitoring

Units (PPMU) medical monitor, Doug Roberts for a second time, after being ignored from the

previous request on September 12th, 2011;  "I'm very sick and tired of this."


101.   On or around this date Plaintiff begins trying to figure out how to force his care through

litigation. The Court must be aware that being in prison makes it nearly impossible to be

"reasonably diligent" as to how to go about a section 1983 lawsuit. Plaintiff begins to study all

the material he is afforded and does not become aware of the Prison Litigation Reform Acts

complete exhaustion requirement until this time nor statute of limitations (C.R.S. 13-80-102).

Since Plaintiff was continually put under false pretenses that his medical care would be

addressed by Defendants, this would establish circumstances proving Defendants wrongful conduct prevented litigation until this time.

102.    On January 6th, 2012, Plaintiff again request to see Defendant Blake for a dental emergency, after an appointment was canceled three weeks earlier; "back pre-molar keeps breaking, very painful....would declare an emergency but won't do anything."

103.    On January 16th, 2012, Plaintiff again asks when he is scheduled to see Defendant Blake; "It has been almost a month just to be rescheduled"; respondent to request states "due to holidays and vacations, etc. we are behind." Plaintiffs complaints are subverted because of CCA policies that allow nurses to answer medical kites.

104.    On January 16th, 2012, Plaintiff given confirmation by Defendant Turner that a consultation with Dr. Miller was denied by CDOC and CCA's health care provider Correctional Health Partners.

105.    On January 18th, 2012, Plaintiff files a request to Defendant Turner asking her to speak with Defendant Blake to get scheduled for a dental appointment. Defendant Blake, knowingly, maliciously, and intentionally dismisses the risks posed to Plaintiffs health by failing to see Plaintiff for severe ongoing dental issues, stating, "I am not in charge of scheduling", when in fact Defendant Blake had the full authority to get the Plaintiff a scheduled appointment immediately.

106.    On January 18th, 2012, Plaintiff files request to refill prescriptions that Defendant Oba

arbitrarily allowed to run out; "Would be great to know about these automatic endings in my medications before they occur."

107.    On or about January 20th, 2012, Plaintiff speaks with PPMU medical monitor, Doug Roberts, and thoroughly explains problems with his medical care. Once again, Plaintiff believes he will get some sort of medical attention.

108.    On January 23rd, 2012, Plaintiff files three more grievances relating to medical care; "I need to be treated as required by law"; "kites need to be answered by the intended recipient"; "How is a doctor (chosen to treat patients in DOC) expected to treat their patients when CDOC arbitrarily denies the medical recommendation of the physicians they hire?". Defendants Oba and Turner fail to respond reasonably.

109.    On January 27th, 2012, Plaintiff files additional medical grievance; "15+ restroom trips a day, severe nighty abdominal cramping, and daily rectal/colon bleeding- deal with this (as I have for over 20+ months) myself?"

110.    On February 6th, 2012, Defendant Russell's office replies to a letter that Plaintiff sent them asking for accommodations because of his disability. They fail to reasonably respond.

111.    On February 8th, 2012, Plaintiff is seen by Defendant Oba for the first time in 11 months and is told all his concerns will be fixed, full well knowing that Plaintiff would be transferred out of the facility the next morning.

112.     On February 9th, 2012, Plaintiff is transferred out of the BCCF, specifically for "medical needs" and is transported to Cell house 5, a holdover facility for inmates awaiting placement to other prisons and a part of Colorado Territorial Correctional Facility.

113.     Shorty after arriving at Cell house 5, Plaintiff was given a lunch he could not eat. He notifies staff that he is being transferred for "medical needs" and he has a medically prescribed gluten-free diet; however, no diet is provided, so Plaintiff does not eat anything.

114.     At chow for dinner that night Plaintiff is again denied his medical diet. Staff tells Plaintiff it may "take some time" to receive the diet, so Plaintiff is forced to eat the meal or starve.

115.     After February 9th, 2012 Plaintiff makes daily request for his medical diet to staff while at Cell house 5.

116.     On February 11th, 2012, Plaintiff notifies staff that his intestine has begun to bleed because of being forced to eat the food he was being provided due to the regular treys being packed with gluten. The bleeding was accompanied by intense abdominal pain, night sweats, increased restroom trips, and an overall exacerbation in Plaintiffs symptoms associated with his ulcerative colitis.

117.     Plaintiff then files a kite to the doctor, stating, " I had a gluten-free diet approved by CDOC last April. I have been forced to eat what is given to me for the past 3 days and my gut is bleeding badly...making me very sick." No diet is provided.

118.    On February 12th, 2012,  Plaintiffs intestine begins bleeding profusely and abdominal pain becomes unbearable.  Plaintiff notifies staff and is forced to declare a medical emergency.

119.    After seeing the nursing staff for the emergency, nothing is provided to the Plaintiff for his pain, nor were his symptoms believed. Despite Plaintiff requesting to be monitored so he could show the nurses what his bowl movements are looking like (very bloody), he was forced back to his cell.  Plaintiff was begging at this point to have his medical diet provided. Nothing is done.

120.    On February 14th, 2012,  Plaintiff is transferred to the FCF.  Plaintiffs diet was not provided at Cell house 5 and this began the exacerbation of Plaintiffs symptoms.

121.    Upon arrival at the FCF,  Plaintiff is screened by the nursing staff. He explains what had happened at Cell house 5 and expresses the urgent need to be seen by Defendant Creany. Plaintiff explains his current condition about to go into a full fledged crisis if he is still forced to eat the regular meals. He is told his chart will be reviewed, no diet is provided.

122.    After the screening process was finished,  Plaintiff was placed in a holding cell where he found out he would be locked down 23 hours a day for the next 4-8 days. Upon information and belief, this process of lock down is unique to the FCF and does not occur at any other Level III (security) prison in the state. Meaning, if the CDOC had any policy in place that would allow for proper facility placement of offenders with serious medical needs then Defendant Cline would not of sent the Plaintiff to this facility.

123.    The process of lock down caused adverse medical consequence to the Plaintiff because if he was not locked down he could have prepared his own food. Instead he was forced to eat the treys he was given, which were packed with gluten, and it caused his gut to bleed profusely. Defendants Archuletta and Wager have implemented this policy in violation of the CDOC administrative regulations, which lacks all penological justification.

124.    Plaintiff attempted to eat only what he could off the treys, but avoiding all the gluten was impossible most meals.

125.    That evening Defendant Creany prescribed Plaintiff 60mg of prednisone, which was known to cause the immuno-suppression (worsening) of Plaintiffs condition. Plaintiffs intestine was bleeding so badly that he had no choice but to take the prednisone because the medical diet was still not being provided. The medication did slow the intestinal bleeding but caused horrible joint pains, increased restroom trips, intestinal pain, night sweats, and overall contributed to his condition completely spiraling out of control.

126.    On February 15th, 2012, Plaintiff files a kite requesting Defendant Creany to see him; "the food I'm forced to eat is making me sicker....need to see you ASAP". Plaintiff is told he is scheduled.

127.    That same day Plaintiff files another kite requesting the need for more toilet paper; "I'm using the restroom 20+ times a day." The request is forwarded to Defendant Montoya, who never fixes the issue. Plaintiff was using the restroom 15-30 times a day at this point and was forced to wait hours and endure horrible pain because of not being provided toilet paper within a

reasonable time frame, yet Defendant Montoya does nothing. This is still an ongoing issue.

128.    Plaintiff then requested to speak with Defendant Montoya through numerous medical kites, but she refuses to reasonably respond to him.

129.    Upon Information and Belief, Defendants Montoya, Foster, and Tessiere were the only staff members at the FCF able to authorize a pass to be written for extra toilet paper, they all refused the request, as did Defendant Russell and the ADA inmate coordinators office, in violation of the ADA.

130.    On February 15th, 2012,  Plaintiffs sister, Keri Brooks, speaks to the head nurse at the FCF and thoroughly explains his medical condition and needs. Ms. Brooks is told the medical diet will be given "ASAP", but the diet is still not provided.

131.    On February 17th, 2012,  Plaintiff meets with Defendant Creany and thoroughly explains his symptoms severity and need for previously prescribed Ensure drink supplements, pain medication, extra toilet paper, and medical diet. Nothing is provided.  Plaintiff is told he will be scheduled to see gastroenterologist, Dr, Atul Vahil, but is informed this may take 6-8 weeks.

132.    On February 19th, 2012,  Plaintiff complains of continuing intestinal pain and request medication previously prescribed by Defendant Oba; "need something for intestinal cramping...cramping gets bad at night." Nothing is prescribed or provided by Defendant Creany.

133.    Plaintiff continues requesting his diet and alerts staff his symptoms are still getting worse

despite the prescribed medications; "Food is making me sicker...please fix this ASAP." No reasonable response is provided by Defendants Montoya or Creany.

134.    On February 20th,  Plaintiff gets moved into the general population and finds out he will still be arbitrarily locked down because of the FCF's unique"unassigned" policy instituted by Defendants Wager and (now)Archuletta. Upon information and belief, the FCF's unassigned policy to lock down inmates and restrict "privileges" because the prison fails to provide inmates a job is not instituted at any other prison like this in all of Colorado. This restriction, lacking all penological justification, caused  Plaintiff the unnecessary infliction of pain because he could not lessen his symptoms severity through exercise. The high does of prednisone prescribed by Defendant Creany caused muscle atrophy and horrible joint pains, so because  Plaintiff could not exercise he became severely emaciated, weak, and had to endure tremendous pain.  Defendants Creany and Montoya continue to do nothing.

135.    On February 21st, 2012,  Plaintiff writes a letter to Defendant Russell's office; "I feel like getting accommodations here at Fremont is going to be impossible."

136.    On February 22nd, 2012,  Plaintiffs medical diet is finally provided, two weeks too late. This directly caused  Plaintiffs condition to go into crisis for more than 3 months.

137.    On February 23rd, 2012,  Plaintiffs mom speaks with Defendant Russell, telling him, "I briefly explained your (Plaintiffs) medical disability interfering with your ability to follow a fixed schedule regarding eating and need for exercise." Plaintiff formally request accommodations through Defendant Russell's office, which are all denied in violation of the

ADA.

138.    On February 24th, 2012,  Plaintiff request Defendant Creany to medically unassigned him so he can exercise to deal with the side effects of the prednisone he was prescribed. Defendant Creany does nothing.

139.    After February 24th, 2012,  Plaintiffs family attempts to get him moved to a more suitable facility (fearing for  Plaintiffs safety) and speaks with Defendants Cline, Howell, Montoya, and Russell asking why this is not being immediately addressed. All these Defendants deny responsibility to help the Plaintiff, all do nothing.

140.    On February 26th, 2012,  Plaintiff calls his family to see if they can get him admitted to the hospital or infirmary because he is so sick, in a lot of pain, and fears he might die.  Plaintiff had now lost 15lbs since being transferred from the BCCF, in just 17 days, and his symptoms severity were at their worst point since Plaintiff became incarcerated.

141.    Plaintiff tried to declare a medical emergency after his sister, Keri, calls the FCF's clinical services alerting them of his deteriorating condition. The nursing staff refuses to see Plaintiff.

142.    On February 27th, 2012, Plaintiff begins filing grievances complaining of all the issues he had faced since arriving at the FCF; "The attempted results of trying to treat my condition thus far have left me incontinent, bleeding, unable to sleep, unable to go to chow, unable to clean myself properly.....I should not be in general population being this sick.....I need to be put into a

cell by myself."; "I need to be put into the infirmary or hospital." No reasonable responses provided.

143.    On February 28th, 2012,  Plaintiff files more grievances; "I need to be treated and managed by a gastroenterologist"; "How do I make sure this never happens again"; "Fremont's policy....to punish you for being "unassigned" has left me locked down, unable to exercise....which has left me almost unable to function and in constant pain." No reasonable responses provided.

144.    On March 1st,  Plaintiff files another kite stating the drugs he's been prescribed are still not working and getting extra toilet paper is still and issue. Plaintiff also files more grievances; "Have me submitted to the infirmary so you can witness the severity of my symptoms; "Provide my Boost/Ensure or move me to a facility that can." No reasonable responses provided.

145.    On March 3rd Plaintiff files another grievance. No reasonable response provided.

146.    On March 5th, 2012,  Plaintiffs mom speaks with Defendant Montoya about all these medical problems. Defendant Montoya issues Plaintiff a medical pass so he doesn't miss meals in case he was stuck on toilet when chow pulls were called.

147.    On March 9th,  Plaintiffs weight falls down to 144lbs, at 6'3" tall, as he states, "I'm going to continue to drop weight as long as I'm not given exercise and Ensure." No reasonable responses provided.

148.    On or around March 12th, 2012, Plaintiff writes a 13 page letter to Defendant Russell explaining specific reasons for accommodations to be made; "I wanted to make sure I wrote you personally so there is record of the problems I'm currently experiencing because of my disability....How is there to be any reasonable decision made by your office if the information you need to make that decision is not based on objective evidence or sound medical knowledge....I feel like an attempt was made on my life (moving me from Bent county to the FCF)." No reasonable responses provided.

149.    On March 13th, Plaintiffs ADA accommodation request are denied by CDOC and Defendant Russell's office; additional time to move about the facility—denied; modified work schedule—denied,;modified/ reassigned job duties to accommodate medical condition—denied; access to accessible bathrooms—denied; request placement at another ADA designated facility—denied--all in violation of Title II of the 1990.

150.    On March 14th,  Plaintiffs mom speaks with Defendant Cline, whom states there was no record of  Plaintiff needing to be moved from the BCCF for medical needs, which is contradicted by Plaintiffs Inmate Reclassification Custody rating, stating, "lateral move due to medical needs."

151.    On March 16th, 2012,  Plaintiffs mom supplies a letter to his case manager to provide better insight and clarification of Plaintiffs condition; "I request on my son's behalf that this matter be attended to with sincere and cooperative intent." No reasonable responses provided.

152.    On March 16th, 2012, Plaintiff flies a kite to Warden Susan Jones (answered by Defendant

Wager) warning of irreparable injury if Plaintiff is left at the FCF. No reasonable responses provided.

153.    On March 16th, 2012, Plaintiff meets with Defendant Creany to speak about medical issues. Defendant Creany tells Plaintiff a staffing meeting is going to take place with Defendants Montoya , Plaintiff's cell house captain, and Plaintiff's case manager so accommodations can be put into place so he can better manage his condition. The staffing does not happen for 3 more months, and no accommodations are provided.

154.    On March 18th, 2012, Plaintiff files additional grievance; "I already need to get up in the night because of my medical condition and these lights make sleep impossible." No reasonable responses provided.

155.    On March 19th, 2012, Plaintiff files another grievance; "I cannot exercise.....you cannot arbitrarily punish me because the prison fails to provide me a job." No reasonable responses provided.

156.    On March 21st, 2012, Plaintiff receives a response to his letter written to Defendant Russell's office, which states, "while you may find your disease protected under the ADA, it is not included in this class action (Montez)." Therefore, the CDOC does not feel it is required to provide accommodations to disable inmates that fall outside of this class action, in violation of Department of Justice guidelines for Title II of the ADA, showing intentional discrimination by CDOC policy.

157.   On March 27ᵗʰ, 2012, Plaintiff files another grievance; "I'm emaciated, now 50lbs underweight, can barely walk, and clinical services does nothing." No reasonable responses provided.

158.   On March 28ᵗʰ, 2012, Plaintiffs weight at 136lbs; "No strength, can barely walk." No reasonable responses provided.

159.   On March 30ᵗʰ, 2012, Plaintiffs mom calls Defendant Howell and ask for remedies. No reasonable responses provided.

160.   On March 30ᵗʰ, 2012, Plaintiff is finally "assigned" a job so he is off lock down, but is forced to work in the kitchen 6 hours a days, 5 days a week; a job totally inconsistent with and aggravates his medical condition. If Plaintiff refused to work he would of been written up and given COPD charges, directly affecting his liberty and due process.

161.   On March 31st, 2012, after Plaintiffs first day of work he begins throwing up uncontrollably. He bodies becomes even more stressed out because of the work.

162.   On April 1ˢᵗ, 2012, Plaintiff can not go to work because he is too sick, he is threatened to be written up by staff.

163.   On April 2ⁿᵈ, 2012, Plaintiff is transferred to YOS, another inmate holdover facility, so he can eventually meet with gastroenterologist Dr. Atul Vahil at the Pueblo Medical Center. Plaintiff is transferred inappropriately and is forced to starve himself for the entire 3 day trip, the medical

diet is once again not provided. Plaintiff also request his medication and is told by YOS staff that the medication should of been sent with transport, but no medication is provided to him for the entire trip either.

164.    On April 3rd, 2012, Plaintiff meets with Dr. Vahil for ten minutes and is recommended to have surgery to remove his entire large intestine. For this ten minute doctor visit, Plaintiff was shackled for 24 hours of the 72 hour trip and was forced to starve himself to avoid any fecal incontinence issues.  He is transported back to the FCF the following day.

165.    On or about April 4th, 2012, Plaintiff files a request to his case manager explaining unreasonableness of his job duties because he is so sick and request a different job. If Plaintiff refused to work he would of been put on "RP" (restricted privilege) status, which would of had him locked down, with a cellmate, 22 hours a day, which does not occur at any other facility in all of the CDOC and would of been an atypical and significant hardship compared to the normal incidents of prison life. No reasonable responses provided.

166.    Upon information and belief, Defendants Archuletta and Wagers implementation of this restricted privilege policy is the only of it's kind in all of the CDOC that arbitrarily locks inmates down 22 hours a day without a COPD write-up, violating CDOC's administrative regulations and Plaintiffs due process. This policy is always over Plaintiffs head being housed at the FCF and is a direct threat to his health and safety because of his medical condition. It is also penologically unjustified.

167.    On April 4th, 2012, Plaintiff is finally provided Ensure supplementation after Defendant

Howell speaks with Defendant Creany and tells him to order the drinks.

168.    On April 5th, 2012, Plaintiffs mom writes a letter to Defendant Howell explaining all the issues at the FCF that are causing Plaintiff adverse medical consequence, she request Plaintiff to be transferred to another facility out of medical necessity.

169.    On April 7th, 2012, Plaintiffs medication is allowed to run out because of Defendant Creany's arbitrarily writing the prescription expire. This medication is a drug that must be tapered, so it should of never simply been allowed to run out.

170.    On April 8th, 2012, Plaintiff files another grievance. No reasonable response given.

171.    On April 10th, 2012, Plaintiff sends a kite to Defendant Creany because of his medication running out, "my body is really freaking out, 25+ restroom trips yesterday...this is insane Dr. Creany." Plaintiffs condition exacerbated again.

172.    On or about April 12th , 2012, Plaintiff  sends Defendant Howell a letter explaining the atypical and significant hardships he is facing because of the FCF's unique and unjustified conditions of confinement, expresses his need to be sent to a different facility.

173.    On  April 13th, 2012, Plaintiff files a request to Dr. Creany because his medical rating was inappropriate to his physical condition, which was the reason he was forced to work in the kitchen, which exacerbated his ulcerative colitis. Defendant Creany then changes the medical rating, after Plaintiff had become aware of it, which allowed Plaintiff to get a job more

appropriate for his medical condition. Defendant Creany should have already had this rating in place on the Plaintiff upon his arrival to the FCF.

174.    On April 20th, 2012, Plaintiff speaks with CDOC's surgeon, Dr. Tim Brown. The doctor recommends Plaintiff have a proctocolectomy with j-pouch procedure (requiring the removal of the entire large intestine), with temporary ileostomy (meaning two different surgeries must take place and Plaintiff would have a colostomy bag for months).

175.    On April 26th, 2012, Plaintiff receives three step 3 grievance answers from Defendant DeCesaro. CDOC grievance procedures make it impossible for Plaintiff to receive any requested relief to medical matters because there is no medical professional in place to answer such inquiries, at Defendant DeCesaro's omission.

176.    On April 28th, 2012, Plaintiff writes an 11 page letter to Warden Susan Jones, which is answered by Defendant Wager (for Ms. Jones), alerting Defendant Wager of the problems Plaintiff was facing being housed at the FCF. Defendant Wager dismisses his responsibility to investigate the matter, writes the Plaintiff a memo in response, and does nothing.

177.    On May 9th, 2012, Plaintiff responds to Defendant Wagers memo, letting him know what will happen to him if he is left at the FCF. Plaintiff then writes a letter to Defendant Creany as well, explaining his concern about his safety being housed at the FCF, especially post surgery if Plaintiff was going to opt for it. Defendants do nothing.

178.    On May 14th, 2012, Plaintiff meets with Defendant Creany and is told that he will call Dr.

Vahil to talk about other treatment options, at Plaintiffs request. Plaintiff questions why this surgery recommendation was even made because other first line therapy options had not yet been tried. Plaintiff pleads to try an aggressive last treatment protocol. Defendant Creany agrees and schedules Plaintiff for another appointment with Dr. Vahil.

179.   On May 17th, 2012, Plaintiff files an ADA grievance, no reasonable responses given.

180.   On May 29th, 2012, Plaintiff files a request to Dr. Creany expressing his concerns about being transported properly to see Dr. Vahil, considering the last three day trip required Plaintiff to starve himself; "These trips are very hard on me.....I'm forced to starve myself to avoid any accidents...I can't deal with the prednisone (either)."

181.   On May 29th, 2012, Plaintiff receives more grievance responses from Defendant DeCesaro. No reasonable responses given.

182.   On May 30th, 2012, Plaintiff files another grievance. The grievance addresses yet more reasons as to why Plaintiff feels he needs to be moved out of the FCF. "My disease limits my ability to go to recreation movements....I am not afforded that opportunity (to exercise)....which is essential to my managing my disease...somehow (Defendants) Creany, Howell, Montoya, Wager, and Russell feel it's not necessary to move me...which is flat discrimination...and it will continue until I'm moved to a more suitable facility"; "disregarding the fact that my disability is not being accommodated after all the information I have provided is discriminatory, illegal, and goes against CDOC's AR's...moving me to a facility where I can better manage my disease is a reasonable accommodation...it's a medical necessity."

183.    On May 31st, 2012, Plaintiff files a request to Defendant Creany, stating, "I'll have surgery, but I'd have to be moved. Not going through Fremont's "unassigned" policy again, especially post surgery."

184.    On May 31st, 2012, Plaintiff files another grievance proving CDOC's grievance policy cannot provide reasonable administrative remedies to serious medical needs. Plaintiff specifically advises Defendant DeCesaro of the consequences of this deficiency in the grievance procedure; "I am making you fully aware that this deficiency in the grievance procedure has caused (and will continue to cause) irreparable physical injury to myself and allows discrimination (to continue) in violation of the ADA on a daily basis....makes you personally responsible since you refuse to let your superiors know about the failure of this process." Rather than answer the grievance, Defendant DeCesaro recklessly and arbitrarily denies the grievance.

185.    On June 5th, 2012, Plaintiff files a request to Defendant Montoya asking for his medical pass to be renewed so he is not forced to miss meals at the dinning hall, but no reasonable response is given.

186.    On June 8th, 2012, Plaintiff is called to clinical services at the FCF where a "staffing" meeting takes place. Attending this meeting are Defendants Creany, Montoya, and Howell, amongst many other case managers, captains, and doctors. This meeting was specifically held to address Plaintiffs medical needs, as a response to his and his families concerns. For about an hour Plaintiff explains his difficulties in trying to manage his condition at the FCF and he thoroughly explains all the issues he grieved, wrote letters, and complained about. Despite all

this subjective knowledge gained, the staffing does nothing for the Plaintiff, Defendants do nothing, and he is left to suffer through his days. This staffing committee had the full authority to have the Plaintiff moved to a more suitable facility, but egregiously, maliciously, and wantonly refused to do so.

187.    On June 21st, 2012, Plaintiff request Defendant Creany to make sure his medication is tapered properly. If it was not for Plaintiffs thorough medical knowledge of his disease and constant advocacy for correct treatment, it is of Plaintiffs honest belief he would of died because of everything he had been put through up until this point.

188.    On July 18th, 2012, Plaintiff is properly transported to see Dr. Vahil at the Pueblo Medical Center. Dr. Vahil agrees to prescribe a very aggressive treatment, at Plaintiffs request. This is the first time a medically ethical response is given to Plaintiffs condition, coming 38 months after his initial incarceration, for which he suffered unimaginably.

189.    On or around August 20th, 2012, Plaintiff is finally given the prescriptions Dr. Vahil ordered for him. Since this point in time Plaintiff's condition has dramatically improved, but still he faces daily obstacles to simply function within the FCF because his symptoms change each and every day. He still has not been afforded the ability to eat at the dinning hall to obtain his meals if his body does not allow him, still is being denied extra toilet paper, and still suffers making it out to recreation in order to exercise.

190.    On November 19th, 2012, Plaintiff is given a blood test ordered by Dr. Vahil which was supposed to confirm Plaintiffs original diagnosis of ulcerative colitis to be correct, thus showing

the previous surgery recommendation to be based on a sound medical directive; however, the test was "suggestive" that Plaintiff may have Chron's disease. This proves the surgery recommendation was prematurely made and may had resulted in the wrong surgery to be preformed, as it was scheduled to take place on November 28th, 2012.

191.    On December 21st, 2012, Plaintiff files a grievance asking why Dr. Vahil's orders are not being followed to have Plaintiff scheduled for follow up visits. Plaintiff is unnecessarily having to waits months for these visit to occur, against the doctors orders.

192.    On February 20th, 2013, Plaintiff files a request to ask why he has not received an enema treatment prescribed by Dr. Vahil eight days earlier. Defendant Creany, answers the request by saying, "just saw colonoscopy results today (two weeks after the procedure just to review the results). Plaintiff does not end up starting the enema treatment until March 14th, 2013, so it takes clinical services a month just to get this medication ordered, another inexcusable delay. Before this enema treatment started Plaintiff would leak fluid from his anus every night (i.e. soil himself). The only way to prevent the soiling would require Plaintiff to not eat or drink anything past 5:30pm. Because of Plaintiffs chronic diarrhea he stays dehydrated, so not being able to drink any water past 5:30 pm was a masochistic trait Plaintiff was required to adopt. This resulted in Plaintiff not sleeping uninterrupted  for more than two hours at a time, this happening now for 33 months every night up until this point, which was torturous. Plaintiff had no way to clean himself properly and it was not reasonable to have him in with a cellmate. Defendant Creany was aware of this and did nothing.

193.    On March 27th, 2012, Plaintiff files a grievance because he cannot get the only

medication that helps lessen his intestinal pain as needed. A CDOC policy prevents the medication from being provided, preventing Plaintiff the ability to live pain free. The policy is also an over exaggerated response to any real concern. This CDOC policy is the moving force preventing Defendants Creany and DeCesaro even recommending the medication to be provided as needed.

194.    On March 28th, 2012, Plaintiff files a grievance asking for a pass that was previously issued by Defendant Montoya that allowed him the ability to obtain his meals, but Defendants Creany and DeCesaro fail to reasonably respond after being shown proof of the pass being previously issued. Defendants Foster and Tessiere also unjustifiably refuse to issue the pass.

195.    On April 2nd, 2013, Plaintiff is denied the ability to exercise when his body allows by Defendant Russell's office.

196.    On April 4th, 2013, Plaintiff grieves not being able to go to recreation, a program, because it is unusually difficult or painful to go out at the limited recreation times due to his colitis, in violation of the ADA.

197.    On April 11th, 2013, Plaintiff grieves why his requested accommodations need to be in place at all times per Title II of the ADA, and specifically states the 2008 ADA Amendments Acts spelling out why Defendant Russell's office and the CDOC are required to follow this law.

198.    On April 12th, 2013, Plaintiff files a grievance alerting Defendant DeCesaro why the CDOC grievance policy is an obstruction of his access to the Courts. Defendant DeCesaro does

nothing.

199.   On April 15th, 2013, Plaintiff tells Defendant Creany that his diet is inedible and insufficient because of the CDOC changing the menu; "I will only eat what is provided me to show you what will happen." No reasonable response is provided.

200.   On May 6th, 2013, Plaintiff is seen by the dietician and she states ,"consider ensure if needed to maintain and stabilize weight." Defendant Creany does not follow the dieticians advice and never provides the Ensure because Defendant Tessiere says, "I (Plaintiff) do(es) not qualify for the supplemental drinks."

201.   On May 23rd, 2013, Plaintiff grieves his gluten-free diet being inedible and calorically insufficient. Defendants Creany, Tessiere, and DeCesaro do nothing.

202.   On May 25th, 2013, Plaintiff files a grievance asking for the law library to have more access. Defendant Brown obstructs Plaintiffs access to the Courts by not allowing sufficient access.

203.   On May 30th, 2013, Plaintiff request ADA accommodation from Defendant Russell's office to allow him to get extra toilet paper, they ask for documentation from Plaintiff, but Defendant Creany refuses to provide any documentation, knowing Plaintiff needs it; accommodation denied.

204.   On May 31st, 2013, Plaintiff grieves the fact that the CDOC has no policy in place to

allow proper placement of offenders with serious medical needs.

205.    On May 31st, 2013, Plaintiff grieves how the ADA inmate coordinators office is determining his physical condition because they refuse to screen him properly.

206.    On June 11th, 2013, Plaintiff applies for ADA accommodation to be able to go to med line and meals with the first pull to the dinning hall so he'd not be forced to miss meals. Accommodations denied, ADA inmates coordinators office states, " you may request early med line pass and adult undergarments from clinical services as part of you medical treatment plans." Defendant's Creany, Tessiere, Wager, Archuletta, and Russell refuse to reasonably respond to this ongoing issue.

207.    On July 23rd, 2013, Plaintiff files a grievance asking the CDOC to change it's obviously discriminatory policy that prevents inmates (Plaintiff specifically) from progressing to lower security facilities simply because they are sick, also an ADA violation. Defendant DeCesaro fails to reasonably respond.

208.    A new policy implemented by Defendant Archuletta and Wager on October 15th, 2013, has now locked down the FCF 16 hours a day and recreation periods last in excess of 2 hours, all which is penologically unjustified and not implemented at any other Level III security facility in all of the CDOC. This has now made the Plaintiff unable to exercise at all outside his cell without being forced to endure some type of suffering. Defendants Wager, Archuletta, Creany, and Tessiere still all refuse to provide any accommodation, so since this date Plaintiff will not receive any reasonable exercise opportunities outside his cell at all.

## D. CAUSE OF ACTION

State concisely every claim that you wish to assert in this action.  For each claim, specify the right that allegedly has been violated and state all supporting facts that you consider important, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim.  You do not need to cite specific cases to support your claim(s).  If additional space is needed to describe any claim or to assert more than three claims, use extra paper to continue that claim or to assert the additional claim(s).

Claim One:    Defendant Oba violated Plaintiffs Eighth Amendment right to be free from

cruel and unusual punishment by being deliberately indifferent to his serious

medical needs.

Supporting Facts: Defendant Oba knew he did not provide any acceptable medical care to treat the Plaintiff's ulcerative colitis, a serious medical need. He willfully allowed months to go by before seeing the Plaintiff for follow-up appointments, which he said would occur monthly. He knew the Plaintiff was suffering from his condition, as Defendant Oba accurately documented the problems Plaintiff was having. Defendant Oba knew medications were written to purposely expire and were not being provided as prescribed. He knew CCA policy that allowed nurses to answer medical kites would prevent him from having to properly respond to those complaints. He knew the Plaintiff's medical care should have been managed and treated by a licensed gastroenterologist, as no medical doctor would attempt to do so without one. He knew the medications he did prescribe were ineffective. He knew the Plaintiff's disease, left untreated, could result in Plaintiff needing surgery to remove his entire large intestine, yet,  despite all this subjective and professional knowledge, Defendant Oba willfully, wantonly, and maliciously ignored all the Plaintiffs complaints, causing irreparable injury, pain, suffering, and emotional distress to Plaintiff on a continual basis for over 600 days.

Claim Two:    Defendant Blake violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs.

Supporting Facts: Defendant Blake knew about the Plaintiffs ulcerative colitis and recognized that any further stress on his body could cause unnecessary suffering. He knew that not providing quick and effective dental care to the Plaintiff could cause infections and pain, which would have to be treated with antibiotics, and could further exacerbate Plaintiffs ulcerative colitis. Defendant Blake also knew that Plaintiff could not take non-steroidal anti-inflammatories (aspirin, IB profun, etc) as such medications are contraindicated to Plaintiffs condition, so pain management for any dental problems would almost be impossible without causing other adverse medical consequences to the Plaintiff.  Defendant Blake knew that Plaintiff had a small cavity, but refused to fix it and only offered to pull the tooth out, resulting in Plaintiff leaving the tooth in his mouth. Defendant Blake knew leaving a decaying tooth inside the Plaintiffs mouth could result in an infection, but failed to advise the Plaintiff of this possible problem. This ultimately caused a subsequent infection, Plaintiff losing the tooth, and exacerbated Plaintiff's ulcerative colitis for months. Defendant Blake knew that Plaintiff's teeth were breaking because he believed it to be a side effect of the drug, prednisone, that Plaintiff was always prescribed, yet he made no effort to treat any of Plaintiffs ongoing dental problems. Defendant Blake also knows that nerve pain caused by dental problems can be torturous. Even after the disaster with an infection, Defendant Blake knew of a dental emergency that Plaintiff alerted him to, yet did nothing to help the Plaintiff. Defendant Blake knew that his failure to not immediately treat any dental problems of the Plaintiff caused exacerbation of his ulcerative colitis, pain, suffering, and emotional distress.

Claim Three:   Defendant Turner violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs.

Supporting Facts: Defendant Turner knew that Plaintiff was suffering from his ulcerative colitis. She knew that Plaintiffs scheduled medical appointments were arbitrarily being canceled and allowed it to continue repeatedly. She knew that medical kites were not being answered by the doctors that were supposed to see them because of CCA policy, which prevented Defendants Oba and Blake from needing to treat the Plaintiff.  Defendant Turner knew this would cause delays in necessary consultations and or/treatments with the doctors and ultimately harm the Plaintiff. She knew sick call procedures were handled in a way that would prevent Plaintiff from always having medications because the prescriptions were purposely written to expire due to CCA policy. She knew the Plaintiff was not receiving treatment and waited almost two years to get him sent out of the facility, only after he was denied medical necessity by CDOC and CCA's health care insurer. She knew the Plaintiff was suffering, as she specifically stated, "there are no medical facilities in CDOC on those designated for Hospice care", proving subjective knowledge of how sick she believed the Plaintiff to be and apparently thought he was going to die. Defendant Turner recklessly allowed all these deficiencies to exist at the Bent Count Correctional Facility because she was, "just following policy"; therefore, CCA instituted official municipal policies that were the moving force behind Defendant Turners actions. She knew Plaintiff was enduring a tremendous amount of pain, suffering, and emotional distress on a continual basis, yet waited 21 months to do anything about it.

Claim Four:    Defendant Russell violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. Defendant Russell also failed to provide reasonable accommodations in violation of Title II of the Americans with Disabilities Act.

Supporting Facts: Defendant Russell knows that Plaintiffs medical condition is disabling. She knew that not providing reasonable requested accommodations to the Plaintiff was a violation of the ADA, which would cause Plaintiff adverse medical consequences, as he specifically told her of the clearly established violations. She knew that Plaintiff was not able to exercise to an equal degree as healthy offenders without accommodations, forcing him to miss recreation pulls (a program). Defendant Russell knew not providing accommodations to Plaintiff so he could exercise outside his cell would result in the exacerbation of his symptoms severity, thus inflicting unnecessary pain.  Defendant Russell knew that Plaintiff was missing hundreds of meals because his disability could leave him on the toilet when chow pulls were called, depriving him of basic human need, yet failed to approve any accommodation request. She knew that Plaintiff was having problems even getting extra toilet paper, but refused to accommodate. Defendant Russell knows that Plaintiffs disability could be better managed at Colorado Territorial Correctional Facility or Arkansas Valley Correctional Facility, as having Plaintiff moved would be considered a reasonable accommodation, yet deliberately, maliciously, and wantonly denied every accommodation request Plaintiff has ever applied for, as she has the absolute authority (and responsibility) to provide accommodations. She also knows that failing to provide accommodations is continuing to cause Plaintiff unnecessary pain, suffering, and emotional distress.

Claim Five:    Defendants Howell, Montoya, Foster, and Tessiere violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. Defendants also failed to provide reasonable accommodations in violation of Title II of the Americans with Disabilities Act.

Supporting Facts: Defendants fully understood Plaintiffs medical condition and knew he was suffering being housed at the FCF. They knew keeping the Plaintiff housed at the FCF would cause adverse medical consequences and willfully chose to disregard Plaintiffs complaints and the risk posed to his health and safety. Defendants knew Plaintiff was having problems being able to make it to the chow hall to eat because of fecal incontinence associated with his disease, yet Defendant Montoya only provided a pass for a short time to allow him to not be forced to miss meals. They knew the conditions of confinement at the FCF was incompatible with the Plaintiffs medical needs. They knew Plaintiff could not exercise when his body would not allow him, which was the best way for Plaintiff to manage his disease, but chose to force him to exercise in his cell. Defendants apparently saw nothing wrong with forcing a 6'3", chronically sick individual, living with another man, to exercise in a 11 X 7 cell, full well knowing out-of-cell exercise is absolutely necessary for any human being, much less one specifically requiring it out of medical necessity. Defendants know that the FCF provides the least amount of out of cell exercise opportunities in all of the CDOC for Plaintiffs security classification and medical needs. They knew that the only "accommodation" being provided to the Plaintiff to deal with his fecal incontinence was a diaper. They knew this would not prevent the incontinence, depriving Plaintiff even the minimal standard of human decency by "allowing" him to defecate on himself. Defendants knew that Plaintiffs nutritional needs and management of his disease require

supplementation, but have denied Ensure nutritional supplements after specifically having them ordered, against the dieticians current recommendations. Defendants actions were willful, malicious, reckless, and wanton, which caused and is still causing Plaintiff physical pain, suffering, and emotional distress, as they all had/have the ability to attempt to change these circumstances for the Plaintiff, but failed to take even the simplest measures to ensure his well being and safety.

Claim Six:    Defendant Creany violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. Defendant Creany also failed to provide reasonable accommodations in violation of Title II of the Americans with Disabilities Act.

Supporting Facts: Defendant Creany knew that the conditions of confinement at the FCF have caused Plaintiff adverse medical consequences. He knew Plaintiff required accommodations and/or medical passes in order to able to exercise outside his cell, be given toilet paper as needed, be provided nutritional supplements as previously prescribed by Defendant Oba, pain medication as previously prescribed by Defendant Oba, and the ability to obtain his meals at the dinning hall. Defendant Creany knew that Plaintiff could manage his condition acceptably at other facilities, but failed to personally recommend his transfer based on medical necessity. He knew the Plaintiff was suffering, but failed to implement even the simplest measures to prevent his condition from spiraling out of control, not even making sure his prescribed medical diet was immediately provided when he arrived at the FCF. Defendant

Creany knew he prescribed medications to the Plaintiff that were known to case immuno-suppression (worsening) of his symptoms. Defendant Creany knew the Plaintiff was not being provided an acceptable gluten-free diet, but failed to remedy the issue, failed to provide nutritional supplements, and knowingly allowed Plaintiff to discontinue his medical diet because it was so inedible and calorically inadequate, which continues to this day. Defendant Creany's actions were discriminatory, reckless, and wanton because of the ease in which he could ensure Plaintiffs safety and well-being, but instead he willfully caused Plaintiff the unnecessary infliction of pain, suffering, and emotional distress.

Claim Seven:   Defendant DeCesaro violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. Defendant DeCesaro also failed to provide reasonable accommodations in violation of Title II of the Americans with Disabilities Act.

Supporting Facts: Defendant DeCesaro has in depth knowledge about Plaintiffs medical condition due to his answering 38 grievances and over 100 pages of complaints. Defendant DeCesaro knew Plaintiff was suffering and unable to manage his condition at the FCF and knew Plaintiff had previously been moved out of the BCCF specifically for medical needs. Defendant DeCesaro knew that he was unqualified to answer many of the Plaintiffs grievances, yet, upon information and belief, he's never alerted his superiors (CDOC officials) to look into the merit of these complaints Plaintiff was asserting, nor did he advise the CDOC that they need to have a independent medical professional in place to answer all medical grievances. Defendant DeCesaro

knew Plaintiffs clearly established rights were being violated, as Defendant DeCesaro was

directly told by the Plaintiff how his actions would give rise to liability of personal participation

because of failing to recommend even one single administrative remedy to any of those 38

grievances he answered, which all were meritorious. Defendant DeCesaro demonstrated a pattern

which recklessly denied many of the Plaintiffs grievances, on procedural grounds, which he had

before deemed acceptable, then failed to answer any substantive issues because of his own

contradictions. The specific purpose of the CDOC grievance process is, as outlined by CDOC's

administrative regulations, to answer inmate grievances. He failed to provide answers to

Plaintiffs grievances, and his obligations, for no other reason than being deliberately indifferent

to Plaintiff's serious medical needs, believing he never can be held responsible for any of his

egregious actions. Defendant DeCesaro failed to provide even the simplest measures to protect

the Plaintiff from danger or relieve his pain, on 38 separate occasions, and provided no

reasonable accommodations in violation of the ADA. Additionally, he also failed to consider

objective evidence that gave him proof of a need for a reasonable accommodation to be made.

His actions were arbitrary, contradictory, malicious, wanton, reckless, and callous because he

knew it would cause the Plaintiff to suffer further.


Claim Eight:   Defendant Cline violated Plaintiffs Eighth Amendment right to be free from

cruel and unusual punishment by being deliberately indifferent to his serious

medical needs. Defendant Cline also failed to provide reasonable

accommodations in violation of Title II of the Americans with Disabilities

Act.

Supporting Facts: Defendant Cline failed to act on a medical direction for transfer which resulted in Plaintiff being placed at the FCF. He knew the conditions of confinement at the FCF were causing the Plaintiff to suffer, yet failed to take the simplest measures to protect the Plaintiff from irreparable harm. Upon information and belief, Defendant Cline did not alert his superiors about any of Plaintiffs complaints that were expressed in conversation by Plaintiffs mother. He failed to investigate essential facts that are necessary to make a professional judgment and allowed Plaintiff to be kept at the FCF, knowing it was causing the Plaintiff pain, suffering, and emotional distress.

Claim Nine:   Defendants Wager and Archuletta violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. Defendants also has failed to provide reasonable accommodations in violation of Title II of the Americans with Disabilities Act.

Supporting Facts: Defendant Wager knew there was a threat to the Plaintiffs well-being and safety being housed at the FCF and responded to an eleven page letter of Plaintiffs on May 4th, 2012 for then Warden, Susan Jones. He knew Plaintiff's complaints were not being addressed, but failed to inquire into any essential facts that are necessary to make a professional judgment and instead passed his responsibility back into the hands of clinical services. Defendant Wager knew Plaintiff was not able to get any out-of-cell exercise because of his backing an Implementation/Adjustment policy, which is the only of it's kind in all of the CDOC, that arbitrarily had the Plaintiff locked down upon his arrival for 45 days and caused needless suffering. He knew that the Plaintiff was taking medication that caused muscle atrophy if he was

not afforded exercise, yet did nothing to take even the simplest measures to make sure Plaintiff was afforded adequate out-of-cell exercise, which caused unnecessary pain. Defendants Wager and Archuletta have displayed a pattern of deliberate indifference to all inmates with serious medical needs, including Plaintiff, as they just implemented a new policy on October 15th, 2013 that now keeps inmates locked down at the FCF 16 hours a day. This policy directly resulted in recreation periods now to exceed 2 hours, once a day, without allowing for a half-time recreation pulls, so inmates that have a hard time being outside that long a period can come inside— whether it be hypoglycemic diabetics or the Plaintiff, who already has had to starve himself just to make it out to recreation to prevent fecal incontinence before this policy was implemented. It must be noted that this is the ONLY facility in all of the CDOC that does not allow half-time recreation pulls that last in excess of 2 hours. Now Plaintiff cannot go to recreation to exercise at all without having to endure some type of suffering. Even if he starves himself, now that is causing vertigo for the Plaintiff and he has thrown up every single time he has gone out to recreation to exercise since October 15th, 2013. The only out-of-cell exercise opportunities the FCF offers is at recreation periods. Upon information and belief, Defendants Wager and Archuletta decisions to implement these policies independent of the CDOC has caused a disparate impact of all disabled inmates, including the Plaintiff, and the moving force behind their actions have been due to not even attempting to understand the ADA or consider the adverse medical consequences these policies are causing. Upon information and belief, the CDOC has failed to verse it's Warden's and assistant Warden's in ADA law, so now policies that Defendants Wager and Archuletta feel are acceptable are completely incompatible to those inmates with serious medical needs, including Plaintiff. Defendants Wager and Archuletta are fully understanding of all of this, as plaintiff has written wrote both of them a letter about these issues, but they continue to maliciously, wantonly, and recklessly allow Plaintiff to suffer further

by doing nothing and allowing these unjustified conditions of confinement to continue.

Claim Ten:    Defendant Brown and the Colorado Department of Corrections violated

Plaintiffs First Amendment right of his access to the Courts by obstructing

that ability.

Supporting Facts: The moving force behind much of Defendant Browns actions has been a result of her subjective interpretations of the CDOC's policies. Up until October 15th, 2013, the law library at the FCF provided Plaintiff only 2 ½ hours of access a week, unnecessarily delaying the Plaintiff the ability to file this complaint. All the sudden, on that October 15th date, the policy at the FCF was changed, which has doubled the Plaintiffs access to the law library; this coming after Defendant Brown and the CDOC argued tooth and nail that access was previously sufficient, which it was not. Still, the unnecessary implementation of policies that Defendant Brown has interpreted has made the preparation of legal documents very time consuming, which has already required Plaintiff to file for one extension of time with the Court, just to Amend this initial Complaint. Upon information and belief, Defendant Brown knows the Federal Rules of Civil Procedure for 1983 suites and recognizes that there is no page limit set for 1983 actions, yet she follows a CDOC policy that only allows inmates to print out a 30-page lawsuit, lacking any justification, which is the reason Plaintiffs initial Complaint was not sufficient for the Court. Another policy that Defendant Brown has enforced is the requirement of inmates to erase motions once they are printed off. Plaintiff already warned Defendant Brown that the Court may require him to file and Amended Complaint, which it did, and has resulted in Plaintiff having to re-write his entire complaint and form legal arguments. This had nothing to do with "what is or is

not technologically possible" because the FACT is, every single inmate in the FCF could save over 1000 pages of word documents that could be saved on Defendant Browns single computer without taking up too much memory. It would not cause any more work saving 1000 pages over one page, so the policy is arbitrary. Rather than Defendant Brown deciding to be reasonable and over-ride these policies, which she has the full authority to do, she has maliciously, recklessly, and wantonly forced Plaintiff to re-type his entire complaint, draft it in a manner incomplete to the Courts liking, and is unnecessarily obstructing Plaintiffs ability to get this Complaint filed, which has lasted now for over 5 additional months thus far. This has prevented Plaintiff the ability to seek a redress of grievances through the Courts in a timely manner and has caused him to unnecessarily suffer further.

CDOC policies have instructed Defendant DeCesaro to rubber stamp grievances to state, "you have not exhausted your administrative remedies", to purposely obstruct inmates from accessing the Courts by putting them under the impression they have not exhausted their administrative remedies, when in fact they have. Upon information and belief ,the CDOC is fully aware of the Prison Litigation Reform Acts exhaustion requirement and does everything it can to make even filing grievances difficult, so this rubber stamp put Plaintiff under the false pretense that he was required to do something else to exhaust his administrative remedies before filing a lawsuit. The fact is, once an inmate has gone through the three step grievance process, his administrative remedies are exhausted. There is nothing else an inmate can do, regardless of subjective interpretations of procedural defaults because the CDOC grievance process, at best, is a broken system. Simply stating, "you have not exhausted your administrative remedies" has prevented Plaintiff from filing this action for over a year now because of this malicious, callous, and wanton obstruction, which have caused him to unnecessarily suffer further.

| | |
|---|---|
| Claim Eleven: | Defendant Corrections Corporation of America violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by implementing policies that were the moving force behind Defendant's Oba, Blake, and Turner's actions, and are deliberately indifferent. |

Supporting Facts: Upon information and belief, after an opportunity for further investigation or discovery, CCA is a for profit, public corporation that obviously tries to earn money, so limiting medical care is of top priority because of the high cost associated with treatment. The policies that have been instituted and followed by the Defendants at the BCCF, allow for financial savings to CCA by purposely having Plaintiffs/inmates complaints subverted, even for minimal amounts of time, so doctors do not have to provide treatments. One of these policies, CCA policy 13-80, allows for anyone in health services to "pick up, triage, and respond to" medical kites, which is exactly what goes on at Bent County, and purposely prevented doctors to never have to personally answer medical complaints or even become aware of them . This caused nurses to determine the severity of these complaints, which was malicious, wanton, and reckless because these CCA policies were intending for this to happen. CCA policies also require doctors to purposely write prescriptions to expire, which forced Plaintiff/inmates to have to submit additional kites just to get medication re-ordered or prescribed, when these medications should of never been allowed to expire in the first place by Defendant Oba and Blake. When this happened to Plaintiff, numerous times, it took around a week to start receiving medications again and worsened his symptoms severity. If this happens with all the inmates prescriptions at facilities which CCA operates around the country, then it probably saves the corporation millions of dollars, but causes obvious adverse medical consequences and is deliberately indifferent to all inmates with serious medical needs, including the Plaintiff. These policies were just two of many

others that are believed to exist, which was the moving force behind many of Defendants Oba, Blake, and Turners actions. All the specific policies should be found after discovery.

| Claim Twelve: | Defendant Colorado Department of Corrections violated Plaintiffs Eighth Amendment right to be free from cruel and unusual punishment by implementing policies that were the moving force behind Defendant's actions in this case, all which were deliberately indifferent; in addition to violating Title II of the 1990 ADA. |
|---|---|

Supporting Facts: Upon information and belief, after an opportunity for further investigation or discovery, the CDOC has implemented an official municipal policy that has failed to train and verse it's administrators and clinicians in ADA matters. No administrator at the ADA inmate coordinators office is implementing any of the disability statutes correctly, Title II of the ADA is not being followed, the 2008 ADA Amendments Act is not even being acknowledged, and the CDOC is failing to make any reasonable accommodations for those with disabilities that do not fall under the states Montez Class Action suit, which only recognizes 4 specific/limited disabilities, all in violation of Department of Justice regulations under the ADA. The CDOC has denied reasonable accommodations to those inmates qualifying as having a disability under the ADA (outside of the Montez class action), such as the Plaintiff, because there is no institutional control surrounding ADA matters, so no one can be held accountable for denying accommodations required by law. This has caused system wide disparate treatment, disparate impact, and a failure to provide reasonable accommodations for the Plaintiffs disabilities and every other disable inmate falling outside the Montez Class Action, and this is

known by Defendants Raemisch, Cline, Russell, Howell, Creany, Tessiere, Montoya, Foster, DeCesaro, Archuletta, and Wager because the Plaintiff repeatedly alerted them to the violations. This failure of the CDOC to properly train anyone in ADA law has been the moving force behind much of these Defendants actions because the CDOC has deemed this business as usual, knowing Eleventh Amendment protections usually shield Defendants from liability. This is malicious, reckless, egregious, sickening, ridiculous, and disgusting because of the ease in which Plaintiffs suffering could have been prevented. Plaintiff has been denied an acceptable diet not adverse to his medical needs (digestive disorders and resulting dietary restrictions are a substantial limitation under the ADA , failure to accommodate diet requirements constitutes ADA issue), nutritional supplements that help manage his symptoms severity (discriminatory medical care), extra toilet paper as needed (basic human need), the ability to obtain his meals (basic human need/program), and the ability to exercise outside his cell at recreation (basic human need/program) due to his disability making it unusually difficult, painful, and often times impossible to participate in these programs because the CDOC has failed to accommodate his disability; all in violation of federal and state law. This lack of training of ADA law has also been the moving force behind much of the alleged constitutional deprivations in this suit; therefore, proper defendants under ADA Title II can include the "public entity or an official acting in his official capacity." Title II creates a private cause of action for damages against the state for conduct that actually violates the constitution, validly abrogating state sovereign immunity. This has all occurred to Plaintiff in this case, is discriminatory, and has caused unimaginable physical pain, suffering, and emotional distress to Plaintiff on almost a daily basis since his move to the FCF.

Claim          Defendants Raemisch, Cline, Wager, Archulletta, Creany, Foster, Montoya,
Thirteen:
               Tessiere, Russell, Howell, DeCesaro and polices of the Colorado

               Department of Corrections, which was the moving force behind some of

               these Defendants actions, violated Plaintiffs Fourteenth Amendment right to

               Due Process.

Supporting Facts:  These Defendants all had personal knowledge that Plaintiff being

housed at the FCF was causing him adverse medical consequences, yet ignored his liberty

interest to be placed at a facility that does not harm him simply because of seemingly neutral

operations. Upon information and belief, none of these Defendants even made a recommendation

to have him moved, failing to take even the simplest measures to protect his health and safety or

relieve his pain. They knew the environment at the FCF was atypical and a significant hardship

compared to the ordinary incidence of prison life, but have done nothing to change the Plaintiffs

circumstances, knowing other facilities in the state were an option to better accommodate the

Plaintiffs condition, such as Arkansas Valley or Territorial Correctional facilities. Defendants

Archuletta and Wager implementation of the restricted privilege and the new controlled

movement policies at the FCF also is a direct threat to Plaintiffs well being and safety, which

lacks all penological justification and inmates due process, as the FCF is not functioning within

the framework of the CDOC's administrative regulations.

Upon information and belief, after an opportunity for further investigation or discovery,

the CDOC has failed to implement any policy that allows for correct institutional placement of

inmates with serious medical needs, specifically the Plaintiffs needs, or the policies that they

have in place are inadequate, which resulted in Plaintiff being placed at the FCF, without any due

process. The CDOC has also failed to implement a policy that would allow for reasonable administrative responses or remedies to inmates serious medical needs by not employing a medical official to answer Plaintiffs (or any inmates) step 3 medical grievances. Upon information and belief, Defendant DeCesaro has not alerted his superiors about this deficiency in the grievance process and see's nothing wrong with it. This continues to cause Plaintiff an inability to properly manage his disease, physical pain, suffering, and emotional distress because of the FCF's severely restricted movement, which lacks penological justification for a Level III security facility.

## E. PREVIOUS LAWSUITS

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated?  _X_ Yes  __No  (CHECK ONE).  If your answer is "Yes," complete this section of the form.  If you have filed more than one lawsuit in the past, use extra paper to provide the necessary information for each additional lawsuit.  The information about additional lawsuits should be labeled "E. PREVIOUS LAWSUITS."

1.  Name(s) of defendant(s) in prior lawsuit:  Kristofer Runge

     Morgan May

2.  Docket number and court name:  10-cv-00964-ZLW

3.  Claims raised in prior lawsuit:  Punishment of a pretrial detainee in violation of the Fourteenth Amendment to the United States Constitution.

4.  Disposition of prior lawsuit (for example, is the prior lawsuit still pending? Was it dismissed?):  Dismissed for Plaintiffs inability to file a certified inmate account summary

5.  If the prior lawsuit was dismissed, when was it dismissed and why?  Dismissed June 21, 2010

6.  Result(s) of any appeal in the prior lawsuit:  No appeal, Plaintiff decided not to proceed with the lawsuit since he was no longer incarcerated in the Weld County Jail.

## F. ADMINISTRATIVE RELIEF

1.  Is there a formal grievance procedure at the institution in which you are confined?
     _X_ Yes  __No  (CHECK ONE).

2. Did you exhaust available administrative remedies? _X_ Yes __No (CHECK ONE).

## G. REQUEST FOR RELIEF

State the relief you are requesting. If you need more space to complete this section, use extra paper. The additional requests for relief should be labeled "G. REQUEST FOR RELIEF."

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment:

A. Granting Plaintiff a declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States.

B. A permanent injunction against Defendants compelling them to move the Plaintiff to a more suitable prison for his serious medical needs, specifically Colorado Territorial Correctional Facility or Arkansas Valley Correctional Facility, in order to prevent the atypical and significant hardships imposed by the Fremont Correctional Facilities arbitrary and unjustified conditions of confinement, the discrimination Plaintiff has been subject to on a daily basis, the threat posed to Plaintiffs well being and safety, and the unnecessary infliction of pain; or an order directing Defendants to provide reasonable ADA accommodations so Plaintiff can exercise outside his cell when his body allows, not miss meals, and have extra toilet paper at the FCF or any other facility Plaintiff may be sent to; and an order requiring the CDOC to provide Plaintiff an edible certified gluten-free diet that meets USDA guidelines for a grown adult male in conjunction with

nutritional drink supplements (Ensure/Boost) that allow Plaintiff the ability to better manage his disease.

C.      Granting Plaintiff compensatory and punitive damages. Plaintiff seeks these damages against each Defendant, jointly and severally.

D.      Plaintiff also seeks a jury trial on all issues triable by jury.

E.      Plaintiff also seeks recovery of his costs in this suit, and

F.      Any additional relief this Court deems just, proper, and equitable.


**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed on     _12/20/13_
                    (Date)


_____
(Prisoner's Original Signature)

72