IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-CBS

JASON BROOKS,

        Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
DAVID OBA,
PATRICK BLAKE,
ANGIE TURNER,
CORRECTIONS CORPORATION OF AMERICA,
DEBRA FOSTER,
JULIE RUSSELL,
KATHY HOWELL,
TIM CREANY,
PAUL CLINE,
LOU ARCHULETTA,
DAVID TESSIERE,
RICK RAEMISCH,
DOLORES MONTOYA, and
RON WAGER,

        Defendants.

---

ORDER AND OPINION REGARDING DEFENDANTS' MOTION TO DISMISS IN PART
AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Magistrate Judge Shaffer

This matter comes before the court on a Motion to Dismiss in part (doc. #36) filed on

June 13, 2014 by Defendants Colorado Department of Corrections ("CDOC"), Julie Russell,

Kathy Howell, Tim Creany, Paul Cline, Lou Archuletta, David Tessiere, Rick Raemisch, Dolores

Montoya, and Ron Wager (collectively "CDOC Defendants").  Also before the court is

Plaintiff's Motion for Preliminary Injunction (doc #49), filed on August 7, 2014.  Pursuant to the

Order of Reference dated July 1, 2014, this civil action was referred to the Magistrate Judge "for

all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases

to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c).  (*See* Doc. #44).  This court has

carefully considered the motions and related briefing, the entire case file, the comments offered

by the parties during the June 30, 2014 Scheduling Conference and July 17, 2014 Status

Conference, and applicable case law.  For the following reasons, I grant the CDOC Defendants'

Motion to Dismiss with leave to amend the Eighth Amendment medical claim as asserted against

Defendant Tessiere and deny Plaintiff's Motion for Preliminary Injunction.

## FACTUAL ALLEGATIONS

Mr. Brooks, a *pro se* prisoner incarcerated at the Fremont Correctional Facility ("FCF")

in Canon City, Colorado, filed this lawsuit pursuant to 42 U.S.C. § 1983 claiming the CDOC

Defendants as well as Defendants Patrick Blake, David Oba, Angie Turner, and Corrections

Corporation of America ("CCA") (collectively "CCA Defendants") violated his Eighth

Amendment right against cruel and unusual punishment, Fourteenth Amendment right to due

process, First Amendment right for access to the courts, and withheld accommodations in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 *et seq.*.[1]  Plaintiff

seeks declaratory relief, injunctive relief, and monetary relief in an unspecified amount.[2]

Plaintiff suffers from chronic ulcerative colitis, which causes inflammation and ulceration

of the large intestine.  Plaintiff endures symptoms ranging from weight loss and dehydration to

intestinal bleeding, rectal bleeding, severe abdominal pain, and muscle atrophy, and is plagued

by the persistent need to use the restroom which can result in his taking up to thirty bathroom

---

[1] The CCA Defendants are not subject to this Order and Opinion.  Hereafter, the CDOC Defendants will be referred to simply as "Defendants."

[2] Specifically, Plaintiff asks for declaratory judgment that his constitutional rights have been violated, an order compelling Defendants to transfer him to Colorado Territorial Correctional Facility, Arkansas Valley Correctional Facility, or any other "more suitable prison for his serious medical needs" (doc. #11), and compensatory and punitive damages.

trips a day.  (*See* Doc. #11 at p. 13).  Plaintiff believes his condition can be managed with

"appropriate medications, dietary supplementation, and exercise."  (Doc. #11 at p. 13).  Plaintiff

was diagnosed with ulcerative colitis prior to entering the custody of CDOC in 2009, at which

time he measured 6 feet, 3 inches and weighed 143 pounds.  (*See* doc. #51 at ¶ 9, doc. #51-1 at ¶

16).

Plaintiff was suffering from aggravated symptoms of ulcerative colitis when he was

transferred to Bent County Correctional Facility ("BCCF") in May 2010.  Plaintiff saw

Defendant Oba in March 2011 after multiple requests to see a doctor, and was prescribed a

gluten-free diet.[3]  (Doc. #11 at p. 20).  Plaintiff alleges in his Motion for Preliminary Injunction

that Defendant Oba also prescribed "ensure supplemental shakes" at this time.  (Doc. #49 at pp.

1-2).  Plaintiff was held at BCCF for approximately 20 months, during which time he claims he

received woefully inadequate dental care and treatment for his medical condition.[4]

Plaintiff was transferred from BCCF to Colorado Territorial Correctional Facility

("CTCF") on February 9, 2012 and then to FCF on February 14, 2012.  (Doc. #11 at pp. 33, 34).

Plaintiff alleges he arrived at FCF in a debilitated state of health because he had not received a

gluten-free diet while at CTCF.  (*Id.* at p. 34).  Plaintiff weighed 150 pounds at this time.  (Doc.

#51 at ¶ 12, Doc. #51-1 at ¶¶ 21, 25).  Pursuant to FCF policy, upon arrival Plaintiff was placed

under "lock down" in a holding cell for twenty-three hours daily for four to eight days while the

prison registered him as an inmate.  (Doc. #11 at p. 34).  Following this process, and pursuant to

FCF policy, Plaintiff was then kept under lock down until he received a work assignment.

Plaintiff alleges that as a result, he could not prepare his own meals and was required to eat

---

[3] Plaintiff alleges he is allergic to gluten and it exacerbates the ulcerative colitis.  (*See* doc. #11 at p. 19; doc. #49 at pp. 1-2).

[4] The allegations concerning Plaintiff's incarceration at BCCF implicate the CCA Defendants.  (*See* doc. #11 at pp. 14-29).

glutinous food that caused his intestine to bleed.  Defendant Creany, the doctor at FCF who treated Plaintiff for ulcerative colitis, prescribed Prednisone to stop the internal bleeding. Plaintiff alleges he had no choice but to accept the medicine, though Prednisone causes joint pain and other adverse side effects in someone with chronic ulcerative colitis.  (*See* doc. #11 at p. 35). Plaintiff began receiving a gluten-free diet on February 22, 2012, approximately one week after he arrived at FCF (*id.* at p. 37), and he was assigned a job in the prison's kitchen on March 30, 3012, approximately six weeks after arriving at FCF.  (*Id.* at p. 42).

On February 27, 2012, Plaintiff began filing grievances regarding the prison's medical treatment.  He complained that "[t]he attempted results of trying to treat my condition thus far have left me incontinent, bleeding, unable to sleep, unable to go to chow, unable to clean myself properly…I should not be in general population being this sick…I need to be put into a cell by myself."  (Doc. #11 at pp. 38-9).  He did not receive a response.  At this time, Plaintiff also began requesting special drinks such as "Boost" and "Ensure" to supplement his gluten-free diet, extra toilet paper, and special passes that would allow him to exercise and eat at undesignated times.  (*Id.* at pp. 37, 38, 39).  Pursuant to this request, Defendant Montoya, former Health Services Administrator at FCF, authorized a medical pass in March 2012 that allowed Plaintiff to access the cafeteria if he missed a meal due to his condition.  (*Id.* at p. 39).  The medical pass expired after a few months and Defendant Montoya refused to re-issue the pass, or authorize a medical pass allowing Plaintiff to exercise outside of designated times.  Defendants Russell, Howell, Creany, Cline, and Tessiere also refused to supply Plaintiff with extra toilet paper.

Plaintiff alleges his condition worsened during March and April 2012 because he did not receive nutritional supplements, his pain medication expired, and his prison job working in the

kitchen exacerbated his symptoms.  Plaintiff weighed between 144 pounds and 136 pounds in March 2012.  (*Id.* at pp. 40, 42).

On April 2, 2012, Plaintiff undertook a 72-hour trip to visit Dr. Vahil, a gastronentologist, who recommended removing Plaintiff's large intestine.  (Doc. #11 at p. 43). Thereafter in April 2012, Plaintiff began receiving Ensure per instruction from Defendant Howell, the CDOC Regional Director of Clinical Services, to Defendant Creany.  Later that month, Defendant Creany revised Plaintiff's medical rating, which allowed Plaintiff to obtain a prison job that was more compatible with his condition.   At the end of April 2012, CDOC surgeon, Dr. Tim Brown, recommended that Plaintiff undergo a proctocolectomy and temporary ileostomy.  (Doc. #11 at p. 45).  Plaintiff met with Defendant Creany in May 2012, to ask for another visit with Dr. Vahil to discuss alternative surgeries and treatments.

On June 8, 2012, Plaintiff attended a meeting with Defendants Creany, Montoya, and Howell, among other case managers, captains, and doctors, which was "specifically held to address Plaintiffs [sic] medical needs, as a response to his and his families [sic] concerns."  Doc. #11 at p. 47).  Plaintiff alleges that despite this meeting none of his concerns were addressed.  In July 2012, Plaintiff received medication prescribed by Dr. Vahil and his condition "dramatically improved."  *Id.* at p. 48.  Plaintiff claims that his improvement notwithstanding, he still required a special meal and exercise pass and extra toilet paper, which Defendants refused to provide.  *Id.* A November 19, 2012 blood test ordered by Dr. Vahil suggested that Plaintiff has Chron's disease.[5]

---

[5] "Chron's disease is a chronic inflammatory disease involving any part of the gastrointestinal tract that frequently leads to intestinal obstruction and fistula and abscess formation."  *Wallace v. Astrue*, No. 11-cv-287-PJC, 2012 WL 4052533, at *2 n. 3 (N.D. Okla. September 13, 2012) (citing *Dorland's Illustrated Medical Dictionary* 514 (29th ed. 2000)).

Plaintiff received a gluten-free diet and Ensure without issue until spring of 2013, when CDOC reconfigured the prison system's gluten-free diet, allegedly rendering the meals "inedible" and "calorically insufficient." (Doc. #11 at p. 51, Doc. #49 at ¶ 4). Plaintiff complained about the new diet to Defendant Creany, who arranged for Plaintiff to see FCF's registered dietician, Deborah Cranor, on May 6, 2013. (Doc #49 at ¶ 5, *see also* Doc. #11 at p. 51). Ms. Cranor reported that Plaintiff's ideal body weight is 190 pounds with a nineteen pound variance, and recommended that Plaintiff drink Ensure "if diet and snacks alone aren't enough to stabilize weight." (Doc. #49 at ¶ 6 and p. 18, *see also* Doc. #11 at p. 51). Plaintiff alleges that notwithstanding Ms. Cranor's recommendation, Defendant Tessiere, the Health Services Administrator at FCF, determined Plaintiff did not qualify for Ensure and instructed Defendant Creany not to supply it. (Doc. #11 at p. 51). Plaintiff met with nurse practitioner Sheryl McKim on May 21, 2013 to discuss his dietary needs and Ms. McKim advised Plaintiff that he "will probably be prescribed the ensure supplemental shakes at his next appointment in June." (*See* doc. #49 at ¶ 9 and p. 20). In August 2013, Defendant Creany again told Plaintiff that Defendant Tessiere had said Plaintiff "does not qualify for [Ensure]," but would authorize the supplemental shakes if Dr. Vahil recommended them. (Doc. #49 at ¶ 13).

Plaintiff's next visit with Dr. Vahil occurred almost one year later, on June 10, 2014, where Dr. Vahil ordered that Plaintiff receive "a gluten-free diet with ensure, one can of ensure three times daily." (Doc. #49 at ¶ 16; Doc. #49-1 at p. 2). Plaintiff began receiving a gluten-free diet plus Ensure drinks on July 21, 2014. (Doc. #49 at ¶ 19). Plaintiff alleges that after only two days the specialized diet was withheld because "Defendant Tessiere allowed another nurse practitioner, Trudy Sicotte, the ability to undermine [] orders, and she [took] away the diet and ensure without excuse." (*Id.* at ¶ 20). Plaintiff also alleges that Defendant Tessiere "has

exercised no control over his medical staff's egregious decisions or acknowledges how ridiculous they are; he's [sic] seems to be completely absent or totally incompetent in performing any of his job duties." (*Id.* at ¶ 21).

## PROCEDURAL BACKGROUND

Plaintiff filed his Complaint on October 23, 2013 (doc. #1), and simultaneously filed a motion for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 (doc. #3) and a motion for preliminary injunction (doc. #4). On October 24, 2013, the court granted Plaintiff's § 1915 motion (doc. #5) and ordered Plaintiff to file an amended complaint that complied with Fed. R. Civ. P. 8.[6] (Doc. #6). Plaintiff moved for appointment of counsel on November 8, 2013 (doc. #7). On November 13, 2013, the court denied Plaintiff's request for appointment of counsel and motion for preliminary injunction. (Doc. #8). On November 22, 2013, the court granted Plaintiff's motion for an extension of time to amend his complaint (doc. #10 and doc. #9), and on December 26, 2013, Plaintiff filed a 72-page Amended Complaint asserting thirteen claims (doc. #11). On March 18, 2014, the court dismissed Plaintiff's seventh and tenth claims as legally frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B),[7] thereby dismissing Defendants DeCesaro and Brown from this lawsuit. (Doc. #14).

Defendants waived service on March 24, 2014, with the exception of Ms. Foster and Ms. Montoya, who are no longer employed by CDOC (doc. #19). Defendant Montoya was personally served on April 9, 2014. (*See* Doc. #31). To date, Ms. Foster has not been served.

---

[6] The court also noted that Plaintiff could not hold prison personnel or CCA liable on a theory of respondeat superior and could not sue CDOC for money damages. *Id.*

[7] Plaintiff's seventh claim averred that Defendant Anthony DeCesaro violated his Eighth Amendment right against cruel and unusual punishment by denying his 38 grievances and over 100 pages of complaints without alerting DeCesaro's superiors and by failing to endeavor to relieve Plaintiff's pain, and violated the ADA by failing to provide reasonable accommodations. Plaintiff averred in his tenth claim that Defendant Yvette Brown violated his First Amendment right to access the courts by limiting his library access to two and a half hours a week until October 15, 2013 (when CDOC policy changed), imposing a 30-page printing limit, and requiring Plaintiff to type his Amended Complaint anew because his original Prisoner Complaint had been deleted from the computer system pursuant to CDOC policy. This claim alone asserted a First Amendment violation.

The CCA Defendants waived service on April 2, 2014 (doc. #25).  On May 20, 2014, Defendants requested an extension of time to respond to the Amended Complaint (doc. #32), which this court granted on May 21, 2014 (doc. #33).   The CCA Defendants filed an Answer to the Amended Complaint on May 27, 2014 (doc. #34), along with CCA's corporate disclosure statement (doc. #35).

Defendants filed a Motion to Dismiss the Amended Complaint in part and an Answer on June 13, 2014.  (Doc. #36 and #37).  This court held a Scheduling Conference on June 30, 2014, at which the undersigned set a date for a status conference and stayed discovery pending the briefing of the Motion to Dismiss.  (Doc. #41).   Defendants and CCA Defendants filed their written consent to the Magistrate Judge's jurisdiction on June 30, 2014 (doc. #43), and Plaintiff filed his consent on July 22, 2014 (doc. #47).   Plaintiff filed his Response to the Motion to Dismiss on July 14, 2014 (doc. #45).   This court held a Status Conference on July 17, 2014, at which the undersigned continued the stay on discovery pending this court's decision on the Motion to Dismiss.  (Doc. #46).  Defendants filed a Reply in support of their Motion to Dismiss on July 28, 2014 (doc. #48).   Plaintiff filed a Motion for Preliminary Injunction on August 7, 2014 (doc. #49), asking the court to order CDOC to provide him with "an acceptable gluten-free diet *and* ensure nutritional supplements."   The CCA Defendants filed a Response to the Motion for Preliminary Injunction on August 27, 2014 (doc. #50), and Defendants filed a Response on August 28, 2014 (doc. #51).   Between September 8, 2014 and September 17, 2014, Mr. Brooks as well as non-parties Kavin Smith, Troy Brownlow, James Hunt, and Cesar Briones Madrid submitted declarations in support of Plaintiff's Motion for Preliminary Injunction.  (*See* doc. #52-57).   On October 10, 2014, Mr. Brook's mother, non-party Vayah Terra, submitted a declaration in support of the Motion for Preliminary Injunction (doc. #58).

## STANDARD OF REVIEW

**A.      Fed. R. Civ. P. 12(b)(1) and 12(b)(6)**

Federal courts, as courts of limited jurisdiction, must have a statutory basis for their jurisdiction.  *See Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994).   Pursuant to Federal Rule of Civil Procedure 12(b)(1), the court may dismiss a complaint for lack of subject matter jurisdiction.  The determination of a court's jurisdiction over subject matter is a question of law.  *Madsen v. United States ex. U.S. Army, Corps of Engineers*, 841 F.2d 1011, 1012 (10th Cir. 1987).   "A court lacking jurisdiction cannot render judgment but must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir. 1974).

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).   In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).   "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp.*, 550 U.S. at 556).  The ultimate

duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Because Mr. Brooks is appearing *pro se*, the court "review[s] [his] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States Govt*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). However, a court may not assume that a plaintiff can prove facts that he has not alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *See Gallagher v. Shelton*, 587 F.3d 1063, 1067 (10th Cir. 2009) ("[Court's] role is not to act as [*pro se* litigant's] advocate"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) ("the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues") (internal citation omitted).   Furthermore, the court may, at any time and of its own accord, dismiss any action that is frivolous or which fails to state a claim upon which relief may be granted.   28 U.S.C. § 1915(e)(2)(B)(ii); Fed. R. Civ. P. 12(b)(6); *Hall v. Bellmon*, 935 F.2d 1106, 1108-10 (10th Cir. 1991).

## B.    Injunctive Relief

To succeed on a motion for a preliminary injunction under Fed. R. Civ. P. 65, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.   *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).   "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."    *Beltronics USA, Inc. v. Midwest Inventory*

*Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotations omitted).  Granting such "drastic relief," *United States ex. rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

Three types of preliminary injunctions are disfavored: injunctions that alter the status quo; mandatory injunctions; and injunctions that afford the movant all the relief he could recover following a full trial on the merits.  *Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Horne,* 698 F.3d 1295, 1301 (10th Cir. 2012).  In seeking these types of relief, the movant must show that the factors cited above "weigh heavily and compellingly in [his] favor." *Id.* Finally, Title 18 U.S.C. § 3626(a)(2) requires that, "[i]n any civil action with respect to prison conditions," any "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."

## ANALYSIS

### A.   Motion to Dismiss

#### 1.   Eleventh Amendment Immunity

Plaintiff is suing Defendants Russell, Howell, Creany, Cline, Archuletta, Tessiere, and Wager in their official and individual capacities.  Plaintiff is suing Defendant Raemisch in his official capacity only and Defendant Montoya in her individual capacity only.  Those Defendants sued in their official capacity are immune from claims for monetary damages and retroactive equitable relief.  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt,*

469 U.S. 464, 471–72, (1985)).  The Eleventh Amendment bars suits against a state by its own citizens, and immunizes state defendants sued in their official capacities from liability for damages or equitable relief.  *See Johns v. Stuart,* 57 F.3d 1544, 1552 (10th Cir. 1995). Furthermore, state employees acting in their official capacities are not "persons" subject to suit under § 1983.  *Duncan v. Gunter,* 15 F.3d 989, 991 (10th Cir. 1994).  Accordingly, Plaintiff cannot pursue a § 1983 claim for damages or declaratory relief against the CDOC Defendants who are sued in their official capacity.

2.     Eighth Amendment Claims

Title 42 U.S.C. § 1983 allows an injured person to seek damages for the violation of his or her federal rights against a person acting under color of state law.  *See* 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988).  "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted).  "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from bodily harm."  *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008) (citation omitted).  The Eighth Amendment also prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  Prison officials may be liable for an Eighth Amendment violation for "indifference…manifested…in their response to the prisoner's needs or by…intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed."  *Estate of Booker v. Gomez,* 745 F.3d 405, 429 (10th Cir. 2014).

"The test for constitutional liability of prison officials involves both an objective and a subjective component." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and citation omitted).  First, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"  *Id.* (quoting  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (holding that even a physician's grossly negligent medical judgment is not subject to scrutiny if the prisoner's need for medical treatment was not obvious) (internal quotations and citation omitted).  Furthermore, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted).  The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."  *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted).

Second, under the subjective component, the prisoner must establish deliberate indifference to his serious medical needs by "present[ing] evidence of the prison official's culpable state of mind."  *Mata*, 427 F.3d at 751.  "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (internal quotation and citation omitted).  The Tenth Circuit recognizes two types of conduct constituting deliberate indifference.  The first occurs when a medical professional fails to properly treat a serious medical condition; the second occurs when a prison official prevents an inmate from receiving treatment or denies him access to medical personnel capable of providing treatment.  *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000) (internal citations

omitted).   A prison health official who serves "'solely…as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill the gatekeeper role.'"  *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211.  The subjective standard requires a state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm."  *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837) (internal quotations and further citation omitted).   "'[A]n inadvertent failure to provide adequate medical care' does not rise to a constitutional violation."  *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Estelle*, 429 U.S. at 105–06).  The plaintiff must allege that defendants personally participated in the Eighth Amendment violation.  *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (citing *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976)).   "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Self*, 439 F.3d at 1231 (internal quotations omitted).

Mr. Brooks claims he suffered cruel and unusual punishment at FCF resulting from various Defendants' failure to authorize (1) an adequate gluten-free diet; (2) extra toilet paper; and (3) passes that would allow him to eat and exercise at undesignated times.  Plaintiff claims additional violations of his Eighth Amendment rights resulting from policies implemented at FCF by Defendants Archuletta and Wager, Defendant Cline's decision to transfer him to FCF, and the CDOC's failure to properly train its employees in ADA law.  Defendants argue that Plaintiff has not demonstrated a serious medical need, has not established that Defendants Tessiere, Archuetta, and Wager acted with deliberate indifference, and has not alleged that Defendants Howell, Russell, Wager, Archuletta, Cline, and Tessiere personally participated in a

constitutional violation.    At this stage in the litigation the court must "accept as true all well-pleaded factual allegations" and view those allegations "in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).

a.    Plaintiff's Dietary Needs

Mr. Brooks alleges he cannot maintain a healthy weight eating the CDOC-sanctioned gluten-free diet without supplemental nutrition in the form of Ensure.  Plaintiff is forced to eat glutinous foods to maintain a healthy weight, which aggravates his ulcerative colitis and causes him constant pain and discomfort.   Specifically, Plaintiff suffers from internal bleeding, controlled only by pain medication that weakens his joints; incessant urges to use the bathroom that prevent him from obtaining regular meals, exercise, and sleep; and severe dehydration. These allegations establish that Plaintiff has a sufficiently serious medical need for a specific diet.

Plaintiff does not state in the Amended Complaint how long he received Ensure after it was first provided in April 2012 or why the provision ended.   However, Plaintiff resumed requesting the supplemental drink in May 2013 and Tessiere allegedly refused to authorize it on the basis that Plaintiff did not qualify.   (Doc. #11 at p. 51).   This alone is insufficient to demonstrate that Tessiere consciously disregarded a substantial risk to Plaintiff's health or abdicated his duty as gatekeeper.  *See Mata*, 427 F.3d at 751 (citing *Sealock*, 218 F.3d at 1211). *See also* Estelle, 429 U.S. at 104–105 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care").   Deliberate indifference lies where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Self*, 439 F.3d at 1231 (quoting *Farmer*, 511 U.S. at 837) (internal quotations omitted).

This court declines to take judicial notice *sua sponte* of allegations asserted in Plaintiff's Motion for Preliminary Injunction (*see U.S. v. Smalls*, 605 F.3d 765, 768 n. 2 (10th Cir. 2010) (instructing that a court may take judicial notice of district court filings)), though notes that certain allegations contained therein are relevant to the subjective component of Plaintiff's Eighth Amendment medical claim.  Therefore Defendants' Motion to Dismiss in part is granted with leave to amend as to the medical claim raised against Defendant Tessiere.  Plaintiff is also given leave to add nurse practitioner Sicotte as a defendant should he choose to file a Second Amended Complaint.

b.      Specialized Meal and Exercise Passes, and Extra Tissue

Plaintiff claims Defendants Russell, Howell, Cline, Creany, Montoya, and Tessiere refused to authorize these special items, which were necessary for him to accommodate the symptoms caused by his ulcerative colitis.  Plaintiff sought the meal pass so that he could eat before or after designated times in the event he was too ill to attend meals.  Though he appears to have requested the pass as a preventative caution (*see* doc. #11 at p. 39), he also alleges he missed "hundreds of meals" as a result of his medical condition (*see* doc. #11 at p. 56). Defendant Montoya authorized the meal pass on March 5, 2012.  (*Id.* at p. 39).  Plaintiff asked Montoya to renew the pass in June 2012, and she declined.  (*Id.* at p. 47).  Plaintiff began receiving a medical diet in February 2012, two weeks after he arrived at FCF, and began receiving Ensure in April 2012, two months after he arrived at FCF.  (Doc #11 at pp. 37, 43-44). Therefore, by June 2012 he was receiving a gluten-free diet plus supplemental drinks.  Plaintiff

does not allege why his ulcerative colitis caused him to continue to miss meals if he was receiving his requested medical diet.

Plaintiff alleges that his condition periodically prevented him from engaging in recreation during the designated hours.  However, he does not allege that he was wholly prevented from exercising as a result of Defendants' refusal to authorize a special pass.  Denial of a flexible exercise schedule does not give rise to an Eighth Amendment violation.  *See Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (holding that an allotted one hour per week in an outdoor exercise facility, while restrictive, did not in and of itself rise to level of an Eighth Amendment violation; and, recognizing that courts have not deemed the denial of fresh air and exercise to be a "per se" Eighth Amendment violation); *cf. Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir. 1992) ("[A] total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees.") (citations omitted).  Moreover, on May 6, 2013, Ms. Cranor recorded that Plaintiff has "[e]nergy to work out daily – primarily weights with basketball at times."  (Doc. #49 at p. 18).  While "no precise standards have been set forth delineating what constitutes constitutionally sufficient opportunities for exercise," *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994) *abrogated on other grounds by Lewis v. Casey,* 518 U.S. 343 (1996), it is clear from Plaintiff's allegations that he regularly participates in some exercise.

Finally, Plaintiff claims extra toilet paper is necessary to accommodate his increased need to use the restroom arising from the unmanaged ulcerative colitis.  Plaintiff does not allege, however, that Defendants refused toilet paper altogether or that the lack of additional toilet paper resulted in serious injury.  *See Whittington v. Ortiz*, 472 F.3d 804, 808 (10th Cir. 2007) ("A deprivation of hygiene items without any corresponding injury would not state an Eighth

Amendment violation.") (citation omitted).  He claims only that he did not receive his preferred allotment of tissue.  Accordingly, Defendants' failure to authorize additional toilet paper did not result in a sufficiently serious deprivation.

Defendants' Motion to Dismiss in part is granted as to the Eighth Amendment conditions of confinement claims with leave to amend as to why Plaintiff required a meal pass after he began receiving his medical diet plus supplements.

c.      FCF Policies

Plaintiff alleges that Defendants Archuletta and Wager, the respective Warden and Assistant Warden of FCF, implemented several policies that violated the Eighth Amendment prohibition against cruel and unusual punishment.  Pursuant to these policies, each inmate is confined to his cell 24 hours a day for four to eight days upon transfer to FCF.  Thereafter, offenders without work assignments are confined to their cells forty hours each week while their fellow inmates report to prison jobs.  The inmates are allowed two continuous hours of recreation per day, though the facility does not provide a scheduled interval during which inmates can return to their cells.  Plaintiff claims the lock down policies prevented him from engaging in adequate exercise when he arrived at FCF and the recreation policy prevents him from returning to his cell if his symptoms so demand.

"[Section] 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by the Constitution....'" *Dodds v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983).  Thus, "'the establishment or utilization of an

unconstitutional policy or custom can serve as the supervisor's affirmative link to the constitutional violation....[W]here an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application.'" *Dodds,* 614 F.3d at 1199 (quoting *Davis v. City of Aurora,* 705 F. Supp. 2d 1243, 1263–64 (D. Colo. 2010)) (internal quotations omitted). For a plaintiff to succeed under this theory, he must demonstrate: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.*

Pursuant to the policies, Plaintiff spent forty-five days in lockdown when he arrived at FCF. (Doc. #11 at p. 61). He does not allege that all exercise was unavailable during this time, or that a physician ordered him to engage in a certain amount of exercise. Plaintiff has established a serious medical need for a specialized diet, not for a specific exercise regimen. However, even if I found that the lock down and recreation policies subjected Plaintiff to the unnecessary and wanton infliction of pain, he has not alleged that Archuletta and Wager acted with deliberate indifference to his medical needs. *See Farmer*, 511 U.S. at 847 (A prison official acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."). Plaintiff argues he wrote Archuletta and Wager a letter explaining his concerns and they "continue[d] to maliciously, wantonly, and recklessly allow Plaintiff to suffer further by doing nothing and allowing these unjustified conditions of confinement to continue." (Doc. #11 at pp. 62-63). These allegations do not establish that Archuletta and Wager consciously disregarded a substantial risk that Plaintiff would suffer harm. Furthermore, they fail to establish that these

Defendants personally participated in a constitutional violation. *See Davis v. Arkansas Valley Corr. Facility,* 99 Fed. Appx. 838, 843 (10th Cir. 2004) (holding defendant warden was not implicated under § 1983 merely because plaintiff copied him on correspondence outlining complaints about medical care); *see also Crowder v. Lash*, 687 F.2d 996, 1005-6 (7th Cir. 1982) (rejecting theory that defendant prison official should be held liable for constitutional violations on the basis that plaintiff had informed him personally and by letter of the "deprivations [plaintiff] had encountered."); *Doyle v. Cella,* 2008 WL 4490111, at *2 (D. Colo. Sept. 30, 2008) (finding plaintiff's allegation that defendant warden was "made aware" of constitutional violations insufficient to establish personal participation of the defendant); *Watson v. McGinnis,* 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.") (internal citations omitted).

Finally, there is no evidence that the FCF policies are unconstitutional. "'[W]here the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the [government], and the causal connection between the policy and the constitutional deprivation.'" *Anglin v. City of Aspen*, 562 F. Supp. 2d 1304, 1324 (D. Colo. 2008) (quoting *Okla. City v. Tuttle,* 471 U.S. 808, 824 (1985) (internal quotations omitted). Plaintiff's allegations would not satisfy this requirement even if he had alleged a constitutional deprivation.

###### d.   Transfer from BCCF to FCF

Mr. Brooks claims Defendant Cline acted with deliberate indifference to his medical needs when Cline transferred him from BCCF to FCF, and failed to transfer him out of FCF despite his "pain, suffering, and emotional distress." (Doc. #11 at p. 61). Plaintiff further claims that Cline did not communicate to his superiors concerns expressed by Plaintiff's mother.

Plaintiff alleges in his Amended Complaint that FCF is an unsuitable facility due to its mandatory lockdown and recreation policies that periodically prevent him from partaking in exercise. This cannot serve as the basis for an Eighth Amendment violation because Plaintiff has not established a serious need for a specific amount of exercise, nor has he alleged that exercise is so limited as to give rise to cruel and unusual circumstances. Plaintiff has serious dietary needs as a result of his ulcerative colitis, though his symptoms appear to be manageable if he can adhere to a stringent diet. Plaintiff has not alleged that FCF barred prisoners from receiving special diets or restricted certain foods, or that he was under physician's orders to receive treatment that was not available at FCF. Defendant Tessiere's refusal to authorize Ensure prior to a doctor's order is unrelated to FCF's suitability as a facility. Therefore, Plaintiff has not demonstrated that the conditions of his confinement at FCF are sufficiently serious

Moreover, Plaintiff has not alleged that Defendant Cline acted with deliberate indifference.[8] Even if Cline was aware that Plaintiff required a gluten-free diet plus nutritional supplements (*but see Crowder*, 687 F.2d at 1005 (rejecting theory that defendant prison official should be held liable for constitutional violations on the basis that plaintiff had informed him personally and by letter of the "deprivations [plaintiff] had encountered")), Plaintiff has not shown that Cline knew those provisions were inaccessible at FCF. Indeed, Plaintiff ultimately received a gluten-free diet plus Ensure while at that facility. To the extent Plaintiff experienced pain and suffering at FCF as a result of consuming glutinous foods, he has not alleged that Cline knew prison officials refused to supply the supplemental shakes, or that Cline was personally

---

[8] Plaintiff analogizes his case to *Scott v. Garcia*, 370 F. Supp. 2d 1056, 1065-66 (S.D. Cal. 2005), where the court denied prison officials' motion for summary judgment as to constitutional liability for failure to transfer a prisoner plaintiff with severe stomach and digestive problems. However, in *Scott*, defendants failed to transfer the plaintiff despite a doctor's recommendation on three separate occasions that the plaintiff needed an immediate transfer to an institution with a qualified medical hospital. By contrast Dr. Miller at BCCF observed that Plaintiff was a "healthy patient [with] no medical problems." (Doc. #11 at p. 26).

involved in Defendant Tessiere's failure to authorize Ensure prior to a doctor's order.  Finally, ignoring concerns expressed by Plaintiff's mother does not give rise to an Eighth Amendment violation.  *See Doyle*, 2008 WL 4490111, at *2 (finding plaintiff's allegation that defendant warden was "made aware" of constitutional violations insufficient to establish personal participation of the defendant).

        e.      CDOC

Plaintiff alleges that CDOC violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to train its employees with regard to the ADA.  Section 1983 authorizes injured parties to seek monetary damages for the violation of a constitutional right by a person acting under color of state law.  42 U.S.C. § 1983.  The Department is not a person as contemplated by § 1983.  *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Furthermore, the Department is entitled to Eleventh Amendment immunity for claims seeking monetary damages.  The Department is not immune to suits for prospective injunctive relief (*see id.* at n. 10), however, Plaintiff does not seek such relief here.  (*See* Doc. #11 at pp. 66-67, 71-72).

        3.      <u>Fourteenth Amendment Claim</u>

Plaintiff claims he has a protected interest in being housed at a prison facility that can better accommodate his health needs, and that Defendants violated his Fourteenth Amendment right to due process when they refused to authorize his transfer from FCF.  Though not entirely clear, Plaintiff appears to allege the conditions of confinement at FCF present an atypical and significant hardship because of the policies described above regarding mandatory periods of lock down and daily recreation.

The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law.  An inmate is not entitled to a particular degree of liberty in prison.  *See Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994) (holding prisoner did not have liberty interest in a general population classification) (citation omitted); *see also Meachum v. Fano*, 427 U.S. 215, 224 (1976) (following a valid conviction, "the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.").  Nor does an inmate have a protected interest in being housed in a certain prison facility.  *See Meachum*, 427 U.S. at 216.  "A protected liberty interest only arises from a transfer to harsher conditions of confinement when an inmate faces an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.'"  *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)) (further citation omitted).  *See also Sandin v. Conner*, 515 U.S. 472 (1995) (only liberty interest in prison is freedom from atypical and significant hardship created by restraint, and administrative segregation, in itself, is neither).

The Tenth Circuit has instructed courts to follow a two-fold question in evaluating an inmate's challenge to the conditions of his confinement: "what is the appropriate baseline comparison"; and "how significant must the conditions of confinement deviate from the baseline to create a liberty interest in additional procedural protections."  *Estate of DiMarco v. Wyo. Dept. of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007) (assessing whether inmate's administrative segregation violated a liberty interest).  The court advised that a few key factors are relevant in answering the baseline question, such as whether: "(1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement

are extreme; (3) the placement increases the duration of confinement; and (4) the placement is indeterminate." *Id.* The court subsequently clarified that the *DiMarco* factors are instructive, not dispositive, and the inquiry should consist of "a fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement." *Rezaq*, 677 F.3d at 1012 n. 5.

There can be no question that FCF's lock down policies further the legitimate penological interest of properly documenting each new prisoner upon arrival prior to assimilating him into the general population, and accounting for each prisoner during the day if he does not report to a prison job. FCF's policy regarding exercise similarly furthers a legitimate penological interest. Two hours of recreation is undoubtedly healthier than one; but without an overarching need to provide inmates the option of returning to their cells after one hour, the benefit of allowing prisoners flexibility in leaving recreation is outweighed by the burden of supplying and coordinating the manpower needed to escort prisoners at various times.[9] Indeed, all inmates at FCF are subject to these rules. It is not for this court to question policies designed by prison officials where the benefits of such policies are clear on their face. *See DiMarco*, 473 F.3d at 1342 ("any assessment [of conditions of confinement] must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts.").

Furthermore, the conditions of Plaintiff's confinement are not extreme. He alleges he spent forty-five days in lock down upon arrival at FCF. Once he received a work assignment he was removed from lock down status. Plaintiff's placement at FCF did not increase the duration of his confinement; and while the placement appears to be indeterminate, the mandatory periods

---

[9] Plaintiff does not allege that he cannot access a restroom while at recreation or that he has been prevented from returning to his cell upon request.

of lock down no longer apply to Plaintiff because the prison has processed his paperwork and assigned him to a job. Plaintiff complains that the two-hour periods of recreation are the only opportunities for an inmate to exercise outside of his cell, and that he cannot always attend recreation because of his health. (Doc. #11 at p. 62). However, this court is unaware of, and Plaintiff has not cited, law indicating that the deprivation of a flexible exercise schedule constitutes an atypical and significant hardship. *Cf. Wilkinson*, 545 U.S. at 214 (finding atypical and significant hardship created by daily 23-hour lockdown, solitary dining, no outdoor recreation, and no communication with other inmates). Accordingly, the four *DiMarco* factors weigh against finding a liberty interest.

Finally, to the extent Plaintiff claims the conditions of his confinement were harsher at FCF as a result of an inadequate diet and inconsistent access to medical attention, Plaintiff encountered many of the same problems at FCF as he experienced at BCCF.[10] Plaintiff claims he should have been transferred to Arkansas Valley Correctional Facility or CTCF, but fails to explain why either of those facilities were better equipped to manage his medical condition.[11] Short of stating in conclusory fashion that he experienced an atypical and significant hardship at FCF, Plaintiff does not illustrate how his perceived hardship at that facility was out of proportion to routine prison life, especially considering the short duration of the in-take process and the relatively short period of time before he was assigned a prison job. As for the two-hour recreation period, that "life in one prison is much more disagreeable that in another does not in

---

[10] Plaintiff alleges that while at BCCF, his requests to see a doctor were ignored, medical appointments were frequently canceled, prescriptions were written for ineffective medications, prescriptions were allowed to expire, his nutritional supplements were withheld, he never received a treatment plan for his condition or appropriate pain medication, and he was denied a gluten-free diet. (*See* Doc. #11 at at pp. 14-29).

[11] In fact, Plaintiff alleges he did not receive his prescribed gluten-free diet during the five days he was held at CTCF during his transfer to FCF, and that the glutinous food he ate during that period "began the exacerbation of [his] symptoms." (Doc. #11 at pp. 33-34).

itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred…" *Meachum*, 427 U.S. at 225.

Plaintiff also claims he has experienced denial of due process because CDOC has failed to implement policies that allow for the "correct institutional placement of inmates with serious medical needs." (Doc. #11 at p. 68). However, no particular process was constitutionally due or required because Plaintiff was not deprived of any liberty to which he was entitled. *See Templeman*, 16 F.3d at 371. Nor is the denial of process itself a denial of liberty. *See Olim v. Wakinekona,* 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559, 1570 (10th Cir. 1993). Because Plaintiff had no liberty interest in being housed at a particular prison, the Constitution did not require any particular process to that end.

4. <u>Qualified Immunity</u>

Plaintiff sued Defendants Russell, Howell, Creany, Cline, Archuletta, Tessiere, Wager, and Montoya in their individual capacities. The doctrine of qualified immunity "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal quotation marks omitted). Qualified immunity is an affirmative defense to section 1983 liability (*see Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995)); once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct

was clearly established at the time of the alleged violation." *DeSpain*, 264 F.3d at 971 (quoting *Baptiste*, 147 F.3d at 1255).

I find that Defendants Cline, Archuletta, and Wager are entitled to qualified immunity because Plaintiff has not stated a constitutional claim as to them. To the extent Plaintiff may amend his complaint as to the Eighth Amendment medical claim raised against Defendant Tessiere and the Eighth Amendment confinement claim as to the meal pass, a ruling as to whether Defendants Russell, Howell, Montoya, Tessiere, and Creany are entitled to qualified immunity is premature.

5.      Americans with Disabilities Act

Plaintiff claims that Defendants Russell, Howell, and Tessiere violated the ADA when they failed to supply him with special meal and exercise passes and extra tissue paper. Plaintiff further claims that Defendant Tessiere violated the ADA when he failed to provide him with an adequate gluten-free diet; Defendant Cline violated the ADA by transferring him to FCF and failing to authorize his transfer to a more suitable facility; Defendants Archuletta and Wager violated the ADA by implementing the lock down and recreation policies at FCF; and Defendant CDOC violated the ADA by failing to properly train its employees in ADA law.

Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision extends to discrimination against prisoners. *See Penn. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210 (1998). To state a Title II claim, Plaintiff must allege that "(1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion,

denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citing 42 U.S.C. § 12132) (further citation omitted).  Plaintiff must show that he was qualified to receive the benefits he sought and was denied those benefits based solely on his disability.  *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1144 (10th Cir. 2005).

An individual is qualified as disabled under the ADA if he has a physical or mental impairment that substantially limits one or more major life activities.  *See Holt v. Grand Lake*, 443 F.3d 762, 765 (10th Cir. 2006).  Plaintiff claims the ulcerative colitis is managed with "appropriate medications, dietary supplementation, and exercise" (doc. #11 at p. 13), and alleges significant pain and discomfort when his condition is not properly managed.  However, he has not alleged that ulcerative colitis substantially limits his major life activities; he claims only that his ability to attend regularly scheduled meals and recreation is curtailed when his symptoms are inflamed.

Even if Plaintiff were disabled under the ADA, his allegations do not establish that Defendants denied him services that were provided to other prisoners.  *Cf. Rashad v. Doughty*, 4 Fed. Appx. 558, 560 (10th Cir. 2001) (citing *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) for the proposition that an HIV-positive prisoner may have stated an ADA claim by alleging he was denied services provided to other prisoners).  Plaintiff eats and exercises regularly and receives the same allotment of toilet paper as all inmates; the special passes and additional tissue Plaintiff requested would have provided him greater access than what was available to the other prisoners.  Plaintiff's allegations regarding his transfer to FCF, the implementation of certain policies at FCF, and the training of CDOC employees in ADA law similarly do not establish that Defendants prevented him from partaking in activities or services

that were available to other inmates.  As for Plaintiff's difficulty in procuring a gluten-free diet plus Ensure, "failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation." *Rashad*, 4 Fed. Appx. at 560 (citing *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996)) (concluding that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" and that the statute "does not create a remedy for medical malpractice").   While the delay in providing the gluten-free diet may constitute negligence, "negligence alone cannot support a Title II claim."  *Morris v. Kingston,* 368 Fed. Appx. 686, 690 (7th Cir. 2010).   Nor has Plaintiff alleged that Defendants acted with a discriminatory motive in denying him the accommodations he requested.  *See Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (instructing that discriminatory motive must be a "determining factor" in defendants' actions).  Damages under the ADA are available only if a public official intentionally discriminates because of a disability. *See Garcia v. S.U.N.Y. Health Services Center of Brooklyn*, 280 F.3d 98, 111-12 (2d Cir. 2001).

Finally, Mr. Brooks cannot sue Defendants in their individual capacities for liability under the ADA.  *See Butler v. City of Prairie Village, Kansas,* 172 F.3d 736, 744 (10th Cir. 1999) (noting that the reasons for precluding individual liability under Title VII apply equally to ADA). *Cf. Sindram v. Merriwether,* 507 F. Supp. 2d 7, 11–12 (D.D.C. 2007) and cases cited therein.  "[T]he proper defendant in a Title II claim is the public entity itself or an official acting in his or her official capacity."  *Hicks v. Keller,* No. 11–cv–0422–WJM–KMT, 2012 WL 1414935, at *6 (D. Colo. April 24, 2012).   Any ADA claims against Defendants in their individual capacities must be dismissed.

**B.     Preliminary Injunction**

Plaintiff filed a Motion for Preliminary Injunction (doc. #49) on August 7, 2014. Plaintiff alleges therein that he continues to receive inadequate health care at FCF; specifically, Dr. Vahil prescribed Ensure for him, he subsequently received the drink for only two days, and he is unable to maintain a healthy weight consuming only the gluten-free diet.   Plaintiff asks the court to order CDOC employees to supply him with "an acceptable gluten-free diet *and* ensure nutritional supplements."

A party seeking preliminary injunctive relief must satisfy four factors: a likelihood of success on the merits; a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in the movant's favor; and that the injunction is in the public interest.  *RoDa Drilling Co.*, 552 F.3d at 1208.  Plaintiff must show that these four factors "weigh heavily and compellingly in [his] favor," because he is seeking a mandatory injunction and the same relief he would be entitled to should he prevail on the merits.  *See Fundamentalist Church of Jesus Christ of Latter–Day Saints*, 698 F.3d at 1301 (citation omitted).

Plaintiff's Motion for Preliminary Injunction implicates only Defendants Tessiere and Creany and non-party Sicotte.   Plaintiff is not entitled to injunctive relief as to Defendant Tessiere because he has not shown a likelihood of success on the merits as to the constitutional claims brought against Tessiere.   Defendant Creany did not move to dismiss the constitutional claims raised against him; however, he is no longer employed at FCF and no longer responsible for ordering the shakes.  (*See* doc. #49 at p. 8).  Furthermore, Plaintiff's allegations demonstrate that Ms. Sicotte is the individual responsible for withholding the Ensure shakes from Plaintiff despite Dr. Vahil's recommendation and Tessiere's authorization.  While Ms. Sicotte's non-party

status does not on its own preclude this court from issuing an injunction directed at her, "it nevertheless heightens the hurdle that must be cleared to obtain the injunction: not only must the motion advance considerations satisfying the traditional injunction factors ... but those considerations must also constitute ... 'appropriate circumstances' ... to justify issuing an injunction against a non-party." *Andrews v. Andrews*, 160 Fed. Appx. 798, 799-800 (10th Cir. 2005) (quoting *United States v. New York Telephone Co.,* 434 U.S. 159 (1977)).

I need not address whether appropriate circumstances exist because I find that Plaintiff has not made a compelling showing that he is likely to suffer irreparable harm in the absence of preliminary relief. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotations and citations omitted). Irreparable harm is defined as something greater than "merely serious or substantial harm," and the moving party "must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* Defendant Creany attests that in August 2013, Plaintiff weighed 158 pounds, trained with weights twice a week, played softball twice a week, and believed that his condition had improved significantly. (Doc. #51 at ¶ 34, Doc. #51-1 at ¶ 63). At this time, Plaintiff purportedly expressed to Defendant Creany his dislike for the gluten-free diet and asked that Ensure drinks be supplied to him. (*See id.* at ¶ 35, Doc. #51-1 at ¶¶ 64, 65). Creany explained that he did not think Ensure was medically necessary given Plaintiff's current state of health. Plaintiff responded that he would assume responsibility for managing his gluten intake and asked to receive a standard diet, which was thereafter provided.[12] (*See id*. at ¶¶ 35-36, Doc. #51-1 at ¶ 65). Between April 2014 and June 2014, Plaintiff reported success in managing his

---

[12] Defendant Creany also attests that he ordered a 30-day supply of Ensure for Plaintiff in March 2012 to prevent weight loss, and that Plaintiff failed to retrieve the shakes from the clinic, stating it was "bull shit" that he had to wait several minutes to be helped. (Doc. #51 at ¶ 18, Doc. #51-1 at ¶¶ 31, 33).

condition, and Dr. Vahil noted that the ulcerative colitis had improved significantly.  (*See* doc. #51 at ¶¶ 39, 41, Doc. #51-1 at ¶¶ 69, 72).  In light of evidence that Plaintiff voluntarily forwent his prescribed medical diet over a year ago, maintains a reasonable weight for his body mass index, is not malnourished according to laboratory reports, continues to eat the standard diet, and expressed satisfaction with the management of his condition as recently as April 2014 (doc. #51 at ¶¶ 49, 72, 73, doc. #51-1 at ¶¶ 69, 77, doc. #51-2 at p. 33, and doc. #51-3 at ¶¶ 23, 31), I cannot find that Plaintiff is in imminent danger of irreparable harm.  Accordingly, Plaintiff's Motion for Temporary Restraining Order is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss in part (doc. #36) is GRANTED, and Plaintiff's Motion for a Preliminary Injunction (doc. #49) is DENIED.  Plaintiff may file a second amended complaint within 30 days of the date of this Order and Opinion.

DATED at Denver, Colorado, this 17th day of October, 2014.

BY THE COURT:

s/Craig B. Shaffer
United States Magistrate Judge