FILED
United States Court of Appeals
Tenth Circuit

September 8, 2021

Christopher M. Wolpert
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| JASON BROOKS,<br><br>Plaintiff - Appellant,<br><br>v.<br><br>COLORADO DEPARTMENT OF CORRECTIONS; JULIE RUSSELL; KATHY HOWELL; DAVID TESSIER,<br><br>Defendants - Appellees. | No. 19-1390 |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:13-CV-02894-SKC)**

---

Angela Boettcher* and Aja Robbins,** Boulder, Colorado (Matthew Cushing, Matthew Cushing PLLC, Boulder, Colorado, on the briefs), for Plaintiff - Appellant.

Karen Lorenz, Assistant Attorney General (Philip J. Weiser, Colorado Attorney General, with her on the brief), Colorado Department of Law, Ralph L. Carr Judicial Center, Denver, Colorado, for Defendants - Appellees.

---

*Angela Boettcher argued on behalf of Appellant, but has since filed a motion to withdraw as attorney of record. The court granted that motion in an Order dated August 18, 2021.

**Aja Robbins argued on behalf of Appellant, but has since filed a motion to withdraw as attorney of record. The court granted that motion in an Order dated August 23, 2021.

Before **TYMKOVICH,** Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

At the time this appeal was initiated, Jason Brooks was a Colorado-state inmate serving a lengthy prison sentence for securities fraud. Brooks has an extreme and incurable case of ulcerative colitis. As a result, even when his disease is well treated, Brooks suffers from frequent, unpredictable fecal incontinence.

This case involves the Colorado Department of Corrections's ("CDOC") efforts, or lack thereof, to deal with the impact of Brooks's condition on his ability to access the prison cafeteria. *See generally Brooks v. Colo. Dep't of Corr.*, 715 F. App'x 814 (10th Cir. 2017) (unpublished disposition) (discussing the basis for Brooks's civil rights suit). In particular, in its current incarnation, this appeal turns on whether the district court erred when it concluded as follows: (1) Brooks's Americans with Disabilities Act ("ADA") claim for damages failed because the CDOC's offer to provide Brooks with adult diapers was a reasonable accommodation of Brooks's disability; and (2) Brooks's Eighth Amendment claim

against ADA Inmate Coordinator Julie Russell failed because the decision not to access the cafeteria with the use of adult diapers was Brooks's alone.[1]

We conclude the district court erred in its treatment of Brooks's ADA claim for damages. A reasonable juror could conclude the offer of adult diapers was not a reasonable accommodation of Brooks's disability. Thus, at least as to the question of the reasonableness of the proposed accommodation, the district court erred in granting CDOC summary judgment on Brooks's ADA claim for damages. The district court, on the other hand, correctly granted summary judgment in favor of Russell on Brooks's Eighth Amendment claim. In reaching that conclusion, however, this court relies on a ground not addressed by the district court. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1213 (10th Cir. 2017) (recognizing that this court can affirm a district court's judgment "on any ground supported by the record"). We conclude the record is devoid of sufficient evidence for a jury to find Russell acted with a sufficiently culpable state of mind—deliberate indifference to Brooks's ability to access food—when she

---

[1]In his appellate briefs, Brooks also challenged the district court's dismissal, on mootness grounds, of his ADA claim for injunctive relief. During the pendency of this appeal, however, Brooks was released from the custody of the CDOC to serve the parole portion of his sentence. The parties agree that Brooks release from prison moots his claim for prospective injunctive relief. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010). Given the parties' agreement, this court **grants** the defendants' motion and **dismisses** as moot Brooks's challenge to the district court's dismissal of his ADA-based claims for prospective injunctive relief.

declined Brooks's request for a movement pass. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **dismisses** in part, **reverses** in part, **affirms** in part, and **remands** to the district court for further proceedings consistent with this opinion. Brooks's motion to proceed in forma pauperis, 28 U.S.C. § 1915, is hereby **granted**.

## II. BACKGROUND

### A. Factual Background[2]

Brooks suffers from ulcerative colitis, a chronic autoimmune disease of the large intestine.[3] The disease causes a "significant amount" of abdominal pain as well as multiple "urgent, loose, watery, and often bloody bowel movement[s] per day." The disease can only be managed, not cured. It is uncontested that Brooks's ulcerative colitis qualifies as a disability under Title II of the ADA.

---

[2]Set out here is a general statement of the background facts. Additional facts relevant to the resolution of the issues on appeal are specified below in the Analysis section. *See infra* Section III. In setting out the facts, this court recites them "as we must view them: in the light most favorable to the party opposing summary judgment." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1211 n.1 (10th Cir. 2013). That is, this court views the facts, resolves all factual disputes, and makes all reasonable inferences in Brooks's favor. *See Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).

[3]"Ulcerative colitis is a chronic inflammatory bowel disease . . . in which abnormal reactions of the immune system cause inflammation and ulcers on the inner lining of [the] large intestine." Experts are unsure of the disease's causes. https://www.niddk.nih.gov/health-information/digestive-diseases/ulcerative-colitis (last visited June 28, 2021).

During the relevant time period, management of Brooks's ulcerative colitis was complicated by his status as a CDOC inmate. During his incarceration, Brooks was transferred between numerous Colorado correctional facilities, including Brent County Correctional Facility ("Brent County"), Fremont Correctional Facility ("Fremont"), and Sterling Correctional Facility ("Sterling"). After his transfer to Fremont from Brent County in February of 2012, Brooks missed hundreds of meals per year due to his disability.[4] At this time, Brooks's ulcerative colitis caused him to use the restroom nearly thirty times per day. His flare-ups were unpredictable, unmanageable, and frequently occurred during his assigned "chow pull."[5] The frequency of these flare-ups, which were attended by debilitating gastrointestinal pain and the risk of soiling himself, forced Brooks to miss most of his meals. Often, it was necessary for Brooks to stay by the toilet rather than attend a chow pull. The record reveals that Brooks's ideal weight is 190 pounds with a nineteen pound variance (i.e., a healthy weight for Brooks was

---

[4]This fact is drawn from the CDOC "Food Service – Diet Miss History" ("FSDMH"). The significance and meaning of the FSDMH is discussed further below.

[5]Prisoners at Fremont access the cafeteria as a group with their living unit. These living-group-wide calls to the cafeteria are referred to as "chow pulls." As a general matter, chow pulls rotate daily, leaving mealtimes variable. As discussed more fully below, Brooks's request for an ADA accommodation relates specifically to the variable nature of normal chow pulls. He asserts that with a regularly scheduled chow pull, such as those afforded to diabetic prisoners, he can more easily schedule his bathroom visits so as to reduce or eliminate the possibility of fecal incontinence during his time in the cafeteria.

anywhere between 171 and 209 pounds). When Brooks arrived at Fremont, he weighed 150 pounds; by the next month, however, his weight had decreased to between 144 and 136 pounds.

After Brooks was transferred to Fremont, clinical services officials placed him on a treatment plan to address his stomach pain and bleeding. Over time, this treatment lessened Brooks's gastrointestinal pain. Unfortunately, however, the absence of triggering pain made it more difficult for Brooks to recognize when he needed to use the restroom. Thus, according to Brooks, he faced the following "impossible choice": he could either attempt to attend meals, endure the symptoms of his disability, and sit in his feces among the other inmates, or go without food. Even when he attempted to attend meals, Brooks's symptoms and flare-ups often forced him to leave the cafeteria before he could eat.[6]

The CDOC has a system in place to accommodate inmates with disabilities. ADA Inmate Coordinators like Russell are responsible for providing accommodations to ensure inmates with disabilities can gain meaningful access to programs and services. Diabetic inmates, for example, receive a pass that allows them to access meals before other inmates, accommodating their need to eat

[6]For instance, the FSDMH could reasonably be read to indicate Brooks missed a majority of the meals offered between June 6, 2012 and February 6, 2013. Within this period, Brooks missed at least two meals per day 108 times and missed all three meals 74 times. He did not receive a single meal from October 10 to 13, 2012; October 27 to 31, 2012; and January 10 to 16, 2013.

shortly after taking their medicine. Brooks requested a similar pass to accommodate his often unpredictable need to use the restroom around mealtimes. Shortly after he was transferred to Fremont, Brooks received such a pass from clinical services. *See generally, e.g.*, Colo. Dep't of Corr. Admin. Reg. 300–55 (Offender Movement Schedule). That pass allowed him to attend meals with the diabetic inmates. According to Brooks, this pass allowed him to reasonably manage his disability by permitting him to (1) adjust his schedule to use the restroom before going to the dining hall, thus alleviating some of his pain and risk of incontinence while eating, and (2) enter the dining hall before a line formed, thus allowing him to eat quickly and return back to his cell to use the restroom if necessary.

After three months, Brooks's movement pass expired.[7] Clinical services refused to renew the pass, alleging it was the ADA Inmate Coordinator's responsibility to do so. Without the pass, Brooks continued to miss an exceedingly high percentage of his meals. After nearly a year of unsuccessfully seeking other accommodations for his disability, Brooks filed a request with Russell, the ADA Inmate Coordinator, seeking the renewal of his pass. Russell

---

[7]The record reveals that Brooks was afforded this pass because, during the relevant time period, he was receiving medications daily from the prison "med-line." The pass allowed him to attend the med-line and take meals with the diabetic chow pull. After three months, when Brooks no longer needed to attend the med-line, his pass expired.

denied the request "for first pulls to eat meals," claiming (1) it was a medical issue to be dealt with by clinical services and (2) it was "unreasonable due to the unintended security concerns it would create." When Brooks returned to Clinical Services to again request the pass, he was told that "these passes are no longer issued by clinical services" but were the responsibility of the ADA Inmate Coordinator.

For more than a year, Brooks filed ADA requests through the office of the ADA Inmate Coordinator, filed numerous grievances through CDOC's grievance process, and attempted to secure accommodations through clinical services. These requests were repeatedly denied. In particular, Russell specifically refused Brooks's requested accommodations for his disability. In his first letter to the office of the ADA Inmate Coordinator in 2012, Brooks described the difficulties he faced while attempting to obtain treatment and accommodation for his disability. The office denied the request and recommended frequent restroom breaks. The office acknowledged, however, that such breaks would "not always [be] possible due to security and accountability reasons" and, instead, suggested that adult diapers would accommodate his digestive concerns "during those times." Ultimately, Brooks refused to wear the recommended diapers because, inter alia, having to sit in soiled diapers among other inmates in the dining hall

would have placed him at risk of assault. Throughout 2012 and 2013, Brooks made numerous other accommodation requests, all of which were denied.

Brooks also unsuccessfully sought accommodations through clinical services during the same time period after his initial movement pass expired. For example, Brooks requested a transfer to an ADA-designated facility to help manage his condition. Defendant Kathy Howell, the Regional Director of Corrections and Clinical Services, who was responsible for overseeing health services at Fremont and a number of other prisons, attended the meeting addressing Brooks's request. Although the stated purpose of the meeting was to address Brooks's needs, Brooks's movement pass was not renewed to help him access meals, nor was he moved to a facility that could better accommodate him. Brooks also requested a movement pass and extra toilet paper from clinical services; Defendant David Tessier, a health services administrator assigned to Fremont, denied both requests.

**B. Procedural Background**

Brooks eventually commenced the instant litigation, seeking both injunctive relief and money damages. Among others, Brooks named as defendants the CDOC, Russell, Howell, and Tessier. As specifically regarding Russell, Brooks alleged she violated both Title II of the ADA and the Eighth Amendment by refusing to provide reasonable accommodations—such as a movement pass and

extra toilet paper—that would allow him to successfully manage his disability. As a result, Brooks alleged, Russell knowingly denied him access to food. Brooks claimed the CDOC violated Title II of the ADA and the Eighth Amendment by failing to train its employees properly, thereby perpetuating a department-wide policy that deprives inmates of reasonable accommodations under the ADA.

The district court dismissed Brooks's ADA claims and his claims against the CDOC, but gave him leave "to amend his medical claim against Defendant Tessier and his conditions of confinement claim as related to his request for special meal passes." Brooks filed an amended complaint. In response, Russell, Tessier, and Howell sought summary judgment. The district court granted the motion as to all remaining Eighth Amendment claims. This court reversed in part and remanded. *Brooks*, 715 F. App'x at 814. With regard to Title II of the ADA, this court revived Brooks's claims against Russell, Howell, and Tessier in their official capacities and reversed the dismissal of the claims against the CDOC, concluding Brooks "plausibly" alleged diapers "were an insufficient accommodation" for his disability. *Id.* at 818, 823. This court also revived the Eighth Amendment claim against Russell in her individual capacity. *Id.*

After this court's partial reversal and remand, the district court reopened the case. Shortly thereafter, the CDOC transferred Brooks to Sterling, where he

was eventually issued a movement pass allowing him to access his meals with the diabetic chow pull. After additional discovery, the defendants again moved for summary judgment on all claims. Because Brooks had been transferred to Sterling, defendants argued Brooks's claims for injunctive relief were moot and should be dismissed. The district court dismissed Brooks's claim for injunctive relief under the ADA on the basis that his transfer from Fremont to Sterling mooted his request for injunctive relief. The district court concluded Brooks's ADA damages claim failed on the merits because the undisputed facts showed the CDOC's provision of diapers was a reasonable accommodation of Brooks's disability. Finally, the district court concluded the undisputed facts did not demonstrate an Eighth Amendment violation on the part of Russell because it was Brooks's own actions (i.e., his refusal to utilize the reasonable accommodation of an adult diaper) that deprived him of adequate nutrition.

Brooks appeals the district court's summary judgment order resolving his ADA and Eighth Amendment claims.

## III. ANALYSIS

### A. ADA Claim

Brooks asserts his Title II claim directly against the CDOC and against Howell, Russell, and Tessier in their official capacities. Title II of the ADA makes it illegal for a "public entity" to discriminate against a qualified individual

with a disability in the provision of government programs, activities, and services. 42 U.S.C. § 12132. State prisons are public entities for purposes of Title II of the ADA. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The ADA protects qualified individuals with disabilities "who, with or without reasonable modifications to rules, policies, or practices . . . meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131. The law places an affirmative obligation on public entities to reasonably accommodate qualified individuals with disabilities to allow them to participate in its programs and services. *See generally* 28 C.F.R. § 35.130.

To establish a Title II violation under a reasonable accommodation theory, Brooks must show: (1) he is a qualified individual with a disability; (2) he was "excluded from participation in or denied the benefits of some public entity's services, programs, or activities" and (3) such exclusion or denial of benefits was by reason of his disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999) (quotation omitted). A claim for failure to make a reasonable accommodation does not require a showing of discriminatory motive. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017). Nor is Brooks required to show a complete deprivation of access to food and nutrition to state a Title II reasonable accommodation claim. 28 C.F.R. § 35.150 (requiring that a public

entity's services, programs, and activities be "readily accessible"); *see also Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (explaining how impediments to access short of complete deprivation can prevent ready access).

**1. Injunctive Relief**

As noted above, *see supra* n.1, the parties agree that Brooks's challenge to the district court's dismissal of his request for ADA-based injunctive relief was mooted by his release on parole. Accordingly, we dismiss that portion of Brooks's appeal challenging the district court's treatment of his ADA claims for prospective injunctive relief. Furthermore, we direct the district court on remand to vacate that portion of its judgment addressing this particular issue. *See Wyoming v. United States Dep't of Agric.*, 414 F.3d 1207, 1213 (10th Cir. 2005) ("When a case becomes moot pending appeal, the general practice is to vacate the judgment below and remand with directions to dismiss. This is because a party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment. Consequently, it is frequently appropriate for an appellate court to vacate the judgment below when mootness results from happenstance . . . ." (citations, quotation, and alteration omitted)).

### 2. Damages

#### a. Background

The Supreme Court has established a three-step framework for evaluating whether Eleventh Amendment immunity applies to a state prisoner's Title II claim for money damages. Under that framework, courts must "determine in the first instance, on a claim-by-claim basis, . . . which aspects of the State's alleged conduct violated Title II." *United States v. Georgia*, 546 U.S. 151, 159 (2006). If a court concludes that some aspects of a state's conduct violated Title II, it should then move on to determine whether that conduct violated the Fourteenth Amendment. *Id.* Notably, the Supreme Court has made clear that the Fourteenth Amendment incorporates against the states the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at 157. As to any such acts of misconduct, Congress's abrogation of the states' Eleventh Amendment immunity is constitutionally valid. *Id.* at 158–59. Finally, at step three of the framework, courts should consider the following: "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 159. This question is resolved by the reference to the congruence and proportionality test set out by the Supreme Court in *City of Boerne v. Flores*,

521 U.S. 507, 520 (1997). *See generally Guttman v. Khalsa*, 669 F.3d 1101, 1116–17 (10th Cir. 2012).

The district court resolved this case at the first step of the three-part framework. The district court began by noting it was undisputed Brooks's ulcerative colitis rendered him a qualified individual with a disability. Likewise, the district court recognized defendants' concession that Brooks's disability left him unable to meaningfully access meals. Thus, the district court limited its inquiry to the following question: did the undisputed facts demonstrate that CDOC's offer to Brooks of adult diapers amounted to a reasonable accommodation of Brooks's disability? In resolving that question in defendants' favor, the district court concluded as follows:

> The Court finds that Defendants' provision of adult undergarments to address [Brooks's] incontinence, though not ideal, is a reasonable accommodation that would provide him meaningful access to his meals. Incontinence is defined as: "inability of the body to control the evacuative functions of urination or defecation: partial or complete loss of bladder or bowel control." Inherent to the condition is the inability to control bladder or bowel functions, which Brooks has acknowledged. Given this aspect of the condition, a different meal pass would not meaningfully or reasonably accommodate Brooks' condition because, ultimately, he cannot control his bladder/bowel functions.
>
> More to the point, Brooks conceded in his deposition that undergarments are reasonable if an individual has an inability to control their bowels, and he acknowledged that he is unable to control his bowels despite his efforts to hold them:

> Q. (By Mr. Vanlandschoot): You testified before that you knew a couple of guys that used undergarments.
>
> A. (By Mr. Brooks): Yeah.
>
> Q. Explain to me why it's okay for them but not for you.
>
> A. Oh, there's not really a rationale of being okay or not okay. There is a rationale of being reasonable or unreasonable, and in all situations it's completely unreasonable, unless you have an inability to control your bowels. . . .
>
> Q. So that gets back to sort of the interchangeable nature of the way that you use incontinence, because incontinence—my understanding is that you are incapable of controlling, whether it's your bowels or your urine.
>
> A. Yeah.
>
> Q. And so it sounds to me like what you are testifying to today is you're not incontinent, however, there are some circumstances when you have held your bowels for so long that you cannot stop or you cannot affect the leakage.
>
> A. Yeah, that's both true. But right now, I can't even tell when the leakage is about to start. So that is not up to me. I can't even—without that pain response, without even knowing that. That's the difficulty now. So I can't tell. I know, if I use the restroom, that probably is a good indicator that it's not going to happen. It doesn't mean it's not going to happen entirely.

Brooks concedes three things with this testimony: (1) undergarments are reasonable if "you have an inability to control your bowels;" (2) he has an inability to control his bowels (whether or not he calls it

> "incontinence"); and, (3) because he has an inability to control his bowels, undergarments are a reasonable accommodation.
>
> . . . . The undisputed facts show that Defendants provided Brooks a reasonable accommodation to his incontinence that would allow him meaningful access to the chow hall.

District. Ct. Order at 21–23 (citations, both legal and record, and footnote omitted).

**b. Discussion**

**i. Standard of Review**

This court reviews de novo a district court's grant of summary judgment. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). In analyzing whether a genuine fact issue exists, this court views the facts, resolves all factual disputes, and draws all reasonable inferences in favor of the nonmoving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Becker*, 709 F.3d at 1022 (quotations omitted).

**ii. Application**

The district court's resolution of Brooks's ADA damages claim turned exclusively on the question whether defendants' offer of adult diapers amounted to a reasonable accommodation. The district court erred in concluding no material issues of fact existed as to this question and, thus, it could resolve the matter as an issue of law.[8] First, despite the district court's contrary conclusion, there exist genuine issues of material fact as to whether adult diapers gave Brooks meaningful access to meals. In particular, the district court erred in concluding Brooks's deposition testimony conclusively establishes the reasonableness of the adult-diaper accommodation. Read in its entirety, a reasonable juror could understand Brooks's deposition testimony as standing for the proposition that although diapers may be a reasonable accommodation for some sufferers of ulcerative colitis, they were not a reasonable accommodation at his stage of the

---

[8]In *Punt v. Kelly Services*, 862 F.3d 1040, 1050–51 (10th Cir. 2017), this court set out a helpful analytical structure, based on a modified *McDonnell Douglas* framework, for analyzing failure-to-accommodate claims. Such an alternative is necessary because discriminatory intent is not a relevant consideration in failure-to-accommodate cases. *Id.* at 1049. *Punt* also makes clear that "[w]hether an accommodation is reasonable under the ADA is a mixed question of law and fact." *Id.* at 1050–51 (quotation omitted). Here, as set out more fully below, underlying fact issues make it impossible to resolve as a matter of law whether the provision of adult diapers is a reasonable accommodation of Brooks's ulcerative colitis as it relates to his ability to access the cafeteria. *Id.* at 1050 (holding that "[t]he determination of whether a requested accommodation is reasonable must be made on the facts of each case taking into consideration the particular individual's disability" (quotation omitted)).

disease. Second, a reasonable juror could conclude dignitary and safety interests render diapers an inadequate accommodation of Brooks's ulcerative colitis to facilitate cafeteria access. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016) (recognizing that if "[a]n accommodation . . . [is] so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him," then it is not a "reasonable accommodation" (citation omitted)). Third, a jury could conclude that a movement pass is such a superior accommodation, and an accommodation for which defendants have not identified any significant institutional concerns, that diapers do not provide truly meaningful access to the cafeteria. *See Alexander v. Choate*, 469 U.S. 287, 301–02 (1985) (recognizing accommodations for an individual's disability are not "reasonable" for purposes of the ADA if they do not provide "meaningful access"—not just physical access—to the facility's services, programs or activities).

In granting summary judgment to defendants, the district court relied heavily on what it described as a deposition-based concession from Brooks that adult diapers were a reasonable accommodation. The portion of Brooks's deposition cited by the district court, however, omits the context of his statements: diapers were reasonable for older inmates at the prison who were experiencing ulcerative colitis for the first time and who, thus, had no warning or ability to control their bowel movements. *See* R. Vol. 7 at 260–61 ("[T]he guys

that I knew that did use [diapers] were older, 50 [to] 60 years old . . . [t]hey had just gotten sick, so [they had] no understanding of" what would happen when "this disease hits you for the first time.").[9] In contrast to the district court, a reasonable juror could read the cited portion of Brooks's deposition to stand for the following propositions: (1) diapers in the prison environment are "completely unreasonable" unless the inmate has a total inability to control his bowels; (2) Brooks has, over the previous six or seven years, developed an effective strategy—using the restroom immediately prior to an available chow pull—for managing incontinence associated with his disease;[10] and, thus, (3) diapers are not an appropriate accommodation for his particular disability. Such a reading of Brooks's deposition is entirely consistent with all other aspects of the record, which demonstrates Brooks has always maintained, from his very first interactions with staff at Fremont to his appellate brief in this appeal, that diapers are both ineffective and an affront to his dignitary interests. The district court erred in

[9]Notably, the district court omitted this contextual testimony from Brooks's deposition and replaced it with an ellipse. *Compare* District. Ct. Order at 22 *with* R. Vol. 7 at 261–62.

[10]R. Vol. 7 at 244 (explaining that "at the beginning . . . it will literally hit you without any warning," but that after experience with the disease like his an individual "get[s] an acute understanding of when it is going to happen"); *id.* at 245 (testifying that "obviously, if I use the restroom, then I know I can have half an hour" and that even if he is really sick he knows he "can probably have a half an hour to run, go eat and come back without having any of the issues arise"); *id.* at 262 (Q. And so it sounds to me like what you are testifying to today is you are not incontinent. . . . A. Yeah.").

concluding Brooks's deposition conclusively demonstrated diapers are a reasonable accommodation for his disability.

The record also indicates a jury could conclude diapers did not provide Brooks with meaningful access to the cafeteria and, thus, did not amount to a reasonable accommodation of Brooks's disability. First, evidence in the record indicates adult diapers did not allow Brooks to meaningfully access the cafeteria because it is unacceptable to both Brooks and other inmates for him to remain in the cafeteria with feces in his diaper.[11] The record also indicates Fremont did not have in place an adequate system for incontinent inmates to dispose of soiled diapers. *See* R. Vol. 7 at 261 (explaining difficulties experienced by Brooks's

---

[11]Brooks testified as follows in his deposition:

> So the diaper, as far as being able to contain, again, it wouldn't change any of my responses. If I was in a diaper or not in a diaper and I soiled myself, I'm leaving the chow hall. If I'm walking, I'm not going to the chow hall. If I'm walking back, I'm running back. That doesn't do anything as far as my responses of what I'm going to do.
>
> I would never just sit there at the chow hall, if I had soiled myself, and sit there and continue eating. That's nothing—I would never . . . .

R. Vol. 7 at 246; *see also id.* at 239 ("They say, well, here's a diaper . . . . But, again, that's just—for me to sit around everybody else, if I am leaking fluid, it's just not something that could be done."); *id.* at 456 (arguing in a supplemental pro se brief submitted to the district court that forcing him to access the cafeteria in a soiled diaper subjected Brooks to the risk of assault by other inmates).

first cellmate, a paraplegic, in trying to dispose of a diaper after cleaning himself in a dry cell). Furthermore, the FSDMH shows Brooks missed an exceedingly large number of meals while at Fremont.[12] The reasons for these meal misses certainly bear on the question whether the offer of adult diapers was an appropriate, not just effective, accommodation of Brooks's ulcerative colitis. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 399–400 (2002) (holding that "reasonable accommodation" in ADA means more than just effective accommodation).

Finally, the record reveals the existence of another, equally permissible accommodation: a movement pass allowing Brooks to access his meals at a consistent time each day, giving him time to prepare himself so he can reduce the

---

[12]The defendants assert the FSDMH actually supports the district court's determination that diapers are a reasonable accommodation for Brooks's disability. In so arguing, defendants assert the FSDMH shows that Brooks missed as many meals at Fremont while he had a movement pass as he missed when he did not have such a pass. There are two problems with defendants' arguments in this regard. First, the data set out in the FSDMH is subject to various reasonable interpretations, and at this stage of the proceedings the court is obligated to read the evidence in the manner most favorable to Brooks, the nonmoving party. Furthermore, the record reveals that the period during which Brooks had a movement pass corresponded with a period of extreme sickness and treatment with prednisone. Later periods, however, correspond with Brooks's treatment with Humira, a period during which his symptoms were significantly mitigated. Thus, it might be expected that Brooks would have missed more meals earlier in his placement in Fremont. At a minimum, however, he missed more, and a jury could reasonably find many more, meals during later periods of his placement in Fremont. Thus, the defendants are simply wrong to assert the FSDMH supports the district court's grant of summary judgment in their favor on Brooks's ADA claim for damages.

chances of soiling himself in the cafeteria. As noted above, a reasonable juror could read the FSDMH as demonstrating this accommodation was, at the very least, just as effective at allowing Brooks to access the cafeteria and did so without any of the extremely negative implications for Brooks's dignitary interests and his ability to avoid conflicts with other inmates. It is undisputed that numerous other inmates, such as diabetics and inmates with certain jobs, have these movement passes. This evidence undermines any argument that a movement pass could not be granted to Brooks because it would pose a security risk or alter the prison environment. Absent any evidence of security concerns specific to Brooks, of which there is none in the record, a reasonable juror could conclude that if inmates can leave with the first chow pull to accommodate their diabetes or work schedules without altering the prison environment, Brooks could have been afforded a similar change in movement schedules in order to accommodate his disability.

In summary, a reasonable juror could find the following facts: (1) diapers did not give Brooks meaningful access to meals, (2) movement passes are routinely granted, and (3) such a pass significantly improved Brooks's ability to access meals in the past. Given these underlying facts, a reasonable jury could ultimately conclude the defendants did not provide Brooks with a reasonable accommodation. Thus, the district court erred in granting summary judgment on

the basis that actions of the defendants did not amount to a violation of the ADA.[13]

---

[13]The defendants ask this court to affirm the district court's grant of summary judgment on the alternate basis that Brooks failed to demonstrate the existence of a valid waiver of Colorado's Eleventh Amendment immunity. *See generally supra* Section III.A.2.a (setting out three-part test from *United States v. Georgia* for analyzing the ADA's abrogation of Eleventh Amendment immunity). Defendants assert Brooks's claim does not fall within the second part of the *United States v. Georgia* test because Russell did not violate Brooks's Eighth Amendment rights. As set out more fully below, this court agrees that the district court correctly granted summary judgment to Russell on Brooks's Eighth Amendment claim. *See infra* Section III.B. In arguing this determination is relevant to the second step of *United States v. Georgia*, the defendants improperly focus on the wrong actor. The question under the second part of *United States v. Georgia* is whether any of Colorado's conduct that does not comply with Title II violated Brooks's constitutional rights. Defendants have not identified, and this court has not been able to find, any authority standing for the proposition that a state actor must be personally liable for a constitutional violation in order for the State's conduct to come within the parameters of the second part of *United States v. Georgia*. Instead, the case law points in the opposite direction. *Cf. Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 86 (2000) (conducting abrogation analysis as to the Age Discrimination in Employment Act even though the plaintiff did not bring a Fourteenth Amendment equal protection claim); *United States v. Georgia*, 546 U.S. 151, 159 (2006) (indicating the district court on remand should analyze whether Georgia's alleged Title II violations also violate "either the Eighth Amendment or some other constitutional provision"). Indeed, in the somewhat related context of municipal liability under 42 U.S.C. § 1983, this court has made clear "that even where the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033–34 (10th Cir. 2020). Likewise, this court has held that the question whether a governmental entity violated an individual's Eighth Amendment rights is entirely objective. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998). Thus, the defendants have not come close to demonstrating that this court's resolution of Brooks's claim against Russell in
(continued...)

**B. Eighth Amendment Claim**

**1. Background**

Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An inmate raising an Eighth Amendment conditions-of-confinement claim must prove both an objective and subjective component associated with the deficiency. *Id.* at 834. The objective component requires conditions sufficiently serious so as to (1) deprive an inmate "of the minimal civilized measure of life's necessities" or (2) subject an inmate to "a substantial risk of serious harm." *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001) (quotation omitted). "The subjective component requires that a defendant prison official have a culpable state of mind, that he or she acts or fails to act with deliberate indifference to inmate health and safety." *Id.* To prove deliberate indifference, a prisoner must adduce sufficient facts to show the defendant knew of and disregarded "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Under this standard, "the official

[13](...continued)
Russell's favor resolves step two of the test set out in *United States v. Georgia*. Furthermore, despite defendants' assertion to the contrary, Brooks's filings below, construed liberally because of his pro se status, do not reveal that he waived any argument in favor of abrogation under *United States v. Georgia*'s third step. Ultimately, given that the district court did not address these difficult questions, this court concludes the best course is to leave them for further development in the district court on remand.

must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* This high standard for imposing personal liability on prison officials (i.e., the same standard of subjective recklessness used in the criminal law) is necessary to ensure that only those prison officials that inflict punishment are liable for violating the dictates of the Eighth Amendment. *Id.* at 835–45; *see also Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (holding that *Farmer*'s "subjective component is not satisfied[] absent an extraordinary degree of neglect"); *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1286 (10th Cir. 1999) (recognizing that *Farmer*'s deliberate indifference standard sets out a "stringent standard of fault").

The district court concluded Brooks's Eighth Amendment claim against Russell failed because Russell's actions did not implicate *Farmer*'s objective component. Consistent with its decision on the merits of Brooks's ADA damages claim, the district court concluded any risk of harm was occasioned by Brooks's own choice to reject the offer of adult diapers and, concomitantly, to simply skip meals. The district court also noted that late in the litigation the parties had jointly agreed the movement pass Brooks requested was not medically indicated. Instead, the matter was purely one of an ADA reasonable accommodation.[14]

[14]On appeal, Brooks asks this court to construe his Eighth Amendment claim as also implicating the inadequate medical care framework set out in *Estelle*
(continued...)

According to the district court, Brooks's Eighth Amendment claim failed, even if treated as a conditions-of-confinement claim, because denial of medical care that is not medically indicated is not an Eighth Amendment violation.

**2. Discussion**

As set out above, *supra* Section III.A.2.b.i, this court reviews de novo a district court's grant of summary judgment, construing all evidence and drawing all inferences in favor of Brooks, the nonmoving party. Notably, "[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007) (quotation omitted).

---

[14](...continued)
*v. Gambel*, 429 U.S. 97, 103 (1976). Given his concession below that he is only raising a conditions-of-confinement claim, we reject Brooks's belated request. In any event, we do not perceive how such an approach would aid Brooks. The only Eighth Amendment claim before this court is Brooks's claim against Russell. Brooks does not point to any evidence that Russell has medical training; is empowered to make medical decisions; or, as ADA Inmate Coordinator, is empowered to override treatment decisions made by medical professionals. Furthermore, for purposes of personal liability under 42 U.S.C. § 1983, "[p]laintiffs must do more than show that their rights were violated or that defendants, as a collective and undifferentiated whole, were responsible for those violations. They must identify specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated their clearly established constitutional rights." *Walker v. Mohiuddin*, 947 F.3d 1244, 1249–50 (10th Cir. 2020) (quotation omitted).

For many of those reasons set out above in reversing the district court's grant of summary judgment in favor of the defendants on Brooks's ADA claim, there is serious reason to doubt the district court's conclusion that the situation faced by Brooks in accessing the cafeteria does not meet the Eighth Amendment's objective component. *See supra* Section III.A.2.b.ii. This court can, however, "affirm the district court for any reason that finds support in the record." *See Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1248 (10th Cir. 2000). Here, the record reveals that Brooks failed to come forward with evidence creating a genuine issue of material fact as to whether Russell acted with deliberate indifference to his ability to access food and nutrition. The absence of such evidence is fatal to his Eighth Amendment claim, *Farmer*, 511 U.S. at 834, and renders all other facts immaterial, *Bruner*, 506 F.3d at 1025.

Brooks asserts an issue of material fact exists as to Russell's state of mind because there is evidence of the three following overarching facts: (1) Russell had authority to issue a movement pass; (2) Russell knew she had that authority; and (3) Russell was aware Brooks was missing hundreds of meals a year as a result of her inaction. Brooks is wrong, however, in asserting the record contains evidence from which a reasonable juror could conclude Russell knew she had the authority to issue a movement pass (and, therefore, also wrong in asserting she knew her "inaction" led Brooks to miss hundreds of meals). Brooks cites to a portion of the

record containing excerpts of Russell's deposition. Appellant's Opening Br. at 48 (citing R. Vol. 7 at 275–77 for the following proposition: Russell admitted "her office had the authority to issue any accommodation 'that would be . . . a modification of a policy, process or procedure' that would assist an inmate in accessing meals and the dining facility"). The deposition material cited in Brooks's brief, however, merely recognizes that ADA accommodations can relate to a "wide range" of "activities, programs, or services," including "daily living" and physical access to the cafeteria. R. Vol. 7 at 274–75. There is simply nothing in this deposition testimony to support Brooks's assertion Russell recognized her authority to grant him a movement pass. Indeed, in several other portions of her deposition Russell makes clear she did not believe she had authority to issue a movement pass (i.e., in the parlance used in the deposition, a med-line or meal pass). *Id.* at 275–81. Thus, the only record evidence identified by Brooks in his appellate briefs fails to create an issue of fact as to Russell's state of mind.

Although this failure on the part of Brooks to identify relevant evidence is enough to doom his Eighth Amendment claim, we note that having scoured the record, this court is confident Brooks's failure to cite such evidence is attributable solely to the fact no such evidence exists. The record establishes that the only movement pass Brooks had during the relevant time period was granted

by a member of clinical services, not an ADA Inmate Coordinator. In denying Brooks's request for a movement pass at step two of CDOC's grievance procedure, Russell specifically informed Brooks he may "request early med line pass and adult undergarments from Clinical services as part of your treatment plan." Russell's determination that the availability of a movement pass was a medical issue beyond her purview was affirmed by Anthony A. DeCesaro at step three of the grievance process.[15] There is no evidence that Russell, or any other ADA Inmate Coordinator, has ever granted an inmate a movement pass. Russell's view that she lacked power to grant Brooks a movement pass is not a view held by her alone. In response to interrogatories propounded by Brooks during the period of additional discovery following this court's remand, ADA Inmate Coordinator Janet Smith averred as follows: "Under CDOC policy a medical/meal pass is not an ADA accommodation. To the extent Mr. Brooks believes his condition required a specific provision from clinical services, he must communicate his needs to his providers and work with them to determine what is appropriate for his condition." R. Vol. 7 at 538. Likewise, a declaration

[15]DeCesaro's letter denying Brooks's step-three grievance states as follows: "Your requests for accommodations are better characterized as medical restrictions, not ADA accommodations. You were evaluated for these requests and the[y] were not medically indicated for you at this time. I cannot second guess the medical, professional opinion of the FCF medical providers regarding this evaluation." R. Vol. 1 at 197.

submitted by Ryder May, a nurse within CDOC familiar with Brooks's medical condition, stated she held a meeting with Brooks and a CDOC dietician to discuss Brooks's medical needs. When, during that meeting, Brooks stated he was attempting to obtain a movement pass from the "ADA office," May informed Brooks as follows: "I told him that this issue could be addressed through medical and was not something typically handled by the ADA coordinator. I told Mr. Brooks the facility provides undergarments to offenders that have incontinence issues." R. Vol. 7 at 267.

Based on the record before this court, no reasonable juror could conclude Russell acted with deliberate indifference to Brooks's right to receive adequate access to the prison cafeteria. Instead, at best, Russell had a reasonably mistaken belief that she did not have the power to accommodate Brooks's request and, critically, that clinical services did have that power. This state of affairs does not satisfy *Farmer*'s "stringent" deliberate indifference standard. *See Giron*, 191 F.3d at 1286.

## IV. CONCLUSION

Brooks's challenge to the district court's dismissal of his ADA claims for prospective injunctive relief was rendered moot by Brooks's release from CDOC custody on parole during the pendency of this appeal. Thus, as to that single issue, Brooks's appeal is **DISMISSED**. The district court erred in concluding

Brooks's ADA claim for damages failed because the defendants' offer to Brooks of the use of a diaper to access the cafeteria was a reasonable accommodation of Brooks's particular disability. Thus, the district court's judgment in favor of the defendants on Brooks's ADA-based claim for damages is **REVERSED**. The district court, however, correctly granted summary judgment to Russell on Brooks's Eighth Amendment conditions-of-confinement claim because Brooks failed to adduce evidence showing Russell acted with deliberate indifference. Thus, the district court judgment in favor of Russell on Brooks's Eighth Amendment claim is **AFFIRMED**. This matter is **REMANDED** to the district court for further proceedings consistent with this opinion as to Brooks's ADA damages claim and to vacate that portion of its judgment addressing Brooks's ADA claim for prospective injunctive relief.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

September 08, 2021

Matthew Cushing
University of Colorado School of Law
Campus Box 401
Boulder, CO 80309-0000

**RE: 19-1390, Brooks v. CDOC, et al**
Dist/Ag docket: 1:13-CV-02894-SKC

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc: Karen Lorenz

CMW/sds