## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-SKC

JASON BROOKS,

      Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,

      Defendant.

---

## FINAL PRETRIAL ORDER

---

### 1.   DATE OF CONFERENCE AND APPEARANCES OF COUNSEL

The Final Pretrial/Trial Preparation Conference was held on September 13, 2022, at 9:00 a.m. in Courtroom C201, Byron G. Rogers United States Courthouse, 1961 Stout St, Denver, CO 80294 before U.S. Magistrate Judge S. Kato Crews. Trial counsel attended in person.

 Kevin D. Homiak of Homiak Law LLC appeared on behalf of Plaintiff Jason Brooks. Assistant Attorneys General Kelley Dziedzic, Rachel Lieb and Joshua Urquhart appeared on behalf of Defendant Colorado Department of Corrections ("CDOC").

The Parties' Stipulated and Proposed Jury Instructions and Proposed Verdict Forms were filed on September 1, 2022, Amended Proposed Jury Instructions and Proposed Verdict Forms were filed on September 6, 2022, and the proposed Final Pretrial Order was filed on September 7, 2022. Final proposed jury instructions and final proposed verdict forms shall be filed no later than December 2, 2022.

## 2.  JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Second Amended Complaint alleges a violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213.

## 3.  STATEMENT OF CLAIMS AND DEFENSES

**Plaintiff Jason Brooks:**

Mr. Brooks brings a single claim against the CDOC under Title II of the ADA for intentionally discriminating against him in failing to provide a reasonable accommodation for his disability. Mr. Brooks has a severe and incurable case of ulcerative colitis, which qualifies as a disability under the ADA. Even when reasonably managed, Mr. Brooks says that his condition causes him intense pain from the sudden onset of fecal urgency, often resulting in fecal incontinence, and can require him to use the bathroom upwards of fifteen times a day. Mr. Brooks claims that, for six years, he tried to obtain reasonable accommodations from the CDOC to attend his prison meals around his condition.

Mr. Brooks claims that the CDOC violated the ADA by intentionally and repeatedly failing to provide him a reasonable accommodation for his ulcerative colitis. Specifically, Mr. Brooks claims that (i) the CDOC acted with personal ill will or animosity towards Mr. Brooks; and (ii) the CDOC knew a harm to Mr. Brooks's federally protected rights under the ADA was substantially likely and failed to act upon that likelihood. Mr. Brooks says that the Department of Corrections' intentional discrimination caused him to: (1) unnecessarily endure pain attempting to get his meals at the chow hall while trying to withhold the onset of bouts of fecal urgency; (2) soil himself if he

could not withhold that urgency; and (3) miss meals entirely. As a result of having to choose between these options, Mr. Brooks missed hundreds of meals while incarcerated at the Fremont Correctional Facility and experienced significant damages.

**Claim 1: Intentional Discrimination by Failing to Reasonably Accommodate Mr. Brooks's Disability under Title II of the Americans with Disabilities Act**: Plaintiff has burden of proof on all elements by a preponderance of the evidence.

Elements:     **(1) Mr. Brooks has a disability;**

(a) The parties stipulate that this element is satisfied

**(2) Mr. Brooks was denied meaningful access to prison meals;**

(a) Mr. Brooks missed hundreds of meals at Fremont Correctional Facility from 2012 to 2018 due to CDOC's failure to provide him a reasonable accommodation (Testimony of Mr. Brooks, Pl's Exs. 2, 4-15).

(b) During the period of time that he had a similar pass (March 5, 2012 to June 5, 2015), Mr. Brooks missed all three of his meals on only 11% of the days (*See* Pl's Ex. 2).

(c) Mr. Brooks missed all three of his meals on 26% of the days from June 6, 2012 to October 31, 2012 (*See id.*)

(d) Mr. Brooks missed all three of his meals on 45% of the days in November 2012, and he missed all three of his meals on 48% of the days in December 2012 (*See id.*)

**(3) This denial was because of Mr. Brooks's disability; and**

(e) Mr. Brooks missed hundreds of meals at Fremont Correctional Facility due to his frequent fecal incontinence (Testimony of Mr. Brooks, Pl's Exs. 2, 4-15)

(f) Mr. Brooks remained well below his healthy weight during his incarceration at Fremont (Testimony of Mr. Brooks, Pl's Ex. 25)

(g) Mr. Brooks frequently complained to Defendants and other CDOC employees that he was unable to access his meals due to his

3

disability (Testimony of Mr. Brooks, Pl's Ex. 4-20)

(h) Mr. Brooks repeatedly asked for reasonable accommodations to ensure that he could meaningfully access his meals (Testimony of Mr. Brooks, Pl's Ex. 4-20)

**(4) The Department of Corrections intentionally discriminated against Mr. Brooks.**

(a) For more than a year, Mr. Brooks filed ADA requests through the office of the AIC, filed numerous grievances through CDOC's grievance process, and attempted to secure accommodations through clinical services – each of which was denied (Testimony of Mr. Brooks, Pl's Ex. 7-19)

(b) Mr. Brooks's mother even spoke with ADA Inmate Coordinator Julie Russell directly about his need for accommodations and his missing meals (Testimony of Ms. Terra, Pl's Ex. 13)

(c) In October 2013, Mr. Brooks filed this lawsuit bringing an ADA claim and asserting, among other things, that he lacked meaningful access to meals due to his disability (Testimony of Mr. Brooks, Pl's Ex. 41)

(d) CDOC ADA Inmate Coordinator designees like Julie Russell are responsible for "ensuring that offenders with disabilities are provided reasonable accommodation, are not subjected to discrimination, or excluded from participation in or denied the benefits of DOC services, programs, and activities." (Testimony of Ms. Julie Russell, Pl's Ex. 1)

(e) The ADA Inmate Coordinator's office is responsible for providing reasonable accommodations to CDOC inmates to ensure that they can access a "wide range" of services—including access to the dining hall, education programs, work, exercise, getting from one location to another, assistance cutting up items on their food tray, assistance transferring from a wheelchair, showering, bathing, and general hygiene. (Testimony of Ms. Julie Russell, Pl's Ex. 1)

(f) Mr. Brooks received a similar pass in March 2012 for a period of three months—which indicates that giving him the pass did not present a security concern (Testimony of Mr. Brooks, Pl's Ex. 3)

(g) In June 2013, Mr. Brooks asked clinical services to renew his meal

pass, but it denied his request, stating that the current policy is that such accommodations are addressed by the ADA Inmate Coordinator's office (Testimony of Mr. Brooks, Pl's Ex. 8)

(h) Mr. Brooks then asked the ADA Inmate Coordinator's office to renew the pass, explaining what clinical services had told him, and that he had been forced to miss hundreds of meals since his previous pass expired, but that office denied his request and directed him back to clinical services. (Testimony of Mr. Brooks, Pl's Ex. 10)

(i) Despite having nearly two decades of experience in the CDOC system and having worked as an AIC Designee in the CDOC's ADA Inmate Coordinator's office since 2008, Ms. Russell falsely told Mr. Brooks that a meal pass "was not an accommodation under the ADA, period." (Testimony of Ms. Russell, Pl's Ex. 22)

(j) This same false statement was repeated by ADA Inmate Coordinator designee Janet Brooks, CDOC Nurse Ryder May, and CDOC Grievance Officer Anthony DeCesaro. (Testimony of Mr. Brooks, Pl's Ex. 14, 21, 23)

(k) In fact, nothing in CDOC policies prohibits an ADA Inmate Coordinator from issuing a meal pass to Mr. Brooks he could access meals early with the first chow pull, and, in fact, a similar pass is issued to inmates for a variety of medical needs and disabilities (Testimony of Ms. Adrienne Sanchez, Pl's Ex. 24)

**Defendant Colorado Department of Corrections:**

In its defense, Defendant CDOC asserts that Mr. Brooks cannot establish a violation of the ADA because CDOC made and/or offered reasonable accommodations to provide Mr. Brooks with access to meals while incarcerated. The evidence shows that Mr. Brooks received numerous opportunities for accommodation, namely adult undergarments, –routinely given to incontinent inmates – over the years, with no indication from those inmates that it was not an appropriate and reasonable accommodation. CDOC primarily manages numerous inmates with ulcerative colitis and other similar incontinence issues through the issuance of adult undergarments, as well as treatment plans determined by medical staff. CDOC reasonably accommodated Mr. Brooks's

incontinence by providing him with adult undergarments, which allowed him to access meals while mitigating the risk of a bowel accident.  Mr. Brooks, however, refused this accommodation.

Additionally, the evidence will show that any purported failure to accommodate did not injure Mr. Brooks.  CDOC records show attendance at meals at approximately the same frequency when he did or did not have the requested accommodation of a medline pass (or similar).  Records also show that Mr. Brooks gained weight and reported greatly improved health (including improvement of his ulcerative colitis symptoms) when he did not have a medline pass (or similar), indicating that the failure to provide him with the requested accommodation did not result in any physical harm or other injury.  Finally, the evidence will show that even if the provided accommodation was insufficient, and a medline pass (or similar) would have been a reasonable accommodation to address Mr. Brooks's incontinence, CDOC (through its staff members) lacked the requisite intent for Mr. Brooks to be able to recover damages for that purported ADA violation.

**Claim 1: Violation of the Americans with Disabilities Act**:

    **(1)  Mr. Brooks was a qualified individual with a disability; and**

        (a)  The parties stipulate that this element is satisfied.

    **(2)  Mr. Brooks was excluded from participation in or denied the benefits of the Colorado Department of Corrections' services, programs, or activities; and**

        (a) The CDOC disputes that Mr. Brooks was denied access to prison meals, and disputes steps that it failed to take adequate steps to provide Mr. Brooks with meaningful access to prison meals. This includes providing inmates such as Mr. Brooks with meals at their cells if they missed meals due to medical or similar issues.  (Testimony of Sgt. Joseph Maldonado; Testimony of Sgt. John Romero; Testimony of Dr. Susan Tiona)

        (b) The CDOC provided Mr. Brooks with a reasonable accommodation for his ulcerative colitis in the form of adult undergarments;

however, Mr. Brooks refused to accept this accommodation. (Testimony of Dr. Susan Tiona; Testimony of Ryder May; Testimony of Julie Russell; Def. Exs. 9, 37-38)

(c) Testimony from health care providers working for the CDOC will establish that adult undergarments are specifically designed to help individuals who suffer from incontinence, and this is the manner of accommodation offered to any offender with incontinence issues throughout the CDOC. (Testimony of Dr. Susan Tiona; Testimony of Dr. Timothy Creany; Testimony of Ryder May)

(d) Testimony from the CDOC witnesses will also establish that Mr. Brooks' requested accommodation – a meal pass allowing him to obtain meals from the prison cafeteria with the "first pull" – was not reasonable in light of the CDOC's legitimate penological interests, which include consistency in the treatment of offenders, as well as the controlled movement of offenders, which is a fundamental aspect of prison security.  (Testimony of Kathy Howell; Testimony of David Tessier; Testimony of Lt. Timothy Werth; Testimony of Sgt. John Maldonado; Testimony of Sgt. John Romero)

(e) Furthermore, documentary evidence and testimony from Mr. Brooks's treating providers will indicate that a pass of the type that Mr. Brooks was requesting was not medically indicated based on the CDOC's understanding of the severity of Mr. Brooks' symptoms. Indeed, during his incarceration at Fremont Correctional Facility, Mr. Brooks told multiple medical providers that his ulcerative colitis was as well-controlled as it had ever been. (Def. Exs. 2, 15, Testimony of Dr. Timothy Creany; Deposition Testimony of Dr. Atul Vahil (deceased); Testimony of Dr. Susan Tiona)

(f) If Mr. Brooks did experience an episode of fecal incontinence that resulted in his inability to obtain a meal from the prison cafeteria, corrections staff will testify that they would have facilitated Mr. Brooks being excused to go to the bathroom and/or obtaining a meal. (Sgt. John Romero, Sgt. Joseph Maldonado, Lt. Timothy Werth)

**(3) Such exclusion or denial was by reason of his disability; and**

(a) The CDOC disputes that frequent fecal incontinence was the reason for Mr. Brooks missing meals while incarcerated at Fremont Correctional Facility.  (Def. Exs. 12-14)

(b) Documentary evidence and witness testimony will show that Mr.

Brooks accessed meals at about the same frequency during the time periods in which he had a medline pass, and when he did not. Specifically, CDOC records document Mr. Brooks' Diet Miss History at Fremont Correctional Facility from February 25, 2012 through August 9, 2014. These records demonstrate that even when Mr. Brooks had a medline pass for three months in early 2012, the pass did not prevent him from missing meals. Because Mr. Brooks' possession of such a pass for three months in 2012 (and a de facto pass for several months after that, in which Mr. Brooks has testified that he was permitted to go with the first medline pull after the expiration of his pass) did not noticeably improve his meal attendance, he cannot establish that missing prison meals was by reason of his ulcerative colitis, as opposed to some other, unknown reason. (Def. Exs. 12-14)

**(4) That the Defendant's discrimination was intentional.**

(a)  Witnesses will testify that CDOC offered Mr. Brooks the same accommodation that is offered to all offenders who experience incontinence: adult undergarments. Because Mr. Brooks was not treated any differently than other inmates who experience his same symptoms, Mr. Brooks cannot establish that he was discriminated against intentionally. (Testimony of Dr. Susan Tiona; Testimony of Ryder May; Testimony of Janet Smith; Testimony of David Tessier)

(b) Several CDOC employees did not believe it to be within their purview to grant Mr. Brooks his requested accommodation. Mr. Brooks was, however, given the accommodation that was believed to be within their authority: adult undergarments.  CDOC also will offer testimony that when Mr. Brooks initially was given a medline pass from March 5, 2012 through June 5, 2012, it was issued by clinical staff in connection with medications that he was taking, and not as an ADA accommodation. (Testimony of Julie Russell; Testimony of Kathy Howell; Testimony of David Tessier; Testimony of Dolores Montoya)

(c) Documentary and testimonial evidence will establish that a pass allowing Mr. Brooks to leave for the prison cafeteria with first pull was not a required treatment for his ulcerative colitis, and at no time did he demonstrate a medical necessity for any other alternative meal access procedure. Mr. Brooks did not require an accommodation beyond incontinence supplies; accordingly, the denial of any other requested accommodation cannot constitute intentional discrimination against him. (Testimony of Dr. Susan

Tiona; Testimony of Dr. Timothy Creany; Def. Exh. 12-14)

## 4.  STIPULATIONS

The following facts are undisputed:

1.  Mr. Brooks suffers from ulcerative colitis, a chronic autoimmune disease of the large intestine.

2.  Mr. Brooks's ulcerative colitis constitutes a disability under the Americans with Disabilities Act.

3.  Defendant CDOC is a public entity covered by the Americans with Disabilities Act.

4.  At all times relevant to the subject matter of this litigation, Mr. Brooks was a citizen of the United States of America and domiciled in the State of Colorado.

5.  At all times relevant to the subject matter of this litigation, Mr. Brooks was incarcerated within the CDOC system.

6.  At all times relevant to the subject matter of this litigation, the Department of Corrections was responsible for the provision of medical services and reasonable accommodations to inmates with disabilities under the ADA.

7.  The parties stipulate to the authenticity of all CDOC documents and records under F.R.E. 803(6).

## 5.  PENDING MOTIONS

a.  Mr. Brooks's Motion *in Limine* No. 1 Re: Criminal History of Fact Witnesses Richard Vaughn Littrell and Troy Brownlow

b.  Mr. Brooks's Motion *in Limine* No. 2 Re: His Criminal History and Collateral Challenges to His Convictions

c.  Mr. Brooks's Motion *in Limine* No. 3 Re: Dismissed Claims, Defendants, Former Attorneys, and Mr. Brooks's Civil Litigation History

## 6.  WITNESSES

a.  List the nonexpert witnesses to be called by each party:

d.  Plaintiff Jason Brooks (will call):

i.  **Jason Brooks**: Mr. Brooks will testify regarding his disability, Defendants' denial of his meaningful access to prison meals and other services due to his disability, Defendants' knowledge of this denial of meaningful access due to his disability; his repeated requests for reasonable accommodations, Defendants' failure to provide him a reasonable accommodation for his disability and failure to take other adequate steps to address this denial, and his damages.

e.  Plaintiff Jason Brooks (may call):

i.  **David Tessier**: Mr. Tessier is expected to testify about his experience as a Health Service Administrator at Fremont Correctional Facility during Mr. Brooks's incarceration. He is expected to testify about his knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, his failure to take adequate steps to address that denial of meaningful access, his failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, his knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and his false statements to Mr. Brooks to the contrary.

ii.  **Julie Russell**: Ms. Russell is expected to testify about her knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, her failure to take adequate steps to address that denial of meaningful access, her failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, her knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and her false statements to Mr. Brooks to the contrary.

iii.  **Kathy Howell**: Ms. Howell is expected to testify about her experience as a Regional Health Service Coordinator at Bent County Correctional Facility, Fremont Correctional Facility, and/or Sterling Correctional Facility during Mr. Brooks's incarceration. She is expected to testify about her knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, her failure to take adequate steps to address that denial of meaningful access, her failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, her knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and her false statements to Mr. Brooks to the contrary.

iv. **Adrienne Sanchez**: Ms. Sanchez is expected to testify consistent with her January 14, 2022 declaration submitted by Defendants in support of their motion to dismiss on the basis of sovereign immunity. In particular, she is expected to testify that nothing in AR 750-04 would prohibit an AIC from issuing a meal pass so that Mr. Brooks could access meals early with the first pull, and that a similar pass is issued to inmates for a variety of medical needs and disabilities.

v. **Janet Smith**: Ms. Russell is expected to testify about her knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, her failure to take adequate steps to address that denial of meaningful access, her failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, her knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and her false statements to Mr. Brooks to the contrary. In particular, Ms. Smith is expected to testify as to the reasons why she denied Mr. Brooks a meal pass as a reasonable accommodation for his disability and her false statements in response to Mr. Brooks's discovery requests that a meal pass is not an ADA accommodation.

vi. **Anthony DeCesaro** (appearing in person or by videoconference): Mr. DeCesaro is expected to testify about his experience as a CDOC Grievance Officer responsible for responding to grievances from the Fremont Correctional Facility during Mr. Brooks's incarceration. He is expected to testify about his knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, his failure to take adequate steps to address that denial of meaningful access, his failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, his knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and his false statements to Mr. Brooks to the contrary.

vii. **Dolores Montoya**: Ms. Montoya is expected to testify about her experience as a Health Service Administrator at Fremont Correctional Facility during Mr. Brooks's incarceration. She is expected to testify about her knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, her failure to take adequate steps to address that denial of meaningful access, her failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, her knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and any false statements to Mr. Brooks to the contrary.

viii. **Vaughn Littrell**: Mr. Littrell was Mr. Brooks's cellmate at the Fremont Correctional Facility and knew Mr. Brooks very well. In additional, Mr. Littrell was a recreation worker while housed at the Fremont Correctional Facility. Mr. Littrell may be called to testify about his witnessing of Mr. Brooks's physical condition and his difficulties being able to access the chow hall and how he and hundreds of other inmates—including diabetics and other workers—were permitted to leave when the first chow pulls were called and how Plaintiff was denied this same opportunity. Mr. Littrell may also testify to everything he witnessed Mr. Brooks do in trying obtaining accommodations so he could obtain his meals.

ix. **Troy Brownlow**: Mr. Brownlow was Mr. Brooks's cellmate at Bent County and again at the Sterling Correctional Facility, knowing Plaintiff very well. Mr. Brownlow may be called to testify about his witnessing of Mr. Brook's physical condition and his difficulties with fecal incontinence, as well as his first-hand observation of evidence of Mr. Brooks having experienced a fecal accident while incarcerated.

x. **Kerri Brooks**: Ms. Brooks is Mr. Brooks's sister and corresponded with him and CDOC employees during Mr. Brooks's incarceration at Fremont Correctional Facility. As such, Ms. Brooks may have knowledge and information about Mr. Brooks's management of his chronic ulcerative colitis, representations made by CDOC employees regarding Mr. Brooks's request for accommodations and the denial of those requests, and the damages claimed in Mr. Brooks's Second Amended Complaint.

xi. **Wendy Updegraff**: Ms. Updegraff is Mr. Brooks's mother and corresponded with him and CDOC employees during Mr. Brooks's incarceration at Fremont Correctional Facility. As such, Ms. Updegraff is expected to offer testimony regarding Mr. Brooks's management of his chronic ulcerative colitis, representations made by CDOC employees regarding Mr. Brooks's request for accommodations and the denial of those requests.

xii. **Dr. Timothy Creany:** Dr. Creany is expected to testify about his experience as a physician at Fremont Correctional Facility during Mr. Brooks's incarceration. As such, Dr. Creany may have knowledge and information regarding the care and treatment he provided to Mr. Brooks in managing his chronic ulcerative colitis, and any requests for accommodations, including but not limited to meal passes, related to Mr. Brooks's condition.

xiii. **Dr. Athul Vahil:** Dr. Vahil passed away in 2020. Dr. Vahil was deposed in 2016. Dr. Vahil is expected to testify about his experience as a treating

gastroenterologist involved in the management of Mr. Brooks's chronic ulcerative colitis while he was incarcerated at Fremont Correctional Facility. Dr. Vahil may offer testimony regarding his care and treatment of Mr. Brooks's debilitating condition and his claimed damages. His testimony will be presented by reading designated portions of his deposition transcript.

xiv. **Dr. Susan Tiona**: Dr. Tiona was a physician working at Fremont Correctional Facility during Mr. Brooks's incarceration and provided care and treatment related to Mr. Brooks's chronic ulcerative colitis. As such, Dr. Tiona is expected to offer testimony regarding the management of Mr. Brooks's debilitating condition, the accommodations Mr. Brooks sought related to his disease, and the damages alleged in his Second Amended Complaint.

xv. **Meghan Reed**: Ms. Reed may be called to testify about her role as the ADA Inmate Coordinator, the requests Mr. Brooks made to the AIC office for reasonable accommodations, and her involvement in responding to Mr. Brooks's grievances on his accommodation requests.

xvi. **Jay Hudson:** Mr. Hudson is expected to testify regarding his experience as a major at the Fremont Correctional Facility while Mr. Brooks was incarcerated there. He is expected to testify about his knowledge that Mr. Brooks was denied meaningful access to prison meals due to his disability, his failure to take adequate steps to address that denial of meaningful access, his failure to provide Mr. Brooks a reasonable accommodation to ensure access to prison meals, his knowledge that the ADA Inmate Coordinator's office was authorized to issue meal passes as a reasonable accommodation, and his false statements to Mr. Brooks to the contrary.

xvii. **Ryder May, RN**: Nurse May may be called to testify regarding what constitutes reasonable accommodations under CDOC policy, whether a medline/meal pass is a reasonable accommodation, and what (if any) training CDOC employees receive on what constitutes a reasonable accommodation in the period during which Mr. Brooks was incarcerated at Fremont Correctional Facility.

xviii. **Sgt**. **John Romero**: Sgt. Romero was a corrections officer at Fremont Correctional Facility during the time of Mr. Brooks' incarceration. Sgt. Romero is expected to testify about his interactions with Mr. Brooks, the operations of the cellhouse to with Mr. Brooks was assigned, the operations of Fremont Correctional Facility, the role of the ADA Inmate Coordinator, reasonable accommodations afforded to inmates, the chow pull system, and his interactions with Mr. Brooks.

xix. **Sgt. Joseph Maldonado**: Sgt. Maldonado was a corrections officer at

Fremont Correctional Facility during the time of Mr. Brooks' incarceration. Sgt. Maldonado is expected to testify regarding the policies, practices and procedures of Fremont, the role of the ADA Inmate Coordinator, reasonable accommodations afforded to inmates, the chow pull system, and his interactions with Mr. Brooks.

   xx.

   xxi. CDOC Custodian of Records and any witness necessary to authenticate any exhibits in this matter

   xxii. Any witnesses identified by Defendants as may call or will call witnesses

f. Any witnesses necessary to rebut any testimony offered by Defendants' witnesses

g. Defendant Colorado Department of Corrections (will call):

   i. **David Tessier**: Mr. Tessier is a former Regional Health Services Administrator with the CDOC and a former Health Service Administrator at Fremont Correctional Facility during the alleged time frame. Dr.. Tessier is expected to testify about his role as Health Service Administrator (an "HSA"); that the process for an inmate to obtain a medline pass would be to make such a request through the inmate's healthcare provider, and that an inmate does not need to go through the HSA to obtain a meal pass, as it is based on medical need.

   ii. **Julie Russell**: Ms. Russell was an ADA-Inmate Coordinator ("AIC") during the time of Mr. Brooks' incarceration at Fremont Correctional Facility. Ms. Russell is expected to testify about the duties and responsibilities of her role as AIC, as well as the requests that Mr. Brooks made to the AIC office. Ms. Russell is expected to testify that she did not believe she had the authority to issue a medline pass of the sort being sought by Mr. Brooks, and that she believed the issuance of such a pass fell within the exclusive purview of clinical services.

   iii. **Dr. Timothy Creany**: Dr. Creany was a Physician II with the CDOC, and provided medical care at Fremont Correctional Facility during Mr. Brooks' incarceration. As such, Dr. Creany treated Mr. Brooks for his ulcerative colitis for several years. Dr. Creany will testify about his treatment of Mr. Brooks, as well as Mr. Brooks' compliance with Dr. Creany's recommended treatment protocol. Dr. Creany is expected to testify that, over time, Mr. Brooks' ulcerative colitis symptoms improved with medication management and he reported fewer symptoms.

   iv. **Dr. Atul Vahil**: Dr. Vahil passed away in 2020. Dr. Vahil was deposed in 2016. Dr. Vahil was an outside gastroenterology physician who provided

treatment to Mr. Brooks during his incarceration at Fremont Correctional Facility. During his deposition, Dr. Vahil testified about the overall health of Mr. Brooks as well as his treatment of Mr. Brooks, which included an endoscopy, colonoscopy, and prescribing the medication Humira. Dr. Vahil testified that Humira improved Mr. Brooks's symptoms.

v. **Dr. Susan Tiona**: Dr. Tiona formerly was the Chief Medical Officer with the CDOC; as part of Dr. Tiona's duties and responsibilities, she oversaw the provision of health care to the offender population throughout the CDOC, and actively participated in that care when needed. In this capacity, Dr. Tiona reviewed the medical file for Mr. Brooks. As such, Dr. Tiona is expected to offer testimony regarding the management of Mr. Brooks' condition, the accommodations Mr. Brooks sought related to his disease, and the medical reasoning behind either the grant or denial of any requested accommodations.

vi. **Sgt. John Romero**: Sgt. Romero was a corrections officer at Fremont Correctional Facility during the time of Mr. Brooks' incarceration. Sgt. Romero is expected to testify about his interactions with Mr. Brooks, the operations of the cellhouse to with Mr. Brooks was assigned, the operations of Fremont Correctional Facility, and his observations of Mr. Brooks' difficulty (or lack thereof) with accessing meals from the prison cafeteria.

vii. **Sgt. Joseph Maldonado**: Sgt. Maldonado was a corrections officer at Fremont Correctional Facility during the time of Mr. Brooks' incarceration. Sgt. Maldonado is expected to testify that he does not have any recollection of Mr. Brooks experiencing difficulties with his meals. Sgt. Maldonado is also expected to testify that an offender can request permission to bring meals back to the unit to eat, but he does not recall Mr. Brooks routinely making such a request.

viii. **Dolores Montoya**: Ms. Montoya was employed as a Health Service Administrator at Fremont Correctional Facility during a portion of Mr. Brooks' incarceration. Ms. Montoya is expected to testify that in that capacity she issued medline passes (and similar passes) to inmates at Fremont based on either (a) a doctor's recommendation or (b) instruction from the CDOC ADA Inmate Coordinator. Ms. Montoya will further testify that although she does not have an independent recollection, based on her review of relevant documents, she believes that in March of 2012 such a pass was issued to Mr. Brooks.

ix. **Adrianne Sanchez**: Ms. Sanchez is the Associate Director of the CDOC. Ms. Sanchez is familiar with Mr. Brooks' request for a meal pass as an

accommodation under the ADA. Ms. Sanchez is expected to testify about the CDOC policies which would govern either the granting or denial of a meal pass as an accommodation under the ADA.

x. **Carie Swibas**: Ms. Swibas was a dietician who evaluated Mr. Brooks during his incarceration at Fremont Correctional Facility. Ms. Swibas is expected to testify that Mr. Brooks' weight was within a normal range based upon his body mass index, and that lab results indicated that he had a good overall nutritional status. Ms. Swibas is also expected to testify that Mr. Brooks' canteen purchases contradicted his medical diet, as well as his self-reported gluten sensitivity.

**Defendant Colorado Department of Corrections (may call)**:

i. **Lt**. **Timothy Werth:** Lt. Werth was the living unit supervisor of Mr. Brooks' minimally-restrictive housing unit at Sterling Correctional Facility. Lt. Werth is expected to testify that he was not aware of any difficulty that Mr. Brooks was experiencing with accessing meals or restrooms. Lt. Werth is also expected to testify that controlled movement is a fundamental aspect of prison security, but that if Mr. Brooks needed to get to the restroom outside of his normal access, he would just need to communicate this with the correctional staff. To Lt. Werth's knowledge, security staff had been flexible with Mr. Brooks and his need for restroom access.

ii. **Ryder May**: Mr. May was a nurse at Sterling Correctional Facility during Mr. Brooks' incarceration. Mr. May provided treatment to Mr. Brooks for his ulcerative colitis following his transfer to Sterling Correctional Facility from Fremont Correctional Facility. Mr. May is expected to testify that she has treated several inmates with ulcerative colitis, and that adult undergarments are an appropriate solution for inmates who experience incontinence in a prison setting.

iii. **Kathy Howell**: Ms. Howell is a former Regional Health Services Administrator for the CDOC. Ms. Howell is expected to testify as to her belief that a meal pass is issued based on medical need, and that even with such a pass, an offender could still miss meal pulls if he or she were in a bathroom.

iv. **CDOC Custodian of Records**: If necessary, Custodian of Records will testify regarding the authenticity of any CDOC records.

v. Any witnesses identified by Defendants as may call or will call witnesses.

    vi. Any witnesses needed to rebut testimony offered by witnesses called by Plaintiff.

 b. List the expert witnesses to be called by each party:

  h. Plaintiff (will call): None

  i. Plaintiff (may call): None

  j. Defendants (will call):

    i. Dr. Susan Tiona: Dr. Tiona is expected to testify with consistent with paragraph (vi), above.

    ii. Dr. David Creany: Dr. Creany is expected to testify consistent with paragraph (iv), above.

  k. Defendants (may call): None

## 7. EXHIBITS

Copies of listed exhibits must be provided to opposing counsel and any pro se party no later than 30 days before trial. The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8. DISCOVERY

**<u>Plaintiff Jason Brooks:</u>**

Discovery has been completed, but Mr. Brooks is awaiting the production of supplemental discovery responses from the Department of Corrections. Defendants' Responses to Plaintiff's Requests for Production were served on October 15, 2018. In RFP No. 3, Mr. Brooks requested "a physical copy of all DOCNET information concerning Jason Books, Jason Brooks' grievances, or any other information regarding Jason Brooks placed on DOCNET files since 2012." In response,

Defendants did not object but instead stated: "See DOCNET file, Grievances, and documents. Bates Nos. CDOC/BROOKS-02442-03029."

Mr. Brooks believes that his DOCNET file should include (i) a complete log of all grievance officers'/grievance responders' comments in chronological order from 2012 to 2018, and (ii) Mr. Brooks's ADA accommodations in chronological order from 2012 to 2018. Mr. Brooks has reviewed CDOC's documents bates stamped CDOC/BROOKS-02442-03029 and did not find either (i) or (ii) in that bates range. Thus, his counsel requested via email on November 17, 2022, that the Department of Corrections either identify the bates numbers of responsive documents or supplement its production with those documents. Department of Corrections has not yet done either.

## 9.   SPECIAL ISSUES

**<u>Plaintiff Jason Brooks:</u>**

Mr. Brooks intends to file a trial brief arguing that the Tenth Circuit and the District of Colorado has repeatedly held that intentional discrimination for a failure-to-accommodate claim under Title II of the ADA can be shown by "a defendant's *deliberate indifference* to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 (10th Cir. 2016) (emphasis added); *Cropp v. Larimer Cnty.*, 793 F. App'x 771, 780 (10th Cir. 2019) ("[A] plaintiff can establish intentional discrimination by presenting evidence that . . . the defendant acted with *deliberate indifference* to the strong likelihood that pursuit of its questioned policies would likely result in a violation of federally protected rights." (emphasis added and brackets and quotation marks omitted)); *see also Freeman v. Colorado Dep't of Corr.*, No. 16-CV-02181-NRN, 2019 WL

1296631, at *5 (D. Colo. Mar. 21, 2019) (Neureiter, M.J.) (same). This should come as no surprise, given that the Tenth Circuit had previously applied the same deliberate indifference standard to claims for intentional discrimination under the Rehabilitation Act. *See Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228–29 (10th Cir. 2009) ("[I]ntentional discrimination can be inferred from a defendant's *deliberate indifference* to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." (emphasis added)).

The Tenth Circuit's decision in *Hamer* did not overrule this line of cases. *Hamer v. City of Trinidad*, 924 F.3d 1093 (10th Cir. 2019). Nor could it, given that *Cropp* was decided six months after *Hamer*. Instead, *Hamer* merely confirmed the unremarkable proposition that the Tenth Circuit "requires proof of intentional discrimination before a plaintiff can recover compensatory damages under [the Rehabilitation Act]" and has "suggested that as much is required under Title II [of the ADA]." *Id.* at 1108. *Hamer* said nothing about *how* such intentional discrimination could be shown, nor did it hold that evidence of deliberate indifference is sufficient. As a result, the Tenth Circuit's decisions in *J.V.* and *Cropp* control here. Mr. Brooks fully incorporates the issues identified in its Trial Brief herein.

**Defendant Colorado Department of Corrections:**

**Deliberate indifference**

For the purpose of this case only, Defendant CDOC will not dispute that a plaintiff can satisfy the intent requirement to recover money damages under Title II of the ADA through a showing of deliberate indifference.

**Elements of an ADA claim under a *Monell*-type theory**

More broadly, the parties have a fundamental disagreement regarding how the jury should be instructed on the elements of the one claim in this case. It appears that Mr. Brooks has pivoted, at least to some degree, from alleging a direct claim under Title II of the ADA and is now attempting to assert a *Monell*-type custom-or-policy, or a failure to train, theory. As described in Plaintiff's statement of claims, above, Mr. Brooks now seems to be arguing than an official policy, informal custom, or training failure was the source of his inability to access prison meals. The CDOC is in the process of researching whether such a policy-or-custom/failure-to-train theory is appropriate in the ADA Title II context, and if so, what effect that might have (for example) on jury instructions. CDOC believes that briefing on this issue may be necessary; however, it suggests that the parties and the Court postpone resolution of what essentially is an issue of first impression in the Tenth Circuit and elsewhere until a point at trial in which (a) Plaintiff has presented evidence sufficient to establish a *Monell*-type policy or custom or lack of training, and (b) Plaintiff indicates his intent to pursue recovery under such a theory.

### 10. SETTLEMENT

Counsel for the Parties certifies the following:

1.  The Parties have conferred and do not believe settlement discussions would be productive because they are too far apart at this time.

2.  There was no settlement conference.

3.  The parties discussed the possibility of settlement but neither side has made any offers because they are too far apart.

4.  Counsel for the parties and any pro se party do not intend to hold future settlement conferences.

5.  Counsel for the parties and any pro se party may hold future settlement conferences.

6.  It appears from the discussion by all counsel and any pro se party that there is little

possibility of settlement

7. Counsel for the parties and any pro se party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11. OFFER OF JUDGMENT

Counsel and any pro se party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the Defendant against whom claims are made in this case.

## 12. EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice. The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order. In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

The five-day jury trial is set to begin on December 12, 2022 at **9:00 a.m.** in Courtroom C201, Byron G. Rogers United States Courthouse, 1961 Stout St, Denver, CO 80294 before U.S. Magistrate Judge S. Kato Crews.

Dated this 28th day of November, 2022

BY THE COURT:

_____
United States Magistrate Judge

**APPROVED:**

_s/ Kevin D. Homiak_
Kevin D. Homiak
HOMIAK LAW LLC
1001 Bannock Street, Suite 238
Denver, Colorado 80204
(505) 385-2614
kevin@homiaklaw.com

and

Athul K. Acharya
PUBLIC ACCOUNTABILITY
P.O. Box 14672
Portland, OR 97293
503-383-9492
athul@pubaccountability.org

_Attorneys for Plaintiff Jason Brooks_

PHILIP J. WEISER
Attorney General

*/s/ Joshua G. Urquhart*
JOSHUA G. URQUHART*
Senior Assistant Attorney Generals
KELLEY M. DZIEDZIC*
RACHEL M. LIEB*
Assistant Attorneys General
*Counsel of Record
Civil Litigation & Employment Law Section
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000
Facsimile: 720-508-6032
E-mail: kelley.dziedzic@coag.gov,
rachel.lieb@coag.gov,
joshua.urquhart@coag.gov

*Attorneys for Defendant Colorado*
*Department of Corrections*