Deposition of Wendy Updegraff, Volume II

42

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-SKC

JASON BROOKS,

        Plaintiff,

vs.

COLORADO DEPARTMENT OF CORRECTIONS,

        Defendant.

_____

DEPOSITION OF WENDY MARIE UPDEGRAFF

VOLUME II

_____

        PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Defendant on November 10, 2022, at 2:01 p.m., before Jana Mackelprang, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public.

**PLAINTIFF'S MIL NO. 2 - EXHIBIT A**

Deposition of Wendy Updegraff, Volume II

58

1  Oh, there we go.  Okay, yep, yep.  Yep,
2  that's my notebook, including my thoughts for the day.
3  Okay.  Okay.  Oh, you got my diary there.
4    Q.   Now, for Exhibit 25, are those --
5    A.   Those are my notes, but --
6    Q.   Ma'am, I'm going to ask you -- Wendy, I'm
7  going to ask you very politely not to talk over me
8  until I have finished my question.  And it's for the
9  benefit of the court reporter.
10       Exhibit 25, are those notes that you
11 saved because they related in some way to your son's
12 case?
13   A.   Yes.
14   Q.   As part of this lawsuit, I believe you
15 provided about 3700 pages of documents to Mr. Homiak.
16 Does that sound about right as far as the quantity of
17 paper you possessed?
18   A.   I just know it was four boxes of USPS
19 12-by-12 boxes.
20   Q.   Okay.  And the contents of those boxes,
21 did you give them to your son's lawyer?
22   A.   Yes.
23   Q.   Okay.  If it was a piece of paper in one
24 of those boxes, would it be fair to say, at some point
25 over the past couple of years, you have put eyes on it

59

1  or read it?
2    A.   Not since it went into storage and
3  until -- well, yeah -- no, the answer is no, not until
4  now.  It went into storage.
5    Q.   If something had your handwriting on it,
6  would that mean that you'd read it at some point in
7  time?
8    A.   I'm sorry, I don't understand the
9  question.
10   Q.   So there's a couple of documents that
11 appear to have your handwritten notes on them.
12   A.   Oh, yes, my paperwork and then my
13 thoughts and my tracking whatever, my process, correct,
14 if that's what you're asking about.  But I don't -- the
15 notes are -- I didn't put a date on my notes.
16   Q.   That's fine.  When did you start to
17 receive Jason's medical records from his time in DOC?
18 So not any records preincarceration, but when did you
19 start to receive medical records from the time he spent
20 in prison?
21   A.   Those dates are actually written on all
22 the mailings, because I left everything in the original
23 mail envelope.  And if there wasn't a date on the mail
24 stamp, it was dated.
25       So this is when everything was getting

60

1  finished, so I'm not really sure.  The Bent County was,
2  Fremont, Bent County, it was because he was doing it in
3  steps, and he would send me exhibits that he had, so
4  there was a package.
5        I really don't know when actually he
6  first sent me that.  I think -- I know I was in
7  California.
8    Q.   Would the dates on --
9    A.   I'm not sure.
10   Q.   Would the dates on the envelopes in your
11 own handwriting be a reliable way to figure out when
12 you were receiving certain information?
13   A.   Yes, because -- yes.
14   Q.   Great.  I want to have you go to
15 Exhibit 22.
16   A.   All right.
17   Q.   Just so you know --
18   A.   Wait.  Where did it go?
19       MR. HOMIAK:  It's the next Post-It.
20       THE DEPONENT:  Oh, it's backwards.
21   Q.   (By Ms. Dziedzic) It's the one that is
22 the letter to Judge Tuttle in Weld County.
23   A.   Yes.
24   Q.   Okay.  So in that letter, you're writing
25 about how you were without opportunity of financial

61

1  restitution or relief as one of the victims and talking
2  about how the sentence didn't allow any possibility of
3  financial re-compensation or recovery of losses.
4        My question is:  When it comes to Jason's
5  underlying crime, were you a victim of that offense?
6        MR. HOMIAK:  Object to form.
7        THE DEPONENT:  Yes.  I'm listed --
8        MR. HOMIAK:  Sorry.  You can answer.
9        THE DEPONENT:  I'm listed as a victim in
10 the original indictment on page 23 or something.
11   Q.   (By Ms. Dziedzic) When you're talking
12 about how, in that letter, you've been without
13 opportunity of financial restitution or relief, my
14 question is:  What amount of restitution should you
15 have been owed?
16       MR. HOMIAK:  Object to form.
17       THE DEPONENT:  I never even went there.
18 I never considered that it was because of restitution.
19 I didn't know anything about restitution other than
20 it's usually a group situation.
21   Q.   (By Ms. Dziedzic) Let me ask you a
22 different question.
23   A.   So I can't answer that because I didn't
24 have any way to qualify or quantify and I didn't care
25 because it was whatever process the restitution

8 (Pages 58 to 61)

Calderwood-Mackelprang, Inc.  303.477.3500

Deposition of Wendy Updegraff, Volume II

**62**

1  department set up.
2      Q.   As a result of being one of Jason's
3  listed victims, what were your financial losses?
4      MR. HOMIAK: Object to form. You can
5  answer.
6      THE DEPONENT: What?
7      MR. HOMIAK: I just said object to form.
8  You can answer.
9      THE DEPONENT: Object to what?
10     MR. HOMIAK: Form, F-O-R-M. You can
11 basically ignore it.
12     THE DEPONENT: Oh. Well, I can just -- I
13 can ignore it --
14     MR. HOMIAK: You can ignore my objection.
15 Answer her question.
16     THE DEPONENT: What happened was four
17 members of my family are homeowners. All four members
18 of my family remain renters. We all lost our homes.
19     Q.   (By Ms. Dziedzic) So did you lose your
20 home as a result of having been defrauded by Jason?
21     MR. HOMIAK: Object to form.
22     THE DEPONENT: No. No.
23     Q.   (By Ms. Dziedzic) And so then, when
24 you're talking to the judge about how you were without
25 opportunity for financial restitution or relief as one

**63**

1  of his victims, my specific question is: Can you try
2  to quantify for me, what were your financial losses?
3      MR. HOMIAK: Object to form. You can
4  answer.
5      THE DEPONENT: I can answer?
6      MR. HOMIAK: Yeah, so I'm just objecting
7  for the record to make sure I'm preserving it for
8  trial. So you can basically ignore my objections. I
9  have to do it for the record.
10     THE DEPONENT: What are my -- am I
11 supposed to answer?
12     MR. HOMIAK: Yes. If you want me to say
13 you should answer, I can say you should answer.
14     THE DEPONENT: Oh, okay.
15     In total, it was around $350,000.
16     Q.   (By Ms. Dziedzic) As you sit here today,
17 ma'am, are you currently on disability?
18     A.   No.
19     Q.   Was there a period in your life when you
20 were?
21     A.   Yes.
22     Q.   From approximately when to when?
23     A.   That disability came from misdiagnosed,
24 four-generational -- this is --
25     Q.   Ma'am, I'm going to stop you because my

**64**

1  specific question is years. From when to when were you
2  on disability? Not why.
3      A.   I was on disability from 1995 to 2014.
4      Q.   Just as a yes-or-no question: From 1995
5  until 2014, did you have any source of income other
6  than disability?
7      A.   Yes.
8      Q.   What were those sources or source of
9  income in that time frame?
10     A.   I had a common law partner. I had a
11 relationship, a common law partner.
12     Q.   Okay. From 1995 to 2014, did you draw
13 any income from being a life coach?
14     A.   I remained unincorporated. I was
15 community based.
16     Q.   Ma'am, my question is: Did you get
17 dollars?
18     A.   Did I get any income?
19     Q.   Yes.
20     A.   It is on a social security statement.
21     Q.   So that's a yes?
22     A.   What I received is on -- yes, is on
23 social security records.
24     Q.   To the extent that there are commissary
25 records from the Department of Corrections reflecting

**65**

1  you putting about $11,000 on to Jason's books during
2  his incarceration, where was that money coming from?
3      MR. HOMIAK: Object to form. Go ahead.
4      THE DEPONENT: Yes, I was making monthly
5  payments for his needs.
6      Q.   (By Ms. Dziedzic) How were you able to
7  make those?
8      A.   How? It came right out of my social
9  security check.
10     Q.   Okay. Slightly different topic: Was it
11 your belief that Jason could not safely consume any
12 product that contained gluten?
13     A.   Yes.
14     Q.   Was one of your frustrations with the DOC
15 the fact that he was labeled as noncompliant with
16 medications or recommendations?
17     A.   No.
18     Q.   Do you recall ever speaking to anybody
19 with the DOC about how Jason shouldn't be seen as being
20 noncompliant with his treatment?
21     A.   Say that again, please.
22     Q.   I'll ask a slightly different question.
23 Were you aware that some employees with the Department
24 of Corrections viewed your son as being noncompliant
25 with his treatment protocol?

9 (Pages 62 to 65)

Calderwood-Mackelprang, Inc.  303.477.3500