Deposition of Keri Brooks

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-SKC

JASON BROOKS,

        Plaintiff,

vs.

COLORADO DEPARTMENT OF CORRECTIONS,

        Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF KERI BROOKS

_____


PURSUANT TO NOTICE, the above-entitled videoconference (Zoom) deposition was taken on behalf of the Defendant on November 14, 2022, at 2:01 p.m., before Jana Mackelprang, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public.

Deposition of Keri Brooks

**Page 20**

1  review Jason's medical records from the time he was at
2  Fremont?
3      A.   I don't recall.
4      Q.   Did you ever review the notes from the
5  dietitian while he was at Fremont?
6      A.   I don't recall that at all.
7      Q.   And in preparation for today's
8  deposition, were there any documents that you reviewed?
9      A.   No.
10     Q.   Did Jason ever talk to you about what his
11 diet consisted of when he was at Fremont?
12     A.   Not that I recall outside of -- no, not
13 that I recall.
14     Q.   And do you have any idea how often your
15 mom was in communication with Jason when he was at
16 Fremont?
17     A.   No.
18     Q.   Did Jason ever talk to you about feeling
19 healthy or feeling well when he was at Fremont?
20     A.   Actually, going back to a question
21 previously, when you asked about interventions, I do
22 recall -- so I'm glad you asked this question because I
23 was going to ask -- that I believe he was finally put
24 on Remicade or Humira -- I don't know if they're the
25 same -- and that that was initially helping, and so

**Page 21**

1  that he was at least gaining weight and getting
2  stronger.  I think he had been trying to lift weights
3  and play basketball.
4      Q.   Do you recall when he was put on Remicade
5  or Humira?
6      A.   I don't.
7      Q.   What do you mean by it was initially
8  helping him?
9      A.   Well, I know that he was feeling better,
10 and then I know that later on that he wasn't feeling
11 better.
12     Q.   Do you recall roughly the dates of that,
13 feeling better, not feeling better?
14     A.   (Nods.)
15     Q.   I'm sorry, could you say that one more
16 time?  The sound cut out.
17     A.   No.
18     Q.   Okay.  Do you know if he ever switched
19 medications after the Humira or Remicade might have
20 stopped working?
21     A.   I don't recall.
22     Q.   And how would you describe your
23 relationship with Jason prior to his incarceration?
24     A.   A loving relationship, but didn't
25 communicate very frequently.  I have a tendency not to

**Page 22**

1  communicate with a lot of people unless they're in
2  front of me.
3      Q.   When you say not frequently, a handful of
4  times a year is a fair amount?
5      A.   I -- yes.  Yeah.
6      Q.   Would you see each other at the holidays
7  or anything like that?
8      A.   Yes, I would see him when I came into
9  town, usually at the holidays, and that would be more
10 frequent, yeah, usually at the holidays.
11     Q.   And during his incarceration, would you
12 say -- well, without seeing him -- would you say that
13 your communication was about the same amount as it was
14 preincarceration?
15     A.   I would say so.
16     Q.   And since he's been released on parole,
17 how would you describe your relationship?
18     A.   Very good and probably communicating more
19 than we ever have.
20     Q.   So how often do you communicate now?
21     A.   Still maybe a couple times a month.  Not
22 still, but a couple times a month, which I would like
23 to be more frequently, but life ...
24     Q.   Right.  Do you know why Jason was serving
25 a prison sentence?

**Page 23**

1      A.   I know what he was convicted of.
2      Q.   And what was he convicted of?
3      A.   Securities fraud.
4      Q.   And do you draw a distinction between
5  what he was convicted of and why he was serving a
6  prison sentence?
7      A.   Sorry, can you rephrase the question or
8  repeat it?
9           MR. HOMIAK:  I have a standing form
10 objection to questions about the underlying facts of
11 Jason's conviction, just so I'm not jumping in and
12 objecting each time.
13     Q.   (By Ms. Lieb) Do you distinguish between
14 why he was serving a prison sentence and what he was
15 convicted of?
16     A.   I'm still unclear.
17     Q.   So you said that you know what he pled
18 guilty to, but that seemed to be different from why he
19 was serving a prison sentence.
20     A.   That I don't know.
21     Q.   I'll move on.  Did you ever invest in
22 Jason's business?
23     A.   Yes.
24     Q.   ==And do you consider yourself a victim of==
25 ==the securities fraud Jason pled guilty to?==

8 (Pages 20 to 23)

Calderwood-Mackelprang, Inc.   303.477.3500

Deposition of Keri Brooks

**Page 24**

1  A. No.
2  Q. Approximately how much money did you
3  invest in Jason's business?
4  A. It was my ex-husband and I. $150,000.
5  Q. And do you know if you were listed on the
6  criminal complaint as a victim?
7  A. Yes.
8  Q. Okay. Did you ever receive any
9  restitution or receive any payment for that $150,000
10 that you initially invested?
11 A. I don't believe so.
12 Q. So why don't you view yourself as a
13 victim?
14 A. I don't really know how to answer that.
15 Because it was -- it was like an investment, more a
16 family investment alone. And his business didn't go
17 the way it was supposed to go, and so we lost the
18 money.
19 Q. Did you ever write any letters or
20 communicate at all with the criminal court judge in
21 Jason's case?
22 A. Prior to his conviction? After his
23 conviction?
24 Q. We'll start with prior to his conviction.
25 A. Actually, I don't know. I vaguely

**Page 25**

1  remember writing a letter, an email, but, again, don't
2  recall -- I don't recall what it was regarding.
3  Q. Did you ever attend any of Jason's court
4  appearances?
5  A. No.
6  Q. After his conviction, did you communicate
7  with the judge at all?
8  A. I don't recall.
9  Q. Sorry, I have voices around me. Okay.
10   Did you ever -- while Jason was at
11 Fremont -- sorry to skip back there -- while Jason was
12 at Fremont, did you ever see any photographs of him or
13 have any visual -- did you ever see him in person or
14 did you ever see any photographs of him during that
15 time?
16 A. Never saw him in person. I vaguely
17 remember -- actually, I can't say for sure.
18 Q. While he was at Bent County, did you ever
19 see any photographs of him or -- I think you already
20 said that you did not see him in person.
21 A. I don't recall.
22 Q. What about while he was at Sterling, did
23 you ever see any photographs of him?
24 A. I can't recall if I saw a photograph at
25 any point during this time or I've just heard about a

**Page 26**

1  photograph with him playing basketball.
2  Q. And while he was at Sterling, did you
3  ever visit him?
4  A. No.
5  Q. Would you say your communication with him
6  while he was at Sterling was the same as it was when he
7  was at Fremont?
8  A. I could assume so, but I don't recall if
9  it was more or less or the same.
10 Q. What kind of recreational activities was
11 Jason involved in either at Fremont or -- well, while
12 he was incarcerated?
13 A. I know basketball was something that he
14 liked, and lifting weights.
15 Q. Do you know if he worked while he was
16 incarcerated?
17 A. Yes, I believe he had to work, but I
18 don't recall what his jobs were.
19 Q. Do you know how often he lifted weights
20 or played basketball?
21   I'm going to ask you to answer verbally.
22 A. No.
23 Q. Thank you.
24 A. I must have cut out.
25 Q. Yeah, it happens.

**Page 27**

1   Did Jason ever talk to you about his
2  efforts to get a meal pass while he was at Fremont?
3  A. I don't recall outside of him asking for
4  accommodations, and I don't remember if he shared the
5  specifics of that.
6  Q. What was -- if he did talk to you about a
7  meal pass, what was your understanding of what a meal
8  pass would do?
9  A. That I don't recall because I don't
10 recall us talking about specifics.
11 Q. Okay. Did you talk about any specific
12 accommodations at all?
13 A. One was getting more toilet paper.
14 Q. And when, if you recall, did you talk to
15 him about trying to get more toilet paper?
16 A. I do not recall.
17 Q. Do you remember if that was a frequent
18 conversation? It happened once?
19 A. I don't recall.
20 Q. Do you recall your mom ever talking to
21 you about accommodations that Jason was seeking?
22 A. I'm sure we did discuss it, but I don't
23 recall.
24 Q. Do you recall any specific subjects of
25 conversations, not necessarily dates?

9 (Pages 24 to 27)

Calderwood-Mackelprang, Inc.   303.477.3500

**PLAINTIFF'S MOTION IN LIMINE NO. 2 - EXHIBIT B**