Deposition of Richard Vaughn Littrell, III

1

```
          IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-SKC

JASON BROOKS,

          Plaintiff,

vs.

COLORADO DEPARTMENT OF CORRECTIONS,

          Defendant.
_____

     VIDEOCONFERENCE DEPOSITION OF RICHARD "VAUGHN"

                     LITTRELL, III
_____


          PURSUANT TO NOTICE, the above-entitled

videoconference (Zoom) deposition was taken on behalf

of the Defendant on October 13, 2022, at 10:02 a.m.,

before Jana Mackelprang, Certified Realtime Reporter,

Registered Professional Reporter, and Notary Public.
```

Calderwood-Mackelprang, Inc.  303.477.3500

Deposition of Richard Vaughn Littrell, III

**Page 11**

1  was the last years and change of my confinement. And
2  so I knew the day he showed up. So he's not like a
3  hard person to miss. He's like 6 foot 4. You know
4  what I mean? So everyone is going to know when you get
5  there. So, yeah, I remember.
6      Q.   Okay. Were you in the same cellhouse?
7  Was he your cellmate? Like what was your kind of level
8  of interaction with him?
9      A.   He was my last cellmate. So -- and I
10  don't remember exactly how long we were cellmates for.
11  Maybe four to six months, I'm guessing. But when he
12  first got there, he was not -- I think he was in
13  cellhouse 1. I was in cellhouse 2 at the time. Then
14  when they made the incentive pod, then we all went over
15  to cellhouse 6 and then 7, I think. And that's when we
16  were cellies, was my last stretch there.
17      Q.   Okay. And that was a, give or take,
18  six-month period of time?
19      A.   It was, yeah, I would say that's probably
20  about right.
21      Q.   Okay.
22      A.   Yeah, that part is kind of hard for me.
23  I mean, four to six months, somewhere around in there,
24  yeah.
25      Q.   Were you both -- by the time you were

**Page 12**

1  cellmates, were you both in the incentive unit at that
2  point in time?
3      A.   We were.
4      Q.   Okay. Did Mr. Brooks ever tell you --
5  kind of like how we discussed your underlying offense
6  was vehicular assault and vehicular homicide, did he
7  ever tell you what his underlying offense was?
8          MR. HOMIAK: Object to form.
9          You can answer.
10         THE DEPONENT: Yeah, I mean, we talked
11  briefly. I think it had something to do with a Ponzi
12  scheme of some sort and a lot of money and quite a few
13  victims, and he had boxes and boxes of case law and
14  case stuff. He had a complex case.
15         And we didn't necessarily get, you know,
16  super into it, but, you know, we talked about it a lot.
17  And I kind of know that -- you know, that's the crime
18  that I thought that he committed.
19      Q.   (By Ms. Dziedzic) Uh-huh. And to the
20  best you can remember, how did he characterize or
21  describe what had happened in his underlying offense
22  that resulted in this DOC sentence?
23         MR. HOMIAK: Object to form.
24         You can answer.
25         THE DEPONENT: I'm not -- and this part

**Page 13**

1  of this thing when it comes to his crime, I'm not going
2  to say that I remember a lot, but I can tell you that I
3  remember some things. I know that he was running some
4  kind of a scheme of some sort and something had to do
5  with Best Buy, and there was people overseas that were
6  involved and there was families here that were possibly
7  getting scammed out of money of some sort, some kind of
8  level like that. That's really all I can remember on
9  that.
10     Q.   (By Ms. Dziedzic) And that's fair.
11     A.   And I think that he had mentioned that,
12  you know, I think that he had mentioned something about
13  his roommate or something at the time up in Boulder or
14  something was -- he got sick. And when he got sick, he
15  couldn't manage the scheme. And things started to fall
16  apart and he had a less-than smart roommate that tried
17  to hold things together and mistakes were made, and
18  then he got caught.
19     Q.   Okay. So we've talked a little bit about
20  what Mr. Brooks -- how he described his offense. What
21  did he tell you about his health or any health
22  conditions he dealt with?
23     A.   So when you see Jason -- I have not seen
24  Jason since I've been out of prison or he's been out of
25  prison. I don't know -- I saw a couple pictures on

**Page 14**

1  social media. So I know sort of what he appears to
2  look like right now. But when I saw Jason, you didn't
3  really have to ask him if he was sick. If you've ever
4  seen a 6 foot 4 and one hundred and maybe thirty,
5  125-pound man -- just a skeleton. That's what he
6  looked like, was a walking skeleton.
7          So he talked to me -- and I was really
8  interested in this because Jason is a pretty smart
9  guy -- and he was talking to me about nutrition and
10  kind of the things that he was dealing with, celiac
11  disease and whatever. So we kind of connected on that
12  level, because I was big into fitness. So some of the
13  things that he was having to do and what was making his
14  body do this, and he talked to me a little bit about
15  celiac and some of the other things he had going on.
16  And we talked a lot about diet, and we read a lot of
17  books about diet together.
18         He suggested that I read his books.
19  That's why I'm still gluten-free to this day. He
20  explained how the human body works and why gluten isn't
21  good.
22         So we broke all of those kinds of things
23  down. And then obviously when -- we talked a little
24  bit out in the yard there, but most of our
25  conversations came when we became cellies. And we were

5 (Pages 11 to 14)

Calderwood-Mackelprang, Inc.   303.477.3500

**PLAINTIFF'S MOTION IN LIMINE NO. 2 - EXHIBIT C**

Deposition of Richard Vaughn Littrell, III

---

51

1  transport molecules take it into your liver and make it
2  sugar and try to break it down.  But your liver can
3  only hold 100 units of sugar in one given digestive
4  cycle, which is three hours.  Then it starts spewing
5  into your body as visceral fat or triglycerides.
6       I never knew what any of this stuff was.
7  I learned all that from Jason Brooks.
8       Q.  Okay.  Did he buy stuff from the canteen?
9       A.  He would.  He would.  He never had a lot,
10 but he would -- he definitely would buy some things.
11      When I say a lot, there are a lot of
12 inmates that had a little grocery in there.  But he
13 would have his things that he could eat, whatever that
14 was, you know, a tuna fish packet that you could buy on
15 canteen or peanut butter, but I think -- I don't know
16 if he could eat -- I can't remember.  There were
17 certain things that he could eat from off of canteen,
18 and he would have those things.
19      Q.  Would he ever buy things off of canteen
20 and then, like with you, Hey, Pal, I got this.  Do you
21 want it?
22      A.  Would I say that to him?
23      Q.  The other way around.
24      A.  Would he say that to me?
25      Q.  Yeah.

52

1       A.  No.  Jason didn't have like -- I don't
2  remember, unless he was spending all his money on phone
3  time or whatever -- I don't remember -- but I don't
4  remember Jason having a lot of groceries.  I don't
5  remember him having a ton of extra stuff.  He would
6  have some snacks for the week he'd pick up.  I never
7  remember seeing Jason having huge canteen sacks on
8  canteen day.  I never witnessed that.
9       He had snacks.  He had his own food.  I
10 didn't feel like I had to feed him.  I'll put it like
11 that.  He had some items, but it was never like -- I
12 lived with a lot of people that had a lot of money
13 coming from the streets, and it didn't seem like that
14 was the case here.
15      Q.  Did you ever know him, like as far as
16 food you could get from canteen, to give it away to
17 other inmates or friends?
18      A.  I don't remember that.  I mean, I think
19 that we did a little spread before I left, and we did a
20 little -- I don't know -- we did nachos or something.
21 And everybody was coming over, telling me goodbye,
22 because everybody knew I was leaving the next day.
23      He was obviously pretty sad about it.  I
24 was sad to leave him in there, you know, because I grew
25 to like Jason.  Jason was a nice guy.  Obviously made

53

1  some stupid mistakes, but Jason is a person that I
2  could see back in society, functioning as a great
3  person.  I didn't see that with everybody.  There's
4  people in there that I hope never get out.
5       Q.  Kind of along those same lines:  I know,
6  Mr. Littrell, you've done a lot since you've gotten out
7  as far as speaking to groups about what happened in
8  your life.
9       Would it be kind of fair to say that you
10 accepted kind of total responsibility for what happened
11 in your life?
12      A.  100 percent.
13      Q.  So what portion of your fellow inmates
14 would you say shared that same mindset?
15      MR. HOMIAK:  Object to form.
16      You can answer.
17      THE DEPONENT:  Fully accepted it, like
18 understood the ramifications of all the people that
19 you've hurt and all your victims and really had a
20 thorough understanding of exactly what you've done?
21      Q.  (By Ms. Dziedzic) Yeah.
22      A.  10 percent.
23      Q.  Would you put Mr. Brooks in that
24 10 percent?
25      MR. HOMIAK:  Object to form.

54

1       You can answer.
2       THE DEPONENT:  I can answer?
3       MR. HOMIAK:  Yeah.
4       THE DEPONENT:  Okay.  I would.  Jason was
5  easily in the top 10 percent of the population of
6  understanding what he'd done and what scale he'd done,
7  and he expressed, you know, his remorse about the
8  situation to me and how he hurt people.  You know, I
9  think he had a good -- now, was it on the same level as
10 me?  I don't know.  I can't speak to that, but I can
11 speak to mine.
12      I was also a Seven Habits core group
13 leader.  So, you know, there was eight or nine of us in
14 the prison that created and taught that class, called
15 Seven Habits of Highly Effective Inmates, that's in
16 almost every prison in the state of Colorado, if not
17 all.
18      Q.  (By Ms. Dziedzic) Are you aware he's
19 tried to get his conviction overturned multiple times?
20      A.  I knew that he was in a position where he
21 was fighting his case to some degree.  I don't know the
22 extent of that.
23      He read a lot, you know, spent time in
24 the library.  He had case law stuff.  And I don't know
25 exactly all the details of that.  I knew that he was --

15 (Pages 51 to 54)

Calderwood-Mackelprang, Inc.   303.477.3500

Deposition of Richard Vaughn Littrell, III

55

1  I wish I could say I knew what his stance was and what
2  he was fighting on, but I don't know that.  I don't
3  know that.
4          To tell you the truth, you know, I was at
5  the door of a sentence, man, that I just wanted to put
6  behind me, and I just had to keep my focus on me.  So
7  some of that, I didn't get involved with, like it
8  wasn't interesting to me to hear what you were trying
9  to argue with this court or this appeal or this or
10 this.  I didn't go into that.
11     Q.   Okay.  To the extent Mr. Brooks would
12 ever discuss his underlying offense, did he ever talk
13 about how much restitution he owed as part of that
14 offense?
15         MR. HOMIAK:  Object to form.
16         THE DEPONENT:  It was a lot.  I don't
17 know, but I remember something -- I don't know -- over
18 5 million.  That's a guess.  Probably not the worst
19 guess.
20     Q.   (By Ms. Dziedzic) Switching gears a
21 little bit:  Mr. Littrell, first --
22     A.   Can you hold on a second?
23     Q.   You're fine.
24         (A brief discussion off the record.)
25         THE DEPONENT:  All right.

56

1      Q.   (By Ms. Dziedzic) At what point did you
2  become aware that Mr. Brooks was filing a lawsuit
3  against the DOC?
4      A.   At what point was I aware that he was
5  filing a lawsuit?  Well, I lost track of Jason.  I had
6  connections -- I had a friendship relationship with
7  another inmate that was there at the prison.  His name
8  is Dave Coleman.  And we would write letters or talk on
9  the phone.
10         He would say, Jason said hi.  Tell him I
11 said hi.  It was like that.  It wasn't like me and
12 Jason were writing each other and he was letting me
13 know what was going on.
14         So I guess when he got out is when he
15 said that he was filing a lawsuit against the
16 Department of Corrections.
17         So when was that?  I don't know man.  He
18 kind of talked to me -- I don't know when he got out.
19 Last year sometime, maybe.  It was a while -- months
20 ago.  A long time ago, like a year ago.  I have no
21 idea.  But I told me then at that point.  So that's
22 when I knew.
23     Q.   And how did he explain the nature of your
24 potential involvement?
25     A.   He said, Would you be willing to testify

57

1  as to what you saw of my health situation and this and
2  that?  It was pretty vague.
3          I said, Yeah, I can always tell the
4  truth.  I don't know what we're trying to overall get
5  to here, but I can always tell what I saw, what I
6  witnessed.
7      Q.   Which kind of leads into my next
8  question.  Did he ever articulate to you what he was
9  hoping to get out of this process or what he was hoping
10 to come of it?
11     A.   I don't think -- no, I mean, I wasn't
12 really talking to him -- are you talking about what he
13 stands to win?
14     Q.   Yeah, did he ever talk about what kind
15 of --
16     A.   What he stands to win if he wins his
17 case.  I don't even know all the implications of what
18 he's trying to do right now, but I do know that there's
19 a lot of money involved.
20         To what note, I have no idea.  I don't
21 know if it's to pay his restitution or -- I have no
22 idea where we're going with that.  But, then again, how
23 often do I talk to Jason Brooks?
24         I talked to him the other day when I told
25 him I have a deposition.  But before that, months.

58

1  Months.  I don't talk to Jason very often, and I
2  haven't seen him face-to-face since he's been out.
3          I don't even know if he's allowed to see
4  former inmates.  I can't remember all the rules on
5  that.  I think you have to be off paper for five years
6  or something or other.
7          But other than Dave Coleman -- I saw
8  another guy one time -- three guys, I've seen three
9  guys since I got out of prison, that I was in prison
10 with.
11     Q.   Has he said anything to you at all about
12 the outcome of this lawsuit potentially impacting how
13 much restitution he'd have to pay?
14     A.   Say that one more time, please.
15     Q.   Yeah.  Has he said anything about how the
16 outcome of this lawsuit might impact the amount of
17 restitution he has to pay?
18     A.   No, we haven't talked about that.
19     Q.   So it sounds like you've had some recent
20 communication with Mr. Brooks over the phone; is that
21 fair to say?
22     A.   Yeah, over the phone, yeah.  I told him
23 that I got contacted by his attorney and the team, and
24 that we set a date for -- I don't think I have talked
25 to Jason since before the first time that -- what's her

16 (Pages 55 to 58)

Calderwood-Mackelprang, Inc.   303.477.3500