1

# Timeline Summary by Topic and Timeframe
## Version final October 21, 2012

### PART I: Prior Established Medical History, Diagnostics and Records:

**Established Family 4-Generational Genetic Deficiency Disease of Celiac and Gluten Intolerance Genes leading to multiple food allergies and systemic inflammation that requires lifetime management.**

### High school and College:

- High School Symptoms age 16 through 18 with Diagnosis from **upper GI Endoscopy: GERD Gastro Esophageal Reflux Disorder and gastritis,**
- **College:** second year ER visit 2001- age 22;
- **College: First Hospitalization and Diagnosis of Ulcerative Colitis, age 23, 2002.**
- **Forced to drop out of final year in College.**
- **Colonoscopy age 28: systemic inflammation; gastroenteritis and colitis and on Remicade.**

### Incarceration age 30 to 32 (first 3 years):

- Entered DOC already severely underweight and actively ill and remained without treatment for the first three (3) years of incarceration, Weld and Bent.
- Bent County entry May 2010:

**Bent - August 2010- ASA Grade III Assessment: Upper GI Endoscopy Severe Systemic Disease; first visit to Dr. Vahil; CODC Gastroenterologist. (Recommended follow-up for colonoscopy- denied)**

**The entire digestive tract from the throat, stomach, small intestines to colon and rectum was involved.**

**Dr. Vahil second visit about 2 years later at Fremont July 2012; Diagnostic: Pancolitis; referred to surgical evaluation for colon removal.**

### Medical Transfer February 9-13, 2012: age 33

- Transferred from Bent County –HSA approved "unable to provide gastroenterologist for treatment needs.
- **Transfer was established and approved specifically for medical necessity with a five-day Holdover Facility and placement assignment.**
- **All/any treatment and daily care needs were stopped cold turkey without any notice** to Jason and remained withheld even when **forced to declare a medical emergency with acute exacerbation; by the Third day.**
  He was being given an allergic diet that due to his disease, turned toxic and inflammatory to the entire digestive tract.

**EXHIBIT A**

2

### ARRIVAL to Fremont Facility February through May 2012:
### Jason is told by Staff that "no medical records" were received:

- **He is forced to declare a medical emergency 2 days after arriving at Fremont, February 16th 2012 and he made the first call to me needing Medical Records transferred from the prior Facility; they had done the Transfer, because they could not accommodate for a Gastroenterologist.**
- **Staff remained silent and nonresponsive to his reporting sever, acute symptoms of out of control diarrhea with cramping and blood and that the normal food provided was making him very sick.**
- **Family steps-in to provide relevant Medical History, Diagnostics and Records to Clinical.**

### PART II: The ADA Staff were the first to be contacted as we already knew that U. C. is a recognized Disability under the ADA (American Disabilities Act 1990)

### He was being completely ignored so that seemed the only way to access Medical Care.

- **In February 2012 the call is made to request an ADA interview for Assessment.**
- I had the ADA Application **Form and it states the Equal Access regulation:**

   **"NO INDIVIDUAL SHALL BE EXCLUDED OR BE SUBJECTED TO DISCRIMINATION TO ACCESS CODC'S SERVICES, PROGRAMS OR ACTIVITIES, does not require member status to request accommodation from the ADA service."**   (Form dated 1-1- 2012)

- **On a phone call to Meghan Reed at ADA Headquarters, I was told that the Form was "obsolete," and not used. The Form had a 2 month old date.**
- **Fremont ADA only qualifies "members" for a few specific medical conditions. U. C.is not included, so the patient does not qualify.**
- **Told Accommodation is under authority of the HSA in Clinical Services.**

### PART III: HSA Dolores Montoya, contact by phone for accommodation needs and providing medical history and Diagnostics: February through May 2012.

- Prior medical history, diagnostic condition and chronic care needs verified by family report and medical records transfer, **including both parents genetic lab tests showing Celiac and Double Gluten Intolerance Genes.**
- Family has a 4-generational genetic history of Celiac and Gluten Intolerance Genes r**equiring dietary protocols that avoid allergic foods;** medically necessary to avoid inflammation sources. (operating the same as Celiac disease or worse)

PART III: HSA

- Accommodation requests made for basic daily care management were based upon **2 primary digestive disorder symptoms; toxic allergic reactions to specific foods and chronic, frequent and urgent (uncontrolled) diarrhea; affecting mobility and ability to follow facility fixed schedules and fixed rules.**

- **Daily care needs requested for extra access based on restriction of mobility and periods of immobilization affecting 7 areas:**
    - extra toilet paper
    - extra bathroom access,
    - extra access for ability to attend fixed mealtimes
    - extra access for ability to attend fixed medline
    - extra access for ability to replace allergic foods in diet
    - extra access for ability to avoid weight loss and malnourishment
    - extra access for ability to exercise that helps the body's immune system

- **Jason suffered regular daily occurrences of being immobilized, too sick to move, not under his control and unable to attend the fixed scheduled times for meals, med-line and/or time out of the cell, especially he needed exercise-time.**

Clinical regularly denied reasonable accommodation and denied daily care needs for equal access; due to uncontrolled symptoms, not under the control of nor due to any fault of the patient that lead to:

- missing and going without food and blamed for "noncompliance"
-missing med-line meds and blamed for refusal of meds
-missing exercise and denied the immune-strengthening affects
-immobilization not under the control of the patient
-lacking safety needs when too sick to be in the general population with uncontrolled symptoms; affecting open social close-quarters re his cell mate and re other inmates during mealtimes (a "diaper accommodation" offered by clinical as "reasonable" is and was completely irrational)

**March 1st, 2012          HSA Dolores Montoya signed the first Meal Pass March 5th that lasted for 3 months (March, April, May) and was NEVER RENEWED**; (this was for chronic care continuing without any treatment and a <u>dietary deficiency that requires lifetime management</u>) Jason requested remedy **when he wrote March 1st Kite and Grievance "have me submitted to the infirmary so you can witness the severity of my symptoms." (denied)**

**OUTCOME: Ms. Montoya went silent and there were No further access accommodations, no help to manage his daily symptoms; from any of the other HSAs over the next 6 years at Fremont, to 2018.** Jason reported by the end of May that "Ms. Montoya has proved to be nonexistent to help me manage my symptoms."

### PART IV: Regional Clinical Administration, Kathy Howell 2 month contact – April to May 30th.

**2 Letters in April:** Two (2) Letters mailed to Kathy for following up to phone calls phone contact. Kathy replies she will talk with HSA regarding care concerns.

==June 6, 2012    Staff Meeting scheduled by Kathy with Clinical members== involved with Jason present to address needs.

**OUTCOME:**

==1 Item was approved in meeting for a 1 Day Transport for medical consults-not the 3 day regular Transport that Jason cannot tolerate. Three weeks later the Transport arrived for a 3-Day Trip so nothing happened. The Gastroenterologist was cancelled.==

==June 18, 2012    Jason reported in Grievance that: "the meeting proved to be a formality…..nothing came of it…..I will continue to be denied basic human needs."==


### PART V: Gastroenterologist Dr. A. Vahil, BCCF and CDOC Medical Records

- ==April 4, 2012:    The first Fremont visit to the Gastroenteroligist, Dr. Vahil for a Colonoscopy Diagnostic: Pancolitis; referred for Surgical Consult for colon removal. (first Gastro visit was 2 years earlier at the Facility with Upper GI Endcosopy Diagnostic: ASA III-Sever Systemic Disease. He was denied treatment there.==
- April 20, 2012   Surgical Consult for Proctocolectomy with J Pouch (external collection bag) Dr. Brown. Jason refuses radical surgery because there is Medication Treatment available; stating that surgery is only used as a last resort.
- <u>March 30th phone call to HSA and Chronic Care Status is approved (signed March 5, 2012); no other accommodation (no toilet paper) or treatment needs change. Expired June 5th, never renewed.</u>
- July 18, 2012 Gastroenterologist visit for Medication Treatment Plan.
- <u>August 17, 2012 Medication Treatment begins a 6 month Trial to January 2013. OUTCOME: Failure to provide the consistency, continuity or patient response monitoring of medications, as medically required. Patient would show up expecting medications and they would not be available with repeated omissions and gaps.</u>

October 21, 2012 by Wendy Marie Updegraff©

**6 Categories covered by Witness:**

**Prior established Medical History, Diagnostics and Records with severity of symptoms since High School Diagnostic of Upper GI esophagitis and gastritis: First Diagnostic of U.C. in College hospitalization age 23 y.o.  Later, put on Medication, Remicade.**

**Timeframe: Fremont Facility: arrived February 14, 2012.**

1. **February 16, 2012 declared medical emergency and first call from Jason for witness advocacy intervention efforts through June 2012.**

2. **Contact for Medical History and Medically necessary daily care efforts focused on Staff phone calls and some letters, made first 3 months, March April and May to June 5, meal pass expired and June 6th, Staff Meeting was held.**

3. **ADA CDOC Legal Services, Fremont ADA Coordinator Julie Russell and Headquarters ADA Meghan Reed** (Americans with Disabilities Act 1990: Civil Rights, prohibits discrimination and guarantees equal access)  **(First Call Feb 23, 2012 through )**

4. **HSA, Health Services Administration**, Clinical Director Dolores Montoya, RN
   **(First call Feb 26th and Meal Pass Signed March 5th after second call March 1 st)**

5. **Regional Director, Kathy Howell, Clinical Services Administration**
   **(First call March 30th with 2 letters mailed and Staff Meeting held June 5th)**

6. **CDOC Gastroenterologist Dr. A. Vahil,** BCCF and CDOC Medical Records:
   - First diagnostic Upper GI Endoscopy, August 2010
   - **Fremont  Diagnostic Colonoscopy, April 4 2012; Pancolitis, referred for Surgical Consult**
   - Third Visit for Medications Treatment Plan Assessment, July 2012.
   - **Initial 6-month Medication Treatment Plan begins August 2012 to January 2013.**

7. **August Conclusions: no recourse, no remedy, no relief.  Litigation Action with Attorney and Social justice Case Advocacy with CCDC Colorado Cross-Disability Coalition.**

8. January 2013 six month Medication Treatment Plan; final dose was reported "missing" and not provided. Contact made with Regional Clinical Administration, Kathy Howell and Staff silence and nonresponse.

September 28, 2022

Hello Kevin,

Jennifer and I had our first conversation yesterday as Witness for the Plaintiff, Jason Trevor Brooks and she asked that I send you time slots available in October for the 2 hour deposition meeting by Zoom with the State of Colorado (CDOC).

At the time of Jason Trevor's incarceration, I was using a copyrighted Assumed Name, Vayah Ashuweye Terra©, M.A. for my private practice in unincorporated self-employment as a stress management and wellness focused psychotherapist utilizing integrative modalities. I completed my Graduate Studies at University of Colorado in 1985 and prior to that I had undertaken extensive counseling certification courses of study and practicums.

My inpatient hospital experience and expertise in both Mental Health, Addictions and DSM Evaluation were established during the mid- 1980's through the mid-1990's in front range Hospital Networks including Mercy Medical Center, St. Anthony Hospital Central and North and I was proactive in both establishing and operating as the Coordinator a 24/7 outreach program (P.A.C.E.) serving the entire front range Hospital network systems; seeing patients in Emergency Rooms, in-patient, ICU, or Rehab for consultation and referrals with direct responsibility to the Primary Medical Physician seeking recommendations and resources for appropriate continuity of care and follow up support systems. Comprehensive evaluation was based upon personal interview, review of current and past medical records and an overview including insurance and community resource support reports.

This background allowed me to step-in on Jason's behalf to advocate for his prior established Medical History, Records and recommended Daily Management Protocol based upon chronic and uncontrolled diarrhea and inflammation/ulceration of the bowel, leading to Ulcerative Colitis and chronic exacerbations, when conditions of daily medical necessity went unmet.

Today I am retired and have gone back to my Given Family Name, Wendy Marie Updegraff, the same name appearing upon Jason's Territorial/Municipal Certificate of Birth registered on April 25, 1980 and upon his parents Baby Boy Deed and Witness Recording establishing his home birth on the day he was born, May 24, 1779.

Here is my October availability:

Timeslot remains 2-4 pm;

October 12 or 13th Wed/Thurs

October 18 -Tuesday

October 25 or 26th Tues/Wed

Jennifer tells me there will also be an interview scheduled with you for review and preparation before the deposition. Regards,

 by: Wendy Marie Updegraff©

BROOKS_003786

## Summary Timeline for Witness Testimony re CDOC Freemont Facility while acting as Medical Continuity of Care Liaison and Medical Quality of Care Advocate on behalf of Jason Trevor Brooks.

(Version: 10-19-22 finalA)

The following is written by Wendy Marie Updegraff, by my hand for Testimony of the material Facts for Witness, according to firsthand experience and applied relevant professional background and training as a psychotherapist specializing in: wellness/integrative modalities, prior employment providing hospital inpatient care specializing in mental health, geriatric health, addictions intervention, ER emergency-room evaluation, assessment and referral to Attending and/or Admitting Physicians for treatment, continuity of care, patient quality of care standards. As the developer and Coordinator of P.A.C.E., Psychiatric and Addiction Assessment and Evaluations, a 24 hour service for the Denver Metro area Hospital networks the expertise applied for the ongoing involvement as a medical communications liaison and advocate for Jason Trevor Brooks; covering medically necessary daily needs management and quality of care issues in the ongoing treatment of his Ulcerative Colitis, a debilitating and chronic condition leaving him immobilized for hours and days at a time and requiring constant toilet access.

The following Timeline is supported by Factual evidence and presented to the best of my knowledge and belief as true and complete as a summary: based upon original records of phone call communications and contacts made to Medical Clinical Services at the Fremont Facility, including CDOC Staff at the State of Colorado Headquarters level or Regional level Administrative personnel, involved or potentially involved. Original records and documents include but are not limited to:

(a) **Original private hand written notes taken and notebooks kept**, during all the phone conversations and contacts made including: dates, communications, inquiries, responses, outcomes and next steps, exchanged with the Staff involved.

(b) **Follow-up email communications and exchanges to the patient** documenting the phone exchange statements, inquiries and outcomes.

(c) **Follow-up Letters to pertinent involved Staff personnel mailed**, with copies of letter(s) retained. Review/exchange of letter(s) contents, subject and outcomes with patient through emails.

(d) **All original documentation retained in safe storage** of all written communication to CDOC Fremont Staff and personnel involved during the patient's learning to navigate the prison system's communication protocols including: Kites-sick call requests, Grievances-Step 1 – 3, Staff Letters of appeal and petition for safety;

(e) **Legal remedy or relief sought remained ongoing through the years due to NO RECOURSE;** including Legal help through Attorneys engaging Court Case submissions, community outreach for prisoner rights and advocacy including multiple International Organizations, University Professors and/or their Students actively involved in prison patient rights and advocacy, the Colorado Cross-Disability Coalition for Advocacy of Social Justice and more.

(f) **Ongoing efforts to receive adequate, appropriate and humane care and Treatment for Diagnosed Severe Systemic Disease and chronic Ulcerative Colitis requiring BOTH DAILY MANANGEMENT**

**NEEDS as well as Medically Necessary TREATMENT. Treatment to meet Standard of Care is required to be consistent, reliable, patient-based with ongoing monitoring of the condition that remains in place, even when or if the patient attains remission.**

(g) Ulcerative Colitis, diagnosed in September of 2002 while attending the State University of Colorado at Fort Collins and already existing as: chronic and in active status at the time of incarceration along with no prior existence of remission of symptoms that began in high school with trial and error efforts for medical treatment and continued system-wide inflammation and episodic exacerbations.

## Part 1: Known Medical History prior to arrest May 24, 2009:

A. Family known Medical issues and chronic symptoms during High School presented as "Medical History" on Progress Notes: <u>GERD, upper GI Gastritis, Esophagitis, Hiatal Hernia, IBS</u> ---------------------------------------------------------------------------(**Source:** Dr. A. Vahil Patient Assessment Report 10-23-2012

B. **September 2002, 23 y. o.**        <u>First Hospitalizatio</u>n- **Endoscopy:** <u>d**iagnosed having chronic ulcerative** **colitis**</u> and family present. **ER visit one year earlier** with worsening symptoms.  **Endoscopy**: **upper GI gastritis, heartburn, stomach pain, intestinal distress, digestive distress, food sensitivities,**  ------------------------------------------------------------------------------------------------------------------------------------------------------------------(**Source:** Case Exhibits Medical Record and Family present)

C. **June 6, 2007**                <u>Prior Medication:</u> **Lab PPD Report for ulcerative colitis**<u>; patient on Remicade.</u>

D. **June 20, 2007   28 y.o.**        <u>**Colonoscopy by Gastroenterologist: Pathology Report: moderately active Colitis with Focal Ulceration, ASA Grade Assessment P2; "mild systemic disease , gastroenteritis and colitis,**</u> polyp biopsy. ---------------------------------------------------------------(**Source:** 4 MEDICAL REPORTS DOCUMENTS: **Medical** ---------------------------------------------------------**Report, Dr. D. Mahnke, Endoscopy Center of the Rockies**

| Date: | Event: | Outcome: | Source: |
|---|---|---|---|
| 1. **May 24, 2009** | **Arrest** and incarceration for white collar crime, Weld County.----------------------------------------------------------------------------------------------------------------------------------(Denver Newspaper) | | |
| 2. **April 27, 2010** | **Sentenced** to 32-36 years in prison. ---------------------------------------------------------------------(Vayah nee Wendy Marie present at court) | | |
| 3. **May 20, 2010** | **Arrived Bent County Correctional Facility (BCCF) operated by private-for-profit Corrections Corporation of America (CCA) with Contract to run federal and state prisons.** ----------------------------------------------------------------------------------(CCD Offender Bio Chart and Wikipedia) | | |
| 4. **July 01, 2010** | **Seen by Bent County Physician and history taken: having Ulcerative Colitis and requested <u>EVALUATION to Rule-out upper G.I. disease, rule-out Crohn's, rule out bacterial overgrowth, test for pylori, test for food antibodies.</u>**----------------------------------------------------------------------------------------------------------------(Bent County Doctor Oba Medical Report) | | |

5. August-26-2010        Upper GI Endoscopy by Gastroenterologist: <u>DIAGNOSED ASA GRADE ASSESSMENT III: Severe Systemic Disease: esophagitis, gastritis, hiatus hernia. Follow-up: Colonoscopy recommended</u> --------------------------------------------------(Dr. A. Vahil Medical Report)

6. 4-16-2011                    Gluten free diet with snacks and Ensure supplement approved. Outcome: Nutritional support supplement (Ensure) expires 10-3-2011-----------------------------------------------------------------------------------------------(Factual Allegations Timeline hand written by Jason and entered into a subsequent Litigation Case and CCDC Letter -10/20/12)

7. 9-8-2011                    **Colonoscopy by Internist Dr. Miller** includes: **Colitis as active disease,** "PRIOR TO SEDATION ASA CLASSIFICATION WAS CLASS 1: HEALTHY MALE, NO MEDICAL PROBLEMS. Under Comments: 'active disease", colitis, polyps removed for biopsy.

**OUTCOME:** Fremont utilizes this "PRIOR TO SEDATION ASA" entry: "healthy male, no medical problems" appearing in multiple Fremont Staff written records and verbal statements of "no record of medical' aka meaning no medical issues; through arrival February 14, 2012 and into initiation of actual Medication Treatment begun in August 2012.       ---------------------------------------------------------------------------------------------------------------------------------------(Kites, Grievances, Medical Records)

8.  January 23, 2012        HSA acknowledges the need for a Gastroenterologist to treat the patient's medical condition. Patient documents "<u>so I have to deal with these severe symptoms myself</u>" while it has "<u>taken OVER 20 MONTHS FOR THE HSA TO DETERMINE THE NEED FOR A GASTROENTEROLOGIST </u>(for PROPER Treatment)." (patient's Grievances record 1-23-12, Step 1)

**OUTCOME:** <u>WITHIN 2 WEEKS PATIENT IS TRANSFERRED so medical necessity can be met at another Facility.</u>

9. Transfer Scheduled:        HSA determines that the patient's need for actual Treatment (vs patient daily symptom self-management of his condition) cannot be accommodated and within 2 weeks the HSA (Health Services Administrator) APPROVES A FACILITY TRANSFER FOR MEDICAL NECESSITY FOR GASTROENTEROLOGIST; FEBRUARY 6TH.

10. **January 25, 2012**        Inmate Custody Rating: MINIMUM RESTRICTIVE (CCD report for Transfer)

11. **February 6, 2012**        Lateral Transfer Authorized by Offender Services, **Bent County Facility acknowledges it has no treatment accommodation for recognized medical condition.** -------------------------------------------------(patient Grievances on record)

12. **February 9, 2012**        TRANSPORT RECORD -Bent County Transfer for Facility Placement  ---    according  to "medical necessity;"  ---------------------------------------(Bent County Transport Record)

**SOAP OBJECTIVE ASSESSMENT**: **Patient was lead to belief that his medical needs would be able to be better met with Transfer; that the next Facility would allow or be more able to meet Treatment requirements for a chronic, debilitating lifetime disease.**

**Material Facts support the opposite conclusion based on transfer and arrival statements made of "no medical history;" the status applied and unknown to patient-that he arrived in was: a "healthy male, no medical problems, including chronic diarrhea does not exist."**

13. **February 9 to February 13, 2012    Arrived at Transfer Hold-Over Unit - Cell House 5:**------------------------------------- 5 day holdover.

14. **February 13, 2012 Hold-over    Staff report that they; "have no medical records" or that "no medical records were transferred."** meaning his disease and his symptoms went ignored and he had no food to eat without making his symptoms worse, aka getting sicker. <u>**Jason was FORCED UNDER EXTREME DURESS TO DECLARE A MEDICAL EMERGENCY; enduring conditions of extreme bodily stress, forced with either starvation or eating food that turns toxic in his body while under extraordinary indifference to symptoms of acute exacerbation being excused and ignored.**</u>          ---------------------------------------**(Vayah: Jpay letter; email to patient 2/26/2012)**
(also Itemized Summary of Case Exhibits 1-85, 16 pages, #2, page 1: Cell House 5- **"account charge for medical emergency"**)

15. **February 14, 2012        ARRIVED AT FREMONT, CDOC State of Colorado/COLORADO Facility.**

<u>**OUTCOME: "no medical records"**</u> **were received by Fremont Health Services.** Jason's call to me from Fremont asking for Medical records to be faxed **2-16-12**-------------------------------------------------------------(Source: Jpay Email Vayah and Keri 2-15/2-16-12)

<u>**OUTCOME: "no Transport or medical records"**</u> were received by **Paul Cline, Offender Services Department** responsible for Transfer Facility assignment. Per Phone **contact 3-14-12** "he had no documentation of any paperwork" ----------------------------------------------- (Source: Vayah email follow up to Jason)

16. **February 16, 2012        Jason FIRST PHONE CALL ASKING ME FOR HELP to call the Bent ---------------------------------- County Head Nurse and have his Medical Records faxed** to Health Services at Fremont, as told by Staff "they do not have them." -------------------------------------------------------------------------------------------------------------------------------(Jpay Email Vayah and Keri 2-15/2-16-12)

17. **February 16, 2012        Head Nurse, Deb at Bent County** call made by Keri, Jason's sister, ----------------------------------------------for Medical Records not received by Fremont. **Head Nurse, Deb states:** -----------------------------------------**the "MEDICAL RECORDS WERE TRANSFERRED WITH HIM"** – Records ------------------------------------------------are resent directly to Fremont Health Services.   -----------------------------------------------------------------------------------------------------------------(Keri's jpay Email: 2-16-12 and myself email 2-26-12 to Jason)

**SOAP ASSESSMENT**: **Corporate Private Policy agenda:** without or lacking any medical records, assessment or evaluation, the patient was treated as a member of the general population and subject to

discrimination on a default basis imposed by Facility Staff including statements: **condition does not exist, medical records do not exist.** ------------------------ (Grievances Record)

**18. A) February 23, 2012**     **FIRST CALL TO JULIE RUSSELL, ADA COORDINATOR**, providing --------------------------------------------- family known medical background on HIS ULCERATIVE COLITIS and ----------------------------------------------------condition; requesting **Assessment and Evaluation for a Pre-Existing chronic and disabling medical condition**.  Response: There are Forms to fill out to request an interview.

**Outcome: March 21, 2012**     ADA Coordinator Letter to Jason stating the **Application Forms filled out by Jason did not cover his Condition** so **he did not qualify for ADA "membership" or assistance**. There were only 4 specific categories ADA addresses. **Referred to HSA for "Accommodation" needs.**  [DEFINITION: ACCOMMODATION NEEDS WERE ADDRESSED AS "REASONABLE OR UNREASONABLE" AT THE FACILITY'S DISCRETION] (Vayah Email to Jason 2-23-12)

**ACCOMODATION OUTCOME:** request for bathroom access "accommodation" during mealtime was: "a Diaper is reasonable". [Per Grievance Protocol Refuted and Rebutted as unreasonable; imposes hardship conditions including potential violence by other inmates in proximity to a dirty diaper during mealtimes.]

**SOAP ASSESSMENT: UNREASONABLE - public offensive smell, toxic contact with inflamed rectum,  duress in proximity with many other inmates while eating.]** (Grievance record)

**18. B)**                         Letter from Meghan Reed, Office of Legal Services, ADA Inmate Coordinator: Reply to Jason re inquiry for ADA status; *"While you may find your disease protected under the ADA, it is not included; not an AIC/ADA issue; your matter is one of "reasonable accommodation."* The Letter ends with Administrative Regulation 750-04 QUOTE: " *According to the ADA no qualified individual with a disability shall, on the basis of disability be excluded from participation or denied the benefits of DOC services, programs or activities or be subjected to discrimination.*"

<span style="color:purple">**SUBSEQUENTLY THE EQUAL ACCESS POLICY CLAUSE WAS REMOVED FROM THE ADA APPLICATION FORM** (I was told directly that this occurred during a phone call speaking with Meghan about the Application Form that I had downloaded from the CDOC website and dated January 1, 2012. Told the Form was obsolete less than 3 months later by Meghan, stating that the clause no longer applies and my Form was obsolete.)</span>

**Jason rebutted that the ADA "equal access Clause" was misleading and that internal corporate policy DID NOT support or apply it except in extremely limited medical diagnoses. Subsequently, the Facility removed it from the Inmate Public Bulletin Board.**         --------------------(Meghan Reed, ADA Inmate Coordinator, Office of Legal Services, 3- 21-12)

**SOAP ASSESSMENT: INFORMATION CONFLICT:  "EQUAL ACCESS" FOR ALL INMATES REMAINED UNDEFINED.**  Jason was directed back to the authority of the **HSA to request**

"reasonable accommodation;" a CDOC Policy allowing "equal access" based on a "qualified disability" that states "no individual shall be excluded from participation or denied benefits of DOC services, programs, or activities or be subjected to discrimination. Outcome: Without a "qualified status" his condition was treated as if there were no medical needs and no severe symptoms of disease. "Reasonable" Accommodation requests were regularly denied without a qualified status that remained undefined and the word "reasonable" also remained undefined and subject to nondisclosed discretion.-------------------------------------------------------------------------(Megan Reed Letter, ADA dated 4-23-12 and personal Notes and email to Jason of ADA conversations)

19. **February 26, 2012**          **FIRST CALL TO DOLORES MONTOYA** as an involved family member to provide patient medical background for symptoms progressing through High School, first year in college symptoms sent him to the ER and about 1 year later hospitalized and diagnosed with chronic ulcerative colitis since September 2002. Relevant family history of 4-generational genetic predisposition, prior **medications attempted and medically necessary daily care needs from chronic diarrhea such as bathroom access, dietary supplementation for malnutrition, malnourishment and weight loss.** ------------------------------------------------------------------------------------------------------------------------------------------- (Letter for CDOC from CCDC Jamie Lewis, Case Advocacy 8-24-2012, Vayah's Email report to Jason)

20.A) **March 01, 2012**          **Second Call to HSA Nurse, Montoya and MEAL PASS approved** by Dorothy Montoya HSA; **reported how debilitating symptoms leaving him immobilized, did not allow Jason flexible access to mealtimes and he ended up repeatedly missing and going without food; while already suffering malnutrition, continuing malnourishment and weight loss. ((Signed Meal Pass 3- 5-2012 by current symptoms reported)**

**OUTCOME:** Jason and myself, we were never told that the MEAL/MEDICAL PASS EXPIRES in 90 days. Kite dated June 5th to HSA requesting medical pass that allows first pull to meds and meals. (Medical Kite: Request for Sick Call 6-5-12) The Meal Pass was never renewed though every protocol was attempted for relief or remedy and medical disease condition continued to degrade. FACT-DIARRHEA WITHOUT DIETARY REPLACEMENT OF ALLERGIC FOODS, cannot and does not come under control, the symptoms persist and can remain for a lifetime; FOUNDATIONAL INFLAMMATORY ALLERGIC dietary needs were never PROPERLY addressed.

**PRIVATE CORPORATE POLICY OUTCOME: MEAL PASS EXPIRED IN 90 DAYS AND WAS NEVER RENEWED.** A Medical Assessment by Dr. Vahil in October 2012, for medication monitoring after 2 months of appropriate Medication Treatment states; **"patient continues to have diarrhea. Dr. Vahil ends Report with: "I appreciate the opportunity of participating in the care of this pleasant patient."** -------------------------------------------------------------------------(Medical Report, Dr. Vahil              10- 23-12)

**SOAP ASSESSMENT: Diarrhea is a constant product of the disease.**

20. B) **March 01, 2012**          Grievance Request Step 1: QUOTE: Jason states **"if you think I'm lying about my condition, then have me submitted to the infirmary so you can witness the severity of my symptoms". Grievance repeated Step 2 on March 30, 2012.**
   (Grievance Record)

BROOKS_003792

**Grievance REPLY:** "no remedy stated."

**ASSESSMENT:** **FACT: Members of the General Public are not required to know or learn Legalese nor speak Territorial Code. In plain American english the remedy for relief was stated clearly and the response came back in JUSTINIAN CODE.** (see- the United States Supreme Court decision, West Virginia vs EPA June 30, 2022 and Declaration of Interdependence of the Governments in the United States, 1937)

**Legal Definition of Federal Code:** legal code - a code of laws adopted by a state or nation; "a code of laws". Justinian code, Roman law, civil law - the legal code of ancient Rome; codified under Justinian; the basis for many modern systems of civil law, including the Federal British Territorial government and the Municipal Government operated by Congress in the District of Columbia.

**21. March 14, 2012**      **ADA FORM (Litigation Remedial Plan Application Form) STATES:** "OFFENDERS WHO DO NOT QUALIFY FOR CLASS MEMBER STATUS ARE STILL ENTITLED TO REQUEST ACCOMMODATION UNDER THE ADA."

**OUTCOME:** Vayah downloaded this FORM from the CDOC Website on 3-14-12 and also on AIC Meghan Reed's Letter 3-21-12 and was subsequently told by Meghan Reed, AIC that THE CLAUSE WAS REMOVED AND NO LONGER APPLIES. (AIC Letter 3-21-12 including Approve/Deny Reports-all denials, "not qualified" per internal corporate Policy)

**Grievance:** Jason was able to refute the ADA Policy of providing false and misleading information and GET THE FACILITY TO REMOVE THE POSTED ADA POLICY FROM THE INMATE BULLETIN BOARD, after if went through full grievance process. (phone call from Jason)

**22. March 16, 2012**     **My 4 page Letter to Mr. Chavez, Case Manager per Paul Cline whom** reports Jason needs to work with his Case Manager to coordinate Medical Care with HSA for daily needs.

**OUTCOME:** Mr. Chavez was not involved.

**SOAP ASSESSMENT: MISDIRECTION.**

[Definition: SOAP is a method used by medical providers for medical charting critical information for the patient's health; Subjective, Objective, Assessment, Plan]

**23**. **March 30, 2012**     **First Call to Kathy Howell, Regional Medical Administrator**. (call was made to Dolores Montoya for attention for Jason, but she was out of town) Kathy given medical history and ongoing issue of no continuity of care, lack of treatment and daily safe diet.

Kathy answers my inquiry regarding the **discrepancy between Bent County having complete Medical Records {including a proper Diagnosis and the required daily management protocols including Ensure supplementation for weight loss, extra gluten free snacks for malnutrition and pain medication} that Fremont is completely dismissing or ignoring.**

**Kathy's RESPONSE: "PRIVATE AND PUBLIC (re PARENT CORPORATIONS PROVIDING MEDICAL SERVICES) DON'T FIT WELL TOGETHER-WE USE DIFFERENT FORMULARIES."** **(Discrepancy noted: Ensure used for the last 5 years, is over the counter, not a formulary**)

**OUTCOME: DAILY MANAGEMENT NEEDS CONTINUE TO BE IGNORED BY FACILITY STAFF.** Follow up with two (2) LETTERS MAILED to Kathy (per our conversation(s)) dated 4-5 and 4-13, 2012 (original letter copies retained)

**24. April 4, 2012** Colonoscopy/Endoscopy by Dr. A Vahil; "PANCOLITIS" REFERRED FOR SURGERY EVALUATION. -------------------------------(Medical Record 4-4-12)

**25. April 5, 2012** First Letter to Kathy Howell, Regional Clinical ADMIN, non-resolution re lack of care issues at Fremont. ---------------------------------------------------(mailed Letter copy and receipt)

**26. April 13, 2012** WORK-JOB CLASSIFICATION: {My Note: LACKING ANY REFERENCE TO RECENT DIAGNOSTIC ASSESSMENT} WORK STATUS APPLIED : "AS ANY OTHER HEALTHY INMATE" to work-duty in the kitchen standing 6 hours a day; WHILE WEAK, IN PAIN AND VERY ILL IN AN ACUTE EXACERBATION FORCED BY CONDITIONS OF NONTREATMENT. NOTE: March 30th still working, standing in the kitchen 6 hours a day.------------------------------------------------------------------(Vayah Jpay Email to Jason 4-26-12 and Kite Sick Call request to reset M-rating for job placement 4-13-12 Exhibit 10 and-Exhibit 8 -Grievance Step 2 dated 3-30-12 (14 Highlights Case)

**27. April 13, 2012** Kite Sick Call: Upon learning this same day that THE DOCTOR IS THE ONE TO SET THE WORK CLASSIFICATION FOR JOB PLACEMENT allowing for the "severity of his sickness" but had never attended to it. JASON REQUESTS THE WORK M-RATING BE RESET AS HE HAD NEVER BEEN INFORMED UNTIL TODAY. -------------------------------Kite #52A. Exhibit 1-85)

**SOAP ASSESSMENT: cruel and unusual punishment allowed and promoted.**

**28. April 20, 2012** Dr. Timothy R. Brown, M.D. Surgery Specialists of Fremont County ------------------------------------------Surgical Consult April 20, 2012 (referred by Dr. Vahil from 4-4-12 visit); ---------------------------------------Report on History and Physical: "TEN YEAR HISTORY OF MEDICALLY INTRACTABLE ULCERATIVE COLITIS, NO LONGER ABLE TO TOLERATE STEROIDS, HAS 10-16 BOWEL MOVEMENTS EACH DAY. NO RECENT COLONOSCOPY FOR REVIEW. RECOMMENDATION FOR PROCTOCOLECTOMY WITH J-POUCH. "patient understands and agrees to proceed." ---------------------------------------------------------------(Medical Record – service date 4-20-12)

**FOLLOW-UP: May 5, 2012** Jason sees actual Records statement and rebuts any "agreement to proceed" as this was a consult only and the consequences would be massively invasive, risky and life altering. (Medical Record History and Physical dated 5-3-12)

**OUTCOME: Jason emphatically denies and rebuts in Grievances that there was any "agreement" made to proceed and that he has the right to receive less invasive, less risky and life altering treatments. RADICAL SURGERY IS ONLY USED AS A LAST RESORT AND NOT UNTIL OR UNLESS OTHER LESS INVASIVE TREATMENT MEDICATIONS ARE ATTEMPTED FIRST.** Jason through Grievances (over next 2 months) presents his right to Treatment with other potential medications that are available.

**SOAP ASSESSMENT: Medical without prior records, prescribed high dose Prednisone**; already contraindicated by prior medical record overuse: showing dangerous side effects, had to be discontinued.

**PREDNISONE IS NOT A TREATMENT, ONLY FOR SHORT TERM MANAGEMENT** and in Jason's case had already been overused to the point of dangerous side-effects.

**INMATE DEATH IN CELL:** Per Prison News on **JUNE 18, 2012 THERE OCCURRED "AN UNTIMELY DEATH OF A 27 Y.O. INMATE ON PREDISONE" and the same day, Clinical called Jason into a Staffing Meeting."**          (Vayah Email to Jason 2-26-12; Medical Record and Exhibit #5-14 Highlights)

**29. May 01, 2012**             **Authorization FORM to Release Medical Information** signed by Jason for Vayah and Keri.  ------------------------------------------------------------ (Medical Record 5-1-12)

**ASSESSMENT: Despite all my Facility Staff contacts this had not been done yet. Jason remained -------------------------------uninformed and therefore MY STAFF CONVERSATIONS AKA PATIENT'S -----------------------------------MEDICAL HISTORY AND NEEDS remained off the record.**

**30. May 2, 2012**        Jason's 11 page hand written Letter to Warden Jones, appealing for a course of action re conditions of the Facility impose a dangerous environment for his medical safety. Reporting that Clinical Services is nonresponsive with lack of treatment and daily care needs that puts him at risk and is harming his health condition further. Petitioning that "the Warden is responsible for ensuring the safety and well-being of prisoners" per [C.R.S. 17-1-104.]

**RESPONSE MAY 4:  re Medical-** "Warden has no authority" Referred back to Clinical to request again.          ---------------------------------------------------------------(Exhibit #71 and #72 of Exhibits 1-85)


**MAY EVENTS ARE NUMEROUS AND STUCK ON A MERRY-GO-ROUND; LIKE GROUND HOG DAY— A REPEATING SYNDROME OF THE SAME - NO RECOURSE BUT THE PLODDING THROUGH OF A SLOW GRIEVANCE SYSTEM (USING POLICY "CODE," A FOREIGN LANGUAGE).
I RECOGNIZE THAT STAFF HAVE BECOME UNRESPONSIVE AND THAT MY OWN ACTIONS CAN DO NO MORE.**

**31. May 30, 2012**         **CHRONIC CARE STATUS APPROVED** BY CLINICAL; JASON IS NOT TOLD            and Staff vs treatment or care need responses do not change -------------------------------           (Exhibit #6-14 Highlights)


**32. May 31, 2012**              Grievance Step 1: What is the purpose of CDOC's grievance process if no reasonable administrative remedies can ever be provided for medical issues? (#76: Itemized Summary List of Exhibits 1-85)


**33. May 31, 2012**             Medical Kite communication includes: "Ms Montoya has proved to be non-existent to help me manage my symptoms" -------------------------------(Jason's Kite Sick Call dated 5/31/12)

**34. June 5, 2012**           Kite Request for Meal Pass renewal that expired today. {subsequently **Pass WAS NEVER RENEWED**} --------------------- (Itemized Summary List of Exhibits 1-85)

**35. June 08, 2012**         **Staffing Meeting held by Kathy Howell** with Jason present. Jason was approved for a 1-day Transport (for medical testing) as he cannot tolerate the hardships of normal 3-day Transport.

**36. June 18, 2012**         **Staff Meeting OUTCOME**: no follow through, nothing came of it including: Jason states in Grievance "proved to be a formality; will continue to be denied basic human needs." He also would call and let me know important points. On 6-18-12, ten days later, the **1 Day Transport Order was ignored and Gastroenterologist appointment was cancelled.** Grievance Process remains the only channel to establish a record of daily conditions for patient. ---------------------------------------------------------------------(Exhibit #78: Itemized Summary of List of Exhibits)

**JUNE CONCLUSIONS: Grievances continue reporting "denied" and accommodation does not happen.**

**JULY CONCLUSIONS: The Grievance Process continues through to STEP 3 conclusion: receiving Step 3 responses completes the mandatory "exhaustion" per each separate item or issue. If not "approved = exhausted" the process must start all over from scratch.  To my belief nothing was every approved through the Grievance process; denial was 100%.**

**37. July 21, 2012**         Grievance Step 3 Highlights: Jason states: *"the Staffing Meeting proved to be a formality which has provided no reasonable accommodations to better manage my disease…there still is no accountability here and issues continue to be ignored…I'll continue to be denied basic human needs"*… --------------------------------------------------------------- ( #83: Itemized Summary List of Exhibits 1-85, 7-21-12)

**Without or until the required "exhaustion "of grievance protocol; even Attorneys could not respond or engage to advocate for Jason. My role turned to Secretarial for Jason. I was his interface with communications and resources, Attorneys and Advocacy Outreach efforts from the outside world.**

**AUGUST CONCLUSIONS:**

**38. Medication Treatment by Gastroenterologist Dr. Vahil's Assessment and course for medications Plan (visit July 18, 2012) began due to Jason's refusal to undertake the serious risk and life altering ordeal of surgical removal of his colon. He also discovered that CDOC DOES NOT DO CORRECTIVE REVERSALS for temporary J pouches which proposed, in my own words: "a lifetime sentence to being crippled." Omissions and gaps remained, disallowing consistency and stability in treatment.** ----------------------------------------------------------------(Dr. Vahil Medical Record Assessment and Plan, 7/18/12)

 **(FACTS ON MEDICAL RECORDS SHOW HIS CONDITION OF DETERIORATION AND THE HARM SUFFERED DUE TO LACK OF PROPER MEDICAL CARE ON THE SUM OF THE INCARCERATION TIMELINE.)**

**A.)QUOTES Jason regarding his medical care- my hand written notes in my notebook dated 3-31-12. The words he would speak to me continued to ring true for months and years; continued with regular occurrences of omissions, terminations, expirations, despite Medication Therapy begun in August):**

- **they still ignore me**
- **this is deliberate indifference**
- **their policy definition is subject to their own interpretation (within the litigation handbook)**
- **I can't walk a hundred yards**
- **they can't take care of me here**
- **I can't get toilet paper**
- **my custody rating is all zeros**
- **I can't stand in med-line and then go to meal-line without a bathroom break, so I miss meals**
- **I can't tolerate conditions of confinement, without access to a bathroom**
- **I can't access a flexible exercise time that I need to help by body move out all the toxins**

**B.) SUMMARY ASSESSMENT OF MEDICAL SERVICES:**

a.) **INCONSISTENT, UNPREDICTABLE, CONTRADICTORY; NO FOLLOW-UP, NO FOLLOW THROUGH, ANY POSITIVE ACTION WENT DROPPED, REMOVED OR TERMINATED AND WAS SHORT LIVED.**
b.) **STAFF TURNOVER** was often and regular and with each occurrence, the new Staffing was marked by **no Continuity of Care ALLOWING MEDICAL CARE DISRUPTIONS THAT COMPLETELY COMPROMISED PATIENT'S CHRONIC CARE CONDITION.**
c.) **ANY SUCCESS THAT DID HAPPEN WAS SHORT LIVED AND NEVER RETURNED and/or EXPERIENCED CONSTANT DISRUPTIONS:** the first meal pass of 90 days, never renewed, medications ordered regularly allowed to run out or terminated or removed; sometimes within 2 days of the Order written.

**C.)ACTION - LEGAL LITIGATION IS REQUIRED FOR REMEDY OR RELIEF:**
Actual Medication Treatment begins while system obstacles and obstructions continue to occur regularly; interfering with and making consistent, reliable and timely treatment difficult at best, **while daily needs go unmet REPRESENTING UNACCEPTABLE HARM UNDER DURESS TO PATIENT.**

**D.)PRIVATE INTERNAL CORPORATE POLICY: CDOC operates a Private (by Board Members for profit of their shareholders) Corporate Policy that mandates AUTHORITY OVER CLINICAL SERVICES "AT THEIR DISCRETION" INCLUDING:**

A. Over-riding or dismissing doctor's Orders and Recommendations.
B. Allowing medications and medical passes or whatever relief acquired to be randomly, sometimes within days, terminated or allowed to run out, leaving serious gaps in treatment and/or never reinstated.
C. Frequent Staff Turnover with no continuity of care protocol had Staff that remained uninformed or unfamiliar with a patient's condition or needs including; ANY GROUND GAINED with prior Staff WAS LOST, usually permanently.
D. Imposes an environment that is an active endangerment; not safe while trying to manage a chronic debilitating disease putting Jason's at further risk of bodily deterioration and harm.

**E.)LEGAL LITIGATION IS BEGUN:**

**39. August 2012:** Legal Litigation for lack of safety, bodily harm and endangerment is pursued by Vayah ( nee Wendy) with an experienced Attorney and outreach is made to the Colorado Cross-Disability Coalition under public advocacy; to build and develop a legal case and an advocacy case. (First Attorney engaged August 2012 through February 2013. CCDC engaged August through October 2012) (CCDC Case Management Jamie Lewis and RN 111 Nurse Terencia; records)

**40.** **QUOTE: CCDC Case Management RN Nurse Terencia Beavais** states:
   **"I am aware of systemic abuses at Fremont. They don't have the right to kill him."**
   --------------------------------(Phone interview conversation; hand written notes, 50 minutes, 9-6-2012)

**ACTUAL MEDICATION TREATMENT (SINCE INCARCERATION May 24, 2009) BEGINS FOR 6 MONTHS: AUGUST 2012 TO JANUARY 15, 2013.**

**41. January 15, 2013   LAST SHOT OF PRIMARY MEDICATION SCHEDULED JANUARY 15TH; CLINICAL "DID NOT HAVE."** ----------------------------------------------------------------------------------------------------------- (phone call from Jason, to assist)

**42. January 15, 2013   Call in and Letter to Kathy Howell for intervention: Bullet list for Fremont Facility "unable to maintain appropriate treatment protocol:"**

1. Follow-up visits are not provided.
2. Medications are not ordered.
3. Medication monitoring and adjustments are not made.
4. Communicated issues are left ignored at best and unresolved at worse.
5. Necessities are left forgotten.
6. Medical protocol is not followed.
7. The new HSA does not talk or provide action.
8. The new Case Manager does not cooperate when it is his job to do so.
9. No one is responsible and everybody is working to be unaccountable.
10. The avenues of communication have been effectively shut off and closed down. The grievance review system is not set up to resolve anything, only to shut you down or shut you up.

   **OUTCOME:** Kathy Howell has been transferred to another department, there is a new Regional Coordinator Patrice Baldwin and I am referred back to the new HSA.   ------------------------------------------------------(Letter to Kathy Howell to send upon phone contact, was NOT SENT dead end. 1-15-12)

**43. January 16, 2012   Call made to new HSA Ms. Foster to introduce myself and make 3 specific requests for: meal pass (never renewed), extra toilet paper (never provided),  and visit to Gastroenterologist to monitor and adjust medications treatment (monthly visits not provided).** -----------------------------------------------------------------------(Letter to Ms. Foster was NOT SENT. dead end)

**Last Staff Letter Report written but not sent, due to nonresponse, included:**

- **Medications allowed to unexpectedly "run out, not supplied or terminated."**
- **repeated incidences of missing meals and enduring forced fasting without toilet or food, during lengthy medical transport(s)**

- **Constant Turnover in Staffing without responsibility for continuity of care by record or history.**
- **Letter Summary including: Multiple and repeated incidences ALLOWING inconsistency and gaps in; medications, visits for monitoring and/or adjusting Treatment response, REPEATED Treatment lapses and omissions all of which compromise the effectiveness and success of Treatment, including ongoing denial of daily care needs.** ----------------------------------------------------------------------------------------------------------------(Phone Call without sending the Letter to HSA, Ms. Foster 1-16-13; no follow up, nonresponsive)

**Witness Statement:**

I know that my son was left to face the reality of being left to die in his cell due to a denial and lack of medical treatment, irregular and inconsistent treatment constituting active endangerment and harm to his bodily disease with repeated care needs unexpectedly terminated, cancelled, denied ongoing.

Clinical response by the system-structure compartmentalization was "untimely" in the extreme; allowing and promoting unnecessary suffering, pain and harm to the patient.

Groundhog Day repeat/replay has continued over days, weeks, months and into years exposing an internal administrative policy operating in conflict of interest, ruled by budget control and budget management where humane care, much less standards for quality of care, cannot and do not exist.

**Jason appeared as a Witness in the court litigation by family for sick 27 year old inmate, left to die in his cell, during stay at Bent County (BCCF) under Dr. Oba's care. The mother lost her son; went to court and won the Case.** ---------------------------------------------------------------------------------------- (Prison Legal News Article: Colorado CCA Doctor Disciplined for Role in Prisoner's Death, March 2013)

**OUTCOME: DOJ (internal private corporate policy) ends reliance on privatized facilities due to "ongoing scrutiny."** (CCA Legal News November 3, 2016 - Correctional Corporation of America rebranded its corporate name to "CoreCivic" - Wikipedia)

Footnote: the use of ALL CAPS in this Testimony in the form of an affidavit is for Witnesses' purpose of emphasis or highlight for ease of reading. Any presumption that my words are using DOG LATIN is rebutted and refuted herein. The use of **bold** print or underline is for the same plain purposes and not to be construed as pertaining to any other implied meaning re Federal District Statutory Code Style Manual.

BROOKS_003799