IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-SKC

JASON BROOKS,

    Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,

    Defendant.

---

**RESPONSE TO PLAINTIFF JASON BROOKS' MOTION IN LIMINE NO. 3 RE: MR. BROOKS' FORMER ATTORNEYS, DISMISSED CLAIMS AND DEFENDANTS, AND MR. BROOKS' OTHER CIVIL LITIGATION**

---

Defendant Colorado Department of Corrections ("CDOC"), by and through the Colorado Attorney General, respectfully files the within Response to Plaintiff Jason Brooks' Motion in Limine No. 3 re: Mr. Brooks' Former Attorneys, Dismissed Claims and Defendants, and Mr. Brooks' Other Civil Litigation ("Motion #3"). CDOC states the following in support thereof:

**INTRODUCTION**

The parties' various Motions in Limine and Trial Briefs in the above-captioned matter have discussed the background of, and facts surrounding, this case at length, and in the interest of brevity, CDOC will not rehash it in this Response. As for the specific issue raised in Motion #3, by way of summary, as part of his case-in-chief at the upcoming trial, Brooks is expected to provide extensive testimony concerning virtually all aspects of his sole remaining Americans with Disabilities Act ("ADA") claim – *e.g.*, the severity and progression of his ulcerative colitis, the sufficiency (or lack thereof) of any accommodations provided for it, his communications

1

with CDOC staff in an effort to address his condition, and a myriad of other relevant issues. It is probably no exaggeration to say that Brooks is planning to be his own star witness. To that end, the credibility of Mr. Brooks himself is among the central issues that the jury will have to decide. CDOC thus believes that the timing of Mr. Brooks' lawsuit, his financial motivations in filing it, and the direct and indirect pre-filing guidance that he received from other attorneys or advocacy groups on what he should do and say to be able to maximize his chances at bringing a successful claim, are highly relevant considerations to put before the jury as it decides whether Mr. Brooks is credible.

Specifically, the discovery in this case[1] now details a curious timeline, and one that may well lead a jury to conclude that Mr. Brooks made several misrepresentations about his medical condition, and therefore his need for specific accommodations, in an attempt to provide the pretext that might substantiate his ADA claim. The relevant events are as follows: shortly after arriving at Fremont Correctional Facility ("FCF") on February 14, 2012, Mr. Brooks was issued a pass allowing him "first pull to meds & meals x3 months." A copy of this pass is attached hereto as **Exhibit A**. By the explicit wording of the pass, it was valid for three months: from

---

[1] On October 21, 2022, CDOC deposed Mr. Brooks' mother, Wendy Updegraff a/k/a Vayah Terra ("Updegraff/Terra"). At that deposition, Updegraff/Terra expressly relied on a set of notes and made other, repeated references to relevant documents she had in her possession. After approximately 45 minutes, the parties halted her deposition, and counsel for CDOC indicated that they believed it should be paused until the notes and other documents in Updegraff/Terra's possession were produced to, and reviewed by, CDOC. Counsel for Mr. Brooks agreed, and subsequently produced more than 4,000 pages of documents to CDOC as supplemental disclosures on or by October 25, 2022. Among the thousands of pages of documents in Updegraff/Terra's possession were hundreds of pages of handwritten notes documenting Updegraff/Terra's communications with Mr. Brooks (in which they apparently discussed Mr. Brooks' motives and strategy in filing the instant lawsuit). Furthermore, Updegraff/Terra possessed documents detailing her and Mr. Brooks' communication with various attorneys and advocacy groups in the 2012-2013 timeframe.

March 5, 2012 until June 5, 2012. (*Id.*) The pass clearly expired on June 5, 2012; however, Mr. Brooks did not file a grievance related to the expiration or re-issuance of the original pass until March 28, 2013. See **Exhibit B**. Furthermore, Mr. Brooks did not actually request a renewal of this pass as an accommodation under the ADA until May 31, 2013. A copy of this Request for Accommodation is attached as **Exhibit C**.

During the same period of time that Mr. Brooks began grieving the lack of a pass, and also requesting the re-issuance of a pass as an ADA accommodation to address his reported fecal incontinence brought on by his ulcerative colitis, he was reporting a greatly improved medical condition to his healthcare providers. In January of 2013, Mr. Brooks' medical records reflect "no stool incontinence." See **Exhibit D** – Brooks Medical Records, p. 1. On April 12, 2013 – two weeks after grieving the lack of a first pull meal pass and approximately six weeks before requesting such a pass as an ADA accommodation – Dr. Timothy Creany, a FCF medical provider, saw Mr. Brooks to discuss his ulcerative colitis and noted, "[patient] is now doing as well as he had ever." (*Id*. at p. 2.) Dr. Creany also noted that any prior fecal incontinence had "mostly resolved." (*Id.*) On June 11, 2013, Mr. Brooks was seen by Dr. Atul Vahil, a gastroenterologist, and reported "this was the best he had felt in years," and that his stool incontinence was both infrequent and improved. (*Id*. at p. 3.) On August 1, 2013, Mr. Brooks again told Dr. Creany that "this was the best he has ever been." (*Id*. at p. 4.) Even into June of 2014, Mr. Brooks gastroenterology records reflect "no stool incontinence." (*Id*. at p. 5.)

Mr. Brooks' stated reason for needing a first pull meal pass to access prison meals was because he was experiencing "fecal incontinence," which reportedly rendered him unable to meaningfully access prison meals in the FCF cafeteria. *See* Exhibit C. He further represented that

he had missed "hundreds of meals" because of "this" (presumably fecal incontinence) since his previous pass expired. (*Id*.) A jury may be left to wonder why Mr. Brooks would so adamantly request a meal pass as an ADA accommodation, and why he would maintain that he had missed hundreds of meals *due to fecal incontinence* when, in fact, he was telling healthcare providers that he was not incontinent of stool and was actually doing quite well.

To that end, Mr. Brooks' communications with prior advocacy groups or legal counsel may serve to answer this important question. Among the documents recently provided by Updegraff/Terra is an e-mail from attorney Alison Ruttenberg to Mr. Brooks; Updegraff/Terra appears to have acted as an intermediary in delivering the communication to her son. In this communication, Ms. Ruttenberg informs Mr. Brooks that, to have a viable lawsuit, he needs to take a series of highly specific actions, and he needs to do so immediately. A copy of this e-mail is attached as **Exhibit E**. Ms. Ruttenberg tells Mr. Brooks, "I need you to file 10 more grievances, to exhaust the other issues…So, please just DO THIS now so we can get jurisdiction over the other issues." (*Id*.) Ms. Rutenberg then proceeds to lay out the 10 issues that Mr. Brooks is to grieve "now"; issue nine goes to the ADA claim in this case ("Making you wear a diaper when bathroom access is not given. You need to put in the grievance that you need a bathroom every ten minutes, or whatever it is that you need. You need to specifically ask for it.") (*Id*.)

Ms. Ruttenberg goes on to tell Mr. Brooks, "In fact, the ADA has not been exhausted at all…" (*Id*.) Updegraff/Terra forwards Ms. Ruttenberg's letter to Mr. Brooks on March 21, 2013; over the next ten days, Mr. Brooks dutifully does as he is told. He grieves his lack of a meal pass, and – for the first time – requests a meal pass as an ADA accommodation. With this background in mind, a jury could conclude that Mr. Brooks requested a first pull meal pass in the spring of

2013 not because he legitimately needed it at that time as an accommodation for the current state of his ulcerative colitis, but because he wanted to use the failure to provide the requested accommodation as the basis for an ADA lawsuit.

Exhibit E is one of several examples where documents retained and produced by Updegraff/Terra illuminate Mr. Brooks' potential motivations behind his ADA claim. Other documents reference decisions (purportedly made by Mr. Brooks) not to pursue an advocacy case with the Colorado Cross-Disability Coalition because it could compromise a "real" legal case. Yet additional recently produced documents shed light on Mr. Brooks' potential financial motivations for not pursuing this type of relief. For example, Updegraff/Terra produced a document in which she wrote, "injunctive relief claim = no money" (emphasis in original); *see* **Exhibit F.** During her deposition, Updegraff/Terra testified that she would frequently take handwritten notes of her conversations with Mr. Brooks, and that many of her notes, such as Exhibit F, are little more than a transcription of Mr. Brooks' thoughts about his legal strategies and his scheme to optimize the chances of succeeding in his real goal – to extract the most money possible out of CDOC.

## ARGUMENT

I. *Evidence relating to Mr. Brooks' former attorneys, dismissed claims, dismissed defendants, and/or other civil constitute admissible because such evidence goes to Mr. Brooks' credibility and motives.*

As explained above, Mr. Brooks reported experiencing greatly improved health by the time he followed Ms. Ruttenberg's directive to grieve the issues of diapers, bathroom access, and a lack of ADA accommodations for his ulcerative colitis. The CDOC therefore disputes Mr. Brooks' assertion that his disability and its associated symptoms (namely, fecal incontinence)

was the reason that he could not access prison meals. The CDOC should be allowed to explore reasons why Mr. Brooks might say something that is, in fact, untrue. To this end, and despite Mr. Brooks' objection, evidence bearing on Mr. Brooks' credibility and motive is highly relevant.

> a. The evidence is admissible under F.R.E. 401, 402, and 404(b).

As a threshold matter, 'relevant evidence' means evidence having any tendence to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. 401. It is only *unfair* prejudice, substantially outweighing probative value, which permits exclusion of relevant matter pursuant to Rules 401 and 402. *See United States v. Pettigrew*, 455 F.3d 1164, 1175 (10th Cir. 2006) (quoting *United States v. Sides,* 944 F.2d 1554, 1563 (10th Cir. 1991)). Moreover, the Supreme Court has pointed out that "[p]roof of bias is *almost always relevant* because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy or truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984) (emphasis added).

Finally, F.R.E. 404(b) permits the admission of evidence which shows a party's motive, plan, or scheme. "Showing [a] plaintiff's plan, scheme, or modus operandi through admission of prior lawsuits can undoubtedly be a proper purpose under F.R.E. 404(b)." *Van Deelen v. Johnson*, 2008 WL 4683022, at *3 (D. Kan. 2008) (citing *Batiste–Davis v. Lincare, Inc.,* 526 F.3d 377 (8th Cir. 2008); *Mathis v. Phillips Chevrolet, Inc.,* 269 F.3d 771, 776 (7th Cir. 2001); *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490 (7th Cir. 1998); and *Byrne v. Gainey Transp. Services, Inc.,* 2005 WL 1799213, at *2 (D. Kan. 2005)).

Here, the probative value of Mr. Brooks' communications with prior attorneys and/or advocates is that such evidence tends to show that he is parroting what someone else is telling him that he would need to say in order to bring a successful claim, as opposed to describing his real needs and symptoms as they existed in real time. Furthermore, Mr. Brooks' apparent (albeit most likely mistaken) belief that pursuing injunctive relief would preclude him from "money" also evinces a logical motivation to exaggerate or even fabricate aspects of his disability, to the extent he believed that doing so could result in a (perceived) payday. This evidence is offered for the proper, relevant purpose of rebutting Mr. Brooks' assertion that the first pull meal pass was a reasonable accommodation for his alleged fecal incontinence, and that the denial of such is a violation of his rights under the ADA. Additionally, evidence that evinces Mr. Brooks' beliefs about what kinds of remedies might be available to him, should he succeed on his claims (which include the ADA claim), are also probative sources of evidence as it relates to Mr. Brooks' motive for describing his symptoms and need for accommodation in a particular way. To the extent that Mr. Brooks abandoned efforts to pursue an "advocacy case" or obtain injunctive relief or any other course of action that might result in him receiving some sort of accommodation that he felt was more suitable because he felt that it would jeopardize his chances at a windfall recovery, that is clearly relevant to his motives in saying and doing what he did in the relevant 2012-2013 time period.

To the extent that CDOC was deposing Updegraff/Terra about draft complaints circulated amongst Mr. Brooks, Updegraff/Terra, and prior attorneys, the focus of the questioning was on whether and to what extent Updegraff/Terra was personally editing Mr. Brooks' legal claims – i.e., whether Mr. Brooks' statements about his needs and symptoms were truly his own, or were

7

being suggested and/or fed to him from another source. To that end, Updegraff/Terra was presented with documents that seemed to suggest that she was an active participant in guiding Mr. Brooks' characterization of his claims. What is relevant is not that Mr. Brooks previously raised several other claims against a myriad of other defendants; instead, what *may* be relevant pursuant to Rules 401 and 403 is the degree to which his mother – or anyone else – was telling him what he needed to say (or telling him what prospective attorneys were telling her that he needed to say), and the degree to which he was parroting back the same. Again, such evidence is relevant because it would tend to cast doubt on whether Mr. Brooks was actually experiencing the symptoms and circumstances that he has described in support of his ADA claim, or whether he was just *saying* that he did because someone told him that he needed to be able to do so to assert a successful claim for money damages.

      b. *The evidence is admissible pursuant to FRE 613(b).*

  Furthermore, evidence about Mr. Brooks' prior claims may be relevant and admissible to the extent that they would constitute prior statements of a witness (here, Mr. Brooks) under F.R.E. 613. As the court is well aware, Mr. Brooks has largely proceeded *pro se* over the years; therefore, Mr. Brooks' statements in previous filings are truly his own words. In these filings, Mr. Brooks' has repeatedly described (1) the nature of his disability, (2) the nature of his symptoms, and (3) the responses of various CDOC officials. Mr. Brooks has not always been consistent in his characterization of the same. CDOC can envision circumstances where it may desire to use Mr. Brooks' prior statements from his previous claims and filings as inconsistent statements governed by F.R.E. 613(b). "Prior pleadings may be introduced on cross examination

for use as an impeachment tool under Fed. R. Evid. 613." *Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1432 (10th Cir. 1990).

CDOC agrees with Mr. Brooks that it cannot admit evidence of his prior claims for the purpose of proving that Mr. Brooks is litigious. Moreover, CDOC is certainly not seeking to re-litigate Mr. Brooks' dismissed claims, as those claims were decided squarely in favor of CDOC. CDOC agrees with Mr. Brooks that a jury should decide Mr. Brooks' ADA claim on the merits, and a decision on the merits necessarily means a jury must be allowed to hear relevant evidence bearing on Mr. Brooks' credibility and motives.

## II.     *CDOC does not oppose a limiting instruction, whereby the jury would be instructed as to the purpose(s) for which they may consider evidence about other attorneys, claims, and/or defendants.*

Should the court determine that evidence about prior claims, defendants, and/or attorneys is relevant and admissible, CDOC does not oppose instructing the jury on the purposes for which such evidence is being offered. As stated above, such evidence would be offered for the purposes of assessing Mr. Brooks' credibility and motive. CDOC does not object to the jury being told that the statements and/or opinions of other individuals, including attorneys, should have no bearing on its determination of the issues, or its conclusions about the merit of the case.

Furthermore, should the jury receive evidence about communications between Mr. Brooks and other attorneys/advocacy groups, CDOC would not object to a limiting instruction that informs the jury that the evidence is being offered for its effect on Mr. Brooks. Indeed, the CDOC is wholly unconcerned with whether Mr. Brooks was receiving *accurate* legal information; what is relevant is what Mr. Brooks *believed* he needed to say or do in order to

receive a desired outcome, based on the information he was receiving.[2] Should this court instruct the jury that it may consider the words/communications only for the reason they are offered (that is, to explain what Mr. Brooks did after hearing the words), CDOC would have no objection.

## CONCLUSION

WHEREFORE, for the foregoing reasons, CDOC respectfully requests that the Court deny Mr. Brooks' Motion in Limine No. 3 and permit CDOC to cross-examine Mr. Brooks (and, likely, Updegraff/Terra) about their communications with former attorneys/advocates.

Respectfully submitted this 2nd day of December, 2022.

PHILIP J. WEISER
Attorney General

/s/ *Kelley M. Dziedzic*
KELLEY M. DZIEDZIC*
Assistant Attorney General II
JOSHUA G. URQUHART*
Senior Assistant Attorney General
RACHEL M. LIEB*
Assistant Attorney General
*Counsel of Record
Civil Litigation & Employment Law Section
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000
Facsimile: 720-508-6032
E-mail:
joshua.urquhart@coag.gov
kelley.dziedzic@coag.gov
rachel.lieb@coag.gov

---

[2] Notably, Mr. Brooks' communications with outside attorneys/advocates are *not* being offered for the truth of the matter asserted; instead, these communications are being offered for their effect on the listener (here, Mr. Brooks). Accordingly, the prohibitions against hearsay found in FRE Rules 801 and 802 do not apply. It is the fact that Mr. Brooks received and apparently acted on certain information that is relevant and probative, not whether the same information was truthful or accurate.

*Attorneys for Colorado Department of Corrections*

## CERTIFICATE OF SERVICE

This is to certify that on December 2, 2022, I have duly served the within RESPONSE TO PLAINTIFF JASON BROOKS' MOTION IN LIMINE NO. 3 RE: MR. BROOKS' FORMER ATTORNEYS, DISMISSED CLAIMS AND DEFENDANTS, AND MR. BROOKS' OTHER CIVIL LITIGATION, addressed as follows:

Kevin D. Homiak
kevin@homiaklaw.com

Athul K. Acharya
athul@pubaccountability.org

*Attorneys for Plaintiff Jason Brooks*


Adrienne Sanchez, CDOC
Associate Director, Legal Services

s/ *Elle Di Muro*