# EXHIBIT A

                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-CBS

---

DEPOSITION OF:  ATUL VAHIL, M.D. - June 1, 2016

---

JASON BROOKS,

Plaintiff,

v.

DAVID OBA, PATRICK BLAKE, ANGIE TURNER,
CORRECTIONS CORPORATION OF AMERICA,
DEBRA FOSTER, JULIE RUSSELL, KATHY HOWELL,
DAVID TESSIERE, and TRUDY SICOTTE,

Defendants.

---


              PURSUANT TO NOTICE, the deposition of
ATUL VAHIL, M.D., was taken on behalf of the Defendants
David Oba, Patrick Blake, Angie Turner, and Corrections
Corporation of America at 150 South Santa Fe Avenue,
Pueblo, Colorado 81003, on June 1, 2016, at 3:48 p.m.,
before Gail Obermeyer, Registered Professional Reporter
and Notary Public within Colorado.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                           6/1/2016

Page 2

A P P E A R A N C E S

For the Plaintiff:

        DANIEL R. SHAFFER, ESQ.
        Daniel R. Shaffer, LLC
        405 Ridges Boulevard, Suite B
        Grand Junction, Colorado 81507
        (Appearing telephonically)


For the Defendants David Oba, Patrick Blake, Angie
Turner, and Corrections Corporation of America:

        ANDREW D. RINGEL, ESQ.
        Hall & Evans, LLC
        1001 17th Street, Suite 300
        Denver, Colorado 80202


For the Defendants David Tessiere, Julie Russell,
and Kathy Howell:

        JOHN ALLEN VanLANDSCHOOT, ESQ.
        Colorado Attorney General's Office
        Ralph L. Carr Colorado Judicial Center
        1300 Broadway, 8th Floor
        Denver, Colorado 80203


For the Defendant Trudy Sicotte:

        JOSEPH PATRICK SANCHEZ, ESQ.
        Goodspeed & Merrill, LLC
        7000 East Belleview Avenue, Suite 355
        Greenwood Village, Colorado 80111


For the Deponent Atul Vahil, M.D.:

        LISA LEASURE, ESQ.
        Faraci Leasure, LLC
        4500 Cherry Creek Drive South, Suite 625
        Denver, Colorado 80246

**Brooks v. Oba, et al.**                    **ATUL VAHIL, M.D.**                    **6/1/2016**

Page 3

I N D E X

EXAMINATION OF ATUL VAHIL, M.D.:                              PAGE
June 1, 2016

By Mr. Ringel                                                   4

By Mr. Sanchez                                                 49

By Mr. VanLandschoot                                          57

By Mr. Shaffer                                                 72


                                                           INITIAL
DEPOSITION EXHIBITS:                                     DESCRIPTION

Exhibit 1   Curriculum Vitae of Atul Vahil,                    6
            M.D.

Exhibit 2   Progress Notes of Atul Vahil,                      9
            M.D. pertaining to Jason Brooks,
            7/18/12, with attachments

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 4

1           WHEREUPON, the following proceedings

2      were taken pursuant to the Federal Rules of Civil

3      Procedure.

4                *        *        *        *        *

5                (Deposition Exhibits 1 and 2 were marked.)

6                     ATUL VAHIL, M.D.,

7      having been first duly sworn to state the whole truth,

8      testified as follows:

9                          EXAMINATION

10     BY MR. RINGEL:

11          Q.   Doctor, would you state your name for the

12     record, please.

13          A.   Yeah.  Atul, A-t-u-l, Vahil, V-a-h-i-l.

14          Q.   Doctor, my name is Andrew Ringel.  I am an

15     attorney.  I represent three -- four of the defendants

16     in a lawsuit brought by one of your patients by the

17     name of Jason Brooks.  My clients are Corrections

18     Corporation of America, David Oba, Angie Turner, and

19     Patrick Blake.  Everyone else in the room, other than

20     your lawyer, represents one of the other parties in the

21     lawsuit.  And Mr. Shaffer, who is on the phone,

22     represents Mr. Brooks.

23               We're here to take your deposition.  Have

24     you ever had a deposition taken before?

25          A.   No.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 5

```
 1          Q.   Okay.  I'm sure that your attorney has
 2   given you an understanding of what the process of a
 3   deposition is like, but there are a few ground rules
 4   that I want to establish at the beginning to make sure
 5   that you and I are on the same page.  Okay?
 6          A.   Okay.
 7          Q.   If you don't understand one of my
 8   questions, please tell me that in any way you feel
 9   appropriate.  Okay?
10          A.   Okay.
11          Q.   If you answer one of my questions, I'm
12   going to assume you understood.  Is that fair?
13          A.   Sure.
14          Q.   If you need me to repeat or rephrase a
15   question, please ask me to do that.  Okay?
16          A.   Okay.
17          Q.   It's important for the court reporter to
18   get everything down that is being said during this
19   deposition, so we need to follow a few rules to make
20   sure that that happens smoothly.  If you can wait for
21   me to finish my complete question before you start your
22   answer, that would be great.  Okay?
23          A.   Sure.
24          Q.   If I interrupt you and you have just
25   paused and not completed your answer, please tell me
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 6

1    that, and I will give you every opportunity to complete

2    your answer.

3            A.    Okay.

4            Q.    It's also important to answer verbally

5    with some kind of intelligible word.  Some people in

6    conversation will say things like uh-huh or huh-uh, and

7    it's hard to know what that means.  And the court

8    reporter cannot easily take down a shake of the head or

9    a nod of the head, even though if I'm looking at you

10   I'm going to understand what you mean.

11                If you happen to nod your head, instead of

12   answering my question, I may ask you, "Do you mean

13   yes?"  I'm not trying to be obnoxious, I'm just trying

14   to have clarity as to what we're talking about.  Okay?

15           A.    Sure.

16           Q.    All right.  You've been handed what's been

17   marked for purposes of this deposition as

18   Exhibit No. 1.  Can you identify what that is for the

19   record, please?

20           A.    This is my CV.

21           Q.    Is that CV current?

22           A.    Yes.

23           Q.    And that generally provides your education

24   and work history; is that correct?

25           A.    That's correct.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                      6/1/2016

Page 7

1          Q.    I'm not going to go over it, but I wanted

2     to ask you a few general questions.  Your specialty is

3     gastroenterology; is that correct?

4          A.    That's correct.

5          Q.    How long have you been a

6     gastroenterologist?

7          A.    Over 25 years.

8          Q.    And where do you practice now?

9          A.    I'm practicing at the current address,

10    which is 1600 North Grand Avenue, Suite 440, Pueblo,

11    Colorado.

12         Q.    And what is the name of your practice?

13         A.    Digestive Diseases Specialists of

14    Colorado.

15         Q.    And how long have you practiced with that

16    organization?

17         A.    Sixteen years.

18         Q.    Okay.  Are you an owner of that business?

19         A.    Yes.

20         Q.    Okay.  Are there any -- is will anybody

21    else who is, like, a partner of yours?

22         A.    No.

23         Q.    Okay.  How many employees do you have?

24         A.    Fourteen.

25         Q.    Okay.  What -- can you describe generally

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 8

1   for me the nature of your practice?

2            A.   So it's a solo practice, which is the

3   gastroenterology practice.   Then I am affiliated with

4   two hospitals in town, but I'm not employed by them.

5   All the other practices in town are employed.   And I

6   have independent privileges with the hospital where I

7   do go and see consults requested by the primary care

8   physicians.   And I do calls at both of the hospitals.

9            Q.   And those two hospitals are St. Mary's and

10  Parkview?

11           A.   That's correct.

12           Q.   Okay.   How long have you had medical

13  privileges at those two hospitals?

14           A.   Same duration of time.

15           Q.   Okay.   Sixteen years?

16           A.   Yeah.

17           Q.   Okay.   Have you -- other than Mr. Brooks,

18  how frequently do you treat inmates who are

19  incarcerated in a prison or a jail?

20           A.   Generally, just once a month.

21           Q.   Okay.   How many times have you seen

22  Mr. Brooks?

23           A.   I've seen -- can I refer to this

24  (indicating)?

25           Q.   Sure.

Brooks v. Oba, et al.                     ATUL VAHIL, M.D.                        6/1/2016

Page 9

1          A.    It's just notes in chronological order.

2    About 12 times, 13 times.

3          Q.    And always in your clinic?

4          A.    Or surgery center where we do the

5    procedures.

6          Q.    All right.  What was the first time you

7    saw Mr. Brooks?

8          A.    The first time, I was asked to see him for

9    an endoscopy, for a procedure, for diarrhea and weight

10   loss.  And we did an endoscopy on him, which is the

11   upper endoscopy.  And that's when we -- that was the

12   first time I saw him.

13         Q.    And what was the date of the first time

14   you saw him?

15         A.    8/26/10.

16         Q.    And what was the most recent time that you

17   saw him?

18         A.    9/15, September '15.  I don't know the

19   exact date.  I can check it.

20         Q.    September of 2015?

21         A.    Yes.

22         Q.    Okay.  What I wanted to ask you now is the

23   sources of your information about Mr. Brooks.  Okay.

4    So you have, and what's been marked as Exhibit 2, is a

25   copy of your medical records that were produced by your

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                              6/1/2016

Page 10

```
 1    counsel.  Is that what Exhibit 2 is?

 2              A.    That's correct.

 3              Q.    And that consists of 77 pages; is that

 4    right?

 5              A.    That's correct.

 6              Q.    Are there any other records that your

 7    clinic maintains of Mr. Brooks, of any kind, other than

 8    what is in those 77 pages?

 9              A.    No.

10              Q.    What about billing records?

11              A.    I'm not sure.  There may be, yeah.

12              Q.    I assume that you charge somebody to

13    get --

14              A.    Sure.

15              Q.    -- for your services to see Mr. Brooks,

16    right?

17              A.    Yes.

18              Q.    Who do you charge?

19              A.    We charge the DOC.

20              Q.    Do you have a contract with the Colorado

21    Department of Corrections?

22              A.    Yes.

23              Q.    How long have you had such a contract?

24              A.    I'm not sure.  Maybe about over ten years.

25              Q.    Is it an annual contract, or does it have
```

Brooks v. Oba, et al.            ATUL VAHIL, M.D.            6/1/2016

Page 11

```
 1   some other duration?

 2        A.    I'm not sure.

 3        Q.    Okay.  Do you have a copy of the contract

 4   somewhere in the records of your clinic?

 5        A.    We should have, yeah.

 6        Q.    Are you paid -- how are you generally

 7   compensated pursuant to the contract with the

 8   Department of Corrections?

 9        A.    Generally, we have a contract for X number

10   of patients on one day that we assign to DOC.

11        Q.    And that's once a month?

12        A.    Once a month.

13        Q.    So you are a resource for the Colorado

14   Department of Corrections for any inmate with the DOC

15   that needs gastroenterology services that you could

16   provide on a once-a-month basis?

17        A.    Yes.

18        Q.    Is it a specifically scheduled date on the

19   month, like the first Tuesday in the month?  How does

20   that work?

21        A.    No, it's not.  Generally, it is on

22   Tuesday, once a month, but sometimes if they don't have

23   enough patients, it may go on to the next month.

 4        Q.    And the goal is for them to fill up one of

25   your days --
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 12

1          A.    Right.

2          Q.    -- to either see someone in your clinic or

3    to do a procedure in your surgical center?

4          A.    Right.  The majority of them are the

5    procedures, maybe one or two consults, like his.

6          Q.    Okay.  And the procedure -- what types of

7    procedures do you do for the CDOC?

8          A.    Upper endoscopy, which is the

9    esophagogastroduodenoscopy, that's what it's called;

10   colonoscopy; esophageal dilation; polyp removal.

11   That's about the bulk of it.

12         Q.    Do you know where the inmates that you see

13   are generally incarcerated, or do you not know, one way

14   or the other?

15         A.    We don't know.

16         Q.    Do you know how patients get referred to

17   you by the Department of Corrections?

18         A.    Yeah.  So they are scheduled -- they call

19   us, "These are the patients to be seen on this day.

20   This is the reason for the procedure," or whatever.  We

21   have a contract about a consultant practice, which is a

22   specialist consultant, not on a -- monitoring on a

23   regular basis.

24         Q.    Understood.  Okay.  So your role with

25   respect to the DOC inmates as a physician is to be a

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                      6/1/2016

1    specialist consultant?

2         A.   That's correct.

3         Q.   So the people that would be the primary

4    healthcare providers for each of these patients would

5    be someone other than you?

6         A.   That's correct.

7         Q.   And they presumably -- do you know who

8    that would be for any particular patient?

9         A.   No.

10        Q.   You mentioned a scheduler.  Do you know

11   who the person is who schedules for the Department of

12   Corrections with your office?

13        A.   No.

14        Q.   Do you have a scheduler at your office?

15        A.   Yeah.

16        Q.   Does that person interface with the

17   Department of Corrections scheduler?

18        A.   Not all the time, because -- yeah,

19   majority of the times, yes.

20        Q.   Okay.  Who is the person that's the

21   scheduler at your office?

22        A.   Her name is Rebecca.

23        Q.   What is Rebecca's last name?

24        A.   Her name is Rebecca Gonzales.

25        Q.   And how long has Ms. Gonzales worked with

Brooks v. Oba, et al.          ATUL VAHIL, M.D.          6/1/2016

Page 14

1   you as a scheduler?

2          A.    In our office, it's not just one job.

3   They take care of the scheduling, they take care of

4   this, if somebody else is not available.  It's not one

5   particular person assigned just for the scheduling.

6          Q.    Understood.  Okay.  Let me ask a better

7   question and a more general one.  How long has

8   Ms. Gonzales worked for you?

9          A.    Six, seven years.

10         Q.    And among her duties and responsibilities

11  is scheduling?

12         A.    Partly, yes.

13         Q.    Fair enough.  And she might be a person

14  who would act as a liaison with the scheduler for the

15  Department of Corrections?

16         A.    She is not specifically assigned for that.

17  Sometimes other people take care of -- yeah.

18         Q.    You have a variety of different

19  administrative staff?

20         A.    Yes.

21         Q.    And any one of them could be responsible

22  for scheduling of a particular patient?

23         A.    Right.

24         Q.    Okay.  I understand.

25         A.    Because the schedule is not -- what comes

1   is they put the schedule together, and they just fax it

2   to us:  These are the patients to be seen for this

3   reason.

4           Q.   Okay.  So --

5           A.   Just not they're scheduling one person at

6   a time.

7           Q.   No.  I understand that.  So the Department

8   of Corrections knows that you have availability on a

9   particular day?

10          A.   Right.

11          Q.   They create a schedule, and then they send

12  you the schedule with the information about what each

13  of those individual patients needs to be seen by you

14  for?

15          A.   Right.

16          Q.   Okay.  And it gets faxed to you from

17  somebody at the Department of Corrections?

18          A.   Yes.

19          Q.   And you don't know who that is?

20          A.   I don't know who that is.

21          Q.   Okay.

22          A.   I mean, my office will know.  I don't

23  know, personally.

4           Q.   I understand.  No.  You can only tell me

25  what you know, Doctor.  And you don't know that, and

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 16

```
 1    that's perfectly reasonable.  Okay.

 2                So other than the medical records that you

 3    have, you may have billing records related to

 4    Mr. Brooks, true?

 5          A.    That's correct.

 6          Q.    And you may have scheduling records

 7    related to Mr. Brooks?

 8          A.    Yes.

 9          Q.    Also true?

10          A.    Yes.

11                MR. RINGEL:  Counsel, can you track down

12    those records for me, please?

13                MS. LEASURE:  I can't, but I'll work with

14    the doctor and his office to do so.

15                MR. RINGEL:  Okay.  Thank you.

16          Q.    (BY MR. RINGEL)  What condition or

17    conditions have you treated Mr. Brooks for?

18          A.    Primarily ulcerative colitis.

19          Q.    What is ulcerative colitis?

20          A.    Ulcerative colitis, it's a chronic

21    inflammatory bowel disease.

22          Q.    When was Mr. Brooks diagnosed with that

23    disease?

24          A.    Per my records, he was diagnosed in 2002.

25    But I saw him for first time for that condition in
```

Brooks v. Oba, et al.                          ATUL VAHIL, M.D.                          6/1/2016

Page 17

 1    April or -- April of 2012.

 2           Q.    Okay.  You have records -- some records in

 3    your records from medical treatment from other

 4    providers other than yourself, right?

 5           A.    Yes.

 6           Q.    How would you have obtained such records?

 7           A.    Sometimes they come with the patient at

 8    the time when they're scheduled for the colonoscopy or

 9    for the consult; generally, mostly for the consult,

10    since we ask them to provide the previous records.  So

11    one of those was, when I first saw him, the colonoscopy

12    done by another physician, Dr. Miller.

13           Q.    Right.

14           A.    So that was one that I have.

15           Q.    Okay.  And then you have some Department

16    of Corrections medical records, too?

17           A.    Right, right.

18           Q.    But you would agree with me that you have

19    not reviewed all of Mr. Brooks' medical records?

20           A.    That's correct.

21           Q.    Either inside the Department of

22    Corrections or from other -- any other outside medical

23    provider that he might have seen?

 4           A.    Yes, I have not.

25           Q.    Okay.  And your role is not to manage his

1  ulcerative colitis, generally.  Is that fair?

2          A.    That's correct.

3          Q.    The person or persons who would manage

4  that disease for Mr. Brooks would be primary care

5  healthcare providers, right?

6          A.    That's correct.

7          Q.    At whatever facility he's incarcerated at?

8          A.    Yes.

9          Q.    And that's perfectly reasonable, isn't it?

10         A.    Yes.

11         Q.    In fact, that's what would happen to a

12 patient not incarcerated, right?

13         A.    Not necessarily.

14         Q.    Okay.  So when you -- if you have a

15 patient who has ulcerative colitis who just lives in

16 Pueblo, would you follow up with that patient, or would

17 the patient's primary care physician follow up with

18 that patient?

19         A.    Generally what happens when I get a

20 consult from a primary care physician, I see the

21 patient for these chronic diseases till they are okay

22 or they voice that they are doing fine.  Because

23 these -- they may go in remission, so I don't need to

24 see them.  Maybe once a year we might see them, once in

25 two years, when their colonoscopy is due.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    5/1/2016

Page 19

```
 1          Q.   Okay.  So you would follow up maybe a

 2   little bit more frequently with a non-incarcerated

 3   patient than you would follow up with an incarcerated

 4   patient?

 5          A.   Yes.

 6          Q.   And the difference is because one patient

 7   is incarcerated and the other is not, or is there some

 8   other difference, as far as you know?

 9          A.   No.  That's the primary difference.

10          Q.   All right.  You first saw Mr. Brooks for

11   the endoscopy on August 25, 2010; is that right?

12          A.   Yes.

13          Q.   Do you know when -- do you know who

14   referred him to you?

15          A.   No, I don't recall.

16          Q.   Do you know what facility he was

17   incarcerated at at that time?

18          A.   No.

19          Q.   Okay.  I will represent to you that he was

20   incarcerated then at a facility called the Bent County

21   Correctional Facility.  Have you ever heard of that

22   facility?

23          A.   Yes.

 4          Q.   Okay.  Are you aware who the owner and

25   operator of that facility is?
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 20

 1          A.   No.

 2          Q.   Okay.  Have you ever heard of, before

 3   today, a company called Corrections Corporation of

 4   America?

 5          A.   Yes.

 6          Q.   Have you had any interactions with anyone

 7   who was an employee or affiliated with Corrections

 8   Corporation of America?

 9          A.   No.

10          Q.   Have you ever had a contract with

11   Corrections Corporation of America?

12          A.   No.

13          Q.   Have you ever had a contract with anyone

14   in the prison or jail industry, other than the Colorado

15   Department of Corrections?

16          A.   No.

17          Q.   Do you provide consulting work for the

18   Pueblo County jail?

19          A.   No.  It's primarily for the DOC.

20          Q.   Okay.  I mean, you're aware that the

21   Pueblo County sheriff operates a jail not too far from

22   here in downtown Pueblo, right?

23          A.   Yes.

24          Q.   Have you worked with the Pueblo County

25   sheriff or seen any patients that were incarcerated in

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1    these recommendations and these impressions on these

2    medical records?

3         A.   No.  What we generally do, as soon as I'm

4    done with the procedure, I do the dictation -- or do

5    the report, and that goes with the patient's chart.

6         Q.   Okay.  So the general procedure is, this

7    report would go with the patient's chart back to --

8    with the patient to their prison facility?

9         A.   Right.

10        Q.   Okay.  And then what is your understanding

11   of what happens next?

12        A.   I mean, our contract is, forget about it,

13   unless I get called from them again that this patient

14   is having a problem.

15        Q.   So who, in your understanding, is

16   responsible to implement your recommendations as are

17   found on page 21 of your medical records?

18        A.   The providers who are treating the patient

19   at the Department of Corrections.

20        Q.   Does this report go back to PHP?

21        A.   No.  This goes to the DOC.  And I don't

22   know -- I'm not clear about the PHP part of it and DOC

23   part of it.  DOC patient comes in for the problem.  We

24   do the procedure, what is requested of it, make the

25   recommendation, and then the report goes with the chart

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

```
 1    to the provider at DOC.
 2           Q.    And then whatever action the provider
 3    takes -- your understanding is the provider would get
 4    the information from you, and then it's the provider's
 5    responsibility to take further action --
 6           A.    That's correct.
 7           Q.    -- to implement your recommendations?
 8           A.    Right.
 9           Q.    Do you have --
10           A.    If they're deemed reasonable.  Some of
11    them may not agree with my recommendation.  They say,
12    "That's okay."  But if they think that that's what they
13    agree with, then, yeah, that's correct.
14           Q.    Fair enough.  When you act as a consultant
15    or a specialist, you provide a recommendation.  Is that
16    different than an order for the patient?
17           A.    That's different, yeah, because on the
18    report we write recommendations, not an order.
19           Q.    And it would be up to the healthcare
20    provider at the facility to exercise his or her
21    clinical judgment and do an order based on your
22    recommendation, fair?
23           A.    Yes.
24           Q.    Okay.  And they may know more than you
25    know about the totality of the healthcare related to
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 33

1   this particular patient?

2          A.    That's correct.

3          Q.    Because they're treating the patient as a

4   whole, not just one particular problem for the patient?

5          A.    That's right.

6          Q.    What is your understanding of how, if you

7   have one, and you may not know, do you have any idea

8   how a colonoscopy -- so let's take Mr. Brooks.  You

9   recommended a colonoscopy at the next available

10  appointment.  Do you have any idea of how -- assuming

11  the primary care healthcare provider at his facility

12  agreed with your recommendation and made it an order,

13  do you have any idea of what process exists to get that

14  to occur?

15         A.    No.

16         Q.    You don't know who would have to approve

17  it or anything like that?

18         A.    No.  Sometimes they call us to make

19  recommendations, or we request a colonoscopy, so they

20  want us to write the whole thing to the DOC to get it

21  authorized.

22         Q.    Do you know who authorizes it?

23         A.    No.

24         Q.    So you've had circumstances where you

25  provide the sort of -- the supporting information to

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

Page 34

1  get a procedure like a colonoscopy authorized?

2          A.   Yes.

3          Q.   Do you know why you didn't do that with

4  respect to Mr. Brooks?  Because you didn't do that,

5  right?

6          A.   Well, it was recommended.

7          Q.   Right.

8          A.   And generally what happens is that the

9  providers take care of that or they call me, "Is it

10  absolutely needed?"  If they call me, then we initiate

11  the process from our side.

12          Q.   So the way you understand that it works is

13  the provider gets this information, and the provider

14  can either implement the recommendation or provide --

15  communicate with you and get you to implement the

16  recommendation?

17          A.   Yes.

18          Q.   And then where does -- when you're

19  implementing the recommendation for a particular

20  patient, what do you do with it?  Who do you send it

21  to?  How does that work?

22          A.   I think we send it to PHP.  Those were the

23  medical records of PHP.  And I don't know exactly who

24  is the person who authorizes or rejects or whatever it

25  does.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 35

1          Q.    Okay.   Is it your understanding that PHP

2    has some role in approving or not approving outside

3    medical care for inmates at the Department of

4    Corrections?

5          A.    Yes.

6          Q.    So for someone to get to see you in the

7    first place, they would need to have approval from PHP?

8          A.    That's correct.

9          Q.    And for them -- for that particular inmate

10   to have another procedure or another visit with you,

11   they would have to get further approval from PHP,

12   right?

13         A.    Yes.

14         Q.    They act kind of like an insurance company

15   does?

16         A.    That's true.

17         Q.    And they are looking at issues of medical

18   necessity, right?

19         A.    Right.

20         Q.    Okay.   So it's no different than Humana,

21   but Humana does it inside, and the Department of

22   Corrections has PHP do it for the Department of

23   Corrections?

24         A.    Right.

25         Q.    Is ulcerative colitis a chronic disease?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 36

1    A.    Yes, it is.

2    Q.    How does it progress?

3    A.    Well, everybody can have a different

4  course.  It can be mild, moderate, severe.  It can be

5  non- -- it can be refractory to medical treatment.  It

6  can be -- it can go into remission for years.  So there

7  are different variations of this, and everybody behaves

8  differently.

9    Q.    How would you characterize Mr. Brooks'

10  version of ulcerative colitis, in terms of mild,

11  moderate, or severe?

12    A.    Moderately severe.

13    Q.    Is there, I don't know, a scale that --

14    A.    No.

15    Q.    -- exists related to that kind of

16  assessment of Mr. Brooks' problem?

17    A.    I'm not aware.

18    Q.    When you say, "moderately severe," what

19  does that mean to you?

20    A.    Well, I'm saying, "moderately severe,"

21  because at different stages of the time period that I

22  saw him, there were times that he was severe.  Like

23  when my colonoscopy was performed, he had multiple

24  large ulcers on the colon, obviously suggestive of

25  severe colitis; but other occasions, it was mild.

Page 37

```
 1          Q.   Okay.  So would you agree with me that
 2    there was a colonoscopy performed by someone named
 3    James Miller in September of 2011?  Are you aware of
 4    that?
 5          A.   That's correct.
 6          Q.   So as far as I know, and you tell me if
 7    you know different, that after you saw Mr. Brooks in
 8    August of 2010, the first colonoscopy he had was
 9    September of 2011; is that right?  You don't know
10    anything differently?
11          A.   I don't know anything different.  And for
12    the record, I'm not the only provider for the DOC.
13    They have many other providers, so they are seen by
14    other physicians as well.
15          Q.   Sure.  Understood.  And -- understood.  So
16    Dr. Miller did a colonoscopy in September of 2011.  And
17    that is included in your medical records, right?
18          A.   Yes.
19          Q.   And that's at page 48.  You've reviewed
20    this colonoscopy report prepared by Dr. Miller, right?
21          A.   Yes.
22          Q.   What does it tell you about the status of
23    Mr. Brooks' ulcerative colitis in September of 2011?
24          A.   Well, it is hard for me to say, because I
25    didn't have the colored pictures that, obviously, we
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 38

1   rely on knowing exactly what the mucosa looks like.  So

2   I just have to go on what he has written.

3            Q.   You can't assess it yourself.  You can

4   only rely on his assessment in writing?

5            A.   That's correct.

6            Q.   Because you don't have -- what you would

7   need to assess it yourself is the actual pictures taken

8   by the colonoscopy?

9            A.   Right.

10           Q.   And they're black and white pictures, but

11  they're not sufficiently detailed for you to be able to

12  interpret them.  Is that fair?

13           A.   That's correct.

14           Q.   And you don't have the actual pictures in

15  your medical records?

16           A.   No.

17           Q.   Was there a difference in -- based on the

18  information, limited though it is in Dr. Miller's

19  report, did Mr. Brooks' ulcerative colitis get worse

20  during that 11-month period of time?

21           A.   That would be speculation.  I just have

22  one operative record.  I don't know the symptoms, I

23  don't know the other things.  Just speculation.

24           Q.   You don't have any -- you don't have

25  sufficient information?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 39

1           A.    Right.

2           Q.    Fair enough.  You suggested a colonoscopy

3    of Mr. Brooks, and then he ultimately got a colonoscopy

4    after September of 2011.  What is your understanding of

5    the treatment that he received after the colonoscopy?

6           A.    Let me go back to my report on this.  The

7    colonoscopy was performed in 2013.

8           Q.    Well, that's your colonoscopy.

9           A.    Right.

10          Q.    Okay.  So you performed a colonoscopy in

11   2013.  And what were the results of your colonoscopy on

12   Mr. Brooks?

13          A.    Let me just pull it up, please.

14          Q.    Sure.

15                MS. LEASURE:  It's page 20.

16                THE DEPONENT:  20?  No.  20 was the upper

17   endoscopy.  So that's 2/12/13, page 30.

18          Q.    (BY MR. RINGEL)  Okay.  So page 30 is the

19   first colonoscopy you performed on Mr. Brooks?

20          A.    Right.

21          Q.    And that occurred on February 12th of

22   2013?

23          A.    That's correct.

24          Q.    Do you have any basis to compare

25   Mr. Brooks' ulcerative colitis, as you observed it in

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 40

1   the colonoscopy of 2013, and what it was like

2   previously?

3         A.   No.

4         Q.   So the best way to kind of analyze what

5   the status of Mr. Brooks' ulcerative colitis is a

6   colonoscopy?

7         A.   That's correct.

8         Q.   And the colonoscopy in 2013 was your first

9   opportunity yourself to make that assessment?

10        A.   That's correct.

11        Q.   And your assessment was moderate to severe

12   UC?

13        A.   That's correct, involving certain parts of

14   the colon.

15        Q.   Understood.  As you identify in this

16   report?

17        A.   Right.

18        Q.   And what was your treatment protocol for

19   Mr. Brooks after your colonoscopy in February of 2013?

20        A.   Okay.  So the treatment was he was already

21   on medication, which we continued.  We waited for the

22   biopsy results, and then we started him on enemas.

23   It's called Rowasa enemas, which is Mesalamine, to

24   treat the ulcerative colitis, since predominantly there

25   was complaint of the left colon.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                     6/1/2016

1          Q.    When you say, "left colon," what does that

2     mean?

3          A.    Well, that's starting from the rectum all

4     the way up to the splenic flexure, which is up here

5     (indicating).

6          Q.    So it's on the left side of Mr. Brooks'

7     body?

8          A.    Predominantly, although there was

9     microscopic colitis here and here (indicating), but

10    regional colitis with ulcers and pseudo colitis was

11    predominantly the left colon.

12         Q.    Okay.  So the basic treatment was the

13    same, other than the starting of these enemas.  Is that

14    fair?

15         A.    That's correct.

16         Q.    Do you know whether Mr. Brooks had an

17    enema prior to 2013?

18         A.    No, I don't know.

19         Q.    But the medication that he was on remained

20    the same after your colonoscopy?

21         A.    Right.

22         Q.    The only change in treatment protocol was

23    the enema, right?

4          A.    Yeah.

25         Q.    Do you know when you first received the

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1    colonoscopy report performed by Dr. Miller?

2          A.   I would think that it was the time when I

3    first saw him, which was in April of 2012.

4          Q.   Okay.  So you -- you first saw Mr. Brooks

5    in August of 2010, right?

6          A.   For the endoscopy.

7          Q.   For the endoscopy.  And then you next saw

8    him in April of 2012, and you believe you got this

9    colonoscopy report from Dr. Miller at that time?

10         A.   Right, because that was not for the

11   procedure.  That was a consult, what to do with the

12   patient.

13         Q.   Okay.  Fair enough.  And so as part of

14   that, you would have had more information about

15   Mr. Brooks, because you had to figure out what was

16   wrong with him and what you should do?

17         A.   Right.

18         Q.   As opposed to the more limited scope of

19   performing a procedure?

20         A.   Right.

21         Q.   Okay.  I'm with you.  What is Mr. Brooks'

22   current prognosis for his UC?

23         A.   Well, I can't say anything at this point,

24   because I haven't seen him for nine months.

25         Q.   What was your prognosis for him and his UC

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 43

1  in September of '15?

2         A.   That he should be on treatment.  And

3  obviously, at this point, you know, with the severity

4  and symptoms that he was having, that he should

5  continue on the treatment that we had prescribed.  And

6  at that point, with his symptoms that I had looked

7  through my records, that they were improving; not

8  everything, but they were improving.

9         Q.   Okay.  And what was the treatment that you

10  prescribed as of September of '15?

11         A.   Okay.  When I saw him, he was already on

12  Prednisone.  He was on 20 milligrams, which was being

13  tapered down at the facility.  So I started him on

14  Asacol, which is an antiinflammatory medication.  I

15  started him on HUMIRA, which is another biologic agent;

16  because he had previously tried another biologic agent

17  called REMICADE.

18         Q.   That didn't work?

19         A.   That didn't work.

20         Q.   When you say, "a biological agent," what

21  does that mean?

22         A.   This is a new form of medications that are

23  prescribed, usually given through parenteral, either

4  subcutaneous or IV.  REMICADE is IV, HUMIRA can be

25  given subcutaneous.  They are anti-tumor necrosis

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                       6/1/2016

Page 44

1  factors, so they act on the tissues or toxins.

2              Q.   When did he start on the HUMIRA?

3              A.   I don't know the exact date.

4              Q.   Were you the original person that

5  prescribed that for him, or did somebody else?

6              A.   I'm the first person who prescribed

7  HUMIRA.

8              Q.   And that -- what year are we talking

9  about?

10             A.   This was on July 12, 2012.  After the

11 colonoscopy, we requested -- yeah.  That was 2012.  It

12 was not after colonoscopy, after the previous report

13 that I went by, since he had a colonoscopy just a year

14 before.

15             Q.   So based on Dr. Miller's colonoscopy, you

16 decided to start Mr. Brooks on a treatment of HUMIRA?

17             A.   Right.

18             Q.   Was HUMIRA available prior to that time,

19 or was it relatively new?

20             A.   It was available.

21             Q.   When did HUMIRA start becoming available?

22             A.   I don't know.

23             Q.   When did you start using it in your

24 practice?

25             A.   Probably about ten years.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

 1            Q.    Was there any basis before you had a

 2     colonoscopy to decide whether HUMIRA was indicated?

 3            A.    Prior to colonoscopy, yes.  The patient,

 4     based on my records, which I saw him on first consult,

 5     he had been tried on REMICADE.  So sometimes if you

 6     want to try something else, that's another biologic

 7     agent that the patient may respond to, if he did not

 8     respond to the first one, which was REMICADE.

 9            Q.    When was the prior biologic agent,

10     REMICADE, started?

11            A.    I don't know.  I just got the records from

12     there stating that the patient had received REMICADE

13     for five months.  From what time to what time, I don't

14     know.

15            Q.    Do you have any understanding, one way or

16     the other, whether the REMICADE was prescribed during

17     Mr. Brooks' incarceration, or did it predate his

18     incarceration, or do you not know?

19            A.    I don't know.

20            Q.    So as of September of 2015, would you

21     characterize Mr. Brooks as stable, in terms of his

22     ulcerative colitis?

23            A.    I have to refer to my last note.

24            Q.    Sure.  It looks like page 11.

25            A.    Well, I would still characterize this as

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

Page 46

1    active colitis, given the fact that he was still

2    complaining of the symptoms.

3            Q.   Fair enough.  So you -- active colitis is

4    different than stable?

5            A.   Right.

6            Q.   When I use a term like "stable," you're

7    thinking the colitis being in remission, fair?

8            A.   Right.

9            Q.   Okay.  And his colitis, as of September

10   2015, was not in remission?

11           A.   That's right.  Plus, he had symptoms.

12           Q.   Fair enough.  So for a colitis to be

13   stable, it needs to be in remission and asymptomatic?

14           A.   That's correct.

15           Q.   And the goal was, in September of 2015, to

16   treat him, as you described in this note, to get him to

17   that point, right?

18           A.   Yes.

19           Q.   Assuming medical treatment doesn't work,

20   what is the next course of action with respect to an

21   ulcerative colitis?

22           A.   Surgery is done.  That's called total

23   proctocolectomy.  They take out the whole colon.

24           Q.   Is that indicated for Mr. Brooks?

25           A.   Yes, I recommended that initially, when I

Brooks v. Oba, et al.                        ATUL VAHIL, M.D.                        6/1/2016

Page 47

1    say him first time, because he had been -- all the

2    medication had still failed.  So that was my

3    recommendation first time when I saw him.

4            Q.    And when you say, "first time," first time

5    as a consultant?

6            A.    As a consultant, not as a physician,

7    right.

8            Q.    Right.  In 2012?

9            A.    Right.

10           Q.    You made the recommendation that he

11   have -- essentially, have his colon removed?

12           A.    That's correct.

13           Q.    Do you know why that recommendation was

14   not followed?

15           A.    No.  But that is a call that a physician

16   made to find out if it is possible to try one more

17   attempt at aggressive medical management before doing

18   surgery.

19           Q.    It would be better to see if it could be

20   managed medically than to remove someone's colon?

21           A.    That's correct.  You usually try the

22   medical management and then go with surgery.

23           Q.    What kind of life does someone have when

24   you remove their colon?

25           A.    Say that again.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                       6/1/2016

Page 48

1           Q.    What kind of daily life does someone have

2     when you remove their colon?

3           A.    It depends upon how the patient's symptoms

4     are.  When it comes to the time that they have total

5     proctocolectomy, they're in such a severe state,

6     sometimes they feel better after having it done, even

7     though they have a stigma of having a colostomy --

8     ileostomy.

9           Q.    Are there restrictions on the activities

10    of daily living someone can have if they have their

11    colon removed?

12          A.    Some restrictions, because they still have

13    about, on an average, five to seven stools a day.  So

14    obviously, to go and take care of that is --

15          Q.    Time-consuming?

16          A.    Time-consuming.  Thank you.

17          MR. RINGEL:  Okay.  I don't have any

18    further questions of you.  I'm going to pass you along

19    to some of my colleagues.

20          MR. SANCHEZ:  If you don't mind, I'll go

21    down there, that way --

22          MR. VanLANDSCHOOT:  I was going to

23    volunteer, but . . .

24          MR. SANCHEZ:  I just have a few questions.

25          (Discussion off the record.)

Brooks v. Oba, et al.                           ATUL VAHIL, M.D.                              6/1/2016

Page 49

```
 1                (Recess taken, 4:46 p.m. to 4:48 p.m.)

 2                MR. SANCHEZ:  All right.  We're back on

 3     the record, Dan.

 4                          EXAMINATION

 5     BY MR. SANCHEZ:

 6           A.   Mr. (sic) Vahil, my name is Joseph

 7     Sanchez.  I introduced myself to you off the record.

 8     And I'm just going to go ahead and introduce myself to

 9     you on the record.  I'm the attorney for one of the

10     named defendants, her name is Trudy Sicotte, just so

11     you know my involvement in the case.

12           A.   Okay.

13           Q.   I just have a couple follow-up questions,

14     if you don't mind.

15           A.   Sure.

16           Q.   With regards to Mr. Brooks, you stated

17     that his diagnosis was ulcerative colitis.  And what I

18     wanted to ask you with regards to his colitis

19     diagnosis, you said it was a chronic inflammatory

20     disease, and I wanted to ask you, what is the required

21     treatment for ulcerative colitis, typically?

22           A.   That depends upon what is the extent of

23     involvement, what is the severity of disease.  So

24     usually for mild, maybe occasionally moderate, we start

25     them on Mesalamine, oral pills that we give them for --
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 50

```
 1    it's antiinflammatory for the inflammatory bowel

 2    disease, for the inflammation of the bowel, per se.

 3         Q.    And I'm assuming with your specialist --

 4    your specialist background in gastroenterology, you've

 5    treated a number of individuals that have been

 6    diagnosed with ulcerative colitis; is that right?

 7         A.    That's correct.

 8         Q.    And with regards to the patients that

 9    you've seen in the past, whether they were prison

10    patients or patients outside of the prison system, when

11    someone has been diagnosed with colitis, do you

12    typically prescribe or order a gluten-free diet?

13         A.    No.

14         Q.    And why is that?

15         A.    Because we can check for the celiac -- the

16    gluten-free diet can been used for celiac disease,

17    which is another disease, which is an autoimmune

18    disease, that can be linked to this.  But we check for

19    that, and if it is negative, we generally don't

20    prescribe.

21         Q.    So generally speaking, then, would it be

22    safe to say that a gluten-free diet is not a required

23    treatment for ulcerative colitis?

24         A.    That's correct.

25         Q.    Turning to Exhibit 2, your doctor's notes,
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 51

1    for a second, if you don't mind turning to page 9.  And

2    I believe that this is your report from your

3    interaction with Mr. Brooks on June 10th of 2014; is

4    that correct?

5              A.   Yes.

6              Q.   I just had a couple questions with regards

7    to that interaction.  First off, when I look to the

8    left-hand side, you have a number of different

9    sections.  And what I mean by that is, there's one

10   heading that says, "Current Medications," and then

11   right below that, "Past Medical History."  And then

12   down below, the last kind of section, is "Review of

_3   Symptoms (sic)."  Do you see where I'm reading that?

14             A.   Yes.

15             Q.   And I had a question here.  Under "Review

16   of Symptoms (sic)," under "Constitutional" there's a

17   notation that says, "No weight loss."  And I wanted to

18   ask you, would you -- would your office typically weigh

19   Mr. Brooks every time he would come in for a visit?

20             A.   Yes; for office visit, not for the

21   procedures.

22             Q.   Right.

23             A.   And actually, it does say loss of

4    appetite.

25             Q.   Okay.  But as far as from the notations

1    that you have, based on your interaction with

2    Mr. Brooks on June 10 of 2014, I'm assuming, then, that

3    prior to making a notation that there was no weight

4    loss, that he was weighed on that day, correct?

5           A.    This is the question -- three of the

6    questions, constitutional symptoms and other stuff,

7    "Review of Systems," what we ask the patient.

8           Q.    Oh, okay.

9           A.    So we ask them, "Do you have any weight

10   loss?"  So these are not objective findings.  Objective

11   findings are on the right side.

12          Q.    Great.  Thank you.  So that "no weight

13   loss" is actually being reported by Mr. Brooks himself?

14          A.    Right.

15          Q.    Okay.  The same goes with the

16   "Gastroenterology" section right below that.  I note

17   that you say, "no nausea, no heartburn, no stool

18   incontinence," and again, "no weight loss."  Is that

19   indication, the "no weight loss" in that section,

20   again, coming from Mr. Brooks himself?

21          A.    That's exactly true.

22          Q.    Now, turning to the other side, the

23   right-hand side of the report, when you told me this is

24   more coming from you, from the diagnostic part, I just

25   had a couple questions with regards to -- starting with

Brooks v. Oba, et al.                          ATUL VAHIL, M.D.                          6/1/2016

Page 53

1   the "History of Present Illness" section.  Do you see

2   where I'm at on there?

3           A.   Yes.

4           Q.   Now, typically, when you're getting a

5   history of your patients, like Mr. Brooks, are you

6   getting that history from interacting with the patient

7   getting their input as telling you what's going on or

8   what has happened with them?

9           A.   Yes.  "History of Present Illness" is what

10  the patient has told us, all of it.

11          Q.   Got you.  So when I look at that

12  paragraph, there's a section in there that I wanted to

13  ask you about.  It states, "Patient reports that he has

14  tested negative for celiac . . ."  Do you see that?

15          A.   Yes.

16          Q.   And again, you'll have to excuse me, I

17  don't have a great medical background.  But for the

18  record, can you explain to me, when someone says

19  they've tested negative for celiac, what does that mean

20  in layman's terms?

21          A.   Celiac disease, as I mentioned, is another

22  autoimmune disease where you become -- you have

23  autoimmune problems with gluten, wheat, barley, rye.

24  So if you consume those, your body produces antibodies

25  to fight against the lining of the small intestine.

Brooks v. Oba, et al.                          ATUL VAHIL, M.D.                          6/1/2016

Page 54

1    And that gets blunted (sic), so absorption is affected.

2              Q.    So would it be -- is it safe to say, then,

3    that by that statement, that Mr. Brooks is telling you

4    that he was tested, and he does not have an allergic --

5    an allergy to gluten foods?  Is that --

6              A.    No, no.  Celiac disease is autoimmune

7    disease where you have symptoms of diarrhea, weight

8    loss, malabsorption, bloating, all that stuff, related

9    to an immune disturbance in the body; which you can

10   check by doing blood tests, which you can check -- what

11   we did on the first endoscopy, first time, biopsy the

12   small bowel.  And those are the two methods of

13   magnocencilic (phonetic) disease.

14             Q.    Okay.  So we know that he's telling you

15   that he tested negative for celiac?

16             A.    Right.

17             Q.    Okay.  But then he tells you that he does

18   seem to be gluten-intolerant, correct?

19             A.    Yes.

20             Q.    To your knowledge, do you know if

21   Mr. Brooks has ever been tested to determine whether or

22   not he has an allergy to gluten foods, specifically?

23             A.    Not to my knowledge.

24             Q.    Okay.  And then when I look at the next

25   sentence under the "History" section, it's noted, "With

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                      6/1/2016

Page 55

1    avoidance of gluten foods and supplementing with ensure

2    he feels that his stools are improved and he is able to

3    keep his weight stable."

4              And again, this is -- these are the words

5    that Mr. Brooks is relating to you.  Would that be a

6    fair assessment?

7         A.   That's correct.

8         Q.   Okay.  Going down to the "Assessments"

9    portion of your report for that day, the last sentence

10   of that section, you state, "Patient continues however

11   to have loose stools and a difficulty with weight gain

12   which he questions as related to intolerance of gluten

13   products."  Did I read that correctly?

14        A.   That's right.

15        Q.   What I wanted to ask you with regards to

16   that statement was --

17              (Interruption in the proceedings.)

18              MR. SANCHEZ:  We'll go off the record.

19              (Discussion off the record.)

20              MR. SANCHEZ:  I'm sorry about that,

21   Doctor.

22              THE DEPONENT:  That's okay.

23        Q.   (BY MR. SANCHEZ)  I was asking you about

4    the "Assessments" section of your report and

25   specifically where it states that Mr. Brooks -- his

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

Page 56

```
 1   question is related to intolerance of gluten products.

 2   Do you see that?

 3        A.   Yes.

 4        Q.   Now, I wanted to ask you, with regards to

 5   the evidence that you have as a doctor, as a treating

 6   physician, the evidence that you had related to

 7   Mr. Brooks' intolerance of gluten products, was that

 8   coming just strictly from Mr. Brooks, or did you have

 9   any other diagnostic information available to support

10   that feeling that Mr. Brooks is expressing to you?

11        A.   It's coming from him, because he asked,

12   "When I go on a gluten-free diet, my symptoms improve."

13   So that's only just what he's suggesting to us.

14        Q.   Now, earlier Mr. Ringel talked to you

15   about, you know, your recommendations, as opposed to

16   your orders.  And I wanted to just kind of ask you,

17   with regards to the gluten-free diet and the Ensure

18   being provided daily as a supplement to Mr. Brooks'

19   diet -- and I guess that kind of falls into the

20   treatment portion of this report --

21        A.   Right.

22        Q.   -- because you state, No. 3, "Gluten free

23   diet with ensure one can of ensure three times daily."

24   Is that -- would you consider that a recommendation of

25   yours or on order?
```

Brooks v. Oba, et al.                      ATUL VAHIL, M.D.                      6/1/2016

1          A.    It's a recommendation.

2          Q.    **A recommendation?**

3          A.    Right.

4          Q.    **And why wouldn't you have considered the**

5   **gluten-free diet and the Ensure supplement in an order**

6   **to the treating physicians at DOC?**

7          A.    Because we don't write any orders.  We

8   just do the recommendations, and then they take care of

9   it.

10          MR. SANCHEZ:  Okay.  Thank you.  I don't

11   have any further follow-up questions.  Thank you.

12          THE DEPONENT:  Thank you.

13                        EXAMINATION

14   BY MR. VanLANDSCHOOT:

15          Q.    **Dr. Vahil, my name is John VanLandschoot.**

16   **I work for the Attorney General, and I represent the**

17   **Department of Corrections.  So specifically, I**

18   **represent Kathy Howell, David Tessiere --**

19          MR. SHAFFER:  I can't hear anything.

20          MR. VanLANDSCHOOT:  All right.  I'll try

21   to talk louder.  Can you hear me now?

22          MR. SHAFFER:  I can you hear you, but I

23   couldn't hear anything before just now.

4          MR. VanLANDSCHOOT:  Okay.  I was just

25   introducing myself, just explaining who I represent.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 58

```
 1          Q.    (BY MR. VanLANDSCHOOT)   Basically, I
 2   represent parties that I don't believe you've had any
 3   contact with.  But I do have some questions that I just
 4   want to go over about these contacts with Mr. Brooks.
 5          A.    Sure.
 6          Q.    So what I'd like to start with is,
 7   generally, for patients with UC, in your experience, do
 8   they tend to be on the higher end or the lower end of
 9   the body mass index?
10                MR. SHAFFER:   I can't hear you, John.
11                MR. VanLANDSCHOOT:   Can you hear me now?
12                MR. SHAFFER:   Intermittently.  Can I just
13   call back on Andrew's phone?
14                MR. RINGEL:   Yeah, that's fine.
15                MR. VanLANDSCHOOT:   We're going to
16   hang up, and we'll stay off the record for a minute.
17                MR. SHAFFER:   I'll call Andrew's phone.
18                MR. VanLANDSCHOOT:   All right.
19                (Pause in the proceedings.)
20                MR. VanLANDSCHOOT:   We'll go back on the
21   record.
22          Q.    (BY MR. VanLANDSCHOOT)   Dr. Vahil, I'll
23   just reask the question.  In your experience, do
24   patients with UC tend to be on the higher end or the
25   lower end of the body mass index?
```

1      A.   Depends upon what the severity of the

2  problem is.

3      Q.   Okay.  What about someone with moderate to

4  severe UC?

5      A.   Obviously, they are probably at the lower

6  end.

7      Q.   And does it also depend on body type?

8      A.   Sure.

9      Q.   Activity level?

10     A.   You can argue for that, yeah.

11     Q.   Did you ever have any discussions with

12  Mr. Brooks about how much he was exercising, whether he

13  was exercising or anything of that nature?

14     A.   No.

15     Q.   At what point does a low body mass index

16  raise a concern for you?

17     A.   Well, he has a disease which we are

18  treating, which is also a way you can lose protein

19  through the colon.

20     Q.   Okay.  So in terms of when you become

21  concerned, as opposed to just treating the condition,

22  at what point does the body mass index come into play?

23     A.   I don't know that there's any number like

24  that.  I mean, you're concerned if somebody is losing

25  weight.  And if the patient is responding to the

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 60

1    treatment, then, obviously, you expect the patient to

2    gain weight.  But otherwise, the treatment would be

3    still aggressive treatment, medical treatment; if that

4    fails, go to surgery.

5              Q.    Okay.  Do you -- are you specifically

6    concerned with the diet that your patients are taking?

7              A.    We're concerned with the disease, yes.

8              Q.    Let's just get into these -- the actual

9    contacts.  I want to start with 001, which is July 18th

10   of 2012.

11             A.    Okay.

12             Q.    I note here in the "Gastroenterology"

13   section on the left-hand side that it indicates that

14   there's no stool incontinence.  And I believe you

15   indicated with Mr. Sanchez that that's something that

16   Mr. Brooks would have explained to you; is that

17   correct?

18             A.    I didn't understand the question.

19             Q.    On the left-hand side under

20   "Gastroenterology," where it says, "no stool

21   incontinence," is that something that Mr. Brooks would

22   have reported to you?

23             A.    Reported to this part of the process,

24   where the "Review of Systems" is done by the medical

25   assistant.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

Page 61

1           Q.   So he would have reported --

2           A.   Indicated to her.

3           Q.   -- this to your medical assistant?

4           A.   Right.

5           Q.   And he indicates here that there's weight

6    loss, but that it's been resolved; is that correct?

7           A.   Yes.

8           Q.   In his "Vital Signs," there's a note that

9    his BMI is 21.  Is that within the healthy range?

10          A.   It's the lower end, yes.

11          Q.   It's on the lower end, but it is within

12   the healthy range?

_3          A.   Yes.

14          Q.   On the "Treatment" section here, you

15   didn't prescribe Ensure on this -- or recommend Ensure

16   on this particular date.  Is there any reason that you

17   didn't do that?

18          A.   Well, we don't prescribe Ensure to

19   everybody who has ulcerative colitis.

20          Q.   And why is that?

21          A.   That's not standard practice of how we

22   practice medicine.  Not for everybody who is within the

23   normal range for weight is prescribed Ensure, for

4    everybody.

25          Q.   So if I can just break that out.  If

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 62

 1    someone is within the normal body mass index, it's not

 2    typical to prescribe them Ensure?

 3          A.    Yeah.

 4          Q.    Okay.  And then I'll go on to 003.  Again,

 5    here in the "Gastroenterology" section on the left-hand

 6    side, there is an indication that there's no stool

 7    incontinence, correct?

 8          A.    Uh-huh, yes.

 9          Q.    And at this point, Mr. Brooks indicated

10    there's no weight loss, correct?

11          A.    Yes.

12          Q.    Again, his body mass index is 20.67.  Is

13    that also within the healthy range?

14          A.    Yes.

15          Q.    And in the "Treatment" section, there's

16    nothing -- nothing here to indicate that Ensure would

17    be appropriate on this occasion?

18          A.    That's correct.

19          Q.    In the "History of Present Illness,"

20    there's an indication that, "He reports significant

21    improvement, noting no further rectal bleeding, no

22    urgency to move his bowels, and decreased abdominal

23    cramping"; is that correct?

24          A.    Yes.

25          Q.    Is that something provided to you or to

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 63

1    your medical assistant?

2              A.    To me.

3              Q.    And that would have been from Mr. Brooks?

4              A.    Directly, yes.

5              Q.    I will turn to No. 5.  I'll start again

6    under the "Gastroenterology" section.  There's an

7    indication that there's no stool incontinence; is that

8    correct?

9              A.    Yes.

10             Q.    And no weight loss?

11             A.    Yes.

12             Q.    In the "History of Present Illness"

13   section, about the middle of that paragraph it says,

14   ". . . noting that he has less urgency to move his

15   bowels, more control, and no further nocturnal stools";

16   is that correct?

17             A.    Yes.

18             Q.    To you, would that indicate that his

19   ability to control his bowels has been improving?

20             A.    Well, it tells me his diarrhea is

21   improving.  I don't know about incontinence, per se.

22   He's saying he's having diarrhea, which he says is

23   improving.

24             Q.    And if he's indicating that there's no

25   incontinence, is that an indication that he is able to

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 64

1    control his bowels?

2              A.    I don't know about incontinence, because

3    he never indicated to me that he was incontinent.

4              Q.    But he is indicating to your medical

5    assistant that he's not experiencing incontinence?

6              A.    Right.

7              Q.    Again, in the "Vital Signs" section, the

8    BMI is 20.4.  Is that also within the healthy range?

9              A.    Yes.

10             Q.    The "Treatment" does not indicate that

11   Ensure is necessary at that point in time; is that

12   correct?

13             A.    Well, let me rephrase it.  The Ensure and

14   the gluten-free diet are recommended, based on what he

15   requested; because he said by taking Ensure and

16   avoiding gluten, his symptoms improved.

17             Q.    Sure.

18             A.    So it was not for a medical reason, per

19   se.  I mean, yes, you can prescribe.  You can always

20   tell the people who can have supplements, especially

21   this kind of disease.  But this was not for a medical

22   reason.  This was per what he wanted, which I agreed

23   with.

24             Q.    So subjectively, he's telling you that

25   this helps me?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 65

1          A.    Yes.

2               Q.    Objectively, it's not indicated in the

3     treatment of his condition?

4               A.    Well, if a patient tells me that, "This

5     makes me feel better," that's an objective finding,

6     too.  I mean, if he's saying, "I'm feeling better not

7     taking this or taking this," it's not an objective

8     finding.  There are a lot of things people say makes

9     them feel better.  So it is -- yes, it is not that I

10    can produce something on paper saying that this is the

11    test result, but he's saying he's feeling better with

12    this.

13               Q.    Sure.  That's fair.  I'll go on to No. 7.

14    On the left-hand side, noting -- and this is June 11,

15    2013.  At this point, the "Gastroenterology" section

16    indicates, "stool incontinence yes"; is that correct?

17               A.    Yes.

18               Q.    At any point, did Mr. Brooks discuss with

19    you that he was trying to get a special medical pass to

20    go to meals at a different time in the prison?

21               A.    I don't recall.

22               Q.    Okay.  Is that something that you would

23    have noted if he had discussed that with you?

24               A.    Yes.

25               Q.    In the same section, "no weight loss,"

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

Page 66

1   again, correct?

2          A.   Yes.

3          Q.   And then in the "History of Present

4   Illness," down toward the end of that paragraph, it

5   indicates that, ". . . he notes that this is the best

6   he has felt in years."  Is that something that he told

7   you?

8          A.   Yes.

9          Q.   And then just below that, "Bowel movements

10  are four to six soft stools with infrequent

11  incontinence of stool."  And so, again, that's

12  something that he told you?

13         A.   Yes.

14         Q.   But up until now, there was no indication

15  that he was having incontinence?

16         A.   From what I can read from the -- my

17  interaction with him, yes, he did not specifically

18  inform about incontinence.

19         Q.   You had not made any notes that he had

20  indicated that to you, right?

21         A.   Right.

22         Q.   Up until this point?

23         A.   Right.

24         Q.   His BMI is 20.42.  Again, that is within

25  the healthy range?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 67

1          A.    Yes.

2          Q.    The "Treatment" does not indicate Ensure.

3    Again, at this point, he had not requested that of you?

4          A.    That's correct.

5          Q.    So I will go to No. 9.  Now, this is

6    approximately a year later, on June 10, 2014.  In the

7    "Gastroenterology" section, he's indicating there is no

8    stool incontinence at this point in time; is that

9    correct?

10         A.    Right.

11         Q.    No weight loss?

12         A.    Yes.

13         Q.    Now, this -- this particular date is -- in

14   the "History of Present Illness" this is the date where

15   he indicates to you that with the avoidance of gluten

16   foods and supplementing with Ensure, he feels that his

17   stools are improved, and he is able to keep his weight

18   stable; is that correct?

19         A.    That's correct.

20         Q.    In the records that we have gone over, is

21   there anything to indicate that his weight was unstable

22   up until this point?

23         A.    No.

24         Q.    And on this particular date, his BMI is

25   20.1.  Is that, again, within the healthy range?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 68

1          A.    Right.

2          Q.    Do you have any way of verifying whether

3     he was actually using Ensure at the facility?

4          A.    No.

5          Q.    So if -- if he was not, in fact, taking

6     Ensure, then you're essentially left to take him at his

7     word when he represents to you that he was?

8          A.    That's correct.

9          Q.    Did he ever indicate to you that he was

10    trying to get Ensure around this period of time?

11         A.    Yeah.  He must have mentioned at that

12    point that he wants to get Ensure.  And he can't get --

13    and he might be supplementing it from outside.  I don't

14    know.

15         Q.    Okay.  Did he ever explain to you that he

16    had been missing multiple meals at the facility?

17         A.    No, I don't recall.

18         Q.    Is that something that you would note if

19    he had indicated that to you?

20         A.    I would have written it down in the

21    "History of Present Illness."

22         Q.    Did he ever indicate to you that stool

23    incontinence, particularly, was preventing him from

24    going to his meals?

25         A.    I don't recall.

Brooks v. Oba, et al.                    **ATUL VAHIL, M.D.**                    6/1/2016

1          Q.   And have you seen anything in these

2    records that would indicate that he represented that to

3    you?

4          A.   I mean, there's no indication, per my

5    conversation with him, what I recorded.  So I don't

6    recall anything outside of this.

7          Q.   Okay.  I think I asked you, but I'm going

8    to ask you again, just to make sure.  The BMI on this

9    particular date in June of 2014 was 20.1.  Is that

10   within the healthy range?

11         A.   Yeah.  It's lower level.

12         Q.   And at this point, that's where you

13   indicate that you recommend using Ensure?

14         A.   Yes.

15         Q.   I think, based on your answers before, is

16   it fair to say that Ensure isn't necessarily something

17   you felt he should take, based on the literature, but

18   you felt that given his comments to you, it would be

19   appropriate to recommend that?

20         A.   Yeah.  I recommended it, because he felt

21   better with this.

22         Q.   And that was solely based on his comments

23   to you?

24         A.   That's correct.

25         Q.   All right.  Let's go to the last one,

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

                                                                        Page 70

1    No. 11.  Now, this is a little over a year after the

2    previous visit.  So this is September 15, 2015.  Again,

3    under the "Review of Systems," there's no weight loss,

4    correct?

5              A.    Yes.

6              Q.    And on this occasion, he does indicate

7    that he's experiencing stool incontinence, correct?

8              A.    Yes.

9              Q.    In the "History of Present Illness,"

10   there's a note at the bottom where it says, "Last year

11   on a gluten free diet with ensure patient was having

12   about 3-6 stools daily."  Is that something that he

13   said to you?

14             A.    Yes.

15             Q.    Were you able to verify that he was

16   actually taking Ensure the year before?

17             A.    No.

18             Q.    Did he ever indicate to you that he had

19   actually canceled his gluten-free diet on his own

20   request?

21             A.    No.

22             Q.    Is that something that you would have

23   noted in your report?

24             A.    If he had told me, yes.

25             Q.    And then the BMI is 19.92.  Is that within

Brooks v. Oba, et al.                    **ATUL VAHIL, M.D.**                    6/1/2016

Page 71

1    the healthy range?

2              A.    It's the lower, but it is not

3    significantly different than the previous one.

4              Q.    Okay.  In the "Treatment" section here,

5    there's no indication that you recommend Ensure at this

6    point in time; is that correct?

7              A.    Right.

8              Q.    Have you reviewed the results of his lab

9    work?

10             A.    I've scanned through it.

11             Q.    In your treatment of Mr. Brooks, did you

12   notice that he was at all nutritionally deficient?

13             A.    Yes.

14             Q.    And how is that?

15             A.    I think I saw that his albumin level and

16   pre-albumin level were low.

17             Q.    In layman's terms, what does that mean,

18   that albumin and pre-albumin levels are low?

19             A.    Well, it's an indication that somebody is

20   malnourished or undernourished.

21             Q.    Did you ever discuss with Mr. Brooks if he

22   was attending his meals at the prison?

23             A.    No.

24             Q.    Did you ever discuss with him whether he

25   was eating things which were -- which are

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                              6/1/2016

Page 72

1     contraindicated by a gluten-free diet?

2          A.   No, I didn't discuss with him.

3          Q.   Are you aware of whether he was buying

4     items off of canteen and eating those items?

5          A.   No.  And it's only a 20-minute visit with

6     the patient, so I don't think you can go through

7     everything that goes on in jail.

8          Q.   Sure.  And I'm just kind of wondering what

9     he told you over time, because he's obviously been

10    seeing you for a couple of years now.

11         A.   Sure.

12         Q.   At any point in these records has

13    Mr. Brooks' weight fallen below the healthy range of a

14    BMI?

15         A.   No, from what I've seen here.

16              MR. VanLANDSCHOOT:  I don't have any

17    further questions.  Anybody else?

18              MR. RINGEL:  Ask Dan.

19              MR. VanLANDSCHOOT:  Dan, I think we're all

20    finished up here.  If you have any questions, now is

21    the time.

22              MR. SHAFFER:  All right.  Thank you.

23                      EXAMINATION

24    BY MR. SHAFFER:

25         Q.   Dr. Vahil, my name is Dan Shaffer.  I

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 73

1    represent Jason Brooks in this matter.  And I have just

2    a few questions.  All right?

3          A.   Sure.

4          Q.   In your initial visit with Mr. Brooks,

5    August 27, 2010, as part of that visit, did you give

6    him a health grade assessment rating?

7          A.   Let me just look at my report just one

8    second.  Yes.

9          Q.   And what was that rating?

10         A.   It was not a health grade rating.  It was

11   an ASA, which is an anesthesia rating, how sick the

12   patient is.

13         Q.   What's that rating -- what rating did you

14   give him?

15         A.   III.

16         Q.   And what does that mean, to you?

17         A.   They're divided in five grades.  Grade I

18   is a normal, healthy patient.  Grade II is mild

19   systemic disease.  Grade III is severe systemic

20   disease.  Grade IV is multiple diseases or severe

21   systemic disease with a constant threat to life.  And

22   obviously, Grade V is about to die.

23         Q.   Now, did you revise that rating at a later

4    time?

25         A.   I don't know.  I can check.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 74

1          Q.    Go ahead.

2          A.    Yeah.  Grade II is what I've written next

3     time.

4          Q.    And when did you revise that?

5          A.    It's on 2/12/13.  And it was actually

6     revised by the anesthesia person who was providing the

7     anesthesia.  Previously, I had seen him, and I had

8     graded him.  This time, it was the anesthesia person

9     who had graded him, gave the Grade II.

10              MS. LEASURE:  Tell him which page

11    number.

12          A.    Page No. 30, colonoscopy report -- 31.

13          Q.    (BY MR. SHAFFER)  Now, you had also

14    indicated that in your initial visit with Mr. Brooks,

15    August 27, 2010, you had made, let's see, four

16    recommendations as a result of that visit:  an

17    antireflux regimen, Prilosec, await pathology results,

18    and colonoscopy at the next available appointment; is

19    that correct?

20          A.    That's correct.

21          Q.    Now, the pathology results were the

22    results of the biopsies that you did on the -- as part

23    of the upper GI, correct?

24          A.    That's correct.

25          Q.    Now, when -- when you ordered the

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 75

1    colonoscopy to be done at the next available

2    appointment, would there be any reason that you

3    would -- you or somebody in your position would wait

4    for the results of the biopsies, the biopsies on the

5    upper GI, before doing the lower GI?

6        A.    Yes, because we had biopsied the small

7    bowel for celiac disease, and if that was positive,

8    then you could have gone with that diagnosis as the

9    cause of his symptoms, what he indicated.

10       Q.    And when were the results of the upper GI

11   biopsies available?

12       A.    It says 8/31/10.

_3            MR. RINGEL:   What page are you referring

14   to?

15            THE DEPONENT:   Page 28 --

16            MR. RINGEL:   Thank you.

17            THE DEPONENT:   -- on the biopsy report.

18       Q.    (BY MR. SHAFFER)   So the results of the

19   biopsy from the upper GI were available at the end of

20   August 2010?

21       A.    That's correct.

22       Q.    And the colonoscopy that you recommended

23   on August 27th of 2010, it's your understanding that

4    that wasn't performed until September 2011?

25       A.    That's correct.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 76

1          Q.   And if I understand your testimony earlier

2     correctly, is it your -- is it your interpretation that

3     the provider that referred the patient to you is

4     responsible for scheduling the appointment?

5          A.   Right.  As when we see the patient, we

6     make recommendations; and essentially, we don't write

7     orders.  This is my understanding, that it is the

8     primary provider who takes it to the next level.

9          Q.   So having -- well, is there any reason, in

10    your opinion, for a provider to wait nearly 12 months

11    after having received the results of the biopsies for

12    the upper GI to go forward with the colonoscopy that

13    you ordered on August 27, 2010?

14          MR. RINGEL:  Object to the form and the

15    foundation.

16          Q.   (BY MR. SHAFFER)  You can go ahead and

17    answer, Doctor.

18          A.   Well, I can't say that; because, you know,

19    since all these patients are seen elsewhere, also

20    including me, I don't know exactly what urgency they

21    need to be seen, because that depends upon the primary

22    care provider.

23          Q.   Well, you would agree you said colonoscopy

24    at the next available appointment?

25          A.   That's correct, right.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

1          Q.   And in using that language, did you intend

2     that to mean 12 months?

3          A.   No.

4          Q.   Now, at some point in your treatment of

5     Mr. Brooks you prescribed a drug called HUMIRA?

6          A.   That's correct.

7          Q.   And you said that that is -- I don't know

8     what word --

9          A.   It's called a biologic agent.

10         Q.   So it's some sort of evolution of

11    REMICADE?

12         A.   That's correct.  That's the same group.

13         Q.   And when did you -- well, did you

14    initially prescribe that in 2015, or do you recall when

15    you initially prescribed that?

16         A.   No.  I prescribed on -- it's on page

17    No. 1 -- 7/18 of 2012.

18         Q.   And when was that prescription actually

19    initiated?  I understand that you made the

20    recommendation.

21         A.   I don't know.

22         Q.   But certainly, as of, well, January 22,

23    2013, Mr. Brooks was receiving HUMIRA, page 4 -- I'm

4     sorry, 5, correct?

25         A.   Yes.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

                                                                          Page 78

```
 1            Q.   And on page 1, it indicates that you saw
 2    him on July 18, 2012, correct?
 3            A.   That's correct.
 4            Q.   And one of the treatment recommendations
 5    was HUMIRA?
 6            A.   That's correct.
 7            Q.   And as recently as September 15, 2015,
 8    according to your treatment assessment, he was still
 9    receiving HUMIRA, page 11?
10            A.   Yes.
11            Q.   And based on your reports from
12    September -- I'm sorry, July 18, 2012 up until and
13    including September 15, 2015, would you say that HUMIRA
14    had been at least partially successful for treating
15    Mr. Brooks' ulcerative colitis?
16            A.   That's my opinion, yes.
17            Q.   And while there were some symptoms he was
18    still reporting, would you agree that some of the more
19    dramatic symptoms had -- he experienced some relief?
20            A.   I don't know how much the HUMIRA alone
21    played a role, but it was a combination of things that
22    he was responding to, yes.
23            Q.   So what are -- are there some side
24    effects -- are there negative side effects associated
25    with HUMIRA?
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 79

1          A.    Well, sensitivity.  Patients can have --

2    some patients can have some long-term effects,

3    especially small bowel cancer, infections -- increases

4    with infections.  So we have to make sure that the

5    patient is not exposed to any previous infection before

6    we start this.

7          Q.    And if he was, that would be a reason to

8    terminate HUMIRA?

9                MR. VanLANDSCHOOT:  Objection to form.

10         A.    Yes.

11         Q.    (BY MR. SHAFFER)  Without determining that

12   there's some negative side effects, what medical

13   justification would there be to terminate HUMIRA?

14         A.    Well, my recommendations were to continue

15   on HUMIRA.

16         Q.    Well, without showing any negative side

17   effects, would it be medically justifiable to terminate

18   HUMIRA?

19                MR. VanLANDSCHOOT:  Object as to form.

20         A.    I would continue him on HUMIRA, based on

21   his medical condition.

22         Q.    (BY MR. SHAFFER)  So today, you would

23   support the recommendation that you made September of

24   2015?

25         A.    That's correct.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 80

1        Q.    Somebody with a mild to moderate or severe

2    ulcerative colitis, in your experience, can that be

3    managed simply by seeing a general practitioner?

4        A.    It certainly can.

5        Q.    And in Mr. Brooks' case, when you saw him

6    in August of 2010, is it your opinion that his

7    condition was being managed?

8        A.    Based on what I recommended at that time,

9    yes.

10       Q.    The proctocolectomy procedure that you

11   spoke about earlier, what are -- what does that

12   procedure entail?

13       A.    It's called -- since ulcerative colitis

14   primarily involves colon, in severe or refractory

15   cases, this is the result that we take -- what they do

16   is they take out the whole colon.  It's called total

17   proctocolectomy.  And colectomy is, obviously, taking

18   out the colon.  Proctum is, obviously, rectum.  So they

19   take out the mucosa of the rectum so that the disease

20   does not recur in that remnant part.  So they take out

21   the whole colon, including the rectal -- including the

22   rectum, and they put in a pouch.  They make a pouch

23   from ileum, which is the distal small bowel.

24       Q.    Can some patients tolerate HUMIRA

25   indefinitely for ulcerative colitis?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 81

1        A.    Yes.

2        Q.    You indicated that the procedure -- or I

3    think Mr. Ringel asked you a question about, oh, the

4    impact of a proctocolectomy on someone's daily life.

5        A.    Yes.

6        Q.    Is a proctocolectomy dangerous?

7        A.    I don't know.  I'll have to ask a surgeon.

8        Q.    Does a proctocolectomy come with some

9    risks, as opposed to a patient receiving HUMIRA?

10            MR. VanLANDSCHOOT:  Object as to form.

11        A.    Well, it is done as the result if medical

12   therapy fails, generally.

13        Q.    (BY MR. SHAFFER)  And is HUMIRA a form of

14   medical therapy?

15        A.    That's correct.

16        Q.    So if the HUMIRA fails, then one possible

17   solution for a patient with ulcerative colitis could be

18   a proctocolectomy?

19        A.    Could be, yes, one possible option.

20   Although, there are other people who can try other

21   regimens.  But yes, if every medical therapy has failed

22   and the patient is still symptomatic, we go to surgery.

23   That's called total proctocolectomy.

24        Q.    And it's your understanding that you

25   recommended a proctocolectomy in August of 2010?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 82

1          A.    No.

2          Q.    When did you make that recommendation?

3          A.    It was in April of 2012.

4          Q.    And it's your understanding that there was

5    some degree of concern with trying an additional

6    medical therapy in lieu of a proctocolectomy?

7          A.    That's correct.

8          Q.    And that regimen was HUMIRA?

9          A.    Part of it.  Because I initiated a

10   combination of treatments, including HUMIRA, including

11   6-MP.  If one drug fails, you can always go up on the

12   combination.  And you can go up on the dosage, as long

13   as there are no side effects to the maximum tolerated

14   dose, then you say the patient failed the treatment.

15   So it is not just saying HUMIRA failed; if the

16   combination therapy failed, yes.

17              MR. SHAFFER:  I don't have any further

18   questions.  Mr. Ringel?

19              MR. RINGEL:  Nothing else for me.

20              THE DEPONENT:  Thank you.

21              MR. VanLANDSCHOOT:  All right.  We'll go

22   off the record.

23

24

25

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 83

1              WHEREUPON, the within proceedings were

2    concluded at the approximate hour of 5:40 p.m. on the

3    1st day of June, 2016.

4                 *       *       *       *       *

5              (It was stipulated and agreed by counsel,

6    with the consent of the deponent, that the reading and

7    signing of the within deposition is waived.)

8

9

10

11

12

3

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

STATE OF COLORADO           )
                            )  ss.
CITY AND COUNTY OF DENVER )

          I, GAIL OBERMEYER, Registered Professional
Reporter and Notary Public ID 19994012647, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said ATUL VAHIL,
M.D. was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place aforesaid
and was thereafter reduced to typewritten form; that
the foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of this
litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 9th day of June, 2016.

          My commission expires May 10, 2019.


_____ Reading and Signing was requested.

__X__ Reading and Signing was waived.

_____ Reading and Signing is not required.