IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-CBS
_____

DEPOSITION OF:  ATUL VAHIL, M.D. - June 1, 2016
_____

JASON BROOKS,

Plaintiff,

v.

DAVID OBA, PATRICK BLAKE, ANGIE TURNER,
CORRECTIONS CORPORATION OF AMERICA,
DEBRA FOSTER, JULIE RUSSELL, KATHY HOWELL,
DAVID TESSIERE, and TRUDY SICOTTE,

Defendants.

_____



                   PURSUANT TO NOTICE, the deposition of
ATUL VAHIL, M.D., was taken on behalf of the Defendants
David Oba, Patrick Blake, Angie Turner, and Corrections
Corporation of America at 150 South Santa Fe Avenue,
Pueblo, Colorado 81003, on June 1, 2016, at 3:48 p.m.,
before Gail Obermeyer, Registered Professional Reporter
and Notary Public within Colorado.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

 1          WHEREUPON, the following proceedings

 2   were taken pursuant to the Federal Rules of Civil

 3   Procedure.

 4               *       *       *       *       *

 5          (Deposition Exhibits 1 and 2 were marked.)

 6               ATUL VAHIL, M.D.,

 7   having been first duly sworn to state the whole truth,

 8   testified as follows:

 9                    EXAMINATION

10   BY MR. RINGEL:

11          Q.   Doctor, would you state your name for the

12   record, please.

13          A.   Yeah.   Atul, A-t-u-l, Vahil, V-a-h-i-l.

14          Q.   Doctor, my name is Andrew Ringel.   I am an

15   attorney.   I represent three -- four of the defendants

16   in a lawsuit brought by one of your patients by the

17   name of Jason Brooks.   My clients are Corrections

18   Corporation of America, David Oba, Angie Turner, and

19   Patrick Blake.   Everyone else in the room, other than

20   your lawyer, represents one of the other parties in the

21   lawsuit.   And Mr. Shaffer, who is on the phone,

22   represents Mr. Brooks.

23               We're here to take your deposition.   Have

24   you ever had a deposition taken before?

25          A.   No.

Brooks v. Oba, et al.                          ATUL VAHIL, M.D.                          6/1/2016

1          Q.     I'm not going to go over it, but I wanted
2    to ask you a few general questions.   Your specialty is
3    gastroenterology; is that correct?
4          A.     That's correct.
5          Q.     How long have you been a
6    gastroenterologist?
7          A.     Over 25 years.
8          Q.     And where do you practice now?
9          A.     I'm practicing at the current address,
10   which is 1600 North Grand Avenue, Suite 440, Pueblo,
11   Colorado.
12         Q.     And what is the name of your practice?
13         A.     Digestive Diseases Specialists of
14   Colorado.
15         Q.     And how long have you practiced with that
16   organization?
17         A.     Sixteen years.
18         Q.     Okay.   Are you an owner of that business?
19         A.     Yes.
20         Q.     Okay.   Are there any -- is will anybody
21   else who is, like, a partner of yours?
22         A.     No.
23         Q.     Okay.   How many employees do you have?
24         A.     Fourteen.
25         Q.     Okay.   What -- can you describe generally

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1   for me the nature of your practice?

2          A.   So it's a solo practice, which is the

3   gastroenterology practice.   Then I am affiliated with

4   two hospitals in town, but I'm not employed by them.

5   All the other practices in town are employed.   And I

6   have independent privileges with the hospital where I

7   do go and see consults requested by the primary care

8   physicians.   And I do calls at both of the hospitals.

9          Q.   And those two hospitals are St. Mary's and

10  Parkview?

11         A.   That's correct.

12         Q.   Okay.   How long have you had medical

13  privileges at those two hospitals?

14         A.   Same duration of time.

15         Q.   Okay.   Sixteen years?

16         A.   Yeah.

17         Q.   Okay.   Have you -- other than Mr. Brooks,

18  how frequently do you treat inmates who are

19  incarcerated in a prison or a jail?

20         A.   Generally, just once a month.

21         Q.   Okay.   How many times have you seen

22  Mr. Brooks?

23         A.   I've seen -- can I refer to this

24  (indicating)?

25         Q.   Sure.

Brooks v. Oba, et al.                     ATUL VAHIL, M.D.                        6/1/2016

1          A.    It's just notes in chronological order.

2    About 12 times, 13 times.

3          Q.    And always in your clinic?

4          A.    Or surgery center where we do the

5    procedures.

6          Q.    All right.  What was the first time you

7    saw Mr. Brooks?

8          A.    The first time, I was asked to see him for

9    an endoscopy, for a procedure, for diarrhea and weight

10   loss.  And we did an endoscopy on him, which is the

11   upper endoscopy.  And that's when we -- that was the

12   first time I saw him.

13         Q.    And what was the date of the first time

14   you saw him?

15         A.    8/26/10.

16         Q.    And what was the most recent time that you

17   saw him?

18         A.    9/15, September '15.  I don't know the

19   exact date.  I can check it.

20         Q.    September of 2015?

21         A.    Yes.

22         Q.    Okay.  What I wanted to ask you now is the

23   sources of your information about Mr. Brooks.  Okay.

24   So you have, and what's been marked as Exhibit 2, is a

25   copy of your medical records that were produced by your

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1    counsel.  Is that what Exhibit 2 is?

2          A.   That's correct.

3          Q.   And that consists of 77 pages; is that

4    right?

5          A.   That's correct.

6          Q.   Are there any other records that your

7    clinic maintains of Mr. Brooks, of any kind, other than

8    what is in those 77 pages?

9          A.   No.

10          Q.   What about billing records?

11          A.   I'm not sure.  There may be, yeah.

12          Q.   I assume that you charge somebody to

13    get --

14          A.   Sure.

15          Q.   -- for your services to see Mr. Brooks,

16    right?

17          A.   Yes.

18          Q.   Who do you charge?

19          A.   We charge the DOC.

20          Q.   Do you have a contract with the Colorado

21    Department of Corrections?

22          A.   Yes.

23          Q.   How long have you had such a contract?

24          A.   I'm not sure.  Maybe about over ten years.

25          Q.   Is it an annual contract, or does it have

Brooks v. Oba, et al.                     ATUL VAHIL, M.D.                        6/1/2016

 1           A.    Right.

 2           Q.    -- to either see someone in your clinic or

 3    to do a procedure in your surgical center?

 4           A.    Right.  The majority of them are the

 5    procedures, maybe one or two consults, like his.

 6           Q.    Okay.  And the procedure -- what types of

 7    procedures do you do for the CDOC?

 8           A.    Upper endoscopy, which is the

 9    esophagogastroduodenoscopy, that's what it's called;

10    colonoscopy; esophageal dilation; polyp removal.

11    That's about the bulk of it.

12           Q.    Do you know where the inmates that you see

13    are generally incarcerated, or do you not know, one way

14    or the other?

15           A.    We don't know.

16           Q.    Do you know how patients get referred to

17    you by the Department of Corrections?

18           A.    Yeah.  So they are scheduled -- they call

19    us, "These are the patients to be seen on this day.

20    This is the reason for the procedure," or whatever.  We

21    have a contract about a consultant practice, which is a

22    specialist consultant, not on a -- monitoring on a

23    regular basis.

24           Q.    Understood.  Okay.  So your role with

25    respect to the DOC inmates as a physician is to be a

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

 1    specialist consultant?

 2         A.    That's correct.

 3         Q.    So the people that would be the primary

 4    healthcare providers for each of these patients would

 5    be someone other than you?

 6         A.    That's correct.

 7         Q.    And they presumably -- do you know who

 8    that would be for any particular patient?

 9         A.    No.

10         Q.    You mentioned a scheduler.  Do you know

11    who the person is who schedules for the Department of

12    Corrections with your office?

13         A.    No.

14         Q.    Do you have a scheduler at your office?

15         A.    Yeah.

16         Q.    Does that person interface with the

17    Department of Corrections scheduler?

18         A.    Not all the time, because -- yeah,

19    majority of the times, yes.

20         Q.    Okay.  Who is the person that's the

21    scheduler at your office?

22         A.    Her name is Rebecca.

23         Q.    What is Rebecca's last name?

24         A.    Her name is Rebecca Gonzales.

25         Q.    And how long has Ms. Gonzales worked with

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1  that's perfectly reasonable.  Okay.

2            So other than the medical records that you

3  have, you may have billing records related to

4  Mr. Brooks, true?

5       A.   That's correct.

6       Q.   And you may have scheduling records

7  related to Mr. Brooks?

8       A.   Yes.

9       Q.   Also true?

10      A.   Yes.

11           MR. RINGEL:  Counsel, can you track down

12  those records for me, please?

13           MS. LEASURE:  I can't, but I'll work with

14  the doctor and his office to do so.

15           MR. RINGEL:  Okay.  Thank you.

16      Q.   (BY MR. RINGEL)  What condition or

17  conditions have you treated Mr. Brooks for?

18      A.   Primarily ulcerative colitis.

19      Q.   What is ulcerative colitis?

20      A.   Ulcerative colitis, it's a chronic

21  inflammatory bowel disease.

22      Q.   When was Mr. Brooks diagnosed with that

23  disease?

24      A.   Per my records, he was diagnosed in 2002.

25  But I saw him for first time for that condition in

Brooks v. Oba, et al.                ATUL VAHIL, M.D.                    6/1/2016

Page 17

1   April or -- April of 2012.

2          Q.   Okay.  You have records -- some records in

3   your records from medical treatment from other

4   providers other than yourself, right?

5          A.   Yes.

6          Q.   How would you have obtained such records?

7          A.   Sometimes they come with the patient at

8   the time when they're scheduled for the colonoscopy or

9   for the consult; generally, mostly for the consult,

10  since we ask them to provide the previous records.  So

11  one of those was, when I first saw him, the colonoscopy

12  done by another physician, Dr. Miller.

13         Q.   Right.

14         A.   So that was one that I have.

15         Q.   Okay.  And then you have some Department

16  of Corrections medical records, too?

17         A.   Right, right.

18         Q.   But you would agree with me that you have

19  not reviewed all of Mr. Brooks' medical records?

20         A.   That's correct.

21         Q.   Either inside the Department of

22  Corrections or from other -- any other outside medical

23  provider that he might have seen?

24         A.   Yes, I have not.

25         Q.   Okay.  And your role is not to manage his

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 18

1    ulcerative colitis, generally.  Is that fair?

2              A.   That's correct.

3              Q.   The person or persons who would manage

4    that disease for Mr. Brooks would be primary care

5    healthcare providers, right?

6              A.   That's correct.

7              Q.   At whatever facility he's incarcerated at?

8              A.   Yes.

9              Q.   And that's perfectly reasonable, isn't it?

10             A.   Yes.

11             Q.   In fact, that's what would happen to a

12   patient not incarcerated, right?

13             A.   Not necessarily.

14             Q.   Okay.  So when you -- if you have a

15   patient who has ulcerative colitis who just lives in

16   Pueblo, would you follow up with that patient, or would

17   the patient's primary care physician follow up with

18   that patient?

19             A.   Generally what happens when I get a

20   consult from a primary care physician, I see the

21   patient for these chronic diseases till they are okay

22   or they voice that they are doing fine.  Because

23   these -- they may go in remission, so I don't need to

24   see them.  Maybe once a year we might see them, once in

25   two years, when their colonoscopy is due.

1      Q.    Okay.   So you would follow up maybe a

2   little bit more frequently with a non-incarcerated

3   patient than you would follow up with an incarcerated

4   patient?

5          A.    Yes.

6      Q.    And the difference is because one patient

7   is incarcerated and the other is not, or is there some

8   other difference, as far as you know?

9          A.    No.   That's the primary difference.

10         Q.    All right.   You first saw Mr. Brooks for

11  the endoscopy on August 25, 2010; is that right?

12         A.    Yes.

13         Q.    Do you know when -- do you know who

14  referred him to you?

15         A.    No, I don't recall.

16         Q.    Do you know what facility he was

17  incarcerated at at that time?

18         A.    No.

19         Q.    Okay.   I will represent to you that he was

20  incarcerated then at a facility called the Bent County

21  Correctional Facility.   Have you ever heard of that

22  facility?

23         A.    Yes.

24         Q.    Okay.   Are you aware who the owner and

25  operator of that facility is?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 31

1   these recommendations and these impressions on these

2   medical records?

3        A.   No.   What we generally do, as soon as I'm

4   done with the procedure, I do the dictation -- or do

5   the report, and that goes with the patient's chart.

6        Q.   Okay.   So the general procedure is, this

7   report would go with the patient's chart back to --

8   with the patient to their prison facility?

9        A.   Right.

10        Q.   Okay.   And then what is your understanding

11   of what happens next?

12        A.   I mean, our contract is, forget about it,

13   unless I get called from them again that this patient

14   is having a problem.

15        Q.   So who, in your understanding, is

16   responsible to implement your recommendations as are

17   found on page 21 of your medical records?

18        A.   The providers who are treating the patient

19   at the Department of Corrections.

20        Q.   Does this report go back to PHP?

21        A.   No.   This goes to the DOC.   And I don't

22   know -- I'm not clear about the PHP part of it and DOC

23   part of it.   DOC patient comes in for the problem.   We

24   do the procedure, what is requested of it, make the

25   recommendation, and then the report goes with the chart

Brooks v. Oba, et al.                     ATUL VAHIL, M.D.                           6/1/2016

Page 32

```
 1   to the provider at DOC.
 2              Q.   And then whatever action the provider
 3   takes -- your understanding is the provider would get
 4   the information from you, and then it's the provider's
 5   responsibility to take further action --
 6              A.   That's correct.
 7              Q.   -- to implement your recommendations?
 8              A.   Right.
 9              Q.   Do you have --
10              A.   If they're deemed reasonable.  Some of
11   them may not agree with my recommendation.  They say,
12   "That's okay."  But if they think that that's what they
13   agree with, then, yeah, that's correct.
14              Q.   Fair enough.  When you act as a consultant
15   or a specialist, you provide a recommendation.  Is that
16   different than an order for the patient?
17              A.   That's different, yeah, because on the
18   report we write recommendations, not an order.
19              Q.   And it would be up to the healthcare
20   provider at the facility to exercise his or her
21   clinical judgment and do an order based on your
22   recommendation, fair?
23              A.   Yes.
24              Q.   Okay.  And they may know more than you
25   know about the totality of the healthcare related to
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

1    this particular patient?

2            A.    That's correct.

3            Q.    Because they're treating the patient as a

4    whole, not just one particular problem for the patient?

5            A.    That's right.

6            Q.    What is your understanding of how, if you

7    have one, and you may not know, do you have any idea

8    how a colonoscopy -- so let's take Mr. Brooks.  You

9    recommended a colonoscopy at the next available

10   appointment.  Do you have any idea of how -- assuming

11   the primary care healthcare provider at his facility

12   agreed with your recommendation and made it an order,

13   do you have any idea of what process exists to get that

14   to occur?

15           A.    No.

16           Q.    You don't know who would have to approve

17   it or anything like that?

18           A.    No.  Sometimes they call us to make

19   recommendations, or we request a colonoscopy, so they

20   want us to write the whole thing to the DOC to get it

21   authorized.

22           Q.    Do you know who authorizes it?

23           A.    No.

24           Q.    So you've had circumstances where you

25   provide the sort of -- the supporting information to

**Brooks v. Oba, et al.**                          ATUL VAHIL, M.D.                          **6/1/2016**

```
 1           Q.    Okay.  Is it your understanding that PHP

 2     has some role in approving or not approving outside

 3     medical care for inmates at the Department of

 4     Corrections?

 5           A.    Yes.

 6           Q.    So for someone to get to see you in the

 7     first place, they would need to have approval from PHP?

 8           A.    That's correct.

 9           Q.    And for them -- for that particular inmate

10     to have another procedure or another visit with you,

11     they would have to get further approval from PHP,

12     right?

13           A.    Yes.

14           Q.    They act kind of like an insurance company

15     does?

16           A.    That's true.

17           Q.    And they are looking at issues of medical

18     necessity, right?

19           A.    Right.

20           Q.    Okay.  So it's no different than Humana,

21     but Humana does it inside, and the Department of

22     Corrections has PHP do it for the Department of

23     Corrections?

24           A.    Right.

25           Q.    Is ulcerative colitis a chronic disease?
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 36

1      A.    Yes, it is.

2      Q.    **How does it progress?**

3      A.    Well, everybody can have a different

4    course.   It can be mild, moderate, severe.   It can be

5    non- -- it can be refractory to medical treatment.   It

6    can be -- it can go into remission for years.   So there

7    are different variations of this, and everybody behaves

8    differently.

9      Q.    **How would you characterize Mr. Brooks'**

10   **version of ulcerative colitis, in terms of mild,**

11   **moderate, or severe?**

12     A.    Moderately severe.

13     Q.    **Is there, I don't know, a scale that --**

14     A.    No.

15     Q.    **-- exists related to that kind of**

16   **assessment of Mr. Brooks' problem?**

17     A.    I'm not aware.

18     Q.    **When you say, "moderately severe," what**

19   **does that mean to you?**

20     A.    Well, I'm saying, "moderately severe,"

21   because at different stages of the time period that I

22   saw him, there were times that he was severe.   Like

23   when my colonoscopy was performed, he had multiple

24   large ulcers on the colon, obviously suggestive of

25   severe colitis; but other occasions, it was mild.

Case 1:13-cv-02894-SKC   Document 425   Filed 12/14/22   USDC Colorado   Page 18 of 54

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 39

1        A.    Right.

2        Q.    Fair enough.  You suggested a colonoscopy

3    of Mr. Brooks, and then he ultimately got a colonoscopy

4    after September of 2011.  What is your understanding of

5    the treatment that he received after the colonoscopy?

6        A.    Let me go back to my report on this.  The

7    colonoscopy was performed in 2013.

8        Q.    Well, that's your colonoscopy.

9        A.    Right.

10       Q.    Okay.  So you performed a colonoscopy in

11   2013.  And what were the results of your colonoscopy on

12   Mr. Brooks?

13       A.    Let me just pull it up, please.

14       Q.    Sure.

15            MS. LEASURE:  It's page 20.

16            THE DEPONENT:  20?  No.  20 was the upper

17   endoscopy.  So that's 2/12/13, page 30.

18       Q.    (BY MR. RINGEL)  Okay.  So page 30 is the

19   first colonoscopy you performed on Mr. Brooks?

20       A.    Right.

21       Q.    And that occurred on February 12th of

22   2013?

23       A.    That's correct.

24       Q.    Do you have any basis to compare

25   Mr. Brooks' ulcerative colitis, as you observed it in

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 40

1    the colonoscopy of 2013, and what it was like

2    previously?

3           A.    No.

4           Q.    So the best way to kind of analyze what

5    the status of Mr. Brooks' ulcerative colitis is a

6    colonoscopy?

7           A.    That's correct.

8           Q.    And the colonoscopy in 2013 was your first

9    opportunity yourself to make that assessment?

10          A.    That's correct.

11          Q.    And your assessment was moderate to severe

12   UC?

13          A.    That's correct, involving certain parts of

14   the colon.

15          Q.    Understood.   As you identify in this

16   report?

17          A.    Right.

18          Q.    And what was your treatment protocol for

19   Mr. Brooks after your colonoscopy in February of 2013?

20          A.    Okay.   So the treatment was he was already

21   on medication, which we continued.   We waited for the

22   biopsy results, and then we started him on enemas.

23   It's called Rowasa enemas, which is Mesalamine, to

24   treat the ulcerative colitis, since predominantly there

25   was complaint of the left colon.

Case 1:13-cv-02894-SKC   Document 425   Filed 12/14/22   USDC Colorado   Page 20 of 54

Brooks v. Oba, et al.                  ATUL VAHIL, M.D.                      6/1/2016

Page 41

1    Q.    When you say, "left colon," what does that

2    mean?

3    A.    Well, that's starting from the rectum all

4    the way up to the splenic flexure, which is up here

5    (indicating).

6    Q.    So it's on the left side of Mr. Brooks'

7    body?

8    A.    Predominantly, although there was

9    microscopic colitis here and here (indicating), but

10   regional colitis with ulcers and pseudo colitis was

11   predominantly the left colon.

12   Q.    Okay.  So the basic treatment was the

13   same, other than the starting of these enemas.  Is that

14   fair?

15   A.    That's correct.

16   Q.    Do you know whether Mr. Brooks had an

17   enema prior to 2013?

18   A.    No, I don't know.

19   Q.    But the medication that he was on remained

20   the same after your colonoscopy?

21   A.    Right.

22   Q.    The only change in treatment protocol was

23   the enema, right?

24   A.    Yeah.

25   Q.    Do you know when you first received the

Brooks v. Oba, et al.                          ATUL VAHIL, M.D.                              6/1/2016

1    colonoscopy report performed by Dr. Miller?

2              A.   I would think that it was the time when I

3    first saw him, which was in April of 2012.

4              Q.   Okay.  So you -- you first saw Mr. Brooks

5    in August of 2010, right?

6              A.   For the endoscopy.

7              Q.   For the endoscopy.  And then you next saw

8    him in April of 2012, and you believe you got this

9    colonoscopy report from Dr. Miller at that time?

10             A.   Right, because that was not for the

11   procedure.  That was a consult, what to do with the

12   patient.

13             Q.   Okay.  Fair enough.  And so as part of

14   that, you would have had more information about

15   Mr. Brooks, because you had to figure out what was

16   wrong with him and what you should do?

17             A.   Right.

18             Q.   As opposed to the more limited scope of

19   performing a procedure?

20             A.   Right.

21             Q.   Okay.  I'm with you.  What is Mr. Brooks'

22   current prognosis for his UC?

23             A.   Well, I can't say anything at this point,

24   because I haven't seen him for nine months.

25             Q.   What was your prognosis for him and his UC

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 43

1    in September of '15?

2              A.   That he should be on treatment.   And

3    obviously, at this point, you know, with the severity

4    and symptoms that he was having, that he should

5    continue on the treatment that we had prescribed.   And

6    at that point, with his symptoms that I had looked

7    through my records, that they were improving; not

8    everything, but they were improving.

9              Q.   Okay.   And what was the treatment that you

10   prescribed as of September of '15?

11             A.   Okay.   When I saw him, he was already on

12   Prednisone.   He was on 20 milligrams, which was being

13   tapered down at the facility.   So I started him on

14   Asacol, which is an antiinflammatory medication.   I

15   started him on HUMIRA, which is another biologic agent;

16   because he had previously tried another biologic agent

17   called REMICADE.

18             Q.   That didn't work?

19             A.   That didn't work.

20             Q.   When you say, "a biological agent," what

21   does that mean?

22             A.   This is a new form of medications that are

23   prescribed, usually given through parenteral, either

24   subcutaneous or IV.   REMICADE is IV, HUMIRA can be

25   given subcutaneous.   They are anti-tumor necrosis

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 44

1  factors, so they act on the tissues or toxins.

2        Q.    When did he start on the HUMIRA?

3        A.    I don't know the exact date.

4        Q.    Were you the original person that

5  prescribed that for him, or did somebody else?

6        A.    I'm the first person who prescribed

7  HUMIRA.

8        Q.    And that -- what year are we talking

9  about?

10       A.    This was on July 12, 2012.  After the

11 colonoscopy, we requested -- yeah.  That was 2012.  It

12 was not after colonoscopy, after the previous report

13 that I went by, since he had a colonoscopy just a year

14 before.

15       Q.    So based on Dr. Miller's colonoscopy, you

16 decided to start Mr. Brooks on a treatment of HUMIRA?

17       A.    Right.

18       Q.    Was HUMIRA available prior to that time,

19 or was it relatively new?

20       A.    It was available.

21       Q.    When did HUMIRA start becoming available?

22       A.    I don't know.

23       Q.    When did you start using it in your

24 practice?

25       A.    Probably about ten years.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

1        Q.     Was there any basis before you had a

2   colonoscopy to decide whether HUMIRA was indicated?

3        A.     Prior to colonoscopy, yes.   The patient,

4   based on my records, which I saw him on first consult,

5   he had been tried on REMICADE.   So sometimes if you

6   want to try something else, that's another biologic

7   agent that the patient may respond to, if he did not

8   respond to the first one, which was REMICADE.

9        Q.     When was the prior biologic agent,

10  REMICADE, started?

11       A.     I don't know.   I just got the records from

12  there stating that the patient had received REMICADE

13  for five months.   From what time to what time, I don't

14  know.

15       Q.     Do you have any understanding, one way or

16  the other, whether the REMICADE was prescribed during

17  Mr. Brooks' incarceration, or did it predate his

18  incarceration, or do you not know?

19       A.     I don't know.

20       Q.     So as of September of 2015, would you

21  characterize Mr. Brooks as stable, in terms of his

22  ulcerative colitis?

23       A.     I have to refer to my last note.

24       Q.     Sure.   It looks like page 11.

25       A.     Well, I would still characterize this as

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 46

1    active colitis, given the fact that he was still

2    complaining of the symptoms.

3           Q.   Fair enough.  So you -- active colitis is

4    different than stable?

5           A.   Right.

6           Q.   When I use a term like "stable," you're

7    thinking the colitis being in remission, fair?

8           A.   Right.

9           Q.   Okay.  And his colitis, as of September

10   2015, was not in remission?

11          A.   That's right.  Plus, he had symptoms.

12          Q.   Fair enough.  So for a colitis to be

13   stable, it needs to be in remission and asymptomatic?

14          A.   That's correct.

15          Q.   And the goal was, in September of 2015, to

16   treat him, as you described in this note, to get him to

17   that point, right?

18          A.   Yes.

19          Q.   Assuming medical treatment doesn't work,

20   what is the next course of action with respect to an

21   ulcerative colitis?

22          A.   Surgery is done.  That's called total

23   proctocolectomy.  They take out the whole colon.

24          Q.   Is that indicated for Mr. Brooks?

25          A.   Yes, I recommended that initially, when I

Brooks v. Oba, et al.                    **ATUL VAHIL, M.D.**                    6/1/2016

1    say him first time, because he had been -- all the

2    medication had still failed.  So that was my

3    recommendation first time when I saw him.

4           Q.   **And when you say, "first time," first time**

5    **as a consultant?**

6           A.   As a consultant, not as a physician,

7    right.

8           Q.   **Right.   In 2012?**

9           A.   Right.

10          Q.   **You made the recommendation that he**

11   **have -- essentially, have his colon removed?**

12          A.   That's correct.

13          Q.   **Do you know why that recommendation was**

14   **not followed?**

15          A.   No.  But that is a call that a physician

16   made to find out if it is possible to try one more

17   attempt at aggressive medical management before doing

18   surgery.

19          Q.   **It would be better to see if it could be**

20   **managed medically than to remove someone's colon?**

21          A.   That's correct.  You usually try the

22   medical management and then go with surgery.

23          Q.   **What kind of life does someone have when**

24   **you remove their colon?**

25          A.   Say that again.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 48

1        Q.     What kind of daily life does someone have

2   when you remove their colon?

3        A.     It depends upon how the patient's symptoms

4   are.  When it comes to the time that they have total

5   proctocolectomy, they're in such a severe state,

6   sometimes they feel better after having it done, even

7   though they have a stigma of having a colostomy --

8   ileostomy.

9        Q.     Are there restrictions on the activities

10  of daily living someone can have if they have their

11  colon removed?

12       A.     Some restrictions, because they still have

13  about, on an average, five to seven stools a day.  So

14  obviously, to go and take care of that is --

15       Q.     Time-consuming?

16       A.     Time-consuming.  Thank you.

17            MR. RINGEL:  Okay.  I don't have any

18  further questions of you.  I'm going to pass you along

19  to some of my colleagues.

20            MR. SANCHEZ:  If you don't mind, I'll go

21  down there, that way --

22            MR. VanLANDSCHOOT:  I was going to

23  volunteer, but . . .

24            MR. SANCHEZ:  I just have a few questions.

25            (Discussion off the record.)

1              (Recess taken, 4:46 p.m. to 4:48 p.m.)

2              MR. SANCHEZ:  All right.  We're back on

3    the record, Dan.

4                       EXAMINATION

5    BY MR. SANCHEZ:

6         A.   Mr. (sic) Vahil, my name is Joseph

7    Sanchez.  I introduced myself to you off the record.

8    And I'm just going to go ahead and introduce myself to

9    you on the record.  I'm the attorney for one of the

10   named defendants, her name is Trudy Sicotte, just so

11   you know my involvement in the case.

12        A.   Okay.

13        Q.   I just have a couple follow-up questions,

14   if you don't mind.

15        A.   Sure.

16        Q.   With regards to Mr. Brooks, you stated

17   that his diagnosis was ulcerative colitis.  And what I

18   wanted to ask you with regards to his colitis

19   diagnosis, you said it was a chronic inflammatory

20   disease, and I wanted to ask you, what is the required

21   treatment for ulcerative colitis, typically?

22        A.   That depends upon what is the extent of

23   involvement, what is the severity of disease.  So

24   usually for mild, maybe occasionally moderate, we start

25   them on Mesalamine, oral pills that we give them for --

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                      6/1/2016

Page 50

1   it's antiinflammatory for the inflammatory bowel

2   disease, for the inflammation of the bowel, per se.

3           Q.    And I'm assuming with your specialist --

4   your specialist background in gastroenterology, you've

5   treated a number of individuals that have been

6   diagnosed with ulcerative colitis; is that right?

7           A.    That's correct.

8           Q.    And with regards to the patients that

9   you've seen in the past, whether they were prison

10  patients or patients outside of the prison system, when

11  someone has been diagnosed with colitis, do you

12  typically prescribe or order a gluten-free diet?

13          A.    No.

14          Q.    And why is that?

15          A.    Because we can check for the celiac -- the

16  gluten-free diet can been used for celiac disease,

17  which is another disease, which is an autoimmune

18  disease, that can be linked to this.  But we check for

19  that, and if it is negative, we generally don't

20  prescribe.

21          Q.    So generally speaking, then, would it be

22  safe to say that a gluten-free diet is not a required

23  treatment for ulcerative colitis?

24          A.    That's correct.

25          Q.    Turning to Exhibit 2, your doctor's notes,

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1    for a second, if you don't mind turning to page 9.  And

2    I believe that this is your report from your

3    interaction with Mr. Brooks on June 10th of 2014; is

4    that correct?

5            A.    Yes.

6            Q.    I just had a couple questions with regards

7    to that interaction.  First off, when I look to the

8    left-hand side, you have a number of different

9    sections.  And what I mean by that is, there's one

10   heading that says, "Current Medications," and then

11   right below that, "Past Medical History."  And then

12   down below, the last kind of section, is "Review of

13   Symptoms (sic)."  Do you see where I'm reading that?

14           A.    Yes.

15           Q.    And I had a question here.  Under "Review

16   of Symptoms (sic)," under "Constitutional" there's a

17   notation that says, "No weight loss."  And I wanted to

18   ask you, would you -- would your office typically weigh

19   Mr. Brooks every time he would come in for a visit?

20           A.    Yes; for office visit, not for the

21   procedures.

22           Q.    Right.

23           A.    And actually, it does say loss of

24   appetite.

25           Q.    Okay.  But as far as from the notations

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

1    that you have, based on your interaction with

2    Mr. Brooks on June 10 of 2014, I'm assuming, then, that

3    prior to making a notation that there was no weight

4    loss, that he was weighed on that day, correct?

5              A.    This is the question -- three of the

6    questions, constitutional symptoms and other stuff,

7    "Review of Systems," what we ask the patient.

8              Q.    Oh, okay.

9              A.    So we ask them, "Do you have any weight

10   loss?"  So these are not objective findings.  Objective

11   findings are on the right side.

12             Q.    Great.  Thank you.  So that "no weight

13   loss" is actually being reported by Mr. Brooks himself?

14             A.    Right.

15             Q.    Okay.  The same goes with the

16   "Gastroenterology" section right below that.  I note

17   that you say, "no nausea, no heartburn, no stool

18   incontinence," and again, "no weight loss."  Is that

19   indication, the "no weight loss" in that section,

20   again, coming from Mr. Brooks himself?

21             A.    That's exactly true.

22             Q.    Now, turning to the other side, the

23   right-hand side of the report, when you told me this is

24   more coming from you, from the diagnostic part, I just

25   had a couple questions with regards to -- starting with

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

1    the "History of Present Illness" section.  Do you see

2    where I'm at on there?

3            A.    Yes.

4            Q.    Now, typically, when you're getting a

5    history of your patients, like Mr. Brooks, are you

6    getting that history from interacting with the patient

7    getting their input as telling you what's going on or

8    what has happened with them?

9            A.    Yes.  "History of Present Illness" is what

10   the patient has told us, all of it.

11           Q.    Got you.  So when I look at that

12   paragraph, there's a section in there that I wanted to

13   ask you about.  It states, "Patient reports that he has

14   tested negative for celiac . . ."  Do you see that?

15           A.    Yes.

16           Q.    And again, you'll have to excuse me, I

17   don't have a great medical background.  But for the

18   record, can you explain to me, when someone says

19   they've tested negative for celiac, what does that mean

20   in layman's terms?

21           A.    Celiac disease, as I mentioned, is another

22   autoimmune disease where you become -- you have

23   autoimmune problems with gluten, wheat, barley, rye.

24   So if you consume those, your body produces antibodies

25   to fight against the lining of the small intestine.

**Brooks v. Oba, et al.**                          **ATUL VAHIL, M.D.**                          **6/1/2016**

Page 54

 1   And that gets blunted (sic), so absorption is affected.

 2          Q.   So would it be -- is it safe to say, then,

 3   that by that statement, that Mr. Brooks is telling you

 4   that he was tested, and he does not have an allergic --

 5   an allergy to gluten foods?   Is that --

 6          A.   No, no.   Celiac disease is autoimmune

 7   disease where you have symptoms of diarrhea, weight

 8   loss, malabsorption, bloating, all that stuff, related

 9   to an immune disturbance in the body; which you can

10   check by doing blood tests, which you can check -- what

11   we did on the first endoscopy, first time, biopsy the

12   small bowel.   And those are the two methods of

13   magnocencilic (phonetic) disease.

14          Q.   Okay.   So we know that he's telling you

15   that he tested negative for celiac?

16          A.   Right.

17          Q.   Okay.   But then he tells you that he does

18   seem to be gluten-intolerant, correct?

19          A.   Yes.

20          Q.   To your knowledge, do you know if

21   Mr. Brooks has ever been tested to determine whether or

22   not he has an allergy to gluten foods, specifically?

23          A.   Not to my knowledge.

24          Q.   Okay.   And then when I look at the next

25   sentence under the "History" section, it's noted, "With

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

```
 1          Q.   (BY MR. VanLANDSCHOOT)  Basically, I

 2   represent parties that I don't believe you've had any

 3   contact with.  But I do have some questions that I just

 4   want to go over about these contacts with Mr. Brooks.

 5          A.   Sure.

 6          Q.   So what I'd like to start with is,

 7   generally, for patients with UC, in your experience, do

 8   they tend to be on the higher end or the lower end of

 9   the body mass index?

10               MR. SHAFFER:  I can't hear you, John.

11               MR. VanLANDSCHOOT:  Can you hear me now?

12               MR. SHAFFER:  Intermittently.  Can I just

13   call back on Andrew's phone?

14               MR. RINGEL:  Yeah, that's fine.

15               MR. VanLANDSCHOOT:  We're going to

16   hang up, and we'll stay off the record for a minute.

17               MR. SHAFFER:  I'll call Andrew's phone.

18               MR. VanLANDSCHOOT:  All right.

19               (Pause in the proceedings.)

20               MR. VanLANDSCHOOT:  We'll go back on the

21   record.

22          Q.   (BY MR. VanLANDSCHOOT)  Dr. Vahil, I'll

23   just reask the question.  In your experience, do

24   patients with UC tend to be on the higher end or the

25   lower end of the body mass index?
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 59

```
 1          A.   Depends upon what the severity of the
 2    problem is.
 3          Q.   Okay.  What about someone with moderate to
 4    severe UC?
 5          A.   Obviously, they are probably at the lower
 6    end.
 7          Q.   And does it also depend on body type?
 8          A.   Sure.
 9          Q.   Activity level?
10          A.   You can argue for that, yeah.
11          Q.   Did you ever have any discussions with
12    Mr. Brooks about how much he was exercising, whether he
13    was exercising or anything of that nature?
14          A.   No.
15          Q.   At what point does a low body mass index
16    raise a concern for you?
17          A.   Well, he has a disease which we are
18    treating, which is also a way you can lose protein
19    through the colon.
20          Q.   Okay.  So in terms of when you become
21    concerned, as opposed to just treating the condition,
22    at what point does the body mass index come into play?
23          A.   I don't know that there's any number like
24    that.  I mean, you're concerned if somebody is losing
25    weight.  And if the patient is responding to the
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

Page 60

1    treatment, then, obviously, you expect the patient to

2    gain weight.  But otherwise, the treatment would be

3    still aggressive treatment, medical treatment; if that

4    fails, go to surgery.

5          Q.    Okay.   Do you -- are you specifically

6    concerned with the diet that your patients are taking?

7          A.    We're concerned with the disease, yes.

8          Q.    Let's just get into these -- the actual

9    contacts.  I want to start with 001, which is July 18th

10   of 2012.

11         A.    Okay.

12         Q.    I note here in the "Gastroenterology"

13   section on the left-hand side that it indicates that

14   there's no stool incontinence.  And I believe you

15   indicated with Mr. Sanchez that that's something that

16   Mr. Brooks would have explained to you; is that

17   correct?

18         A.    I didn't understand the question.

19         Q.    On the left-hand side under

20   "Gastroenterology," where it says, "no stool

21   incontinence," is that something that Mr. Brooks would

22   have reported to you?

23         A.    Reported to this part of the process,

24   where the "Review of Systems" is done by the medical

25   assistant.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                          6/1/2016

Page 61

1        Q.      So he would have reported --

2        A.      Indicated to her.

3        Q.      -- this to your medical assistant?

4        A.      Right.

5        Q.      And he indicates here that there's weight

6    loss, but that it's been resolved; is that correct?

7        A.      Yes.

8        Q.      In his "Vital Signs," there's a note that

9    his BMI is 21.   Is that within the healthy range?

10       A.      It's the lower end, yes.

11       Q.      It's on the lower end, but it is within

12    the healthy  range?

13       A.      Yes.

14       Q.      On the "Treatment" section here, you

15    didn't prescribe Ensure on this -- or recommend Ensure

16    on this particular date.   Is there any reason that you

17    didn't do that?

18       A.      Well, we don't prescribe Ensure to

19    everybody who has ulcerative colitis.

20       Q.      And why is that?

21       A.      That's not standard practice of how we

22    practice medicine.   Not for everybody who is within the

23    normal range for weight is prescribed Ensure, for

24    everybody.

25       Q.      So if I can just break that out.   If

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 62

```
 1   someone is within the normal body mass index, it's not

 2   typical to prescribe them Ensure?

 3        A.   Yeah.

 4        Q.   Okay.   And then I'll go on to 003.   Again,

 5   here in the "Gastroenterology" section on the left-hand

 6   side, there is an indication that there's no stool

 7   incontinence, correct?

 8        A.   Uh-huh, yes.

 9        Q.   And at this point, Mr. Brooks indicated

10   there's no weight loss, correct?

11        A.   Yes.

12        Q.   Again, his body mass index is 20.67.   Is

13   that also within the healthy range?

14        A.   Yes.

15        Q.   And in the "Treatment" section, there's

16   nothing -- nothing here to indicate that Ensure would

17   be appropriate on this occasion?

18        A.   That's correct.

19        Q.   In the "History of Present Illness,"

20   there's an indication that, "He reports significant

21   improvement, noting no further rectal bleeding, no

22   urgency to move his bowels, and decreased abdominal

23   cramping"; is that correct?

24        A.   Yes.

25        Q.   Is that something provided to you or to
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 63

1    your medical assistant?

2              A.    To me.

3              Q.    And that would have been from Mr. Brooks?

4              A.    Directly, yes.

5              Q.    I will turn to No. 5.  I'll start again

6    under the "Gastroenterology" section.  There's an

7    indication that there's no stool incontinence; is that

8    correct?

9              A.    Yes.

10             Q.    And no weight loss?

11             A.    Yes.

12             Q.    In the "History of Present Illness"

13   section, about the middle of that paragraph it says,

14   ". . . noting that he has less urgency to move his

15   bowels, more control, and no further nocturnal stools";

16   is that correct?

17             A.    Yes.

18             Q.    To you, would that indicate that his

19   ability to control his bowels has been improving?

20             A.    Well, it tells me his diarrhea is

21   improving.  I don't know about incontinence, per se.

22   He's saying he's having diarrhea, which he says is

23   improving.

24             Q.    And if he's indicating that there's no

25   incontinence, is that an indication that he is able to

Brooks v. Oba, et al.                     ATUL VAHIL, M.D.                        6/1/2016

1    control his bowels?

2            A.    I don't know about incontinence, because

3    he never indicated to me that he was incontinent.

4            Q.    But he is indicating to your medical

5    assistant that he's not experiencing incontinence?

6            A.    Right.

7            Q.    Again, in the "Vital Signs" section, the

8    BMI is 20.4.    Is that also within the healthy range?

9            A.    Yes.

10           Q.    The "Treatment" does not indicate that

11   Ensure is necessary at that point in time; is that

12   correct?

13           A.    Well, let me rephrase it.   The Ensure and

14   the gluten-free diet are recommended, based on what he

15   requested; because he said by taking Ensure and

16   avoiding gluten, his symptoms improved.

17           Q.    Sure.

18           A.    So it was not for a medical reason, per

19   se.  I mean, yes, you can prescribe.   You can always

20   tell the people who can have supplements, especially

21   this kind of disease.   But this was not for a medical

22   reason.   This was per what he wanted, which I agreed

23   with.

24           Q.    So subjectively, he's telling you that

25   this helps me?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

```
 1        A.    Yes.

 2        Q.    Objectively, it's not indicated in the

 3   treatment of his condition?

 4        A.    Well, if a patient tells me that, "This

 5   makes me feel better," that's an objective finding,

 6   too.  I mean, if he's saying, "I'm feeling better not

 7   taking this or taking this," it's not an objective

 8   finding.  There are a lot of things people say makes

 9   them feel better.  So it is -- yes, it is not that I

10   can produce something on paper saying that this is the

11   test result, but he's saying he's feeling better with

12   this.

13        Q.    Sure.  That's fair.  I'll go on to No. 7.

14   On the left-hand side, noting -- and this is June 11,

15   2013.  At this point, the "Gastroenterology" section

16   indicates, "stool incontinence yes"; is that correct?

17        A.    Yes.

18        Q.    At any point, did Mr. Brooks discuss with

19   you that he was trying to get a special medical pass to

20   go to meals at a different time in the prison?

21        A.    I don't recall.

22        Q.    Okay.  Is that something that you would

23   have noted if he had discussed that with you?

24        A.    Yes.

25        Q.    In the same section, "no weight loss,"
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 66

1    again, correct?

2          A.   Yes.

3          Q.   And then in the "History of Present

4    Illness," down toward the end of that paragraph, it

5    indicates that, ". . . he notes that this is the best

6    he has felt in years."  Is that something that he told

7    you?

8          A.   Yes.

9          Q.   And then just below that, "Bowel movements

10   are four to six soft stools with infrequent

11   incontinence of stool."  And so, again, that's

12   something that he told you?

13         A.   Yes.

14         Q.   But up until now, there was no indication

15   that he was having incontinence?

16         A.   From what I can read from the -- my

17   interaction with him, yes, he did not specifically

18   inform about incontinence.

19         Q.   You had not made any notes that he had

20   indicated that to you, right?

21         A.   Right.

22         Q.   Up until this point?

23         A.   Right.

24         Q.   His BMI is 20.42.  Again, that is within

25   the healthy range?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

1        A.    Yes.

2              Q.    The "Treatment" does not indicate Ensure.

3     Again, at this point, he had not requested that of you?

4        A.    That's correct.

5              Q.    So I will go to No. 9.  Now, this is

6     approximately a year later, on June 10, 2014.  In the

7     "Gastroenterology" section, he's indicating there is no

8     stool incontinence at this point in time; is that

9     correct?

10             A.    Right.

11             Q.    No weight loss?

12             A.    Yes.

13             Q.    Now, this -- this particular date is -- in

14    the "History of Present Illness" this is the date where

15    he indicates to you that with the avoidance of gluten

16    foods and supplementing with Ensure, he feels that his

17    stools are improved, and he is able to keep his weight

18    stable; is that correct?

19             A.    That's correct.

20             Q.    In the records that we have gone over, is

21    there anything to indicate that his weight was unstable

22    up until this point?

23             A.    No.

24             Q.    And on this particular date, his BMI is

25    20.1.  Is that, again, within the healthy range?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                        6/1/2016

Page 68

1        A.    Right.

2        Q.    Do you have any way of verifying whether

3   he was actually using Ensure at the facility?

4        A.    No.

5        Q.    So if -- if he was not, in fact, taking

6   Ensure, then you're essentially left to take him at his

7   word when he represents to you that he was?

8        A.    That's correct.

9        Q.    Did he ever indicate to you that he was

10  trying to get Ensure around this period of time?

11       A.    Yeah.  He must have mentioned at that

12  point that he wants to get Ensure.  And he can't get --

13  and he might be supplementing it from outside.  I don't

14  know.

15       Q.    Okay.  Did he ever explain to you that he

16  had been missing multiple meals at the facility?

17       A.    No, I don't recall.

18       Q.    Is that something that you would note if

19  he had indicated that to you?

20       A.    I would have written it down in the

21  "History of Present Illness."

22       Q.    Did he ever indicate to you that stool

23  incontinence, particularly, was preventing him from

24  going to his meals?

25       A.    I don't recall.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 69

1          Q.    And have you seen anything in these

2    records that would indicate that he represented that to

3    you?

4          A.    I mean, there's no indication, per my

5    conversation with him, what I recorded.  So I don't

6    recall anything outside of this.

7          Q.    Okay.  I think I asked you, but I'm going

8    to ask you again, just to make sure.  The BMI on this

9    particular date in June of 2014 was 20.1.  Is that

10   within the healthy range?

11         A.    Yeah.  It's lower level.

12         Q.    And at this point, that's where you

13   indicate that you recommend using Ensure?

14         A.    Yes.

15         Q.    I think, based on your answers before, is

16   it fair to say that Ensure isn't necessarily something

17   you felt he should take, based on the literature, but

18   you felt that given his comments to you, it would be

19   appropriate to recommend that?

20         A.    Yeah.  I recommended it, because he felt

21   better with this.

22         Q.    And that was solely based on his comments

23   to you?

24         A.    That's correct.

25         Q.    All right.  Let's go to the last one,

Page 70

1    No. 11.  Now, this is a little over a year after the

2    previous visit.  So this is September 15, 2015.  Again,

3    under the "Review of Systems," there's no weight loss,

4    correct?

5           A.    Yes.

6           Q.    And on this occasion, he does indicate

7    that he's experiencing stool incontinence, correct?

8           A.    Yes.

9           Q.    In the "History of Present Illness,"

10   there's a note at the bottom where it says, "Last year

11   on a gluten free diet with ensure patient was having

12   about 3-6 stools daily."  Is that something that he

13   said to you?

14          A.    Yes.

15          Q.    Were you able to verify that he was

16   actually taking Ensure the year before?

17          A.    No.

18          Q.    Did he ever indicate to you that he had

19   actually canceled his gluten-free diet on his own

20   request?

21          A.    No.

22          Q.    Is that something that you would have

23   noted in your report?

24          A.    If he had told me, yes.

25          Q.    And then the BMI is 19.92.  Is that within

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 71

1    the healthy range?

2            A.    It's the lower, but it is not

3    significantly different than the previous one.

4            Q.    Okay.   In the "Treatment" section here,

5    there's no indication that you recommend Ensure at this

6    point in time; is that correct?

7            A.    Right.

8            Q.    Have you reviewed the results of his lab

9    work?

10           A.    I've scanned through it.

11           Q.    In your treatment of Mr. Brooks, did you

12   notice that he was at all nutritionally deficient?

13           A.    Yes.

14           Q.    And how is that?

15           A.    I think I saw that his albumin level and

16   pre-albumin level were low.

17           Q.    In layman's terms, what does that mean,

18   that albumin and pre-albumin levels are low?

19           A.    Well, it's an indication that somebody is

20   malnourished or undernourished.

21           Q.    Did you ever discuss with Mr. Brooks if he

22   was attending his meals at the prison?

23           A.    No.

24           Q.    Did you ever discuss with him whether he

25   was eating things which were -- which are

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                      6/1/2016

1    contraindicated by a gluten-free diet?

2            A.   No, I didn't discuss with him.

3            Q.   Are you aware of whether he was buying

4    items off of canteen and eating those items?

5            A.   No.  And it's only a 20-minute visit with

6    the patient, so I don't think you can go through

7    everything that goes on in jail.

8            Q.   Sure.  And I'm just kind of wondering what

9    he told you over time, because he's obviously been

10   seeing you for a couple of years now.

11           A.   Sure.

12           Q.   At any point in these records has

13   Mr. Brooks' weight fallen below the healthy range of a

14   BMI?

15           A.   No, from what I've seen here.

16           MR. VanLANDSCHOOT:  I don't have any

17   further questions.  Anybody else?

18           MR. RINGEL:  Ask Dan.

19           MR. VanLANDSCHOOT:  Dan, I think we're all

20   finished up here.  If you have any questions, now is

21   the time.

22           MR. SHAFFER:  All right.  Thank you.

23                      EXAMINATION

24   BY MR. SHAFFER:

25           Q.   Dr. Vahil, my name is Dan Shaffer.  I

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 77

 1        Q.    And in using that language, did you intend

 2    that to mean 12 months?

 3        A.    No.

 4        Q.    Now, at some point in your treatment of

 5    Mr. Brooks you prescribed a drug called HUMIRA?

 6        A.    That's correct.

 7        Q.    And you said that that is -- I don't know

 8    what word --

 9        A.    It's called a biologic agent.

10        Q.    So it's some sort of evolution of

11    REMICADE?

12        A.    That's correct.  That's the same group.

13        Q.    And when did you -- well, did you

14    initially prescribe that in 2015, or do you recall when

15    you initially prescribed that?

16        A.    No.  I prescribed on -- it's on page

17    No. 1 -- 7/18 of 2012.

18        Q.    And when was that prescription actually

19    initiated?  I understand that you made the

20    recommendation.

21        A.    I don't know.

22        Q.    But certainly, as of, well, January 22,

23    2013, Mr. Brooks was receiving HUMIRA, page 4 -- I'm

24    sorry, 5, correct?

25        A.    Yes.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

1       Q.    And on page 1, it indicates that you saw

2   him on July 18, 2012, correct?

3       A.    That's correct.

4       Q.    And one of the treatment recommendations

5   was HUMIRA?

6       A.    That's correct.

7       Q.    And as recently as September 15, 2015,

8   according to your treatment assessment, he was still

9   receiving HUMIRA, page 11?

10      A.    Yes.

11      Q.    And based on your reports from

12  September -- I'm sorry, July 18, 2012 up until and

13  including September 15, 2015, would you say that HUMIRA

14  had been at least partially successful for treating

15  Mr. Brooks' ulcerative colitis?

16      A.    That's my opinion, yes.

17      Q.    And while there were some symptoms he was

18  still reporting, would you agree that some of the more

19  dramatic symptoms had -- he experienced some relief?

20      A.    I don't know how much the HUMIRA alone

21  played a role, but it was a combination of things that

22  he was responding to, yes.

23      Q.    So what are -- are there some side

24  effects -- are there negative side effects associated

25  with HUMIRA?

Brooks v. Oba, et al.                     ATUL VAHIL, M.D.                          6/1/2016

Page 79

1         A.    Well, sensitivity.    Patients can have --

2   some patients can have some long-term effects,

3   especially small bowel cancer, infections -- increases

4   with infections.    So we have to make sure that the

5   patient is not exposed to any previous infection before

6   we start this.

7         Q.    And if he was, that would be a reason to

8   terminate HUMIRA?

9              MR. VanLANDSCHOOT:   Objection to form.

10        A.    Yes.

11        Q.    (BY MR. SHAFFER)   Without determining that

12  there's some negative side effects, what medical

13  justification would there be to terminate HUMIRA?

14        A.    Well, my recommendations were to continue

15  on HUMIRA.

16        Q.    Well, without showing any negative side

17  effects, would it be medically justifiable to terminate

18  HUMIRA?

19             MR. VanLANDSCHOOT:   Object as to form.

20        A.    I would continue him on HUMIRA, based on

21  his medical condition.

22        Q.    (BY MR. SHAFFER)   So today, you would

23  support the recommendation that you made September of

24  2015?

25        A.    That's correct.

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                           6/1/2016

Page 80

1          Q.     Somebody with a mild to moderate or severe

2     ulcerative colitis, in your experience, can that be

3     managed simply by seeing a general practitioner?

4          A.     It certainly can.

5          Q.     And in Mr. Brooks' case, when you saw him

6     in August of 2010, is it your opinion that his

7     condition was being managed?

8          A.     Based on what I recommended at that time,

9     yes.

10         Q.     The proctocolectomy procedure that you

11    spoke about earlier, what are -- what does that

12    procedure entail?

13         A.     It's called -- since ulcerative colitis

14    primarily involves colon, in severe or refractory

15    cases, this is the result that we take -- what they do

16    is they take out the whole colon.  It's called total

17    proctocolectomy.  And colectomy is, obviously, taking

18    out the colon.  Proctum is, obviously, rectum.  So they

19    take out the mucosa of the rectum so that the disease

20    does not recur in that remnant part.  So they take out

21    the whole colon, including the rectal -- including the

22    rectum, and they put in a pouch.  They make a pouch

23    from ileum, which is the distal small bowel.

24         Q.     Can some patients tolerate HUMIRA

25    indefinitely for ulcerative colitis?

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                         6/1/2016

```
1          A.   Yes.

2               Q.   You indicated that the procedure -- or I

3    think Mr. Ringel asked you a question about, oh, the

4    impact of a proctocolectomy on someone's daily life.

5          A.   Yes.

6          Q.   Is a proctocolectomy dangerous?

7          A.   I don't know.  I'll have to ask a surgeon.

8               Q.   Does a proctocolectomy come with some

9    risks, as opposed to a patient receiving HUMIRA?

10              MR. VanLANDSCHOOT:   Object as to form.

11         A.   Well, it is done as the result if medical

12   therapy fails, generally.

13         Q.   (BY MR. SHAFFER)   And is HUMIRA a form of

14   medical therapy?

15         A.   That's correct.

16              Q.   So if the HUMIRA fails, then one possible

17   solution for a patient with ulcerative colitis could be

18   a proctocolectomy?

19         A.   Could be, yes, one possible option.

20   Although, there are other people who can try other

21   regimens.  But yes, if every medical therapy has failed

22   and the patient is still symptomatic, we go to surgery.

23   That's called total proctocolectomy.

24              Q.   And it's your understanding that you

25   recommended a proctocolectomy in August of 2010?
```

Brooks v. Oba, et al.                    ATUL VAHIL, M.D.                    6/1/2016

Page 82

1    A.    No.

2    Q.    When did you make that recommendation?

3    A.    It was in April of 2012.

4    Q.    And it's your understanding that there was

5    some degree of concern with trying an additional

6    medical therapy in lieu of a proctocolectomy?

7    A.    That's correct.

8    Q.    And that regimen was HUMIRA?

9    A.    Part of it.  Because I initiated a

10   combination of treatments, including HUMIRA, including

11   6-MP.  If one drug fails, you can always go up on the

12   combination.  And you can go up on the dosage, as long

13   as there are no side effects to the maximum tolerated

14   dose, then you say the patient failed the treatment.

15   So it is not just saying HUMIRA failed; if the

16   combination therapy failed, yes.

17              MR. SHAFFER:  I don't have any further

18   questions.  Mr. Ringel?

19              MR. RINGEL:  Nothing else for me.

20              THE DEPONENT:  Thank you.

21              MR. VanLANDSCHOOT:  All right.  We'll go

22   off the record.

23

24

25