IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02894-SKC

JASON BROOKS,

    Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,

    Defendant.

## RULE 59 MOTION TO ALTER OR AMEND JUDGMENT, OR FOR A NEW TRIAL

Defendant Colorado Department of Corrections ("CDOC"), by and through the Colorado Attorney General, respectfully files the within Rule 59 Motion to Alter or Amend the Judgment, or in the Alternative, for a New Trial (the "Motion").

## INTRODUCTION

As the Court is aware, on December 16, 2022, the jury in the case returned a liability verdict and imposed an award of $3.5 million in Plaintiff Jason Brooks's favor on his claim that CDOC failed to accommodate his disability in violation of Title II of the Americans with Disabilities Act (the "ADA"). The award is shockingly excessive, and remittitur is warranted.

It is crucial to understand the harms for which Brooks should be compensated – and the purported harms for which he should not. The ADA prohibits CDOC from denying inmates access to services and programs due to disability, and it requires the agency to provide reasonable accommodations to allow disabled inmates to access the same services and programs as non-disabled inmates. Here, Brooks successfully asserted that his ADA rights were violated because CDOC denied him a "first pull" or "medline" meal pass, and he thus did not have the

1

same access to the free food services provided in the prison dining hall as did other inmates. Brooks testified that as a consequence, he was not able to fully access the prison's meal services and missed those services on approximately 2,000 occasions. He also testified at length that he suffered mental and emotional distress as a result of either soiling himself, or fearing that he might soil himself, while waiting in line or eating at chow. Brooks finally testified that he experienced brief and temporary abdominal and rectal pain resulting from a sense of urgency and being forced to "hold" his bowels at the dining hall. Based upon this testimony and the other evidence at trial, and the absence of any evidence showing significant other physical harm (*e.g.*, long-term or permanent injury, assault by other inmates, *etc.*), the lion's share of Brooks's damages at trial necessarily must have consisted of the mental and emotional distress he purported suffered as a result of CDOC's failure to reasonably accommodate his disability.

And $3.5 million dollars is a shockingly large amount to compensate that sort of predominantly non-physical harm. This becomes apparent when one examines this verdict in more granular detail. As explained below, the jury essentially awarded Brooks a little more than $640,000 per year, $53,000 per month, $12,000 per week, or $1,700 per day for CDOC's failure to issue him his requested accommodation. All of this was for an ADA violation that, again, did not result in any permanent or even measurable physical injury, and if it resulted in any pain at all, that pain would have only consisted of an unspecified number of episodes of a few minutes of abdominal cramping or pain, at most.

Such an award is grossly excessive, unsupported by the evidence, and should shock judicial conscience. First, the fact that the majority – perhaps vast majority – of Brooks's injury is mental or emotional distress supported only by his self-serving testimony, and that there was

no evidence that Brooks suffered any permanent or long-term harm requiring mental health or other medical care, is enough on its own to cast doubt on the multi-million dollar verdict.

Nor is the jury award consistent with the verdicts reached in other cases. Because of the relatively novel nature of Brooks's ADA claim, there are few cases with sufficiently similar facts to establish a meaningful benchmark specific to the facts of this case. But the ones that are reasonably analogous have resulted in much smaller verdicts – oftentimes a tenth of the size of the award in this case (or less). It is also highly telling to compare the award to situations involving much more egregious and inflammatory fact patterns: cases involving wrongful incarceration claims, and cases in which a prison or prison officials caused the wrongful death of an inmate. In the former, successful plaintiffs typically are awarded around $1 million per year for every year of wrongful incarceration; in the latter, the estates of the deceased inmates are often awarded between $2 million and $5 million. Compensating Brooks for his mental and emotional distress resulting from being denied a meal pass in an amount that would rival the compensation paid to plaintiffs who were wrongfully incarcerated for years, or who died as a result of misconduct, is absurd. A far lower compensatory damages award is warranted here.

Finally, the fact that the majority (likely vast majority) of the jury's award must be attributable to Brooks's mental and emotional injury strongly points toward remittitur for yet another compelling reason: *it is far from clear whether such damages are even recoverable at all for an ADA Title II claim*. That is due to a recent 2022 Supreme Court opinion, which held that such damages for emotional or mental harm are not recoverable for a Rehabilitation Act claim. Noting that Title II of the ADA expressly incorporates the enforcement and remedy provisions in the Rehabilitation Act, a number of district courts in recent months have extended that analysis to Title II clams, holding that damages for emotional and mental distress are not recoverable for

those claims. If that is the case, then the jury awarded Brooks millions of dollars for an injury *that is not compensable under his Title II claim*. Remittitur is warranted for that reason as well.

## LEGAL STANDARD

Rule 59 of the Federal Rules of Civil Procedure states, "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "In the usual remittitur situation, a trial judge reviews the jury's verdict in order to determine if substantial evidence at trial supported the amount awarded. If the court finds that insufficient evidence exists, or finds the amount of the verdict a product of jury passion or prejudice, the court then may determine a reasonable amount as plaintiff's damages and allow plaintiff to remit the excess…." *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987); *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019) ("To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict.").

"Remittitur is not proper unless the amount of damages awarded is so excessive that it shocks the judicial conscience." *O'Gilvie*, 821 F.2d at 1448; *Burke*, 935 F.3d at 1035 ("Remittitur is only appropriate when the jury award is so excessive … as to shock the judicial conscience and raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial.") (internal citation omitted). Bias, passion or prejudice may be inferred from excessiveness. *Franco v. City of Boulder*, No. 19-cv-02634-MEH, 2022 WL 474699, at *9 (D. Colo. Feb. 16, 2022) (*quoting Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981)).

Once the Court has determined that remittitur is appropriate, it may offer Plaintiff remittitur in a particular amount, or, if the Plaintiff rejects that offer, order a new trial. § 2815

4

Remittitur, 11 Fed. Prac. & Proc. Civ. § 2815 (3d ed.); *O'Gilvie*, 821 F.2d at 1448 (*citing Kennon v. Gilmer*, 131 U.S. 22, 28-30 (1889)); *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1258-59 (D. Colo. 2009).

## ARGUMENT

I. **The $3.5 million verdict is contrary to law given the facts and evidence in this case and the Court should grant remittitur.**

  a. **The $3.5 million verdict, which compensates primarily mental and emotional injury, put into context awards Brooks thousands or tens of thousands of dollars for each missed meal or accident or episode of temporary pain.**

As a starting point, it is important to keep in mind the nature of the claims and injuries asserted by Brooks, for which the jury awarded him $3.5 million. Notably, Brooks's Title II claim is not that CDOC failed to provide him with food, and he wasted away as a result; instead, the evidence at trial showed that while he says that he missed approximately 2,000 meals at Fremont (though he conspicuously failed to say that they all were due to the failure to reasonably accommodate him), he made significant canteen purchases, and his weight was relatively stable within an 18-pound range during the entire time from when he was denied access to his preferred chow pull (approximately November 1, 2012) until he was transferred away from Fremont (April 23, 2018). Nor was there any evidence of permanent or long-term physical injury,[1] or physical assault by other inmates. Instead, what the evidence primarily showed at trial was that Brooks suffered mental and emotional distress – as well as an unspecified number of brief and transient episodes of abdominal and rectal pain – as a result of soiling or potentially soiling himself at meals. Those are the injuries (and the *only* injuries) that the jury could compensate him for with its award. They are the injuries that the Court must consider when it assesses whether $3.5

---

[1] Indeed, Brooks testified – and his medical records reflect – that he experienced greatly improved symptoms, including significantly less pain, when he was prescribed Humira in summer 2012, before he began requesting the first pull pass.

5

million is so excessive that it necessarily raises the inference that it was motivated by passion, prejudice, corruption or another improper cause.

As will be explained at length below, the amount of the verdict is so shockingly excessive to warrant remittitur for multiple reasons – it dwarfs the normal verdicts involving only or primarily mental or emotional injury for which mental health or other medical care was neither needed nor sought, it is at odds with the (few) cases involving even somewhat analogous fact patterns, and it rivals the verdicts reached in cases involving far more egregious circumstances. But before engaging in that discussion, it may be helpful to contextualize exactly what $3.5 million represents based on the facts presented at trial.

Using the time frame from November 1, 2012 to April 23, 2018, and given the evidence that Brooks missed approximately 2,000 meals, the jury's award of $3.5 million would equate to about $1,750.00 *per missed meal*. Even if one assumes it would not be unreasonable for a free person to spend an average of $17.50 on a meal purchased outside the home (and presumably it would be less if the person prepared their meals at home), the jury's award came to 100 times that amount per meal. Alternatively, if Brooks is receiving compensation for soiling himself, while there no was testimony as to how often that happened, even if this occurred as frequently as weekly, that would amount to at least $10,835.91 *per accident*. If Brooks is receiving compensation for short bouts of abdominal pain from holding his bowel movements while using the dining hall, per his testimony, even if he experienced that pain every day for the entire time he resided at Fremont – a frequency for which he provided no evidence – he would be receiving $1,548.67 *per day*. The fact that the jury's award means that Brooks is being compensated thousands or even tens of thousands of dollars for each missed meal, or each accident, or each episode of temporary and brief pain, on its face should make the Court immediately suspicious

6

that it is so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial.

> **b. The award is excessive given that the only evidence of Brooks's primary injury – his mental or emotional distress – was his self-serving testimony.**

First, the $3.5 million award is excessive and should shock the judicial conscience because (again) it necessarily must be compensating Brooks for an injury consisting primarily of mental and emotional harm. Moreover, the only evidence of that harm was Brooks's own self-serving testimony that he felt shame, humiliation, and fear at either soiling himself or fearing that he would while waiting in the chow line and/or eating in the chow hall. Notably, there was no evidence that Brooks required mental health or other medical care as a result of the purported mental or emotional trauma. That is not sufficient evidence to support such a large verdict.

The Tenth Circuit has granted remittitur where the plaintiff produces some evidence of emotional or mental harm, including the plaintiff's own testimony, but found that the award was so large that it was against the weight of evidence. *See, e.g., Osterhout v. Bd. Of Cty. Comm'rs of LeFlore Cty., OK*, 10 F.4th 978, 992-93 (10th Cir. 2021) (imposing remittitur from $3 million to $2 million even where plaintiff "did not rely solely on his testimony" and "supported his version of events with medical bills, photos, and testimony from other witnesses about [his] depression, anxiety, and lost income."); *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989) (remanding for recalculation of a $250,000 emotional damages award to $50,000 where there was some evidence of mental and emotional pain, but finding the amount awarded was excessive); *Blangsted*, 642 F. Supp. 2d at 1259 (halving the amount of emotional damages where there was some evidence of emotional harm, but no physical manifestation).

Courts often look to the long-term effects of mental and emotional harm, like seeking mental health treatment, reducing one's quality of living, and inability to work, to help quantify

7

it. *See, e.g., Blangsted*, 642 F. Supp. 2d at 1259; *Mathieu v. Gopher News Co.*, 273 F.3d 769, 783 (8th Cir. 2001) (denying a remittitur motion where plaintiff testified that he lost his job of 34 years, was forced to reduce his standard of living, and became depressed); *Spina v. Forest Preserve Dist. Of Cook Cty.*, 207 F. Supp. 2d 764, 775 (N.D. Ill. 2002) (offering remittitur from $3 million to $300,000 where "the Court cannot uphold a $3 million verdict for a plaintiff who has never sought mental health treatment, whose own expert witness opined that she does not require such treatment, and who still retains her position with her employer.").

Here, Brooks offered no evidence that he has experienced any long-term or lasting effects from the emotional harm he suffered. He did not testify that he sought any mental health treatment, he continued working while incarcerated and, according to his testimony, he is currently seeking employment now that he has been released. While Brooks testified that his fear of soiling himself caused him to keep to himself in prison, he had two former cellmates and self-described friends testify on his behalf, including testimony about participation in activities like basketball during this time. Brooks testified that while he feared threats and physical harm from other inmates if he soiled himself, but he testified that he was never assaulted, and only was threatened once. Like in the cases cited above, Brooks has not presented sufficient evidence to uphold such a large verdict for mostly emotional or mental harm, and remittitur is appropriate.

      **c. The $3.5 million awarded in this case is grossly out of step with damage awards in other comparable prison civil rights cases.**

The $3.5 million awarded by the jury is also so shocking as to raise the inference that it was motivated by passion, prejudice, corruption or another improper cause when compared to the verdicts reached in similar cases. Specifically, in those cases where an inmate experienced pain and suffering or emotional distress, but no permanent injury or even an injury requiring medical care (*e.g.*, a broken bone or loss of limb), damage awards were significantly less. *See,*

*e.g. Norton v. Russell*, No. 6:04-cv-00038, 2007 WL 4954273 (E.D. Okla. Feb. 1, 2007) (jury awarded plaintiff $25,000 for pain and suffering after he suffered a lumbar strain, multiple contusions, and emotional distress after the defendant-officer used excessive force); *Patel v. Wooten*, No. 96 CV 286, 2006 WL 4665935 (D. Colo. Dec. 22, 2006) (awarding plaintiff $630.00 for failure to provide appropriate food for his religious diet); *Quesnoy v. Or. Dept. of Corrs.*, No. 3:10CV01538, 2012 WL 3060638 (D. Or. Jan. 27, 2012) (awarding plaintiff $50,000 after she was denied her ADA accommodations and medical care while in solitary confinement); *Cox v. Mass. Dep't of Corrs.*, No. 13-10379-FDS, 2018 WL 1586019 (D. Mass. March 31, 2018) (largely upholding an award of $250,000 for a mentally disabled inmate who was, over a period of years, denied access to phones and the grievance process to report ongoing sexual harassment and assault).

      *Cox* is particularly illustrative of the impropriety of the verdict in this case. In that case, a plaintiff asserting a claim under the ADA presented evidence at trial that, due to his cognitive disability, he was unable to access prison programs and services, including being unable to fill out requests for medical attention and grievances. *Cox*, 2018 WL 1586019 at *1. He presented further evidence that due to the failure of the prison to accommodate his disability, he was unable to dial the telephone to report multiple sexual assaults, including an incident when other inmates inserted a deodorant bottle into his anus. *Id*. at *2. The Court largely upheld the $250,000 jury verdict, finding that there was sufficient evidence that the plaintiff was denied meaningful access to programs and services. *Id*. at *19. Therefore, even though *Cox* involved an arguably more serious injury to the plaintiff – sexual assault, versus the shame and humiliation and other mental and emotional distress described by Brooks – as a result of an ADA violation, the verdict rendered in the case was less than *a tenth* of the $3.5 million awarded here.

### d. The award in this case rivals verdicts in cases involving much more egregious scenarios, like wrongful incarceration or wrongful death.

Given the relative paucity of Title II ADA cases involving analogous fact patterns, it also may be helpful to compare the instant matter to lawsuits involving much more egregious fact patterns: cases in which the plaintiff (or the plaintiff's estate) was asserting wrongful incarceration or wrongful death claims. And in that regard, it is striking that the jury award in this case is not out of line with the typical verdicts reached in those types of cases, even where the plaintiff had been wrongfully incarcerated for decades, or where the death of the inmate in question was directly caused by the prison or its staff. By comparing Brooks's sole ADA failure to accommodate claims to these sorts of scenarios, it becomes readily apparent that the jury in this case awarded Brooks an amount nearly comparable to what wrongfully incarcerated plaintiffs, or even estates of deceased plaintiffs, normally win at trial. This underscores the grossly excessive nature of what was awarded in this case.

As to wrongful incarceration, jury awards in cases in which the plaintiff-inmates were imprisoned for *years* appear to generally fall within the $1-$2 million per year range, and normally closer to the bottom of that range. *See, e.g., Restivo v. Hessemann*, 846 F.3d 547, 588 (2d Cir. 2017) ("The district court here plainly did not abuse its discretion in holding that the amount awarded, $1 million per year of wrongful incarceration per plaintiff, neither shocks the conscience nor materially deviates from reasonable compensation."); *Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1242 (N.D. Cal. 2008) ("As the court in *Limone* noted, a number of verdicts of approximately $1 million per year have been awarded in cases involving periods of wrongful incarceration which span a significant amount of time."); *Burton v. City of New York*, No. 20-CV-9025(AT)(RWL), 2022 WL 9491955, at *9 (S.D.N.Y. Sept. 26, 2022), *report and recomm. adopted sub nom. Burton v. Blocker*, No. 20CIV9025(AT)(RWL), 2022 WL 9474454

(S.D.N.Y. Oct. 14, 2022) (noting that the plaintiff was seeking roughly $1 million per year of wrongful incarceration, which was in line with similar cases); *Wallace v. Powell*, No. 3:09-CV-286, 2022 WL 3447197, at *14 (M.D. Pa. Aug. 16, 2022) (cataloguing authorities and noting that $1 million per year was frequently used, with some deviation both ways).

To be sure, $1 million per year is somewhat more than the approximately $630,000 per year that the jury awarded Brooks. But it is not *that* much more, and the difference in severity between Brooks's deprivation – being denied a first pull or medline pass and sometimes having accidents or brief abdominal or rectal pain and suffering mental or emotional distress, and missing meals without significant weight loss – and *being wrongfully incarcerated and losing years of one's life* should be obvious. Any reasonable comparison between the two inexorably leads to the conclusion that if a year of wrongful incarceration typically is valued at around $1 million, the annualized cost of Brooks being denied his preferred meal pass and suffering the mental and emotional trauma that he described at trial (as well as brief and transient episodes of abdominal or rectal pain) must be "worth" far less than the $630,000 that the jury assigned to it.

A similar conclusion is compelled by the even more tragic and egregious scenario – claims in which a jury determines that a correctional facility or its staff is responsible for the death of an inmate. While those verdicts vary considerably, the estates of the deceased inmates often are awarded less than $5 million, and in some cases, less than $2 million. *See, e.g., Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 881 (5th Cir. 2016) (holding that a $1.5 million award does not shock the judicial conscience); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 313-14 (7th Cir. 2010) (holding that a $4 million verdict was not excessive); *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (awarding $1.5 million in compensatory damages and $3 million in punitive damages). This is not to suggest that there are no inmate wrongful

11

death cases involving jury awards exceeding $5 million or even $10 million; some do. However, the fact that it is not uncommon for courts and juries to view awards of less than $5 million as reasonable compensation for the death of an inmate should cast a stark light on the excessive nature of the $3.5 million that the jury awarded Brooks for being denied his preferred meal pass, especially in the absence of any concrete injuries other than his attested humiliation and embarrassment, and unspecified episodes of very brief, transient pain.

II. **The jury award in this case is especially shocking and impermissibly excessive in light of the fact that it is not clear that damages for emotional or mental injury are recoverable for a Title II claim under the ADA.**

The $3.5 million award reached by the jury in this case is even more shocking when one considers that the bulk of it must be attributable to the mental or emotional injury purportedly suffered by Brooks – and based on a very recent Supreme Court case and a handful of district court cases interpreting and applying it, it is far from clear that an ADA Title II plaintiff can even recover for that type of injury. Allowing Brooks to collect millions of dollars for a type of harm that may not even be compensable through an ADA Title II claim would be absurd, and remittitur is further warranted for this reason as well.

As an initial matter, based on Brooks's testimony and the argument from his counsel, mental and emotional harm – and not potential physical injury, like pain or perhaps malnourishment – was the primary focus of Brooks's request for damages. Brooks concluded his direct testimony at trial by launching into an extended discussion of the shame and humiliation that he experienced due to his incontinence at meals, and his counsel dwelled at length on the emotional trauma that must result from that sort of incident in both his opening and closing arguments. Based on this, as well as the fact that Brooks presented no evidence of any sort of long-term or permanent physical injury, it must be true that the majority and likely vast majority of the award undoubtedly was meant to compensate Brooks's mental and emotional harm.

12

And that raises one important issue: based on a recent Supreme Court case, it is unclear whether those sorts of mental and emotional damages are even authorized under Title II of the ADA. Specifically, in *Cummings v. Premier Rehab Keller, P.L.L.C.*, --- U.S. ----, 142 S. Ct. 1562, 1571 (2022), the Supreme Court addressed the question of the types of remedies available under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"),[2] as well as the Affordable Care Act (the "ACA"), and specifically, whether those laws permit a plaintiff to recover damages for mental or emotional injury. *Id.* at 1565, 1568. Noting that both statutes were silent on this question, the Supreme Court explained that because the laws conditioned receipt of federal funds on the waiver of Eleventh Amendment sovereign immunity by state governments accepting those funds, they essentially should be seen as establishing a contractual type of relationship between the federal and state governments. *Id.* at 1570. Therefore, the Court reasoned, that analogy compels the conclusion that the relief available to private plaintiffs for Rehabilitation Act and ACA claims are limited to "the *usual* contract remedies in private suits." *Id.* at 1571 (emphasis in original). And, according to the Court, it is well-established that *those* remedies do not include damages for emotional or mental distress or disturbance. *Id.* at 1571-72. As such, according to *Cummings*, a plaintiff pursuing a discrimination claim under the Rehabilitation Act and/or the ACA cannot recover damages for mental or emotional harm. *Id.*

That principle may not seem relevant to Brooks's claim at first blush – after all, he brings it under Title II of the ADA, and not the Rehabilitation Act or the ACA. But Title II was not

---

[2] The Rehabilitation Act is a precursor to Title II of the ADA, and it permits (in relevant part) a disabled individual to sue a government entity that accepts federal funds for disability-based discrimination. *See Anderson v. Colo. Dep't of Corr.*, 848 F. Supp. 2d 1291, 1300 n.2 (D. Colo. 2012) ("The Rehabilitation Act is materially identical to and the model for the ADA[;] the elements are the same except the Rehabilitation Act requires that defendant receive federal funds" (quotations omitted).); *Rogers v. Colo. Dep't of Corr.*, No. 16-CV-02733-STV, 2019 WL 1558081, at *2 (D. Colo. Apr. 9, 2019).

13

enacted in a vacuum; instead, as noted immediately above, it was passed into law after the Rehabilitation Act, and the earlier statute served as a model for that part of the ADA. *See Anderson*, 848 F. Supp. 2d at 1300 n.2; *Rogers*, 2019 WL 1558081, at *2. That is reflected in the enforcement procedures authorized by Title II, which specifies in relevant part: "[t]he remedies, procedures, and rights set forth in [the enforcement provision of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of [the anti-discrimination provision] of [Title II]." 42 U.S.C. 12133. In other words, Title II of the ADA *expressly* incorporates the remedy provision in the Rehabilitation Act, and whatever remedies are authorized by the latter – and only those remedies – are available under the former. *See Johnson v. Ed Bozarth No. 1 Park Meadows Chevrolet, Inc.*, 297 F. Supp. 2d 1286, 1289-90 (D. Colo. 2004); *Mullen v. Bd. of Commissioners of the Cty. of Adams*, No. 1:21-CV-02398-CNS-MDB, 2022 WL 17261428, at *3 (D. Colo. Nov. 29, 2022) ("Title II 'incorporates the remedies, procedures, and rights" of § 794a of the Rehabilitation Act….'") (internal citation omitted); *see also Tyler v. City of Manhattan*, 118 F.3d 1400, 1408 (10th Cir. 1997) (Jenkins, J, dissenting) (noting same).

Extrapolating from those principles, if the remedies for disability-based discrimination under Title II of the ADA are limited to the remedies authorized under the Rehabilitation Act, and if – as recently held by the Supreme Court – the remedies authorized under the Rehabilitation Act do not include damages for mental or emotional harm, then the only logical conclusion is that *a Title II plaintiff cannot recover for those sorts of mental or emotional injuries, either*. And although no circuits or district courts within the Tenth Circuit have addressed that issue yet, in the handful of months since *Cummings* was handed down, a number of district courts around the country have, and they are virtually unanimous in their conclusion

14

that the Supreme Court's decision effectively precludes the recovery of damages for mental or emotional distress or disturbance for a Title II disability-based discrimination claim. *See, e.g., A.W. by & through J.W.; E.M. by & through B.M; M.F. by & through J.C.; & D.G. by & through D.G. v. Coweta County School District & Christi Hildebrand*, No. 3:21-CV-218-TCB, 2022 WL 18107097, at *3 (N.D. Ga. Nov. 16, 2022) (cataloguing decisions from five other district courts concluding that *Cummings* applies to Title II claims, and noting that "[p]laintiffs have not pointed to, nor is the Court aware of, a case post-*Cummings* reaching a different conclusion"); *Faller v. Two Bridges Reg'l Jail*, No. 2:21-CV-00063-GZS, 2022 WL 17260763, at *1 (D. Me. Nov. 2, 2022) ("Given this language, the Court concludes that Plaintiff cannot pursue a remedy on her ADA claim that is not available under Rehabilitation Act. Thus, she is foreclosed from recovering damages for emotional distress on both claims proceeding to trial in this matter."); *Hill v. SRS Distribution Inc.*, No. CIV 21-370-TUC-CKJ, 2022 WL 3099649, at *5 (D. Ariz. Aug. 4, 2022) (noting that "the Supreme Court recently held that damages for emotional distress are not recoverable under the Rehabilitation Act; it is therefore unlikely such damages are available under the ADA"); *Wolfe v. City of Portland*, No. 3:20-CV-1882-SI, 2022 WL 2105979, at *6 (D. Or. June 10, 2022) (same).

Based on *Cummings* and the foregoing decisions expanding it to claims under Title II of the ADA, it seems clear that it is only a matter of time before the Tenth Circuit and other courts within the District of Colorado hold that damages for mental or emotional harm are not recoverable by a Title II plaintiff. Therefore, it would be inherently unjust – and should shock the Court's conscience – to allow Brooks to recover millions of dollars for those ultimately unrecoverable injuries. Remittitur or a new trial is warranted for that reason as well.

## CONCLUSION

WHEREFORE, for the foregoing reasons, CDOC respectfully requests that the Court grant the instant Motion and offer remittitur in their favor, or in the alternative, order a new trial.

Respectfully submitted this 13th day of January, 2023.

                PHILIP J. WEISER
                Attorney General
                /s/ *Rachel Lieb*
                JOSHUA G. URQUHART*
                Senior Assistant Attorney General
                KELLEY M. DZIEDZIC*
                RACHEL M. LIEB*
                Assistant Attorney Generals
                *Counsel of Record
                Civil Litigation & Employment Law Section
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                Telephone: 720-508-6000
                Facsimile: 720-508-6032
                E-mail: joshua.urquhart@coag.gov
                kelley.dziedzic@coag.gov
                rachel.lieb@coag.gov
                *Attorneys for Colorado Department of Corrections*

## CERTIFICATE OF SERVICE

I certify that on January 13, 2023, I have served the foregoing **RULE 59 MOTION FOR REMITTITUR, OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL** upon all parties by **E-FILING** with the court via CM-ECF, and by emailing a copy to the following:

Kevin D. Homiak          Athul K. Acharya
kevin@homiaklaw.com     athul@pubaccountability.org
*Attorneys for Plaintiff Jason Brooks*

**Courtesy copy e-mailed to client representatives:**
Adrienne Sanchez, Associate Director of Legal Services, CDOC


                *s/ Elle Di Muro*